**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| MEGAN LUNDY, Individually and On Behalf of All Others Similarly Situated, ) ) )<br><br>Plaintiff, )<br>)<br>v. )<br>)<br>IDEANOMICS, INC., ALFRED POOR, BRUNO )<br>WU, and CONOR MCCARTHY, )<br>)<br>Defendants. ) ) | Civil Action No. 1:20-cv-04944-GBD<br><br>CLASS ACTION |
| ANDREW KIM, Individually and On Behalf of All Others Similarly Situated, )<br>) )<br>Plaintiff, )<br>)<br>vs. )<br>)<br>IDEANOMICS, INC., ALFRED POOR, BRUNO )<br>WU, and CONOR MCCARTHY, )<br>)<br>Defendants. ) ) | Civil Action No. 1:20-cv-05203-GBD<br><br>CLASS ACTION |

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION
OF AVRAHAM BITRAN FOR APPOINTMENT AS LEAD PLAINTIFF,
APPROVAL OF HIS SELECTION OF LEAD COUNSEL,
AND CONSOLIDATION OF RELATED ACTIONS**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

SUMMARY OF THE RELATED ACTIONS .............................................................................. 2

ARGUMENT........................................................................................................................ 7

    A.    Bitran Is the Most Adequate Plaintiff............................................................. 7

        1.    Bitran Believes He Has The Largest Financial Interest In The Relief Sought By The Class.................................................................................................8

        2.    Bitran Satisfies The Requirements Of Rule 23.........................................9

    B.    Bitran Selected Well-Qualified Lead Counsel To Represent The Class ........................ 11

    C.    Consolidation Of The Related Actions Is Warranted ....................................... 12

CONCLUSION................................................................................................................... 13

## TABLE OF AUTHORITIES

**Cases**

*Chilton v. Chiumento Grp.*,
   365 F. App'x 298 (2d Cir. 2010) ................................................................................. 8

*City of Monroe Employees' Retirement System v. Hartford Financial Services Group, Inc.*,
   269 F.R.D. 291 (S.D.N.Y. 2020) ................................................................................ 8

*In re Olsten Corp. Sec. Litig.*,
   3 F.Supp.2d 286 (E.D.N.Y. 1998) .............................................................................. 8

*Jakobsen v. Aphria, Inc.*,
   18 Civ. 11376 (GBD), 2019 WL 1522598 (S.D.N.Y. Mar. 27, 2019) ..................... 9, 10, 11, 12

*Kasilingam v. Tilray, Inc.*,
   No. 1:20-cv-03459-PAC, 2020 WL 4530357 (S.D.N.Y. Aug. 6, 2020) .................................... 9

*Lax v. First Merchants Acceptance Corp.*,
   No. 97 C 2715, 1997 WL 461035 (N.D. Ill. Aug. 11, 1997)....................................... 8

*Moshell v. Sasol Limited*,
   20-cv-1008 (JSR), 2020 WL 2115410 (S.D.N.Y. May 4, 2020)................................. 9

*Stitt v. On Deck Capital, Inc.*,
   No. 15 Civ. 6126 (AT), 2016 WL 889535 (S.D.N.Y. Feb. 17, 2016) ........................... 9, 10, 12

**Statutes**

15 U.S.C. § 78............................................................................................................ passim

17 C.F.R. § 240.10b-5................................................................................................. 1

**Rules**

Fed. R. Civ. P. 23 ...................................................................................................... 2, 9, 10

Fed. R. Civ. P. 42 ...................................................................................................... 1, 12, 13

Avraham Bitran ("Bitran") respectfully submits this memorandum of law in support of his motion (1) to be appointed Lead Plaintiff pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u-4(a)(3)(B), as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"); (2) for approval of his selection of Bleichmar Fonti & Auld LLP ("BFA") as Lead Counsel for the Class; (3) for consolidation of all related securities class actions pursuant to Rule 42(a) of the Federal Rules of Civil Procedure ("Rule 42(a)"); and (4) for any such further relief as the Court may deem just and proper.

## PRELIMINARY STATEMENT

The above-captioned related securities class actions allege that Ideanomics, Inc. ("Ideanomics" or the "Company") and certain of its senior officers (collectively, "Defendants") defrauded investors in violation of Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)), and U.S. Securities and Exchange Commission Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).  The related actions further allege that from March 20, 2020 to June 25, 2020, (the "Class Period"), Defendants misrepresented and concealed the true state of the Company's electric vehicle business.  Specifically, Defendants repeatedly touted Ideanomics' purported one million square foot electric vehicle expo center in Qingdao, China and announced multiple contracts for the purchase of its electric vehicles.  In truth, Defendants did not have a significant electric vehicle presence in Qingdao, repeatedly published doctored photos of the supposed expo center in its press releases, and announced contracts for the purchase of the Company's electronic vehicles that were completely fabricated.

Pursuant to the PSLRA, this Court must appoint the "most adequate plaintiff" to serve as Lead Plaintiff.  15 U.S.C. § 78u-4(a)(3)(B)(i).  In that regard, the Court is required to determine which movant has the "largest financial interest" in the relief sought by the Class in this litigation,

and also whether such movant has made a *prima facie* showing that it is a typical and adequate class representative under Rule 23 of the Federal Rules of Civil Procedure ("Rule 23").  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  For the reasons set forth below, Bitran is the "most adequate plaintiff" by virtue of, among other things, the $93,229.12 in losses as calculated on a first-in, first-out ("FIFO") basis and a last-in, first-out ("LIFO") basis that he incurred on his investments in Ideanomics securities during the Class Period.  Bitran also satisfies the relevant requirements of Rule 23 because his claims are typical of all members of the Class, and he will fairly and adequately represent the Class.  Indeed, Bitran fully understands the Lead Plaintiff's obligations to the Class under the PSLRA and is willing and able to undertake the responsibilities entailed in acting as Lead Plaintiff to guarantee vigorous prosecution of this action.  *See* Declaration of Javier Bleichmar ("Bleichmar Decl."), Ex. A.

Further, Bitran has selected BFA, a law firm with substantial experience in successfully prosecuting securities class actions, to serve as Lead Counsel for the Class.  Accordingly, Bitran respectfully requests that the Court appoint him Lead Plaintiff and otherwise grant his motion.

### SUMMARY OF THE RELATED ACTIONS

Ideanomics has long been in search of a sustainable business strategy.  Between 2010 and 2017, the Company primarily provided premium content video on demand services under the brand name "You-on-Demand," predominantly in the People's Republic of China.  ¶ 22.[1]  In 2017, Ideanomics shifted its business model to focus on developing next generation financial services and financial technology ("FinTech") products.  ¶ 23.  In 2018, the Company purported to have "built a network of businesses, operating principally in the trading of petroleum products and

---

[1] All citations to ¶__ refer to the complaint filed in *Lundy v. Ideanomics, Inc.*, 1:20-cv-04944 (S.D.N.Y.) ("*Lundy*"), ECF No. 1.

electronic components that the Company believed had significant potential to recognize benefits from blockchain AI technologies." *Id.*   However, in 2019 Ideanomics purportedly ceased operations of its petroleum and electronic components trading business, though the Company continued to represent that it prioritized its FinTech business. *Id.*  In 2019, Ideanomics made its latest business strategy shift, this time to electric vehicles.  In the Company's 2019 Annual Report filed on Form 10-K with the SEC on March 16, 2020, Ideanomics stated, "we found a unique opportunity in the Chinese Electric Vehicle (EV) industry to facilitate large scale conversion of fleet vehicles from internal combustion engines to EV.  This led us to establish our Mobile Energy (MEG) business unit." *Id*.

The Company, however, fraudulently misrepresented the true state of its MEG business unit.  Specifically, Defendants repeatedly touted the prospects and success of its "one million square foot EV expo center in Qingdao, Shandong Province," in China, also known as the "MEG Center."  ¶3.  For example, on the first day of the Class Period, March 20, 2020, Ideanomics published a press release which stated that the Company was "pleased to announce that the Qingdao-MEG Sales Center … is scheduled to start sales operations by May 1." ¶ 24.  Then, on May 26, 2020, Ideanomics published a press release announcing that its Qingdao subsidiary … has officially launched the largest auto trading market in Qingdao at MEG's Qingdao EV hub." ¶ 25.  Defendants further represented that "[t]he MEG Center is a one million square foot EV expo center … [which] announced a soft launch on May 1, 2020 and will house partners ranging from EV manufacturers, EV battery manufacturers, energy storage, energy management, and EV charging solution providers, financial services, insurance companies, vehicle and license plate registration services, and others." *Id.*

By early June 2020, Defendants were lauding the success of the MEG Center.  On June 9, 2020, Ideanomics published another press release which reported that "auto dealers operating in its subsidiary, Mobile Energy Global's (MEG) expo center in Qingdao, have sold 2,139 vehicles for a total value of RMB 235 Million or USD 33 Million."  ¶ 26.  The press release also stated, "[b]ased on the level of sales activity in the first week of June, this month's sales are expected to exceed May levels … In its first five weeks of being operational, the dealers at the MEG Center have received high levels of interest, and management is optimistic that it can achieve its previously stated RMB 1 Billion sales target in 2020."  *Id*.

However, on June 25, 2020, analysts at Hindenburg Research ("Hindenburg") and J Capital Research ("J Capital") revealed Defendants' fraud.  Hindenburg issued a flurry of tweets describing Ideanomics as "an egregious & obvious fraud" and asserting that "investors need to look no further than the company's June 9 press release."  ¶ 30.  Hindenburg explained that the press release "tout[ing] the launch of its MEG EV sales center [] includes a photo that bears a '2020' timestamp," however Hindenburg "found a photo displaying the exact same cars and exact same layout from 2018, years before the supposed soft launch of the MEG center in 2020."  *Id*. Hindenburg also noted that the MEG logo appeared superimposed onto the photo and that Ideanomics' May 26, 2020 press release contained "the exact same signs of photoshopping that impose [Ideanomics'] flat MEG logo on a curved surface."  ¶ 31.  Hindenburg emphasized, "[t]o repeat, the company doctored photos in its PR to suggest it owns/operated the facility…. This strikes us as a clear effort by the company to manipulate the photographs in order to drive its stock price up."  ¶¶ 30-31.

Further, Hindenburg asserted that an investigator sent to visit the MEG Center found that "[t]he facility is actually operated by almost 100 sales groups.  None of those we spoke with heard

4

of [Ideanomics] or MEG.  We spoke to the main office (in a recorded conversation) and they confirmed the same." ¶ 32.  The investigator also contacted five customers that Ideanomics touted as helping to drive its electric vehicle business, but "[n]one of them were aware of Ideanomics and none were able to confirm doing business with" the Company.  ¶ 33.  Hindenburg summed up their findings by stating, "[w]e have watched [Ideanomics'] stock pump and dump on a neverending [sic] stream of press releases over the last 5 years and we expect this time will be no different, resulting in major shareholder losses or regulatory intervention." *Id.*

J Capital published a similar report about Ideanomics titled "Champion of Promotes" which echoed Hindenburg's findings and described the Company as "a zero." ¶ 34.  J Capital wrote, "[t]he company changes its name and promotional story so frequently that it's hard to keep up.  One thing remains a constant, despite all the press releases, buzzwords and hype: shareholders get wiped out." *Id*.  J Capital also investigated the purported MEG Center, and consistent with Hindenburg's findings, was "unable to establish that [Ideanomics] has a showroom in Qingdao, whence the contract announcements have been flowing."  ¶ 35.  While it could not identify the MEG Center, J Capital stated that its investigator "eventually found an [Ideanomics] subsidiary that has a mail drop at a 1 [million square foot] shopping mall in Qingdao's Chengyang District. Neither the manager of the mall nor two store owners we contacted in the center have ever heard of [Ideanomics], any of its subsidiaries or joint ventures, or the EV showroom the company says it opened on May 1." *Id*.  Again consistent with Hindenburg, J Capital also noted that "[f]rom June 11-22, [Ideanomics] announced five contracts for electric vehicles …. On June 23 and 24, we spoke with representatives from four of the five 'buyers.'  All four denied there were contracts. One of them went as far as to tell our staff member that the [Ideanomics] press release is 'fake news.'" ¶ 36.

5

On this news, Ideanomics' stock price fell $0.65, or approximately 21%, from $3.09 on June 24, 2020 to $2.44 on June 25, 2020.  ¶ 6.

On June 26, 2020, Ideanomics published a press release in response to Hindenburg and J Capital in which the Company stated it "would like to clarify the status of" the MEG Center. Specifically, Ideanomics said the MEG Center was in "Phase I" of its development, which included the "commencement of our fleet sales division" and now occupied approximately 215,000 square feet.  The press release also stated that "Phase II," which would include the opening of "the MEG welcome center and executive offices," and "Phase III of the project, and the remaining 60,000 square meters will come online as further renovations are completed."  ¶ 37.  This contradicted Defendants' past statements, including that "the MEG Center is a one million square foot EV expo center" and that "[t]he MEG Center … now hosts a full suite of car dealer services for new energy and used cars with a capacity of 18,000 vehicles onsite."  ¶ 38.

The Ideanomics press release also included an aerial view of the purported MEG Center. However, Hindenburg responded that the view was "drone footage of the outside of the entire facility.  We think the reason the company isn't posting video from INSIDE the facility is because such video shows they have absolutely no presence on site whatsoever."  ¶ 39.  Hindenburg then posted its own video which "shows only a few cars for sale, and no sign of [Ideanomics] on site." ¶ 40.  Hindenburg also offered new evidence of doctored photographs in Ideanomics' press releases and reiterated, "[Ideanomics] has fabricated its supposed sales center, and altered images in its press releases to make it seem that it operates the facility.  We continue to believe, as we stated yesterday, that the company is engaged in flagrant securities fraud and that it's [sic] stock will wind up in the pennies or halted by regulators."  ¶¶ 40-42.

6

Finally, later in the day on June 26, 2020, Ideanomics published another press release which, while it purported to refute Hindenburg's allegations, confirmed that its MEG Center was not the 1 million square feet expo center the Company previously touted, and instead stated that it "will be expanding to 40,000 square meters and eventually 100,000 square meters." ¶ 43.

On this news, Ideanomics' stock price fell an additional $0.98, or approximately 40%, from $2.44 on June 25, 2020 to $1.46 on June 26, 2020. ¶ 8.

## ARGUMENT

Under the PSLRA, any Class member may move for appointment as Lead Plaintiff within 60 days of the publication of notice that the first action asserting substantially the same claims has been filed. *See* 15 U.S.C. § 78u-4(a)(3)(A). On June 28, 2020, Plaintiff Megan Lundy filed the first of the related actions alleging that Defendants defrauded investors during the period of March 20, 2020 through June 25, 2020. *See Lundy*, ECF No. 1 at ¶1. On the same day, counsel for Ms. Lundy published a notice on *Globe Newswire*, which alerted investors to the pendency of the action and set the deadline to seek Lead Plaintiff status by August 27, 2020. *See* Bleichmar Decl. Ex. B.[2]

Accordingly, Bitran satisfies the PSLRA's 60-day requirement through the filing of this motion.

### A.  Bitran Is the Most Adequate Plaintiff

Bitran respectfully submits that he is entitled to be appointed Lead Plaintiff because he is the movant "most capable of adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i). When selecting a Lead Plaintiff, the PSLRA establishes a presumption that

---

[2] On July 7, 2020, Plaintiff Andrew Kim filed a substantially related securities class action against Ideanomics which alleges that Defendants defrauded investors during the same period of March 20, 2020 through June 25, 2020. *See Kim v. Ideanomics, Inc.*, 1:20-cv-05203 (S.D.N.Y.) ("*Kim*").

the "most adequate plaintiff" is the movant that "has the largest financial interest in the relief sought by the class" and "otherwise satisfies the requirements of Rule 23."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I); *see also Chilton v. Chiumento Grp.*, 365 F. App'x 298, 299 (2d Cir. 2010) (discussing qualifications for Lead Plaintiff presumption).

### 1.    Bitran Believes He Has The Largest Financial Interest In The Relief Sought By The Class

Bitran should be appointed Lead Plaintiff because he believes he has the largest financial interest in the relief sought by the Class.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb).  As demonstrated herein, Bitran incurred total losses of $93,229.12 FIFO/LIFO from his investments in Ideanomics securities during the Class Period.[3]  To the best of Bitran's knowledge, there is no other applicant seeking Lead Plaintiff appointment that has a larger financial interest in this litigation.  Accordingly, Bitran believes that he has the largest financial interest of any qualified movant seeking Lead Plaintiff status and is the presumptive "most adequate plaintiff."  15 U.S.C. § 78u-4(a)(3)(B)(iii).

---

[3] Bitran's PSLRA-required Certification is attached as Exhibit A to the Bleichmar Decl. submitted herewith.  A chart setting forth calculations of Bitran's financial interest is attached as Exhibit C to the Bleichmar Decl.  While Courts in this District generally favor assessing financial interest based on a LIFO methodology, there are various other metrics that Courts have used to further analyze financial interest when warranted.  *City of Monroe Employees' Retirement System v. Hartford Financial Services Group, Inc.*, 269 F.R.D. 291, 293-295 (S.D.N.Y. 2020) (identifying LIFO as the preferred method for calculating "approximate losses," the most important of the four "*Lax* factors" courts consider when determining largest financial interest); *see also Lax v. First Merchants Acceptance Corp.*, No. 97 C 2715, 1997 WL 461035, at *5 (N.D. Ill. Aug. 11, 1997)) (Identifying (1) total number of shares purchased; (2) number of net shares purchased; (3) total net funds expended; and (4) approximate losses suffered, as four factors for courts to consider when determining the largest financial interest.); *In re Olsten Corp. Sec. Litig.*, 3 F.Supp.2d 286, 295 (E.D.N.Y. 1998) (same).  Bitran's PSLRA certification and loss calculation provide all the trading information necessary to calculate his financial interest under all possible metrics and does not presuppose that there is only one valid methodology.

### 2.      Bitran Satisfies The Requirements Of Rule 23

In addition to possessing the largest financial interest in the outcome of the litigation, Bitran otherwise satisfies the requirements of Rule 23.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc).  On a motion to serve as Lead Plaintiff, the movant must make only "a preliminary showing" that it satisfies the adequacy and typicality requirements of Rule 23.  *Jakobsen v. Aphria, Inc.*, 18 Civ. 11376 (GBD), 2019 WL 1522598, at *5 (S.D.N.Y. Mar. 27, 2019); *see also Moshell v. Sasol Limited*, 20-cv-1008 (JSR), 2020 WL 2115410, at *2, (S.D.N.Y. May 4, 2020) ("At the lead plaintiff stage, a lead plaintiff movant need only make a preliminary showing that it satisfies the typicality and adequacy requirements of Rule 23.") (citation omitted).  Here, Bitran unquestionably satisfies both requirements.

Bitran's claims are typical of the claims of other purchasers of Ideanomics securities. Typicality is satisfied when each Class member's claims "arise from the same course of events, and the other class members make similar legal arguments to prove liability."  *Stitt v. On Deck Capital, Inc.*, No. 15 Civ. 6126 (AT), 2016 WL 889535, at *2 (S.D.N.Y. Feb. 17, 2016) (citation omitted); *see also Kasilingam v. Tilray, Inc.*, No. 1:20-cv-03459-PAC, 2020 WL 4530357, at *3 (S.D.N.Y. Aug. 6, 2020) (claims "arising from the same alleged conduct and the same legal theory of the Defendant's alleged liability" found to be typical).  Here, Bitran's and all other Class members' claims arise from the same course of events and their legal arguments to prove Defendants' liability are nearly identical.  Like all other Class members, Bitran: (1) purchased Ideanomics securities during the Class Period, (2) at prices artificially inflated by Defendants' materially false and misleading statements and/or omissions, and (3) was damaged as a result.  *On Deck Capital*, 2016 WL 889535, at *3 (typicality satisfied when movant "claims that [defendant] issued false and misleading statements that caused the company's shares to trade at an artificially

9

inflated price [and] claims arise from the same course of conduct affecting each member of the proposed class"). *See also Aphria*, 2019 WL 1522598, at *5 (same). As such, Bitran is a typical Class representative.

Bitran likewise satisfies the adequacy requirement of Rule 23. Under Rule 23(a)(4), the representative party must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In order for the Class' interests to be fairly and adequately represented, a Lead Plaintiff must not have interests that are antagonistic to the Class that it seeks to represent, must have a sufficient interest in the outcome of the case to ensure vigorous advocacy, and must retain counsel that is capable and qualified to vigorously represent the interests of the Class. *See On Deck Capital*, 2016 WL 889535, at *2. Bitran satisfies these elements because his substantial financial stake in the litigation provides the ability and incentive to vigorously represent the Class' claims. Bitran's interests are perfectly aligned with those of the other Class members and are not antagonistic in any way. There are no facts to suggest any actual or potential conflict of interest or other antagonism between Bitran and other Class members.

Indeed, Bitran is committed to discharge his obligations as a Lead Plaintiff under the PSLRA to oversee and supervise the litigation separate and apart from counsel and submitted a sworn certification as to his willingness and ability to fulfill those duties. *See* Bleichmar Decl., Ex. A. What's more, Bitran has submitted a supplemental Declaration providing the Court with additional information supporting his *bona fides*, including explaining who he is, that he is an experienced investor, and given his substantial financial interest in the litigation, that he intends to continue to actively oversee counsel, confer with counsel regarding litigation strategy, attend important court proceedings, hearings, depositions and mediations, and review and authorize the

10

filing of important litigation documents. *See* Bleichmar Decl. Ex. D, Declaration of Avraham Bitran, ¶¶ 2-5.

Further, Bitran has demonstrated his adequacy through his selection of BFA as Lead Counsel to represent the Class in this action. As discussed more fully below, BFA is highly qualified and experienced in the area of securities class action litigation and has repeatedly demonstrated an ability to conduct complex securities class action litigation effectively.

**B.      Bitran Selected Well-Qualified Lead Counsel To Represent The Class**

The PSLRA provides that the Lead Plaintiff is to select and retain counsel to represent the Class it seeks to represent, subject to Court approval. *See* 15 U.S.C. § 78u-4(a)(3)(B)(v). "There is a strong presumption in favor of approving a properly-selected lead plaintiff's decision as to counsel." *Aphria*, 2019 WL 1522598, at *5 (citation omitted). Indeed, the Lead Plaintiff's choice of counsel is not to be disturbed unless doing so is necessary to "protect the interests of the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa).

BFA is among the foremost securities class action law firms in the country. BFA's partners have served as Lead and Co-Lead Counsel on behalf of dozens of institutional investors in securities class actions, and have secured significant recoveries on behalf of investors in some of the most prominent fraud cases in recent decades. *See* Bleichmar Decl. Ex. E. In this District, the firm recently achieved a $234 million resolution for the benefit of the class in *In re MF Global Holdings Sec. Litig.*, 1:11-cv-07866-VM (S.D.N.Y. July 15, 2016), as well as a $120 million recovery in *Freedman v. Weatherford Int'l, Ltd.*, 1:12-cv-02121-LAK (S.D.N.Y. Nov. 4, 2015). BFA also recently secured a $219 million resolution in *In re Genworth Fin. Inc. Sec. Litig.*, 3:14-cv-00682-JAG (E.D. Va. Sept. 26, 2016), which represents the largest securities class action recovery ever achieved in the Eastern District of Virginia. Currently, BFA is serving as Lead

11

Counsel in numerous additional securities class actions, including, for example, Granite Construction Inc., Teva Pharmaceutical Industries Ltd., and Endo International PLC, which courts recently sustained over defendants' motions to dismiss and are proceeding through discovery. *See The Police Retirement System of St. Louis v. Granite Construction Inc.,* 3:19-cv-4744-WHA (N.D. Cal.); *Ontario Teachers' Pension Plan Board v. Teva Pharms. Indus. Ltd.*, 3:17-cv-558-SRU (D. Conn.); *Pelletier v. Endo Int'l Plc*, 17-cv-5114-MMB (E.D. Pa.).

Thus, the Court may be assured that by granting this motion, the Class will receive the highest caliber of legal representation. Accordingly, the Court should approve Bitran's selection of BFA as Lead Counsel for the Class.

## C.   Consolidation Of The Related Actions Is Warranted

There are at least two related actions pending in this District against Defendants:

| Case | Civil No. | Date Filed |
|---|---|---|
| *Lundy v. Ideanomics, Inc.* | 1:20-cv-04944-GBD | June 28, 2020 |
| *Kim v. Ideanomics, Inc.* | 1:20-cv-05203-GBD | July 7, 2020 |

These actions present virtually identical factual and legal issues because they each allege claims under Sections 10(b) and 20(a) of the Exchange Act against identical Defendants, relating to identical periods of time, and are premised upon the same misstatements regarding Ideanomics' electric vehicle business. Rule 42(a) grants broad discretion to consolidate cases that involve common questions of law or fact, as here. *See On Deck Capital*, 2016 WL 889535, at *2 (consolidating cases "alleging the same violations of the Exchange Act, by similar parties, and based on the same conduct"); *Aphria*, 2019 WL 1522598, at *1 (same). Accordingly, consolidation is appropriate under Rule 42(a).

12

## CONCLUSION

For the reasons discussed above, Bitran respectfully requests that the Court:  (1) appoint him to serve as Lead Plaintiff; (2) approve his selection of BFA as Lead Counsel for the Class; (3) consolidate all related actions pursuant to Rule 42(a); and (4) grant any such further relief as the Court may deem just and proper.

Dated:  August 27, 2020

Respectfully Submitted,

**BLEICHMAR FONTI & AULD LLP**

*/s/ Javier Bleichmar*
Javier Bleichmar
Ross Shikowitz
7 Times Square, 27th Floor
New York, New York 10036
Telephone: (212) 789-1340
Facsimile:  (212) 205-3960
jbleichmar@bfalaw.com
rshikowitz@bfalaw.com

*Counsel for Proposed Lead Plaintiff Avraham Bitran, and Proposed Lead Counsel for the Class*

**OF COUNSEL**

John A. Kehoe
Michael K. Yarnoff
**KEHOE LAW FIRM, P.C.**
Two Penn Center Plaza
1500 JFK Boulevard, Suite 1020
Philadelphia, PA 19102
Telephone: (215) 792-6676
Facsimile: (510) 350-9701
jkehoe@kehoelawfirm.com
myarnoff@kehoelawfirm.com

*Additional Counsel for Proposed Lead Plaintiff Avraham Bitran*

13