**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MEGAN LUNDY, individually and on behalf of all others similarly situated, | Case No. 1:20-cv-04944-GBD-OTW |
| Plaintiff, | |
| v. | |
| IDEANOMICS, INC., ALFRED POOR, BRUNO WU, and CONOR MCCARTHY, | |
| Defendants. | |
| ANDREW KIM, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:20-cv-05203-GBD-OTW |
| Plaintiff, | |
| v. | |
| IDEANOMICS, INC., ALFRED POOR, BRUNO WU, and CONOR MCCARTHY, | |
| Defendants. | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION OF
RENE AGHAJANIAN FOR CONSOLIDATION OF RELATED ACTIONS,
APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF
SELECTION OF COUNSEL, AND IN OPPOSITION
TO COMPETING MOTIONS**

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ...................................................................................1

II.   ARGUMENT...........................................................................................................4

    A.    Mr. Aghajanian Should Be Appointed Lead Plaintiff ............................................4

    B.    Mr. Bitran Does Not Meet the Criteria for Appointment under the
        PSLRA ...................................................................................................................4

        1.    Mr. Bitran's Calculation of the PSLRA's Damages Limitation is
              Contrary to Case Law and His Own Statements.........................................4

        2.    Mr. Bitran's Willingness to Invent Calculations that Reduce the
              Class's Damages Establish His Inadequacy ...............................................8

    C.    *Hebron* Confirms That Mr. Sons's Motion Should Be Denied .............................9

III.  CONCLUSION.......................................................................................................10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
   692 F.3d 34 (2d Cir. 2012)..................................................................................5

*Borenstein v. Finova Grp., Inc.*,
   2000 WL 34524743 (D. Ariz. Aug. 30, 2000).......................................................3, 9

*In re BP p.l.c. Sec. Litig.*,
   2016 WL 7668474 (S.D. Tex. Nov. 4, 2016) ...........................................................6

*In re Comverse Tech., Inc. Sec. Litig.*,
   2007 WL 680779 (E.D.N.Y. Mar. 2, 2007)..............................................................2

*In re eSpeed, Inc. Sec. Litig.*,
   232 F.R.D. 95 (S.D.N.Y. 2005) ..............................................................................4

*In re Hebron Tech. Co., Ltd. Sec. Litig.*,
   2020 U.S. Dist. LEXIS 169480 (S.D.N.Y. Sept. 16, 2020)............................ *passim*

*Jaffe Pension Plan v. Household Int'l, Inc.*,
   756 F. Supp. 2d 928 (N.D. Ill. 2010) ................................................... 1-2, 2, 5, 6

*In re Vivendi Universal, S.A. Sec. Litig.*,
   123 F. Supp. 3d 424 (S.D.N.Y. 2015)....................................................... 1-2, 2, 6

**Statutes**

15 U.S.C. § 78u–4(e) ............................................................................... 4-5, 5

15 U.S.C. § 78u-4(a) .....................................................................................1

**Other Authorities**

Catherine J. Galley, *et al.*, *Limiting Rule10-b5 Damages Claims*,
   Cornerstone Research, 2014 .................................................................. 6-7

Rene Aghajanian respectfully submits this reply memorandum of law in further support of his motion for appointment as Lead Plaintiff (ECF No. 15) and in opposition to the remaining competing motions filed by Gary Sons (ECF No. 19) and Avraham Bitran (ECF No. 32).[1]

## I.    PRELIMINARY STATEMENT

With losses of approximately $105,176 in connection with his Class Period transactions in Ideanomics securities, Mr. Aghajanian is the movant asserting the largest financial interest that *also* makes a threshold showing of typicality and adequacy under Rule 23 *and* is not subject to unique defenses.   Neither remaining movant provides any "proof" of Mr. Aghajanian's inadequacy, as demanded by the PSLRA.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

Instead, Mr. Bitran challenges Mr. Aghajanian by incorrectly claiming that Mr. Aghajanian committed a "blatant gaffe" by calculating the "mean trading price" under the PSLRA's 90-day damages limitation beginning on June 26, 2020 (after the *final* pled corrective disclosures) rather than on June 25, 2020 (after a *partial* corrective disclosure).[2]  *See* ECF No. 51 at 2, 8-9.  There is no basis for Mr. Bitran's self-serving arguments, which are both devoid of legal support and directly contradicted by case law and evidence.  *See, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 123 F. Supp. 3d 424, 436 (S.D.N.Y. 2015) (using "the mean trading price of the Vivendi ADSs during the bounce back period following the *final* corrective disclosure . . . to calculate damages as required by . . . 15 U.S.C. § 78u–4(e)(1)"); *Jaffe Pension Plan v. Household Int'l, Inc.*, 756 F. Supp. 2d 928, 939 (N.D. Ill. 2010) (concluding, after jury trial affirming multiple corrective

---

[1]     Unless otherwise noted, all references to "ECF No. __" are to docket entries in *Lundy v. Ideanomics, Inc.*, No. 1:20-cv-04944-GBD-OTW (S.D.N.Y.), all capitalized terms are defined in Mr. Aghajanian's opening brief and opposition brief, *see* ECF Nos. 16 & 49, all emphasis is added, and all internal quotation marks and citations are omitted.

[2]     *See* ECF No. 1, ¶¶ 30-36 (alleging June 25, 2020 partial corrective disclosures); ¶¶ 37-44 (alleging June 26, 2020 final corrective disclosures).

disclosures, that "the 90–day period begins on October 11, 2002, the date the jury found defendants' fraud no longer affected Household's stock"); *see also* Reply Declaration of Naumon A. Amjed ("Amjed Reply Decl."), Ex. A ("Kotz Decl."), ¶ 5 ("my general practice has been to begin the calculation of the mean trading price starting at the closing price that prevails after the final corrective disclosure").[3]

Here, as calculated correctly by a majority of movants,[4] the PSLRA's 90-day period appropriately begins on June 26, 2020, the date of the final alleged corrective disclosures. *See, e.g.*, *Vivendi*, 123 F. Supp. 3d at 439; *Household*, 756 F. Supp. 2d at 936. Mr. Bitran's arguments are belied by his opening brief, which acknowledged that the June 26, 2020 final corrective disclosures, and the accompanying stock decline, are a distinct corrective event from the June 25, 2020 partial corrective disclosures. *See* ECF No. 33 at 4-7. In fact, Mr. Bitran specifically described the final disclosures on June 26, 2020, as providing investors with "***new evidence***" of Defendants' fraud. *Id.* at 6; *see also id.* at 7 ("***On this news***, Ideanomics' stock price fell an ***additional*** $0.98, or approximately 40%, from $2.44 on June 25, 2020 to $1.46 on June 26, 2020."). Mr. Bitran now retreats from these clear admissions after realizing that Mr. Aghajanian suffered a larger loss under the proper application of the PSLRA's damages limitation.[5]

---

[3]    Kenneth N. Kotz, has more than twenty years of experience providing expert testimony on issues related to damages and loss causation in cases under the PSLRA. *See* Kotz Decl., Ex. 1. Mr. Kotz's analysis has been specifically cited by courts in this Circuit when assessing movants' claimed financial interests. *See, e.g.*, *In re Comverse Tech., Inc. Sec. Litig.*, 2007 WL 680779, at *8 (E.D.N.Y. Mar. 2, 2007) (citing Kotz's analysis to assess movants' financial interest under the PSLRA), *adhered to on reconsideration*, 2008 WL 820015 (E.D.N.Y. Mar. 25, 2008).

[4]    *See* ECF Nos. 21-2; 27-3; 31-1.

[5]    If Mr. Bitran correctly applied the PSLRA's damages limitation to his own losses, his losses would continue to be less than Mr. Aghajanian's losses. *See* Amjed Reply Decl., Ex. B (recalculating Mr. Bitran's maximum losses with the appropriate 90-day period as $99,369.90).

Even more troubling than Mr. Bitran's erroneous application of the PSLRA's damages limitation is his willingness to allow his counsel to advance specious arguments that *lower* the class's recoverable damages. For example, under Mr. Bitran's methodology the PSLRA's mean trading price for investors selling shares on June 26, 2020 would increase from $1.46 per share (when properly calculated) to $1.95 per share—resulting in a $0.49 per share reduction in potential damages. *See* Amjed Reply Decl., Ex. C. Mr. Bitran's defense-friendly argument would continue lowering *all* investors' potential damages (regardless of when they subsequently sold their shares). *See id.* (detailing mean trading prices). Mr. Bitran was either ignorant of his counsel's anti-class arguments or he was a willing participant in efforts to disadvantage the class. Either way, he is an unsuitable class representative that cannot be appointed even if he claimed a larger financial interest than Mr. Aghajanian (which he does not). *See Borenstein v. Finova Grp., Inc.*, 2000 WL 34524743, at *8 (D. Ariz. Aug. 30, 2000) (holding that movants who took positions against the best interests of the entire class "cannot qualify as the presumptively most adequate plaintiff" because such an appointment "pose[s] a significant risk that the complete interests of all class members would not be fairly and adequately protected").

As detailed at length in the Mr. Aghajanian's opposition brief, Mr. Sons must be disqualified given that he is subject to unique defenses regarding his trading pattern that render him inadequate and atypical. *See* ECF No. 49 at 5-10. Judge Engelmayer's September 16, 2020 opinion in *In re Hebron Technology Co., Ltd. Securities Litigation*, 2020 U.S. Dist. LEXIS 169480 (S.D.N.Y. Sept. 16, 2020), accords with Mr. Aghajanian's arguments and conclusively establishes that Mr. Sons cannot be appointed given that he purchased all of his Class Period shares on the final day of the Class Period while corrective information entered the market, and then purchased an additional 350,000 shares after the fraud was fully revealed. As noted by *Hebron*, "[i]n this

3

District, a person that increases his holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative." *Id.* at *18.  Mr. Sons warrants no exception.

Accordingly, Mr. Aghajanian is the only movant entitled to appointment under the PSLRA.

## II.    ARGUMENT

### A.    Mr. Aghajanian Should Be Appointed Lead Plaintiff

Given Mr. Sons's disqualifying defects, Mr. Aghajanian asserts the largest financial of the remaining movants, is adequate and typical in all respects, and is not subject to any unique defenses.  Accordingly Mr. Aghajanian is entitled to appointment as Lead Plaintiff.  *See In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 98 (S.D.N.Y. 2005) (discussing the PSLRA's sequential process for selecting a lead plaintiff).

### B.    Mr. Bitran Does Not Meet the Criteria for Appointment under the PSLRA

#### 1.    Mr. Bitran's Calculation of the PSLRA's Damages Limitation is Contrary to Case Law and His Own Statements

Faced with this statutorily mandated result, Mr. Bitran—based on a flawed interpretation of the PSLRA's damages limitation, 15 U.S.C. § 78u–4(e)—incorrectly claims that he actually suffered larger losses than Mr. Aghajanian.  *See* ECF No. 51 at 2 (claiming that, "[w]hen correctly calculated, Aghajanian's loss is approximately $13,000 less").  Specifically, Mr. Bitran argues— without citing any case law in support of his position—that the PSLRA's 90-day limitation period should begin with the June 25, 2020 ***partial*** corrective disclosure, rather than the June 26, 2020 ***final*** corrective disclosure.  *See id.* at 5, 8.

Mr. Bitran's application of the PSLRA's damages limitation period to the June 25, 2020 partial corrective disclosure is erroneous.  The PSLRA provides that damages "shall not exceed the difference between the purchase . . . price paid . . . and the mean trading price of that security

during the 90–day period beginning on the date on which the information correcting the misstatement or omission that ***is the basis for the action*** is disseminated to the market." 15 U.S.C. § 78u–4(e)(1). Likewise, where a plaintiff sells the security before the expiration of the 90-day period, damages are limited to "the difference between the purchase . . . price paid . . . and the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells . . . the security." *Id.* § 78u–4(e)(2). The PSLRA does not contemplate applying the 90-day period after a partial corrective disclosure. Mr. Bitran's interpretation would undermine the very purpose of the damages limitation, which Congress designed to prevent windfall damages by limiting recoverable damages to "losses caused by the fraud and not by other market conditions" and "allow[ing] the security an opportunity to recover" or "bounce back" following the complete revelation of the fraud. *See Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 39 (2d Cir. 2012) (quoting *In re Veritas Software Corp. Sec. Litig.*, 496 F.3d 962, 967 n.3 (9th Cir. 2007), and citing S. Rep. No. 104–98, at 20 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 699).

Mr. Bitran's application of the 90-day period to only the June 25, 2020 ***partial*** disclosure is also inconsistent with case law demonstrating that courts routinely start the 90-day period after the ***final*** alleged corrective disclosure. The court's analysis in *Household*, is particularly instructive. There, following a jury verdict in favor of the class, defendants argued that the PSLRA damage limitation should be applied to each of the partial disclosures in the case and while the truth was leaking out to the market. *See Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02-C-5893 (N.D. Ill. May 28, 2009), ECF No. 1623 at 14, attached as Exhibit D to the Amjed Reply Decl. Plaintiffs opposed this interpretation and argued that under defendants' approach, which was not supported by any case law, the 90-day period would include "a timeframe where the stock

5

was still impacted by the fraud" and thus, "would run counter to the purpose of the rule, which is to limit damages to those losses caused by the fraud and not by other market conditions." *Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02-C-5893 (N.D. Ill. May 28, 2009), ECF No. 1622 at 17-18, attached as Exhibit E to the Amjed Reply Decl. To this end, plaintiffs argued that the 90-day period should commence with the final corrective disclosure on October 11, 2002, because this was "the date on which the jury found defendants' fraud no longer affected Household's stock, and the artificial inflation in the stock was zero." *Id.* at 17. The Honorable Ronald A. Guzman agreed with plaintiffs that the PSLRA's damages limitation did not apply to partial corrective disclosures and only applied to the final corrective disclosure which fully corrected the stock price. *Household*, 756 F. Supp. 2d at 936 (concluding that "the 90–day period begins on October 11, 2002" and that there should be "no [damages] limitation for . . . shares sold prior to" this date).

Like *Household*, other courts have started the 90-day period after the final alleged corrective (even when that corrective disclosure occurs after the pled class period). *See, e.g.*, *Vivendi*, 123 F. Supp. 3d at 439 (using "the mean trading price of the Vivendi ADSs during the bounce back period following the ***final*** corrective disclosure . . . to calculate damages as required by . . . 15 U.S.C. § 78u–4(e)(1)"); *In re BP p.l.c. Sec. Litig.*, 2016 WL 7668474, at *22 n.1 (S.D. Tex. Nov. 4, 2016) (starting PSLRA's 90-day period from final corrective disclosure, which occurred approximately two weeks ***after the end of class period***). Applying the PSLRA's lookback provision to only the ***final*** corrective event is also consistent with industry practices. As explained by Mr. Kotz, who has been previously cited by courts as an expert in assessing movants' financial interests under the PSLRA,[6] his "general practice has been to begin the calculation of the mean trading price starting at the closing price that prevails after the final corrective disclosure."

---

[6]       *See supra* footnote 3.

Kotz Decl., ¶ 5; *see also* Catherine J. Galley, *et al.*, *Limiting Rule10-b5 Damages Claims*, Cornerstone Research, 2014, at 8 ("If . . . the plaintiff sells before expiration of the 90-day period, the plaintiff's damages are limited to the difference between the purchase price and the mean trading price between the ***final*** alleged corrective disclosure date and the date on which the plaintiff sells"), attached as Exhibit F to the Amjed Reply Decl.  Given the facts alleged here, Mr. Kotz confirms that he "would begin the PSLRA 90-day period with the June 26, 2020 closing price." Kotz Decl., ¶ 6.  Mr. Kotz further confirms that for investors who, like Mr. Aghajanian, sold shares on June 26, 2020, a proper application would result in a mean trading price of $1.46 per share (the closing price on June 26, 2020).  *Compare id. with* ECF No. 17-2 (applying limitation of $1.46 per share to Mr. Aghajanian's sales on June 26, 2020).

Mr. Bitran cannot credibly argue that the June 25, 2020, and June 26, 2020 corrective disclosures are not distinct events.  As Mr. Bitran's opening brief acknowledges, "***new evidence***" from Hindenburg Research and statements from Ideanomics "contradict[ing] [their] past statements" emerged on—and ***caused*** stock losses—on June 26, 2020.  *See* ECF No. 33 at 6-7 ("***On this news***, Ideanomics' stock price fell an ***additional*** $0.98, or approximately 40%, from $2.44 on June 25, 2020 to $1.46 on June 26, 2020.").  Accordingly, it is clear that this case does not involve a single final disclosure that resulted in a two-day decline in Ideanomics' stock price. Rather, the June 25, 2020, and June 26, 2020 disclosures are ***independent*** events resulting in distinct stock price declines.  *See id.* at 4-7 (Mr. Bitran describing the June 25, 2020, and June 26, 2020 correctives as distinct events).  As such, there is no basis for starting the PSLRA's damage limitation with the June 25, 2020 partial corrective disclosures.

Seemingly recognizing the weakness of his assertion that the 90-day period should begin on June 25, 2020, Mr. Bitran attempts to draw a phantom distinction between partial disclosures—

suggesting that the PSLRA's damages limitation does not apply "if [the] partial disclosure of information was disseminated to the market weeks or months prior to the end of the Class Period." *See* ECF No. 51 at 6 n.7.  As is the case with his broader argument, there is no basis for Mr. Bitran's assertion that partial corrective disclosures earlier in the class period are somehow exempt from the  damages limitation, and that partial corrective disclosures occurring immediately prior to the final corrective disclosure would be the ***only*** corrective disclosures subject to the damages limitation.  This distinction, which is devoid of any supporting case law, is invented out of thin air.

### 2.      Mr. Bitran's Willingness to Invent Calculations that Reduce the Class's Damages Establish His Inadequacy

Not only is Mr. Bitran's application of the PSLRA's damages limitation provision wrong, but it demonstrates his willingness to undercut the class—by unnecessarily reducing the class's recoverable damages—in order to secure appointment as lead plaintiff.  Specifically, because the PSLRA's damages limitation caps investors' recoverable damages based on the difference between the mean trading price through the date of sale during the 90-day period (or through the 90th day if shares are retained), Mr. Bitran's self-serving inflation of the mean trading price (based on the June 25, 2020 start date) directly reduces the recoverable damages for ***every*** class member who held shares of Ideanomics through the final corrective disclosures.  *See* Amjed Reply Decl., Ex. C (calculating difference in mean trading price based on 90-day periods starting on either June 25, 2020, or June 26, 2020).  As noted above, this impact is particularly acute for investors who sold shares on June 26, 2020.  Under Mr. Bitran's analysis, such investors would be limited to the difference between their purchase price and $1.95 per share (the mean trading prices starting on June 25, 2020), and would not be permitted to recover an additional $0.49 per share (based on the correct mean trading price of $1.46 per share).  *See id.*  It is inexplicable why a lead plaintiff candidate would allow his counsel to proffer calculations that—across the board—reduce the

8

class's damages, especially when there is no legal basis for the approach. This self-serving conduct conclusively demonstrates Mr. Bitran's inability to adequately represent the class. *See Finova*, 2000 WL 34524743, at \*8 (holding that movants who took positions against the best interests of the entire class "cannot qualify as the presumptively most adequate plaintiff" because such an appointment "pose[s] a significant risk that the complete interests of all class members would not be fairly and adequately protected").[7]

### C.    *Hebron* Confirms That Mr. Sons's Motion Should Be Denied

As previously noted, Mr. Sons is subject to unique defenses given that he purchased ***all*** of his shares of Ideanomics stock on the last day of the Class Period as corrective information entered the market and then purchased an additional 350,000 shares after Defendants' fraud was fully revealed. *See* ECF No. 49 (detailing Mr. Sons's inadequacy and exposure to unique defenses).

Judge Engelmayer's September 16, 2020 opinion in *Hebron* unambiguously confirms that movants, like Mr. Sons, cannot serve as lead plaintiffs. *See Hebron*, 2020 U.S. Dist. LEXIS 169480, at \*14-22. The facts in *Hebron* are nearly identical to the circumstances here. In *Hebron*, Judge Engelmayer was presented with argument that the movant claiming the largest loss was subject to unique defenses, and therefore ineligible to serve as a lead plaintiff, because he "bought all his . . . shares on [the last day of the class period] at almost precisely the same time that adverse news broke and sent [the] stock tumbling." *Id*. at \*15 (noting argument that such a movant "may be subject to the unique defense that he did not rely on [defendants'] alleged misrepresentations when making his purchases"). Judge Engelmayer rejected this movant and concluded that, regardless of the movant's explanation or the ultimate merits of the argument, a movant with this

---

[7]    In addition to Mr. Aghajanian, three other movants also correctly applied the PSLRA's damages limitation and began the 90-period on June 26, 2020. *See* ECF Nos. 21-2; 27-3; 31-1.

type of trading would be forced to expend resources defending issues that are unrelated to the prosecution of the class's claims. *See id.* at *20-21. Leaving no doubt about the inadequacy of movants like Mr. Sons, *Hebron* states:

> Without resolving any of these disputes at this early stage of the litigation, the Court finds that the cottage industry of issues surrounding [movant]'s purchase of Hebron shares would saddle, or at least potentially saddle, his claims with unique defenses. These could well "divert attention from the substance of the basic claim" and needlessly imperil the claims of the class. . . . That [movant] ***purchased shares of Hebron exclusively on the day that news of its fraud became public, did so in the minutes surrounding its revelation, and then continued to purchase additional shares after*** the disclosure allegedly caused Hebron's shares to plummet, taken together, is ready fodder for a defense keyed to his idiosyncratic circumstances.

*Id*. *Hebron* conclusively forecloses Mr. Sons's appointment and accords with the authorities previously cited by Mr. Aghajanian. *See* ECF No. 49 at 7-10. Any attempt by Mr. Sons to provide supplemental information to explain away his trading would be futile given that, as explained by *Hebron*, the very need to address this issue establishes Mr. Sons's inadequacy. *See* 2020 U.S. Dist. LEXIS 169480, at *19-21 (rejecting movant despite attempts to explain trading and stating that "there is little doubt that [movant] 'increase[d] his holdings in a security after revelation of an alleged fraud.'").

## III.  CONCLUSION

Mr. Aghajanian respectfully requests that the Court grant his motion in full.

DATED: September 17, 2020

Respectfully submitted,

**KESSLER TOPAZ
 MELTZER & CHECK, LLP**

*S/ Naumon A. Amjed*
Naumon A. Amjed
Ryan T. Degnan
Karissa J. Sauder

10

280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
namjed@ktmc.com
rdegnan@ktmc.com
ksauder@ktmc.com

*Counsel for Rene Aghajanian and*
*Proposed Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Tel: (310) 301-3335
Fax: (877) 590-0482
brian@schallfirm.com

*Additional Counsel for Rene Aghajanian*

11