# EXHIBIT F

# Limiting Rule 10b-5 Damages Claims

    

Catherine J. Galley
Cornerstone Research

Erin E. McGlogan
Cornerstone Research

Daniel J. Tyukody
Goodwin Procter LLP

Jason L. Krajcer
Goodwin Procter LLP

CORNERSTONE RESEARCH

## TABLE OF CONTENTS

Introduction ........................................................................................................................................1

Verdicts and Settlements Reviewed ..................................................................................................1

Adjustment 1: Offsetting Recognized Losses with Gains from Inflation...........................................2

Adjustment 2: Adjusting Recognized Losses with Nominal Gains....................................................4

Adjustment 3: Limiting Per-Share Recognized Losses to Nominal Losses .......................................7

The Effect of Damages Adjustments on Opt-Outs ............................................................................9

Damages Adjustments by Plaintiff Law Firms and Claims Administrators......................................10

Conclusion.......................................................................................................................................12

Appendix: Matching of Purchases and Sales—FIFO or LIFO?.......................................................13

Endnotes ..........................................................................................................................................16

## INTRODUCTION

After a Rule 10b-5 securities class action settles or, rarely, reaches a verdict, a process begins to administer the funds to class members. This usually involves several adjustments to the typical damages calculation. Damages arise from "inflation," the difference between the actual stock price and what the price would have been absent the alleged fraud.[1] The adjustments applied in the administration process can reduce individual class members' claims as well as plaintiffs' estimates of claimed aggregate, or classwide, damages.[2] The end results after these adjustments are "recognized losses or claims."[3]

The analysis of damages adjustments in this report is based on a review of settlement allocation plans from 2012 and 2013, recent decisions in two cases following jury verdicts, and the authors' experience in *In re Apollo Group Inc. Securities Litigation* post-judgment proceedings. This review revealed inconsistencies in the way these adjustments were applied among settlements, and between settlements and verdicts, which can influence investors' incentives to remain in or opt out of the class.[4] This report also examines differences across plaintiff law firms and claims administrators regarding how these adjustments were applied.

A broad principle circumscribing damages in Rule 10b-5 cases is the requirement of Section 28(a) of the Securities Exchange Act of 1934, which requires that no plaintiff "recover . . . a total amount in excess of [that person's] actual damages."[5] Because the statute does not define "actual damages," courts have developed different approaches limiting plaintiffs' recoveries according to how they understand that term.

This report focuses on three approaches to adjusting damages:

1. Offsetting recognized losses with gains from price inflation caused by the alleged fraud
2. Adjusting recognized losses with nominal gains
3. Limiting per-share recognized losses to nominal losses

These adjustments can be quite large and may often be underestimated or overlooked by defendants. Their size in *Apollo*, for example, was one reason that the case settled despite the existence of a non-appealable judgment.

## VERDICTS AND SETTLEMENTS REVIEWED

To prepare this report, the authors:

- Reviewed the plans of allocations contained in publicly available settlement claims forms and notices for 65 Rule 10b-5 class action settlements involving only common stock that occurred in 2012 and 2013;[6]
- Reviewed the verdicts for *In re Vivendi Universal S.A. Securities Litigation* and *In re Household International Inc. Securities Litigation*; and
- Analyzed their experience in post-judgment proceedings in *Apollo* that raised many of the issues discussed here.

This report was prepared jointly by Cornerstone Research and Goodwin Procter LLP.

## ADJUSTMENT 1: OFFSETTING RECOGNIZED LOSSES WITH GAINS FROM INFLATION

While the primary measure of damages in Rule 10b-5 cases is based on inflation (i.e., the difference between the price paid and the true value of the security),[7] a number of courts have held that losses from inflation must be offset by any gains from inflation attributable to the same fraud. Courts frequently offset losses from inflation with gains from inflation[8] in determining an investor's total recognized loss.

Figure 1: Example of Offsetting Recognized Losses with Gains from Inflation

An investor holds one share of stock that he purchased before the class period, when inflation was $0. He then sells that share during the class period, when inflation is $7. His resulting gain from inflation is $7. He purchases another share of stock during the class period, when inflation is still at $7, which he holds over a corrective disclosure and sells at $0 inflation. The $7 loss from inflation the investor realized from holding the second purchased share over the corrective disclosure is offset by the $7 gain from inflation from the investor's in-class sale. The investor's recognized losses sum to $0.

The court adopted this type of offset in *Household* and, with limitations, in *Vivendi* following jury verdicts in those cases. The *Household* court held that "out-of-pocket damages are limited to actual damages such that plaintiffs' losses must be netted against any of their profits attributable to the same fraud."[9] In *Vivendi*, the court adopted what it called "partial netting,"[10] meaning that the plaintiffs' losses were offset by gains from inflation arising from sales transactions between the first alleged corrective disclosure date and the end of the class period. The court concluded that applying only gains from sales after the first alleged corrective disclosure event would provide "parity" between transactions eligible for gains and losses.[11]

This seemingly well-recognized legal principle does not, however, explicitly appear in any of the 65 settlements the authors reviewed, even though this type of offset is entirely consistent with plaintiffs' general theory of damages from inflation. In the same way that an investor who purchases a security at artificially inflated prices and sells it after a corrective disclosure is damaged by the security's artificial inflation, so too does an investor benefit from inflation if he or she purchases a security before the price becomes inflated and sells that security while the price is inflated. It is economically rational to subtract those gains from inflation from losses from inflation in calculating the total harm to an investor.

## Calculating Gains from Inflation

Gains from inflation can be calculated when class members' holdings at the start of the class period and individual investors' purchase and sale data during the class period are available. This is usually the case for opt-out investors and sometimes for lead plaintiffs. Initial holdings are an important piece of data because gains from inflation are typically generated from shares purchased prior to the class period (at zero inflation) and sold during the class period (with positive inflation).[12]

Gains from inflation cannot be calculated precisely when performing plaintiff-style aggregate damages calculations, which are based on estimates of when particular shares are bought and sold but do not provide any estimates of overall purchases and sales for individual investors. Gains from inflation can only be offset against the same investor's losses from inflation. In other words, one investor's gains from inflation cannot reduce the damages claim for a different investor's losses. Data are not publicly available on each class member's holdings prior to the class period, nor are data available reflecting each class member's purchases and sales.

What *can* be calculated using publicly available information is the maximum adjustment to a plaintiff-style aggregate damages calculation for gains from inflation. This number can be larger than expected because total gains from inflation during the class period are often larger than total losses from inflation, suggesting zero (or even negative) damages. This obviously cannot be possible in the aggregate, since plaintiffs cannot owe defendants money after a successful verdict or outcome. Nevertheless, the "bank" of these available offsets is often substantial and perhaps underestimated in settlement negotiations and in any post-verdict contested claims process.

Even if an accurate adjustment to plaintiffs' aggregate damages estimate cannot be made ex ante, the economic logic and legal basis for this adjustment is strong and provides an argument for defendants negotiating smaller settlements.

## ADJUSTMENT 2: ADJUSTING RECOGNIZED LOSSES WITH NOMINAL GAINS

The second adjustment restricts an investor's aggregate damages (inflation at purchase less inflation at sale) with his or her aggregate nominal gains (purchase price less sales price).[13] In more than half of the settlements reviewed, nominal gains were used to restrict the recognized loss calculation.

### Figure 2: Adjustments for Nominal Gains



© 2014 Cornerstone Research, Inc. All rights reserved.

In such settlements, nominal gains were used either to directly offset an investor's recognized loss (as shown in the example in Figure 3 below), or to limit an investor's recognized loss to the amount of his or her aggregate nominal losses net of nominal gains.



**Figure 3: Example of Offsetting Recognized Losses with Nominal Gains**

© 2014 Cornerstone Research, Inc. All rights reserved.

An investor purchases a share of stock at a price of $29 during the class period, when inflation is $7 per share. Then she sells the share of stock at a price of $30 also during the class period, when inflation is still $7 per share, for a nominal gain of $1 ($30 less $29). The investor also purchases a second share of stock at a price of $27 when inflation is $7. She then holds that second share of stock over a corrective disclosure, and sells at a price of $25, for a loss from inflation of $7. Her $7 loss from inflation for the sale of this share of stock is reduced by the $1 nominal gain she realized from the initial transaction, resulting in $6 of recognized losses.

When nominal gains are used directly to offset an investor's recognized losses, typically only nominal gains from shares that were purchased during the class period are used, as in the example in Figure 3.[14] However, in almost 15 percent of the settlements applying this type of offset, nominal gains from shares purchased before the class period were also used.

This type of offset is not mentioned in either the *Household* or *Vivendi* verdicts, which ignored nominal gains and restricted the offsets to gains from inflation. Perhaps this is because, overall, a nominal gains offset is likely to be smaller than a gains from inflation offset since a nominal gains offset typically applies only to in–class period purchases. One can also rationalize this as class plaintiffs' attorneys concluding that any gains or losses within the class have to be fairly allocated, whereas if a plaintiff class member receives an "undeserved" windfall as a result of purchases prior to the class period, that is not class counsel's concern.

## Calculating Nominal Gains Adjustments

Similar to the offset for gains from inflation, this adjustment cannot be determined reliably for the class using plaintiff-style aggregate damages models. This adjustment *can* be determined for opt-out plaintiffs and usually lead plaintiffs, because it is possible to obtain the pre–class period holdings and purchase and sales data for such plaintiffs. This information, however, is not obtainable or estimable for each class member before the claims process.

For plaintiff-style aggregate damages, estimates can be made at the extremes, assuming that either no nominal gains or all nominal gains on shares purchased during the class period are able to be offset against losses from inflation. Unlike the case of gains from inflation, nominal gains on shares purchased during the class period typically do not come close to exceeding losses from inflation. Nevertheless, calculating the maximum reduction in damages due to nominal gains can still be helpful for settlement discussion purposes.

## ADJUSTMENT 3: LIMITING PER-SHARE RECOGNIZED LOSSES TO NOMINAL LOSSES

The third adjustment limits recognized losses per share to the nominal loss (purchase price less sales price) on individual transactions. This is also known as a "nominal loss cap."

**Figure 4: Example of Limiting Recognized Losses to Nominal Losses**

An investor purchases a share of stock for a price of $27 during the class period at $7 inflation. He holds the stock over a corrective disclosure and subsequently sells it at a price of $25 when inflation is $0. The recognized loss for this share of stock would be limited to the $2 loss ($25 sales price less $27 purchase price) rather than the $7 loss from inflation.

In almost all of the settlements reviewed, the formula that was used limited plaintiffs' damages on a per-transaction basis to the difference between the purchase price and the actual sale price (or the price calculated in accordance with the Private Securities Litigation Reform Act of 1995 [PSLRA] 90-day rule, discussed below). This was the case regardless of whether the shares were retained at the end of the class period.[15] Verdicts also generally apply this limitation.

**Figure 5: Limiting Recognized Losses to Nominal Losses**



© 2014 Cornerstone Research, Inc. All rights reserved.

This limitation is consistent with the PSLRA 90-day "bounce-back" rule, which limits a plaintiff's damages to the difference between the purchase price and the mean trading price of the security during the 90 days following a corrective disclosure. (If, on the other hand, the plaintiff sells before expiration of the 90-day period, the plaintiff's damages are limited to the difference between the purchase price and the mean trading price between the final alleged corrective disclosure date and the date on which the plaintiff sells the security.[16])

Under the 90-day rule, a form of nominal loss cap is clearly applicable to retention damages (associated with shares held through the final alleged corrective disclosure).[17] Settlements generally apply nominal loss caps to in-and-out damages as well.[18] (In-and-out damages only exist where there is changing inflation over the course of the class period, such as more than one corrective disclosure event.) In the *Vivendi* and *Household* verdicts, nominal loss caps were clearly applied to retention damages. *Vivendi* was silent on whether nominal loss caps were also applied to in-and-out damages, while *Household* explicitly applied nominal loss caps only to retention damages.[19]

## Calculating Nominal Loss Caps

Nominal loss caps can, and arguably should, be calculated for use in any settlement negotiation when trading data are available for individual investors such as opt-out plaintiffs or lead plaintiffs. In addition, and in contrast to the first two adjustments, an estimate of the effect of nominal loss caps can and should also be applied to plaintiff-style aggregate damages estimates, for both retained-share and in-and-out purchasers. Since this adjustment is on a per-share basis, it can be applied to plaintiffs' estimates of matched purchases and sales, and does not require knowledge of an investor's entire trading activity.

## THE EFFECT OF DAMAGES ADJUSTMENTS ON OPT-OUTS

For plaintiffs where detailed trading data are (or should be) available, such as opt-out investors and class representatives, each of the three adjustments described above can and should be applied in settlement negotiations to estimate recognized losses.

The inconsistency of these adjustments across verdicts and settlements is an important strategic consideration in negotiating the terms of a class settlement, whose plan of allocation can influence opt-out behavior. According to a recent report, approximately 53 percent of class actions with class settlements of $500 million or more had at least one related opt-out case.[20]

Investors may have a greater incentive to remain in the class if, as is usually the case, there is no offset for gains from inflation in any class settlement administration, but face such an offset if they opt out and pursue a verdict. For example, proprietary analyses performed by Cornerstone Research in recent large opt-out securities damages cases reveals that offsetting with gains from inflation can result in a substantial reduction in opt-out damages estimates.

Since adjusting recognized losses with nominal gains frequently is observed in settlements, but not in verdicts, to the extent that class members have nominal gains that would substantially reduce their damages if they participate in class settlements, they may have a greater incentive to opt out and seek a verdict (or reach a settlement on different terms) where such an adjustment might not be applied. Certain stock price patterns, such as an increasing stock price throughout the class period until the final alleged corrective disclosure day, increase the likelihood of having large nominal gains, suggesting a greater likelihood of opt-outs. However, it should be noted that, relative to other adjustments, the effect of offsetting nominal gains is usually small.

When it comes to the nominal loss limitation, for investors with potential damages on shares retained at the end of the class period, incentives to opt out or remain in the class are generally unaffected because the limitation is generally applied for these shares in both settlements and verdicts.[21]

## DAMAGES ADJUSTMENTS BY PLAINTIFF LAW FIRMS AND CLAIMS ADMINISTRATORS

Among the 65 settlements reviewed, the adjustments used by the three most observed plaintiff law firms and three most observed claims administrators were analyzed. As noted above, *none of the settlements offset recognized losses with gains from inflation*. The analysis below focuses on nominal gains offsets and limiting recognized losses to nominal losses.

This report summarizes settlements from three frequently observed law firms—Robbins Geller Rudman & Dowd LLP (Robbins Geller), Glancy Binkow & Goldberg LLP (Glancy Binkow), and The Rosen Law Firm P.A. (Rosen)[22]—and three frequently observed claims administrators—The Garden City Group, Inc. (GCG), Gilardi & Co. LLC (Gilardi), and Strategic Claims Services. These three law firms tended to use a particular claims administrator: Robbins Geller used Gilardi 71 percent of the time, Glancy Binkow used GCG 67 percent, and Rosen used Strategic Claims Services 86 percent.



### Figure 6: Damages Adjustments Used by Plaintiff Law Firms

Rosen implemented a nominal gains adjustment the majority of the time and Glancy Binkow implemented the adjustment approximately half the time, whereas Robbins Geller infrequently implemented the adjustment. All three law firms always limited per-share recognized losses to nominal losses.

### Figure 7: Damages Adjustments Used by Claims Administrators

▨ Offsetting with Gains from Inflation    ■ Adjusting with Nominal Gains    ▤ Limiting to Nominal Losses

© 2014 Cornerstone Research, Inc. All rights reserved.

The results for claims administrators are consistent with the law firms with which they are frequently associated. Gilardi, commonly used by Robbins Geller, implemented a nominal gains adjustment much less often than the other two claims administrators. All three claims administrators always limited per-share recognized losses to nominal losses.

## CONCLUSION

The three limitations on Rule 10b-5 damages claims discussed in this report can, and arguably should, be applied to estimate effects on potential damages in any settlement negotiation—pre- or post-verdict, as the authors did in post-judgment proceedings in *Apollo*. There is a clear basis for each adjustment:

1. Offsetting recognized losses with gains from inflation: *used by courts and grounded in economic logic*
2. Adjusting recognized losses with nominal gains: *commonly applied in settlements*[23]
3. Limiting per-share recognized losses to nominal losses: *usually applied in settlements and by courts*

Knowledge of when these three adjustments are typically applied can be informative on the potential for opt-outs and can inform strategies in settlement negotiations.

## APPENDIX: MATCHING OF PURCHASES AND SALES—FIFO OR LIFO?

Assumptions used for matching shares sold with shares purchased can have a substantial impact on calculating damages. Two matching methods generally are used: First In, First Out (FIFO) represents matching the shares sold to the oldest purchase of shares. Conversely, Last In, First Out (LIFO) represents matching the shares sold to the most recent purchase of shares. FIFO matching typically results in higher damages estimates, and LIFO matching typically results in lower damages estimates. The majority of courts prefer LIFO,[24] which was used in *Vivendi*. In contrast, the vast majority of the settlement claims forms incorporated a FIFO matching assumption.[25]

### Figure 8: Matching Assumption



© 2014 Cornerstone Research, Inc. All rights reserved.

FIFO usually produces a higher damages estimate than LIFO because, under FIFO, more shares sold during the class period are matched with shares held prior to the class period. This increases the number of shares purchased during the class period that are held through any alleged corrective disclosure days.[26] However, when damages are offset by gains from inflation, the higher damages under FIFO are generally offset and can approximate damages under LIFO without any gains from inflation adjustment. When offsetting damages with gains from inflation under FIFO, share sales during the class period will typically reflect gains from inflation that are offset against the higher losses from inflation calculated under FIFO.

## Figure 9: Example of Matching Assumption—FIFO versus LIFO



© 2014 Cornerstone Research, Inc. All rights reserved.

Assume the following: (1) an investor holds one share prior to the class period, (2) the investor purchases another share at $7 inflation, (3) the investor then sells one share at $7 inflation, and (4) the investor finally sells her other share after the class period when there is no inflation.

Under LIFO, recognized losses are $0 because the two matched transactions are (1) buy at $7 inflation and sell at $7 inflation for damages of $0, and (2) buy before the class period at $0 inflation and sell after the class period at $0 inflation for $0 damages. (There are no gains from inflation to offset.)

Under FIFO, recognized losses are $7 because the two matched transactions are (1) buy before the class period at $0 inflation and sell at $7 inflation for $0 damages (gain not recognized), and (2) buy at $7 inflation and sell at $0 inflation after the class period for damages of $7.

Under FIFO with gains from inflation including pre-class purchases offsetting losses from inflation, recognized losses are $0, the same as under LIFO, because the two matched transactions are (1) buy at $7 inflation and sell at $0 inflation after the class period for damages of $7, and (2) buy before the class period at $0 inflation and sell at $7 inflation for an offset to damages of a $7 gain from inflation.

## FIFO and LIFO in *Household* and *Vivendi*

In *Household*, the court adopted FIFO even while recognizing that it "often gives plaintiffs a windfall."[27] The court softened that blow by holding that "plaintiffs' gains attributable to defendants' fraud [will be] netted from the plaintiffs' total loss."[28] In *Vivendi,* the court adopted LIFO, noting that when LIFO is used, offsetting damages with gains from inflation would typically not be necessary.[29] The court, however, still applied a partial gains from inflation offset that it called "partial netting."[30] Under "partial netting," the court did not offset class period gains from inflation that occurred before the first corrective disclosure, concluding that this approach provided "parity" and was consistent with the Supreme Court's decision in *Dura Pharmaceuticals*.[31]

## Implications of FIFO and LIFO

The implications of FIFO and LIFO on nominal gains offsets or limiting recognized losses to nominal losses depend upon a number of factors:

- Whether pre–class period purchases are included
- The direction and pattern of the share price before and during the class period
- The timing of the purchase and sale transactions
- Whether offsets with gains from inflation are applied

## ENDNOTES

[1]  Inflation is typically estimated daily and requires experts to determine the value of the security absent the alleged fraud on each day during the period at issue.

[2]  Plaintiff-style aggregate damages estimates are typically calculated based upon a variety of simplifying assumptions and do not reflect a reliable estimate of classwide damages. For example, these estimates use assumptions about trading behavior (known as trading models) to estimate the purchase date of shares sold during the class period or retained at the end of the class period. The actual purchase date of these shares (which dictates the amount of alleged inflation at the time of purchase, including zero alleged inflation if purchased prior to the class period) can only be ascertained from trading information for each individual plaintiff.

[3]  For ease of reading, throughout this report the word *damages* is sometimes used to refer to recognized losses or claims.

[4]  Some settlement allocation plans contain conflicting, or difficult to interpret, language. As a result, in some circumstances the exact calculations cannot be determined precisely.

[5]  15 U.S.C. § 78bb(a)(1).

[6]  The settlements were identified by Cornerstone Research based on a review of case activity collected by Securities Class Action Services LLC. There were a total of 68 Rule 10b-5 class action settlements involving only common stock, three of which did not provide sufficient detail about the plan of allocation. Further analysis of these and other settlements are contained in Cornerstone Research's *Securities Class Action Settlements* reports for 2012 and 2013. *See* Laarni T. Bulan, Ellen M. Ryan, and Laura E. Simmons, *Securities Class Action Settlements—2013 Review and Analysis*, Cornerstone Research, www.cornerstone.com/Publications/Reports/Securities-Class-Action-Settlements-2013-Review-and-Analysis; Ellen M. Ryan and Laura E. Simmons, *Securities Class Action Settlements—2012 Review and Analysis*, Cornerstone Research, www.cornerstone.com/Publications/Reports/Securities-Class-Action-Settlements-2012-YIR.

[7]  *See, e.g., Robbins v. Koger Properties Inc.*, 116 F.3d 1441, 1449 n.5 (11th Cir. 1997) ("The proper measure of damages utilizes the out-of-pocket rule: the plaintiff can recover 'the difference between the price paid and the "real" value of the security, i.e., the fair market value absent the misrepresentations, at the time of the initial purchase by the defrauded buyer.'").

[8]  Gains from inflation can occur from (1) shares held prior to the class period and sold during the class period (purchased at no inflation but sold with inflation); (2) shares purchased and sold during the class period where the alleged inflation is increasing during the class period; and (3) short sale transactions (i.e., shares sold during the class period with alleged inflation and later purchased after the class period end with no inflation).

[9]  *Lawrence E. Jaffe Pension Plan v. Household Int'l. Inc.*, 756 F. Supp. 2d 928, 935 (N.D. Ill. 2010).

[10]  *In re Vivendi Universal S.A. Sec. Litig.*, 284 F.R.D. 144, 159 (S.D.N.Y. 2012).

[11]  See the Appendix for a more complete discussion of the "partial netting" approach adopted in *Vivendi*.

[12]  Gains from inflation on shares purchased during the class period may also offset any recognized loss when inflation fluctuates during the class period.

[13]  Nominal gains can occur from (1) shares held prior to the class period and sold during the class period at a higher price; (2) shares purchased during the class period and sold during the class period at a higher price; and (3) short sale transactions—shares sold during the class period and purchased later (either during or after the class period) at a lower price. Settlements implementing a nominal gains adjustment count nominal gains from one or a combination of these three.

[14]  The nominal gains used in the limitation to net nominal losses is inherently limited to in–class period purchases as the calculation is based on the same transactions that are eligible for damages (i.e., no recognized loss on pre–class period purchases). In addition, in more than three-quarters of the settlements reviewed, the class members were eligible to receive a distribution from the net settlement fund only if they had a net loss, after subtracting all nominal gains from the transactions completed during the class period. In most of these settlements, it is unclear whether the nominal gains were considered as a threshold question only for distribution eligibility, or if they were actually offsetting the recognized losses. When it was unclear, the authors assumed that the nominal gains offset was used only to determine eligibility and not to actually offset recognized losses.

[15]  In addition, in less than 5 percent of the settlements applying this limitation on a per-share basis, the limitation was also applied on an aggregate basis so that an investor's total recognized loss was limited to his or her total gross nominal loss (not taking into account any nominal gains).

[16] The Ninth Circuit has characterized the 90-day bounce-back rule as a rescissory cap on out-of-pocket damages. *See, e.g.,* *In re Mego Fin. Corp. Sec. Litig.,* 213 F.3d 454, 461 (9th Cir. 2000) ("Section 78u-4(e) essentially caps a plaintiff's damages to those recoverable under the rescissory measure."); *In re Veritas Software Corp. Sec. Litig.,* 496 F.3d 962, 967 (9th Cir. 2007) ("This '90-day bounce back rule' . . . limits the plaintiffs to rescissory damages and does not calculate damages based on the single day decline in price, but instead allows the security an opportunity to recover.").

[17] Retention damages are damages for shares purchased in the class period and held over the final corrective disclosure day. They are capped by the difference between an investor's purchase price for that security and the average closing price between the disclosure date and the earlier of the sale date of the security or 90 days after the disclosure date.

[18] In-and-out damages are damages on shares bought during the class period and sold after the first corrective disclosure but before the final corrective disclosure. The cap applied to these shares is simply the difference between the purchase and sales price.

[19] *See Household,* 756 F. Supp. 2d at 936.

[20] Amir Rozen (Cornerstone Research), Joshua B. Schaeffer (Cornerstone Research), and Christopher Harris (Latham & Watkins), *Opt-Out Cases in Securities Class Action Settlements,* 2013, https://www.cornerstone.com/Publications/Reports/Opt-Out-Cases-in-Securities-Class-Action-Settlements.

[21] One exception might be where investors have potential damages on shares sold during the class period, and their nominal losses are substantially less than any potential damages, they may be incentivized to opt out and seek a verdict where a nominal loss cap might not be applied to those damages.

[22] Some settlements identified more than one law firm as lead counsel. There was one settlement where both Robbins Geller and Glancy Binkow were identified as lead counsel.

[23] Note that offsetting recognized losses with gains from inflation, and adjusting recognized losses with nominal gains, would potentially adjust for the same gains. One approach would be to calculate both for each investor, and apply the maximum.

[24] *See, e.g., In re eSpeed Inc. Sec. Litig.,* 232 F.R.D. 95, 101–02 (S.D.N.Y. 2005) ("[M]ore recently, courts have preferred LIFO and have generally rejected FIFO as an appropriate means of calculating losses in securities fraud cases. Moreover, in a number of instances where courts have used FIFO . . . they have done so reluctantly.") (internal quotations omitted); *Hill v. Tribune Co.,* 2005 WL 3299144, at *2 (N.D. Ill. Oct. 13, 2005); ("The current majority view . . . is that securities fraud losses should be calculated using LIFO. LIFO is also often used in determining the largest financial interest for purposes of the PSLRA lead plaintiff presumption.") (internal citations omitted).

[25] Of the settlement claims forms reviewed, 88 percent disclosed the matching assumption used for calculating damages.

[26] Note that for investors with no sales during the class period or in the 90 days following the class period, estimated damages will be unaffected by the decision between LIFO and FIFO matching because there are no relevant share sales to match with share purchases.

[27] *Household,* 756 F. Supp. 2d at 936.

[28] *Id.* at 937–38.

[29] "The main advantage of LIFO is that, unlike FIFO, it takes into account gains that might have accrued to plaintiffs during the class period due to the inflation of the stock price." *Vivendi,* 284 F.R.D. at 160 (internal quotations omitted).

[30] *Id.* at 159.

[31] *Id.* ("[P]laintiffs argue [citing *Dura Pharmaceuticals Inc. v. Broudo,* 544 U.S. 336 (2005)] that it would be unfair to offset post-materialization-date losses (i.e., losses from sales completed after the first materialization date) with pre-materialization-date gains (i.e., gains from sales completed before the first materialization date). . . . I agree with plaintiffs . . . [a]ccordingly . . . only those gains resulting from transactions occurring between the first materialization date and the end of the Class Period will be used to offset losses incurred during that very same period. This parity between gains and losses should ameliorate the harsh effects that a full netting methodology would entail (where all gains, pre- and post-materialization date, would be used to offset cognizable losses). This methodology will henceforth be referred to as 'partial netting.'") (internal citations omitted).

## ABOUT THE AUTHORS

**Catherine J. Galley** is a senior vice president in Cornerstone Research's Los Angeles office. She developed the firm's financial institutions practice, and has been active in the firm's securities and corporate and government investigations practices for more than 25 years. In addition, Ms. Galley has managed cases involving breach of contract, corporate governance, valuation, and auditor liability.

**Daniel J. Tyukody** is a partner in Goodwin Procter's Securities Litigation & White Collar Defense Group, where he focuses on securities litigation and regulatory enforcement. Mr. Tyukody has nearly 30 years' experience defending issuers, officers and directors, and underwriters in securities class actions, derivative cases, M&A cases, and SEC proceedings. He also counsels audit committees and special committees in conducting internal investigations.

**Jason L. Krajcer** is an associate in Goodwin Procter's Litigation Department and a member of its Securities Litigation & White Collar Defense Group. Mr. Krajcer specializes in securities and commercial litigation, defending issuers, officers, directors, and underwriters in shareholder class actions and derivative cases. He also represents special committees conducting internal investigations.

**Erin E. McGlogan** is a principal in Cornerstone Research's Los Angeles office. She provides consulting services for complex litigation involving economic and financial issues. Ms. McGlogan's primary areas of focus are securities and financial institutions cases. She also has significant experience with intellectual property, corporate governance, Employee Retirement Income Security Act (ERISA), bankruptcy, general damages, and tax cases.

The views expressed in this report are solely those of the authors and do not necessarily reflect the views of Cornerstone Research or Goodwin Procter LLP.

The authors acknowledge the research efforts and significant contributions of their colleagues at Cornerstone Research and Goodwin Procter LLP.

The authors request that you reference Cornerstone Research and Goodwin Procter LLP
in any reprint of the information included in this study. Please direct any questions to:

Catherine J. Galley
Cornerstone Research
213.553.2561
kgalley@cornerstone.com

Daniel J. Tyukody
Goodwin Procter LLP
213.426.2627
dtyukody@goodwinprocter.com

**Cornerstone Research**

For more than 25 years, Cornerstone Research staff have provided economic and financial analysis and expert testimony in all phases of complex litigation and regulatory proceedings. The firm's industry-leading research is recognized for its innovative reporting on securities class actions and modeling of settlement outcomes. Cornerstone Research staff have expertise in trade execution and pricing, risk management, market microstructure, public and private equity and fixed income, structured finance, and derivatives. Cornerstone Research has more than 500 staff and offices in Boston, Chicago, London, Los Angeles, Menlo Park, New York, San Francisco, and Washington.

www.cornerstone.com
Twitter at @Cornerstone_Res

**Goodwin Procter LLP**

Goodwin Procter LLP is a leading Am Law 50 and Global 50 law firm, with offices across the United States and in Europe and Asia. Excelling at complex transactional work and high-stakes litigation, the firm combines in-depth legal knowledge with practical business experience to help clients maximize opportunities and manage risk. With more than 850 lawyers, Goodwin offers innovative counsel and delivers results through a client-centric and collaborative approach. The firm focuses on matters involving financial institutions, intellectual property, private equity, real estate capital markets, securities litigation/white collar defense, and technology/life sciences. Information may be found at www.goodwinprocter.com. Follow us on Twitter @goodwinprocter.





© 2014 by Cornerstone Research, Inc. All Rights Reserved.
Cornerstone Research is a registered service mark of Cornerstone Research, Inc. C logo and design is a registered trademark of Cornerstone Research, Inc.