**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE IDEANOMICS, INC. SECURITIES LITIGATION | Case No. 1:20-cv-04944-GBD-OTW |
| | **CONSOLIDATED AMENDED COMPLAINT** |
| | CLASS ACTION |
| | **JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

**Page**

I.      NATURE AND SUMMARY OF THE ACTION ................................................................1

II.     JURISDICTION AND VENUE .................................................................................10

III.    PARTIES .................................................................................................11

    A.     Plaintiff ..........................................................................................11

    B.     Corporate Defendant ....................................................................11

    C.     Individual Defendants ..................................................................11

IV.     BACKGROUND AND NATURE OF THE FRAUD .................................................13

    A.     Ideanomics And Its Menagerie Of Corporate Precursors .......................13

        1.     Alpha Nutraceuticals, Inc. – Nutritional Supplements (2004-2007) ....15

        2.     China Broadband, Inc. – Internet Provider (2007-2011) ...........15

        3.     YOU On Demand – Video Content Provider (2011-2016) .............15

        4.     WeCast Network – Video on Demand and Consumer Electronic Sales (2016-2017)...........16

        5.     Seven Stars Cloud Group, Inc. – Fintech and Crude Oil Sales (2017-2018)...........16

    B.     Ideanomics (2018-Present) ..........................................................17

        1.     Ideanomics's Non-Electric Vehicle Related Ventures Quickly Fail ....17

            a.     Fintech Village (2018-2019)..................................... 17

            b.     Cryptocurrency Trading (2019) .................................. 18

        2.     Ideanomics Tries EV..................................................19

        3.     The MEG Division and Ideanomics's Current Form (2019-Present) ....20

    C.     By 2019, Ideanomics's Business Ventures Were Failing, Its Debt Was Growing, And The Threat Of NASDAQ Delisting Was Looming, Casting Doubt On The Company's Survival ..................................................23

    D.     The MEG Center Is Revealed – Along With Gross Exaggerations Of Its Size And Activities ..................................................28

    E.     In Reality, The MEG Center Is Not What Defendants Represented ..................36

        1.     The Market Learns the Truth about the MEG Center...............................36

        2.     Plaintiff's Investigation Confirms that Ideanomics Lied about the MEG Center ..................................................40

V.      MATERIALLY FALSE AND MISLEADING STATEMENTS ....................................41

        A.      March 16, 2020 ..........................................................................................41

        B.      March 20, 2020 ..........................................................................................43

        C.      May 11, 2020 ..............................................................................................44

        D.      May 26, 2020 ..............................................................................................45

        E.      May 28, 2020 ..............................................................................................46

        F.      June 9, 2020 ................................................................................................50

        G.      June 11, 2020 ..............................................................................................51

        H.      June 15, 2020 ..............................................................................................52

VI.     ADDITIONAL SCIENTER ALLEGATIONS ..................................................53

        A.      Defendants' Public Statements On June 26, 2020 Create A Strong
                Inference Of Scienter ..................................................................................54

        B.      Defendants' Positions Within Ideanomics Support A Strong Inference Of
                Scienter ........................................................................................................55

        C.      The Importance Of The MEG Center To Ideanomics Supports A Strong
                Inference Of Scienter ..................................................................................58

        D.      Defendants' Financial Pressures, Threat Of NASDAQ Delisting, And
                Reliance On Equity Issuances Further Raise A Strong Inference Of
                Scienter ........................................................................................................59

        E.      Defendant Wu And His Closely Held Affiliated Entities Structured
                Transactions To Personally Benefit From The Inflation They Created In
                Ideanomics's Stock Price ............................................................................60

VII.    CONTROL PERSON LIABILITY .....................................................................60

VIII.   CLASS ACTION ALLEGATIONS ...................................................................62

IX.     THE FRAUD–ON-THE-MARKET PRESUMPTION OF RELIANCE APPLIES..........64

X.      THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE
        DO NOT APPLY ...............................................................................................65

XI.     LOSS CAUSATION............................................................................................66

XII.    CAUSES OF ACTION ........................................................................................67

XIII.   PRAYER FOR RELIEF ......................................................................................68

Lead Plaintiff Rene Aghajanian, by and through his attorneys, and on behalf of all others similarly situated, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based on, among other things, his counsel's investigation, which includes: (i) public filings with the United States Securities and Exchange Commission (the "SEC") made by Defendant Ideanomics, Inc.; (ii) research reports by securities and financial analysts; (iii) articles published by the news media; (iv) transcripts of Ideanomics's earnings calls; (v) Ideanomics's publicly-available investor presentations; (vi) Ideanomics's press releases and media reports; (vii) economic analyses of Ideanomics's securities movement and pricing data; (viii) on-the-ground investigation in China including site visits; (ix) publicly available social media regarding Ideanomics, including postings on social media accounts of former and current Ideanomics employees; and (x) other publicly available material and data identified herein. Counsel's investigation into the factual allegations contained herein is ongoing, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation and/or discovery.

## I.   NATURE AND SUMMARY OF THE ACTION

1.      This is a federal securities class action on behalf of all investors (the "Class") who purchased or otherwise acquired Ideanomics's common stock between March 16, 2020 and June 25, 2020, inclusive (the "Class Period"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendant Ideanomics as well as Individual Defendants Bruno Wu (Ideanomics's Executive Chairman during the Class Period), Alfred Poor (Chief Executive Officer), Conor McCarthy (Chief Financial

Officer), and Anthony Sklar (Senior Vice President of Communications, Head of Investor Relations, and Corporate Secretary).

2.     During the Class Period, Ideanomics purported to be a global company focused on facilitating the adoption of commercial electric vehicles ("EV") (through its Mobile Energy Global or "MEG" division) and developing financial services and financial technology products it refers to as "fintech" (through its Ideanomics Capital division).

3.     Despite periodic gaudy boasts by Defendants of incipient successes in current "hot" industries such as blockchain, artificial intelligence ("AI"), and EV in the years leading up to the beginning of the Class Period, by January 2020 the price of Ideanomics's stock, which trades on the NASDAQ exchange, had languished well below $1.00 per share for weeks.  As a result, its listing on the exchange was at risk, and its ability to survive as a publicly traded company was in grave doubt.

4.     On January 10, 2020, NASDAQ informed the Company that it if its share price did not trade at a minimum of $1.00 per share for ten consecutive trading days by July 8, 2020, it would be delisted.

5.     Compounding Defendants' problems was that Ideanomics was heavily funding its operations with debt raised by issuing its own equity to creditors that included Defendant Wu.  A delisting, and thus collapse of Ideanomics's equity value, would have rendered this debt worthless. To elevate its stock price and keep it there would require convincing investors that the Company's financial performance and prospects had achieved a notable upturn.  However, Ideanomics's 2019 full-year financial results showed a Company on the brink of financial collapse.

6.     According to Ideanomics's 2019 Form 10-K ("2019 10-K" or "Annual Report") filed on March 16, 2020, Ideanomics was suffering major losses, negative cash flows, negative

earnings per share, and was inordinately reliant on related party transactions with companies controlled by Defendant Wu for whatever earnings it could muster.

7.      The 2019 10-K contained a "going concern" qualification from the Company's auditor, noting a "substantial doubt" about the Company's ability to maintain operations and continue as a going concern, due to recurring losses and negative cash flows.

8.      Moreover, purported focal points of the Company's business that Defendants had touted in prior years—a so-called "Fintech Village" real estate development investment in Connecticut, a video on demand business, and a foray into cryptocurrency-related financial services—had, by 2020, utterly failed.  The Company disclosed in late 2019 and early 2020 that it no longer considered the derelict Fintech Village investment to be a core asset, that the video on demand business had completely melted into Ideanomics's amorphous fintech line, and that, in the fourth quarter of 2019, it had taken a massive $61.1 million impairment on the cryptocurrency business, which now was essentially worthless.

9.      In what now appears to have been a desperate effort to prop up its stock price, stave off delisting, and pay off debt-holders, in late 2019 and early 2020 Defendants began to tout, through a string of press releases and online promotional content, a nascent EV-related business line, which Ideanomics dubbed the MEG division.  Defendants repeatedly emphasized and promoted the progress and promise of MEG as a main source of the Company's revenues in 2020. For example, Ideanomics issued press releases touting the purchase of an ownership stake in the sales arm of a Malaysian EV moped producer, its anticipated financing role in potential future deals to convert mining trucks to EV in Inner Mongolia, and its vaguely-defined financing role with respect to bus fleet conversions to EV in Tianjin, China. These representations were in the context of the Chinese government announcing a grand initiative to turn its entire nationwide fleet

of public vehicles into electrical vehicles by 2022, and Ideanomics claimed to be poised to seize these opportunities for large-scale electrifying of existing vehicles for the government.  Defendant Wu, reportedly a billionaire media-mogul with deep roots in the Chinese markets, was at the center of selling this story to the public markets.

10.     According to a press release dated January 28, 2020, Defendants claimed that Ideanomics's EV activities would generate revenues of 2 billion Renminbi ("RMB") in 2020.

11.     The Company's initial MEG promotions did little to stir investors, and its stock price continued to trade well below $1.00 per share.   With an impending "going concern" qualification to be disclosed in its Annual Report on March 16, 2020, Defendants began making increasingly bold claims about the prospects and undertakings of the MEG business.

12.     Specifically, in public statements just before the Class Period, Defendants started touting potentially lucrative EV-related contracts with the City of Qingdao, China ("Qingdao") that would be linked to a MEG-related property that Ideanomics was purportedly developing in the city.  This planned development would be called the "MEG Center," and it was promoted as a cutting edge sales, information, and financing hub for all things EV.  Across several public statements, Defendants emphasized the MEG Center's opening, ramp-up in operations, and significance to Ideanomics as a major step toward gaining revenues and a foothold in the exploding China EV market.

13.     For example, in a March 3, 2020, press release heralding the MEG Center as a "follow up to [its] partnership with the City of Qingdao . . . in conjunction with [its] MEG Group subsidiary, Qingdao Mobile New Energy Vehicle Sales Co. Ltd," Defendant Wu asserted that the coming "world class sales and service center will feature a full end-to-end customer experience with financing, insurance, vehicle registration, and maintenance all under one roof."  Ideanomics,

of course, would earn revenues every step of the way.  The release also suggested impressive near-term revenues from an existing business the MEG Center would take over, stating that the "new state-of-the-art center will assume the current vehicle sales and revenue activities at the [Qingdao Mobile New Energy Vehicle Sales Co. Ltd.] site."

14.     In the 2019 10-K filed on March 16, 2020 (the first day of the Class Period), alongside its announcement of disastrous earnings, failed business lines, and a "going concern" qualification, Ideanomics also lashed its hopes to its latest venture, which supposedly exploited "a unique opportunity in the Chinese Electric Vehicle (EV) industry to facilitate large scale conversion of fleet vehicles from internal combustion engines to EV.  This led us to establish our Mobile Energy Global (MEG) business unit."  On the earnings call that day, Defendant Poor spoke at length about the MEG division, stressing that the:

> [M]ost significant development in 2019 was the formation of our mobile energy global division.  MEG serves as a catalyst for change in one of the world's most environmentally sensitive areas of industry, which is the vast fleets of commercial vehicles that keep our economies moving at all levels, locally, nationally and globally.
>
> * * *
>
> MEG's focus is in the acquiring of large-scale commercial fleet operators through vehicle procurement and financing services that we offer so that we can position the Company to take advantage of the opportunity and the money to be made in the shift of energy consumption as it moves away from fossil fuels and into clean electricity.

Defendant Wu asserted on a separate promotional video the same day that the MEG center had a 1 million square feet facility that had recently been opened.

15.     Defendants' full-court press on its MEG story also coincided with Ideanomics inking a new Standby Equity Distribution Agreement (the "Equity Agreement") with offshore investment fund YA II PN, Ltd. ("YA II"), operated by Yorkville Advisors Global, LP, an investment management company based in New Jersey.  Under the Equity Agreement, Ideanomics

could access up to $50 million in financing by issuing new equity to YA II at 90% of the stock's market price.   On March 18, 2020, Ideanomics filed a shelf-registration statement for issuance of up to $50 million in new shares in connection with the Equity Agreement.   Among other things, funds from the new loans from YA II enabled the Company to repay the Company's indebtedness to Defendant Wu and Wu's affiliates.   Critically, the Equity Agreement relieved YA II from its obligation to purchase Ideanomics's stock if the Company lost its NASDAQ listing.   Thus, Ideanomics's need to maintain a stock price above $1.00 to avoid delisting was doubly critical during the Class Period.

16.   Between April 28, 2020 and June 18, 2020, the Company reportedly raised millions of dollars through the Equity Agreement.

17.   Meanwhile, Defendants were ratcheting up their promotion of the MEG Center. Indeed, during the Class Period, the Company discussed little else in its public statements.   In fact, of the thirty-eight press releases Ideanomics issued during the Class Period, twenty-nine—the overwhelming majority—related to the MEG division or MEG Center.

18.   From the first day of the Class Period, March 16, 2020, through June 25, 2020 and June 26, 2020, the dates of the two partial corrective disclosures, Defendants made false and misleading statements to the market that materially misrepresented, through gross exaggeration and lies, the extent to which the MEG Center was ready for business and capable of delivering 2020 revenues to the Company.   Defendant Wu appeared in a video interview where, in response to an interviewer's statement that Ideanomics "recently opened a 10,000 square foot facility in Qingdao," Wu responded that "it's much bigger than what you just said," emphasizing that it was 1 million square feet.   Defendants touted, among other things, that a "1 Million square foot site has been renovated as a permanent EV expo center," and that Ideanomics had paired with "more

than 20 partners ranging from EV manufacturers, EV battery manufacturers, energy storage, energy management, and EV charging solutions, financial services, insurance, vehicle and license plate registration services, and others from Qingdao."

19.     They further claimed that due to "the successful development" of the MEG Center, Ideanomics had "received inquiries from several other cities with regards to establishing similar operations."  In other examples, they also claimed that "[t]he Company anticipates that its MEG business unit will be the largest contributor to revenues in 2020" and that it had launched the "largest auto trading market in Qingdao" which "now hosts a full suite of car dealer services for new energy and used cars with a capacity of 18,000 vehicles onsite."

20.     On June 5, 2020, the Company tweeted a statement that reiterated that the MEG Center was a "1 million sq ft EV expo center with the capacity to hold 18,000 vehicles" and was accompanied by a video supposedly taken of the MEG Center from a drone. Then, on June 9, 2020, a Company press release announced that in the MEG Center's first month, it had achieved $33 million in vehicle sales.  The release included a photograph purporting to show the MEG Center with "MEG" signage in front of a new building and car sales lot.

21.     Ideanomics's stock price rose significantly and remained elevated in response to Defendants' auspicious statements about the MEG Center.  By mid-June 2020, Ideanomics's stock traded above $1.00 for ten consecutive trading days.  This allowed the Company to escape the imminent threat of NASDAQ delisting (and the loss of the ability to fund operations by issuing new stock under its Equity Agreement with YA II).  Defendants' battery of public representations about the MEG Center had worked.

22.     The rising stock price also allowed the Company to retire millions of dollars in underwater convertible debt it had issued since late 2019—including debt owed to Defendant Wu

personally and to Wu's company, Sun Seven Stars Investment Group Limited ("Sun Seven Stars") as holders. Specifically, on June 5, 2020, just before Defendants' onslaught of MEG related disclosures caused Ideanomics's stock price to skyrocket, Ideanomics approved reducing the conversion price of these debts to only $0.59 per share, from original conversion prices ranging from $1.00 to $1.50, contingent on immediate conversion of the debt. By June 11, 2020, Ideanomics's debt holders, including Wu and his affiliates, had converted all of the Company's outstanding debt to equity for a windfall.

23.    Ideanomics's knight in shining armor, YA II, likewise made good on the fortuitous timing of its equity-financed loans to Ideanomics. Between April 28 and June 18, 2020, Ideanomics issued 30,083,891 shares of common stock to YA II under this registration statement, at prices ranging from $0.36 to $2.22 per share, purportedly raising $30.5 million.

24.    By June 22, 2020, Ideanomics's stock price had surged to above $3.00 per share on Defendants' claims about the success of the MEG Center.

25.    Then, the truth was revealed. In a matter of two days, Ideanomics's share price lost over half its value, as investors learned from third party reports, followed swiftly by a Company admission that Defendants had vastly overblown the current state of the MEG Center, and thus, the Company's prospects for earning significant revenues from the supposed 1 million square foot sales hub in 2020.

26.    First, on June 25, 2020, reports were issued from two different investment firms that had taken short positions in Ideanomics's common stock, each containing scathing reports from investigations the firms had conducted, and each contending that Ideanomics, and specifically the MEG Center, was not what the Company had claimed. For example, the reports claimed investigators in China had found no trace of an Ideanomics or MEG Center bustling with

EV business at the supposed center's site in Qingdao, but instead found a largely empty mall where no one interviewed had heard of the Company. They also published photograph analyses indicating that Defendants' photographs of the purported MEG Center were instead doctored photographs from years earlier, and reported that interviews with supposed purchasers of EV services, whom Ideanomics had identified in Company press releases, disclaimed any knowledge of Ideanomics. Their conclusion: Defendants had grossly misrepresented the MEG Center and its supposed ability to provide revenues for Ideanomics.

27. In under a day, Ideanomics responded by issuing a stunning press release, in which it purported to "clarify the status" of the MEG Center. Tacitly admitting its prior representations had been false (and explicitly referencing its March 20 and May 26, 2020 alleged misstatements), Ideanomics's June 26, 2020 press release stated that the Company was, contrary to prior representations, in fact launching the MEG Center in three phases, which, in combination, would eventually total 1 million square feet of operations. The MEG Center's first phase, which the Company insisted was currently operational, occupied *less than one-quarter of that space*.

28. In response to this corrective information, on extremely heavy trading volume Ideanomics's stock price fell from its June 24, 2020 close of $3.09 to a June 26, 2020 closing price of $1.46 per share, representing a two-day drop of $1.63, or nearly 53%, per share.

29. Plaintiff's own investigation of the purported MEG Center site in Qingdao further confirms that the MEG Center remains more mirage than reality at the time of this writing. The MEG Center itself is under renovation—work that reportedly started in the final months of 2020. Repeated visits to the site revealed no business activities at all in the MEG Center, and certainly no EV sales center providing end-to-end services, from financing to charging. A nearby automobile trading area houses dozens of sellers of mostly used vehicles and second-hand

automobile parts.  There is no evidence of "more than 20 partners ranging from EV manufacturers, EV battery manufacturers, energy storage, energy management, and EV charging solutions, financial services, insurance, vehicle and license plate registration services, and others from Qingdao" at the site.  Even the handful of what appear to be hastily erected promotional banners festooned around the property merely say that the MEG Center is "Coming Soon."

30.     Defendants' Class Period public statements concerning the MEG Center were materially false and misleading, and were made with scienter, and investors suffered steep losses when the true facts correcting Defendants' misstatements were revealed.  This suit seeks to recover those losses.

## II.     JURISDICTION AND VENUE

31.     The claims asserted in this Complaint arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated under those sections, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

32.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b), (c), and (d).  Many of the acts and transactions that constitute the violations of law complained of in this Complaint, including the dissemination to the public of materially false and misleading statements, occurred in this District. In addition, at all relevant times, Ideanomics's shares were offered, sold, and traded on the NASDAQ exchange.

33.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and facilities of the national securities markets.

### III.    PARTIES

#### A.    Plaintiff

34.    Lead Plaintiff Rene Aghajanian ("Plaintiff") is a resident of California.  As stated in his certification attached to this Complaint as Exhibit A, he acquired and held shares of Ideanomics's common stock at artificially inflated prices during the Class Period, and has been damaged by the revelation of the Company's material misrepresentations and material omissions.

#### B.    Corporate Defendant

35.    In 2020 and at present, Defendant Ideanomics, Inc. ("Ideanomics" or the "Company") purports to be a global company focused on facilitating the adoption of commercial electric vehicles and developing next generation financial services and fintech products.  It purportedly came to adopt these business pursuits after successively adopting then abandoning several other business models in recent years.  Ideanomics's common stock trades on the NASDAQ exchange under the ticker "IDEX." The Company's headquarters are located at 55 Broadway, 19th Floor, New York, NY 10006, and the Company is incorporated under the laws of the State of Nevada. The Company also maintains offices in Beijing, Qingdao, Hangzhou, and Singapore.

#### C.    Individual Defendants

36.    Defendant Alfred Poor ("Poor") is Ideanomics's Chief Executive Officer ("CEO") and Interim Chairman of the Board of Directors.  Poor has served as CEO since February 2019, and became Interim Chairman on December 31, 2020.  Prior to and during the alleged Class Period, Poor made false and misleading statements or omitted material facts in Ideanomics's press releases, earnings calls, and during promotional interviews. Poor, along with Defendant Conor McCarthy, is a signatory to the Company's SEC filings during the Class Period.

37.     Defendant Bruno Wu ("Wu"), Chinese media mogul and purported billionaire who runs various different companies, served as Ideanomics's Chairman of the Board of Directors from January 2016 until December 31, 2020.[1]   During the Class Period, Wu wielded control over Ideanomics, both in his capacity as Executive Chairman, through his equity holdings in the Company, and as Ideanomics's financier.  In its 2019 10-K, Ideanomics disclosed that "[w]e are highly dependent on the services of Dr. Bruno Wu, our Chairman and largest stockholder" and explained that "Dr. Wu spends significant time with Ideanomics and is highly active in our management."  As of March 15, 2020, Defendant Wu personally held 15.2% of Ideanomics's common stock, and all outstanding shares of Series A Preferred Stock, and by virtue of the holdings of his affiliates, Wu has control of at least 21% of Ideanomics's common stock.  Wu is currently the CEO of Sun Seven Stars, and in 2019, Sun Seven Stars loaned some $5 million to Ideanomics, with the debt convertible to Ideanomics shares, and most or all of that debt was converted to shares in June 2020.  In addition, Ideanomics regularly conducts transactions with corporations affiliated with Wu.  For example, in September 2018, Ideanomics acquired Grapevine Logic, Inc., together with Fomalhaut Limited, an affiliate of Wu, and it purchased assets for $7 million relating to a social messaging platform from Wu's company, Sun Seven Stars.  In addition, in May 2019, Ideanomics sold one of its defunct businesses, Red Rock Global Capital Limited, to yet another affiliate of Wu's, called Redrock Capital Group Limited.

38.     Defendant Conor McCarthy ("McCarthy") is Ideanomics's Chief Financial Officer ("CFO,") and has served in that capacity since September 2019.  McCarthy signed the May 11,

---

[1] From November 14, 2018 until February 21, 2019, Defendant Wu briefly stepped down from his position as Chairman and CEO of Ideanomics to serve as the Vice Chairman and Secretary General of the National Committee for China-U.S. Relations, a non-governmental entity.  While serving in that capacity, Defendant Wu remained a Special Advisor to the Board of Directors.

2020 Form 10-Q for the period ended March 31, 2020, which, as alleged below, contained false or misleading statements.

39.     Defendant Anthony Sklar ("Sklar") is currently Senior Vice President of Communications, and during the Class Period also served as Head of Investor Relations and Corporate Secretary.  Defendant Sklar disseminated or actively participated in the dissemination of materially false and misleading statements as alleged herein.

40.     Collectively, Defendants Poor, Wu, McCarthy, and Sklar are referred to throughout this Complaint as the "Individual Defendants." As set forth herein, each of the Individual Defendants are alleged to have personally made or directed the making of false and misleading statements in violation of SEC Rule 10b-5(b), or acted in a scheme with other Individual Defendants to disseminate false and misleading statements in violation of SEC Rules 10b-5(a) and (c).

## IV.    BACKGROUND AND NATURE OF THE FRAUD

### A.    Ideanomics And Its Menagerie Of Corporate Precursors

41.     Ideanomics is the successor to numerous previous businesses, the focus of which has shifted considerably in the past seventeen years.  In what appears to be a pattern, while always operating as a publicly traded company, the entity has, *seriatim*, adopted a corporate identity and business that purported to focus on a "hot" industry, promptly struggled, then abandoned that current business model, and supposedly transformed itself into a new business, working in a new industry of the moment.  In just the past roughly fifteen years, the company has styled itself as operating, one after another, in the industries (among others) of nutritional supplements and vitamins; broadband cable and video on demand; crude oil and consumer electronics trading; fintech and digital currency trading powered by AI and blockchain technologies; and now, for present purposes, EV.  Since at least 2011, Defendant Wu has played a principal, controlling role

13

in Ideanomics and its predecessor corporate entities through a large direct and indirect ownership stake.

42.    Since just 2011, Ideanomics and its predecessor companies have had seven different CEOs, eight different CFOs, and four different company names:

| Company Name | CEO (Start Date) | CFO (Start Date) | Chairman (Start Date) |
|---|---|---|---|
| YOU On Demand Holdings, Inc. (2011-2016) | Shane McMahon (Feb. 23, 2011) | Marc Urbach (Feb. 23, 2011) | Shane McMahon (Feb. 23, 2011) |
| | Weicheng Liu (July 12, 2013) | Mei Chen (Mar. 28, 2016) | Bruno Wu (Jan. 6, 2016) |
| | Mingcheng Tao (Jan. 22, 2016) | Yi Xu (Feb. 4, 2017) | |
| WeCast Network, Inc. (2016-2017) | Bing Yang (Dec. 4, 2016) | Simon Wang (Mar. 23, 2017) | Bruno Wu (Sept. 19, 2016) |
| Seven Stars Cloud Group, Inc. (2017-2018) | Bruno Wu (Oct. 9, 2017) | Jason Wu (Apr. 11, 2018) | Bruno Wu (July 14, 2017) |
| | | Frederico Tovar (June 1, 2018) | |
| Ideanomics (2018-Present) | Bruno Wu (Oct. 17, 2018) | Frederico Tovar (Oct. 17, 2018) | Bruno Wu (Oct. 17, 2018) |
| | Brett McGonegal (Nov. 14, 2018) | Cecilia Xu (May 1, 2019) | Alex Yao (Nov. 14, 2018) |
| | Alfred Poor (Feb. 21, 2019) | Conor McCarthy (Sept. 9, 2019) | Bruno Wu (Feb. 21, 2019) |
| | | | Alfred Poor (Dec. 31, 2020) |

43.    Through all of these incarnations, Defendant Wu has played a principal, controlling role in these enterprises as either chairman, major shareholder, CEO, or a combination of all three. Ideanomics and each of its corporate predecessors typically would declare its entry into a new field or business while simultaneously extracting itself from its previous endeavor, usually in failure. This process often lead to instances of overlap where the company was engaged in several disparate business ventures at the same time.  By way of example, despite changing its name in 2016 from YOU On Demand Holdings, Inc. ("YOU On Demand") (which was a video on demand

service) to WeCast Network, Inc., and holding itself out thereafter as a fintech services provider and sometime crude oil trader, in the 2019 10-K, Ideanomics disclosed that it was not until 2019 that it had finally wound down YOU On Demand.

44.     A brief review of Ideanomics's recent predecessor companies follows.

### 1.     Alpha Nutraceuticals, Inc. – Nutritional Supplements (2004-2007)

45.     Alpha Nutraceuticals, Inc. held itself out as a food, dietary supplement, and cosmetics company, and was incorporated in the state of Nevada.  It changed its name to Alpha Nutra, Inc. on January 27, 2005.  In 2007, it acquired (through reverse triangular merger), and changed its name to, China Broadband, Inc., which was a broadband cable internet company in the Jinan region of China.

### 2.     China Broadband, Inc. – Internet Provider (2007-2011)

46.     China Broadband, Inc. purported to provide broadband internet services to the people of China.   In 2010, China Broadband, Inc. was acquired by, and made a subsidiary of, a company called YOU On Demand.  The combined company's name was changed to YOU On Demand on February 23, 2011.

### 3.     YOU On Demand – Video Content Provider (2011-2016)

47.     YOU On Demand purported to provide premium content video on demand services, with primary operations throughout China. In November 2015, YOU On Demand entered a series of investment agreements with Beijing Sun Seven Stars Culture Development Limited and its affiliate Tianjin Enternet Network Technology Limited, two entities falling under the umbrella of Sun Seven Stars Media Group Limited, for which Defendant Wu served as Founder, Co-Chairman, and CEO.  In January of 2016, Wu became Chairman of YOU On Demand. The company,

however, was not successful, being forced to compete against juggernauts like Alibaba and iQIYI[2]

for limited customers.

48.     Through YOU On Demand's acquisition of China Broadband, Inc., which was

itself involved in a reverse triangular merger with Alpha Nutra, Inc. to first enter the United States

market, Wu was able to get a toehold in the United States market with a publicly listed company,

without the intense scrutiny an initial public offering would have otherwise garnered.

49.     In 2016, YOU On Demand agreed to purchase 51% of a company called M.Y.

Products, LLC.  M.Y. Products, LLC was owned by Sun Video Group HK Limited, which was

also an affiliate of Defendant Wu and his wife.  After the purchase in 2016, the combined company

changed its name to WeCast Network, Inc ("WeCast").

### 4.     WeCast Network – Video on Demand and Consumer Electronic Sales (2016-2017)

50.     Defendant Wu was WeCast's Chairman.  WeCast purported to be a premium

content video on demand service provider, with primary operations in China.  WeCast Network

also began peddling consumer electronics in 2016. The company underwent another name change

in 2017, taking on the moniker Seven Stars Cloud Group, Inc.

### 5.     Seven Stars Cloud Group, Inc. – Fintech and Crude Oil Sales (2017-2018)

51.     Defendant Wu was the Chairman and CEO of Seven Stars Cloud Group, Inc.  The

company described its business model as: "[A]iming to become a next generation Artificial-

Intelligent (AI) [sic] & Blockchain-Powered, Fintech company."  In its first act as a purported

---

[2] Alibaba Group Holding Limited is a Chinese multinational technology company specializing in e-commerce, retail, internet, and technology.  iQIYI is a video streaming service founded by Baidu, Inc., China's largest online search engine.

fintech company, through two joint ventures, it began trading crude oil. This venture was unsuccessful.

52.     As disclosed in its Form 10-K for 2017:

> The Company is in the process of transforming its business model to provide Supply Chain + Digital Finance Solutions. In connection with this transformation, the Company is in the process of considerable changes, which attempted to assemble a new management team, reconfigure the business structure, and expand the Company's mission and business lines. It is uncertain whether these efforts will prove beneficial or whether we will be able to develop the necessary business models, infrastructure and systems to support the business.

**B.      Ideanomics (2018-Present)**

53.     The Company's rapid series of transformations continued when it disclosed in an August 27, 2018 press release that Seven Stars Cloud Group, Inc. would change its name to Ideanomics, Inc., effective October 17, 2018.  When explaining the reason for the name change, Defendant Wu stated:

> Next-generation technologies such as blockchain and artificial intelligence have begun to unlock capabilities in intelligent prediction and trust mechanics by providing enhanced transparency, security, and traceability, while simultaneously making the data smarter . . . . The combination of the 'idea' and the "field of economics," yields Ideanomics – a new paradigm and model for solving problems, creating efficiencies, and more equitably distributing wealth and knowledge. Ideas create value. With ideas, there is a future. Ideanomics, we are digitizing tomorrow!

**1.      Ideanomics's Non-Electric Vehicle Related Ventures Quickly Fail**

**a.      Fintech Village (2018-2019)**

54.     On October 10, 2018, Ideanomics announced that it had purchased property it had dubbed "Fintech Village" on a former part of the campus of the University of Connecticut.  The purpose of the would-be development was supposedly to be an innovation incubator.  Wu asserted Fintech Village would:

> [E]xpand upon the original campus' dedication to excellence by enhancing the efforts to educate, create the ultimate in learning and R&D environments, and by building out the campus to attract top tier academic talent, companies,

entrepreneurs, and innovators from around the world.  Our Fintech Village technology campus will stimulate the highest innovation by boasting the finest in urban design, sustainable and green technologies, and improvements to community connectivity factors such as trails for walking, biking, and enriched urban flow.

55.     Fintech Village was a debacle.  Within seventeen months of announcing it, Ideanomics had racked up millions of dollars of non-payments to contractors, and delays and neglect had resulted in the property becoming overgrown with weeds, undeveloped.  Ideanomics announced in its 2019 10-K, filed March 16, 2020, that it had "identified Fintech Village as a non-core asset, and is evaluating its strategies for divesting of th[e] asset."[3]

### b.     Cryptocurrency Trading (2019)

56.     On March 19, 2019, Ideanomics issued a press release announcing its entry into a digital asset management services agreement with GT Dollar PTE Ltd. ("GT Dollar") and Thai Setaku Insurance PLC.  As part of the deal, Ideanomics purportedly would manage GT Dollar's "digital token assets" and in return, would receive the equivalent of $170 Million dollars in GT Dollar tokens ("GTB"), a digital asset.  In the March 19, 2019 press release, Defendant Poor, recently named Ideanomics's CEO, praised the deal's importance to Ideanomics, stating: "This is a benchmark deal for Ideanomics, and for digital asset management service providers, that will enable GT Dollar to take its plans to the next level."

57.     The deal, however, soon caught the attention of the SEC.  Upon reviewing Ideanomics's Form S-1/A registration statement filed on August 2, 2019, the SEC sent a letter demanding that Ideanomics address several problems and deficiencies related to its disclosures concerning the GTB transaction.  For instance, the SEC noted that Ideanomics had failed to adequately disclose: (i) risks associated with storing digital currency and the potential for hacking;

---

[3] Somewhat contradictorily, the 2019 10-K also noted the purchase of a fifty-eight-acre parcel that "will be the site of our new 'Fintech Village.'"

and (ii) Ideanomics's lack of any plan to monetize the GTB.  It also asked for further explication of Ideanomics's March 19, 2019 disclosure that "GT Dollar has been underwriting its tokens with asset-backed collateral, including real estate, airlines, insurance, as well as regional bank clearance and acceptance, to launch consumer loyalty programs for those using GT Dollar when it initially launched."  The SEC also noted that the main platform for buying and selling GTB, the Asia EDX Exchange website, was inoperative.

58.     By the end of 2019, Ideanomics's leap into cryptocurrencies had proven to be an unmitigated disaster. As would be revealed in Ideanomics's Form 10-Q dated May 11, 2020:

> On October 29, 2019, GTB had an unexpected significant decline in quoted price, from $17.00 to $1.84.  This decline continued through the fourth quarter of 2019, and on December 31, 2019, the quoted price was $0.23.  As a result of this decline in quoted price, and its inability to convert GTB to other digital currencies which were more liquid, or fiat currency, the Company performed an impairment analysis in the fourth quarter of 2019 and ***recorded an impairment loss of $61.1 million.***

59.     At the same time, Ideanomics was striking out in its efforts to transition into a profitable fintech company, the Chinese Communist Party ("CCP") was mounting an aggressive plan to convert all of China's tour buses and city buses into electric vehicles by 2022, and to generally promote EV in China.  Ideanomics began to announce business actions oriented towards the EV market.

### 2.     Ideanomics Tries EV

60.     Seeking to capitalize on the conversion mandate from the CCP, in late 2018 Ideanomics began to announce roles in business endeavors related to EV.  Ideanomics announced it had purportedly secured contracts with city authorities in China in connection with large fleet conversion deals, and that it would act as a middleman facilitating and streamlining payment for various fees on commercial leasing transactions (supposedly using a blockchain ledger). Ideanomics claimed it would collect fees of anywhere between 5%-20% per transaction.  Such

transactions formed the basis of what, Ideanomics claimed, eventually evolved into the Company's

MEG division, and then, the MEG Center.

61.     In a Form 10-Q filed on May 2, 2019, Ideanomics reiterated that it was transitioning

into a fintech company:

> The Company is in a transition period from the Legacy [YOU On Demand]
> business to our new fintech services business, including the build out of the human
> capital needed to transform the business and the infrastructure needed to build out
> the U.S. operations.

62.     However, in that same document, Ideanomics also disclosed a foray into the EV

direct procurement and sales arena—its purchase of a controlling share in the sales arm of a

Malaysian EV moped and bike manufacturer called Treeletrik.  Ideanomics stated that it aimed to

expand Treeletrik's line of EV mopeds and bikes into a full range of EVs, including all manner of

vehicles—buses, trucks, cars, and light rail.  Ideanomics also purchased an 11.22% share in

Treeletrik's parent company, Tree Manufacturing Sdn. Bhd.

63.     In a March 5, 2019 press release focused on Treeletrik, Defendant Wu stated:

> This is an exciting time for the Electric Vehicle industry, with the world's major
> energy companies making continuing investments in grid edge technologies that
> will supply tomorrow's power needs for the EV industry in both commercial and
> residential markets. That's paving the way for mainstream adoption of electric
> vehicles of all types, from buses and specialty vehicles, through to bikes and
> mopeds . . . . Malaysia is at the forefront of EV technology manufacturing in
> ASEAN countries, and we see this as an investment in our future that will benefit
> both shareholders and the environment. Our ability to bring the world's leading EV
> Bus and specialty vehicle technology to Malaysia, coupled with our ability to
> generate large-scale deal origination in the financing sector, has led us to move
> strategically into securing ownership in the licensing, sales and distribution side of
> the business, enabling Ideanomics to participate fully in the high-growth EV
> market.

### 3.     The MEG Division and Ideanomics's Current Form (2019-Present)

64.     Shortly after telling the public in its August 14, 2019 Form 10-Q that WeCast was

the source of the majority of the Company's revenues and was "in the final phase of transitioning"

to a fintech and platform advisory service business, on August 26, 2019, Ideanomics announced the creation of its MEG division (which it later explained in a November 11, 2014 Form 10-Q was formed from WeCast).

65.    Defendants often refer to the new division simply as MEG.  Its two main parts are MEG Sales to Financing and MEG Charging.  Ideanomics refers to this purported structure as "Sales-to-Financing-to-Charging" or "S2F2C."  It purportedly allows Ideanomics to provide services at points along the entire lifespan of the sale and use of an electric vehicle:  facilitating sales, providing financing, and selling electricity and charging stations.  The MEG Sales to Financing business itself contains four subcategories: (i) Lease Financing Fund Supported Sales; (ii) Cash and Non-Fund Sales (iii) Qingdao EV Hub Sales[4]; and (iv) Treeletrik and Ex-China Sales.

66.    The segment of Ideanomics unrelated to the activities of MEG is called Ideanomics Capital.

67.    For ease of understanding, below is a chart of Ideanomics's claimed corporate structure at the time of this filing[5]:

---

[4] As will be explained below, the "Qingdao EV Hub" refers to what will later be referred to as the MEG Center.
[5] While this is an accurate representation of Ideanomics's purported current structure, this is not meant to imply that all of the entities appearing on the chart exist, or existed at all times throughout Ideanomics's existence.



68.     In an October 23, 2019 press release, Defendant Wu made the following claims concerning the potential markets MEG would serve, and specifically, MEG's ability to meet market demand for heavy truck EVs:

> After in-depth conversation and research, conducted by MEG and our partners, with two of China's leading mining provinces, Inner Mongolia and Yunnan, we have determined that they have a combined sales target for heavy trucks and the required batteries of approximately US$14 Billion (RMB100 Billion) over the next three years.  This is exactly the type of market at scale that our MEG group brings for the benefit of our shareholders and consortium partners.

In the same press release, Defendant Poor asserted that Defendants anticipated the MEG division's "heavy truck activities" would begin (and implicitly start to produce revenues) in the second quarter of 2020.

69.     In a press release dated November 11, 2019, Ideanomics issued guidance to the market concerning the MEG division's projected **$2 billion** revenues for 2020.  The press release announced:

> [I]ncreased EV revenue activities for 2020, due to the implementation of the new financing products enabling a faster time to market for fleet customers.  ***Ideanomics***

22

***anticipates revenues for its MEG division in the $2B range for fiscal 2020***, with operating margins in a 6% range, after costs for scaling operations.

70.     In the same release, Defendant Poor represented that the MEG division's calling card would be providing EV related financing:

> The MEG management team, which has only been in place for the past 7 weeks or so, has been at the forefront of identifying the current shortcomings and talking with partners throughout the value chain to help adapt the financing products available. With help from the battery manufacturers, through an attractive buyback program, and participation from utilities and other partners with an interest in EV fleet financing, we have been able to tailor products more in tune with the needs of fleet operators. With our flexible financing programs, manufacturer alliance, and battery partners we will ensure that our fleet customers have the best models, the best pricing, and the best payment options available anywhere.

71.     Ideanomics's November 14, 2019 Form 10-Q provided the following description of the services the MEG division supposedly provided and commercial EV market it supposedly served:

> Our MEG business operates as an end-to-end solutions provider for the procurement, financing, charging and energy management needs for fleet operators of commercial Electronic Vehicles (EV). MEG operates through a series of joint ventures with the leading companies in the commercial EV space, principally in China, and earns fees for every transaction completed based on the spread for group buying of vehicles and fees derived from the arrangement of financing and energy management such as commercial purchasing of pre-paid electricity credits. MEG focuses on commercial EV rather than passenger EV, as commercial EV is on an accelerated adoption path when compared to consumer EV adoption – which is expected to take between ten to fifteen years. We focus on four distinct commercial vehicles types with supporting income streams: 1) Closed-area heavy commercial, in areas such as Mining, Airports, and Sea Ports; 2) Last-mile delivery light commercial; 3) Buses and Coaches; 4) Taxis. The purchase and financing of vehicles provides for one-time fees and the charging and energy management provides for recurring revenue streams.

**C.     By 2019, Ideanomics's Business Ventures Were Failing, Its Debt Was Growing, And The Threat Of NASDAQ Delisting Was Looming, Casting Doubt On The Company's Survival**

72.     Ideanomics's leap into EV was a last-ditch effort to save the Company.  By early 2020, Ideanomics was in dire straits, as revealed in its 2019 10-K.

73.     As reported in that filing, in fiscal year 2019, Ideanomics reported a net loss of nearly ***$97 million***.  By the end of 2019, it had cash and cash equivalents on hand of only $2.6 million.

74.     The Company's 2019 revenues from third parties (non-related parties) were less than $1.3 million.  That represented just 3% of Ideanomics's annual revenues.  Stated another way, 97% of Ideanomics's revenues in fiscal year 2019 came from related party transactions.   In contrast, in 2018, 36% of Ideanomics's revenues were generated by related party transactions.  Thus, in 2019, ***third party revenues dropped 99.5%*** year-over-year.

75.     Furthermore, in the fourth quarter of 2019, Ideanomics knew that its foray into cryptocurrencies had been a total failure, and had determined that it needed to take a ***$61.1 million impairment*** as a result of the investment.

76.     The Company also knew by the end of 2019 that its planned Fintech Village was a bust, and later disclosed that in 2019 it had "identified Fintech Village as a non-core asset, and [wa]s evaluating its strategies for divesting of th[e] asset."

77.     With revenues almost nonexistent throughout 2019, Ideanomics became desperate for funds.

78.     Ideanomics resorted to issuing debt convertible to securities as its lifeline, effectively permitting debt holders a right to acquire Ideanomics shares at a sizable discount, diluting current shareholders, should the stock price ever sufficiently improve.

79.     For example, as disclosed on a Form 8-K on October 3, 2019, it obtained $2.5 million from ID Ventures 7, LLC ("ID Ventures"), a Delaware corporation.  Then on October 29, 2019, ID Ventures loaned an additional $400,000 to Ideanomics in exchange for convertible debt-to-equity securities.  By mid-November 2019, as disclosed in a Form 8-K dated November 14,

2019 ID Ventures loaned yet another $450,000 to Ideanomics, again for more debt-to-equity securities.

80.     Nonetheless, Ideanomics still required additional funding.  So on November 25, 2019, as disclosed in a Form 8-K on the next day, Defendant Wu's company Sun Seven Stars loaned the Company $1 million, also in the form of debt convertible to Ideanomics's common stock at the equivalent conversion price of $1.25 per share.

81.     Then, on December 19, 2019, as Ideanomics disclosed on a Form 8-K filed December 26, 2019, the Company had obtained $5 million in exchange for debt convertible to Ideanomics's common stock at $1.50 per share from YA II, which, as noted above, is a hedge fund registered in the Cayman Islands whose funds are managed by Yorkville Advisors Global, LP. The Form 8-K further disclosed that, also on December 19, 2019, Ideanomics went back to ID Ventures for an additional $5 million in debt convertible to Ideanomics's common stock at $1.50 per share.

82.     Despite the loans Ideanomics received throughout 2019, as set forth in its 2019 10-K, Ideanomics disclosed that its public auditor had determined that there was "substantial doubt" about whether the company would be able to continue as a going concern based on its financial condition:

> This Annual Report on Form 10-K for the year ended December 31, 2019 includes disclosures and an opinion from our independent registered public accounting firm stating that our ***recurring losses and negative cash flows from operations raise substantial doubt about our ability to continue as a going concern.*** Our consolidated financial statements as of December 31, 2019 were prepared under the assumption that we will continue as a going concern and do not include any adjustments that might result from the outcome of this uncertainty. ***As of December 31, 2019, we had an accumulated deficit of $249.0 million, with liabilities of $67.0 million and cash on hand of $2.6 million.***

83.     Compounding the financial pressures already known by the Company, on January 10, 2020, Ideanomics received a letter from the Listing Qualifications Staff of the NASDAQ Stock

Exchange alerting the Company that its common stock had traded below $1.00 for the past thirty

consecutive trading days, and that Ideanomics's common stock was at risk of being delisted.  The

letter stated that the Company had until July 8, 2020 to raise its per-share price to at least $1.00

for ten consecutive trading days.

84.     As already seen, in an effort to survive, starting in late 2019, Ideanomics had

repeatedly touted to the market that it was pivoting to the EV business, and stated in November

2019 that its EV business line was primed to deliver $2 billion in revenues in 2020.

85.     In 2020, it continued to pump out press releases purporting to show its increasing

traction in the EV industry.  On January 24, 2020, as disclosed in a Form 8-K filed on January 29,

2020, Ideanomics announced an arrangement with Qingdao for the City to invest in Ideanomics's

subsidiary Qingdao Mobile New Energy Vehicle Sales Co.  Ltd.:

> Qingdao agreed to invest, pursuant to an installment plan, in the Company's
> subsidiary, Qingdao Mobile New Energy Vehicle Sales Co. Ltd. ("Mobile"), an
> aggregate of potentially 200 million RMB as registered capital with an initial
> investment of 50 million RMB (approximately $7.2 million). The Company and
> Qingdao also agreed to jointly establish Mobile to engage in electric commercial
> vehicle sales.

86.     The amount and frequency of Qingdao's contributions related directly to the new

joint venture achieving successive, challenging benchmarks:

> Pursuant to the Agreement Qingdao agreed that within 10 days after the completion
> of the establishment of Mobile Qingdao would invest 50 million RMB as the first
> installment and, once Mobile starts operation, an additional 50 million RMB as
> registered capital[6] for each 10 billion RMB sales revenue realized by Mobile or
> for each 10 billion RMB increase in the market value of Mobile. Once Mobile
> achieves 30 billion RMB or its market value reaches 30 billion RMB Qingdao will

---

[6] "Registered Capital" is a term of art used in China to refer to a concept akin to what is known as "share capital" in the United States.  The amount of Registered Capital must be disclosed in a company's articles of incorporation, and will be shown in the company's business license, which is information available to the public.  If Registered Capital is increased or decreased, the business license must be updated to reflect the change.  Registered Capital is an important indicator of a company's financial well-being, and may influence a company's ability to receive bank loans, or enter into joint ventures.

pay the 200 million RMB in full as registered capital. Qingdao will receive a 10% equity interest in Mobile for the full investment of 200 million RMB.

87.     Ideanomics's financial problems did not relent in 2020.  As disclosed on its Form 10-Q for the first quarter of 2020 filed on May 11, 2020, by "March 31, 2020, the Company had cash and cash equivalents of $5.9 million *and an accumulated deficit of $260.8 million*."  The 10-Q further stated that "*the Company has incurred losses since its inception and must continue to rely on proceeds from debt and equity issuances to pay for ongoing operating expenses* in order to execute its business plan."

88.     Ideanomics again relied on issuing more of its common stock at a discount to stay afloat.  On March 18, 2020, Ideanomics filed a shelf registration of up to $50 million worth of shares.  Ideanomics used this shelf registration to acquire additional funding by entering into the Equity Agreement with YA II.

89.     Under the Equity Agreement, which was effective on April 3, 2020, and announced by the Company in an April 6, 2020 Form 8-K, Ideanomics sold newly issued shares to YA II at 90% of the stock's market price.   Ideanomics obtained the right to sell up to $50 million of newly registered common stock to YA II over the next three years.  In exchange, YA II obtained the right to purchase the common stock at 90% of the prevailing market price, though YA II could not purchase shares that would result in it owning more than 4.99% of Ideanomics's common stock. Critically, however, YA II did not need to purchase IDEX shares if the Company lost its NASDAQ listing.

90.     As announced in Form 424B2 supplements to the March 18, 2020 shelf registration, as well as in Ideanomics's Forms 8-K, the Company obtained millions from YA II pursuant to the Equity Agreement in a series of sales from April 28, 2020 through June 18, 2020, the date on which YA II made its single largest purchase of $15 million worth of shares.  In total, as of June

18, Ideanomics issued 30,083,891 shares of common stock to YA II for an aggregate purchase amount of $30.5 million, or an aggregate average purchase price of approximately $1.00 per share.

91.     Thus, from at least late 2019 and through early 2020, Ideanomics was essentially earning no revenues, surviving off debt raised from issuing equity including from its Equity Agreement and was treading dangerously close to losing its NASDAQ listing, which would have also dried up its access to funds through the Equity Agreement.  As such, Ideanomics was at risk of ceasing to operate as a going concern.  Ideanomics's purported EV business activities—and more importantly, its ability to sell their prospects to investors and keep Ideanomics's stock price above $1.00 to avoid delisting—were Defendants' last opportunity to avoid corporate ruin.

### D.     The MEG Center Is Revealed – Along With Gross Exaggerations Of Its Size And Activities

92.     Following the announcement of the partnership with the City of Qingdao, Ideanomics announced plans to develop the MEG Center, an EV supercenter of sorts, where various EV manufacturers could display fleet vehicles and EV related products, and customers could do everything from examine vehicles, complete registration and permitting, and secure insurance.

93.     In a press release dated March 3, 2020, touting the MEG Center as a "follow up to [its] partnership with the City of Qingdao . . . in conjunction with [its] MEG Group subsidiary, Qingdao Mobile New Energy Vehicle Sales Co. Ltd," Defendant Wu bragged of the planned "1Million square feet" facility:

> [O]ur world class sales and service center will feature a full end-to-end customer experience with financing, insurance, vehicle registration, and maintenance all under one roof" said Dr. Bruno Wu, Chairman of Ideanomics. "With a range of leading EV brands available on site, from our manufacturing alliance partners, our fleet customers will enjoy a competitive buying experience which focuses on education, test driving, and flexible financing programs to provide the vehicles required to meet their needs in an immersive environment unavailable anywhere else today.

94.     The March 3, 2020 press release also provided:

This new state-of-the-art center will assume the current vehicle sales and revenue activities at the [Qingdao Mobile New Energy Vehicle Sales Co. Ltd.] site, which the City of Qingdao has committed to the Qingdao Mobile New Energy Vehicle Sales Co. Ltd. by injecting the existing business that they have projected to reach *¥1 Billion RMB (approx. $144M US) by year-end 2020 and grow to over ¥2 Billion RMB (approx. $288M US) in 2021, based on their 2019 actual turnover*.

95.     In its 2019 10-K filed on March 16, 2020, Ideanomics further expounded on its venture into the EV market:

As we looked to deploy fintech solutions in late 2018 and into 2019, we found a unique opportunity in the Chinese Electric Vehicle (EV) industry to facilitate large scale conversion of fleet vehicles from internal combustion engines to EV. This led us to establish our Mobile Energy Global (MEG) business unit.

96.     On the same day, Defendant Wu participated in a promotional interview on the YouTube channel Midas Letter RAW, in which he further touted the MEG Center:

[INTERVIEWER:] So you recently opened a 10,000 square foot facility in Qingdao. What kind of penetration do electric vehicles have in the Chinese market at this point?

[DEFENDANT WU:] Well we're actually opening up a hundred thousand sorry a - a million square feet a million square feet a hundred thousand square meters so it's a million square feet. So it's much bigger than what you just said.

97.     Soon after, Ideanomics provided significantly more detail about the supposed progress and scope of the MEG Center.  In a March 20, 2020 press release, the Company stated:

Ideanomics . . . is pleased to announce that Qingdao-MEG Sales Center, branded as Mobile Energy Group Center, *is scheduled to start sales operations by May 1. The 1 Million square foot site has been renovated* as a permanent EV expo center, the cost of which has been met by development funds from the Chengyang business district of the city of Qingdao, in China's Shandong province.

Ideanomics' Mobile Energy Global division ("MEG") will be joined at the site by more than 20 partners ranging from EV manufacturers, EV battery manufacturers, energy storage, energy management, and EV charging solutions, financial services, insurance, vehicle and license plate registration services, and others from Qingdao. The EV hub is designed to be a focal point for commercial fleet operators and the EV industry alike, with MEG headquartering its management, sales and marketing, and administrative operations at the site.

29

The city of Qingdao currently operates an automotive sales and servicing center for a range of vehicle manufacturers at the site, these operations are being assumed by MEG as part of the expanded plans and focus onto EV. ***This will see MEG assume the revenues derived from those activities, with a run rate of approximately RMB 1 Billion in 2019 ($140 Million USD), with profit margins in the 8% range***, as well as facilitate an expedited ramp-up of staff and operations at the site.

98.     After the issuance of the March 20 press release, Ideanomics's per-share price went from a close of $0.42 a share on March 19 to a close of $0.56 per share on March 20, 2020, reaching an intra-day high of $0.92 per share, on heavy volume.  On March 26, 2020, Ideanomics's share price finally closed at above $1.00, the crucial threshold for its stock to stay listed on the NASDAQ.

99.     However, despite trading more consistently around the required $1.00 level, the Company was unable to sustain that price for the ten consecutive days needed to remain listed on the NASDAQ.

100.     Ideanomics's efforts to boost its stock price above $1.00 were not helped by its Form 10-Q dated May 11, 2020, in which it announced more dismal financial results for the first quarter of 2020, including the $61.1 million impairment for the fourth quarter 2019 related to its failed cryptocurrency business.  Its stock fell 18% on the day.  Also on that day, however, Defendants reiterated the centrality of the MEG division and MEG Center to Ideanomics's fortunes, representing, for example, that MEG would be "the largest contributor" of the Company's revenues in 2020.  Defendant Poor also announced that the Company hoped to hold its annual meeting at the MEG Center in June 2020 (unless the highly lethal global COVID-19 pandemic made that infeasible), "to showcase the MEG business" and supposedly allow investors to see the operation in person.  (Perhaps unsurprisingly, Ideanomics did not hold its annual meeting at the MEG Center in June 2020.)

101.     Roughly two weeks later, Ideanomics continued telling its grand MEG Center story, and issued a press release that further represented that the MEG Center had rapidly become a fully-fledged, operational success that was currently open for business.  Specifically, the Company's May 26, 2020 press release stated that the:

> Mobile Energy Global (MEG) division is pleased to announced [sic] that its Qingdao subsidiary Qingdao Chengyang Ainengju New Energy Sales and Service Co. **has officially launched the largest auto trading market in Qingdao** at MEG's Qingdao EV hub.
>
> **The MEG Center in Qingdao now hosts a full suite of car dealer services for new energy and used cars with a capacity of 18,000 vehicles onsite**. **It offers a one-stop buying experience that includes financial services and onsite vehicle registration services**.

102.     Defendants repeated this refrain on social media and in promotional interviews posted on YouTube.  Building upon its May 26, 2020 press release, on June 5, 2020, the Ideanomics Twitter account tweeted: "The MEG Center in Qingdao is a 1 million sq ft EV expo center with the capacity to hold 18,000 vehicles.  The official ribbon-cutting ceremony will be held later this summer."  The tweet was accompanied by a video of aerial drone footage of a facility purported to be the outside of the MEG Center:



103.    Also on June 5, 2020, Ideanomics eliminated its debt with the Defendant Wu-affiliated company Sun Seven Stars, and eliminated outstanding debts it had by promissory notes to Defendant Wu and Ideanomics's Vice Chairman Shane McMahon.  It did so by reducing the conversion price for all its outstanding debt from prices ranging between $1.00 to $1.50 to only $0.59 per share.   Sun Seven Stars received 2,546,271 shares, Wu received 2,687,966, and McMahon received 5,084,746 shares.

104.    On June 9, 2020, Ideanomics issued another press release claiming that within one month of opening for business, Ideanomics's MEG Center had sold 2,139 vehicles for $33 million. The press release also contained what purported to be a photograph of the MEG Center (though investment analysts at Hindenburg Research would soon contend that this was a digitally altered image, with the "MEG" logo superimposed on a curved surface whose curve the logo did not follow—and to claim that the photograph was identical to a photograph taken in 2018, only without the MEG logo):



©2020 Ideanomics

105.     The press release and photograph were enough raise Ideanomics's per-share price from a close of $0.62 on June 8 to a close of $1.02 per share on June 9, 2020.  Trading volume also increased tremendously, going from almost 26.3 million on June 8 to over 107 million on June 9.  The Ideanomics shares Defendant Wu and his affiliate Sun Seven Stars had converted just days before the public release of this Company announcement were worth additional millions of dollars afterwards.

106.     Ideanomics's share price proceeded to trade at above $1.00 for over ten straight trading days in early-to-mid-June, thereby sparing the company from delisting.

107. Ideanomics proceeded to further eliminate its debt through issuing new shares of common stock to a single investor, which diluted its other shareholders.

108. On June 9, 2020, Ideanomics sold 10 million shares of its common stock to YA II at $1.11 pursuant to the Equity Agreement. In addition, the Company agreed to reduce the conversion price on $4 million of the convertible debt it had previously issued to YA II from $1.50 to only $0.59 per share. Furthermore, Ideanomics sold 3,389,830 shares to D-Beta One EQ, Ltd., an affiliate of YA II, for an aggregate purchase price of $2 million, some $1.69 a share. Ideanomics stated that it would use the proceeds from the sale of these shares to pay down its outstanding debts.

109. Two days later, on June 11, 2020, Ideanomics issued a press release announcing that it had eliminated $10.6 million in outstanding debt to ID Ventures and YA II by conversion of those debts into equity. Ideanomics claimed that this reduced its interest payments and pushed maturity on its debt out until mid-2021.

110. Also, from June 11 through June 22, 2020, Ideanomics issued a series of press releases announcing five new sales contracts for EV sales to its MEG division, including, for example, a release on June 19, 2020, in which it announced that its Qingdao EV Hub (the MEG Center) secured an order from Tianjin Zhongcheng Jiaye Automobile Trading Co., Ltd. (Tianjin Zhongcheng) for forty-two vehicles.

111. And, as noted above, on June 18, 2020, YA II purchased another $15 million worth of shares from Ideanomics under the Equity Agreement. In total, as of June 18, under the Equity Agreement, Ideanomics issued 30,083,891 shares of common stock to YA II for $30.5 million, averaging around $1.00 per share.

112.     Further adding to the image of a company on the rise, and underlining Defendant Wu's importance to the Company and his heavy involvement in the day-to-day operations of the Company, on June 21, 2020 Defendant Poor published the following tweet:



113.     Shortly thereafter, on the heels of the press releases, video interviews, tweets, and other forms of communication extolling the supposed blossoming success of the MEG Center and MEG division, Ideanomics's shares had nearly tripled in value, to close at $3.09 on June 24, 2020.

114.     As the Company would admit within forty-eight hours, however, its Class Period representations concerning the supposed operational progress, size, and scope of the MEG Center were materially false or misleading when made, and Defendants knew it (or recklessly disregarded the relevant facts).

**E.      In Reality, The MEG Center Is Not What Defendants Represented**

**1.      The Market Learns the Truth about the MEG Center**

115.    Defendants' representations about the MEG Center were revealed to be material misrepresentations through information that entered the market in rapid succession on June 25 and 26, 2020.

116.    On June 25, 2020, investment analysts at two firms, Hindenburg Research ("Hindenburg") and J Capital Research Limited ("J Capital"), issued reports or information about Ideanomics.  Both firms had taken short positions in the Company's stock.

117.    J Capital Research issued a June 25, 2020 report on Ideanomics entitled "Champion of Promotes." J Capital wrote that it had conducted an investigation into Ideanomics, including by visiting the supposed site of the MEG Center in Qingdao and interviewing people there, and contacting the entities identified as buyers of EV services in Ideanomics's June 2020 press releases about supposed MEG division sales.  The report concluded, in part, that "Ideanomics . . . is a zero. The company changes its name and promotional story so frequently that it's hard to keep up. One thing remains a constant, despite all the press releases, buzzwords and hype: shareholders get wiped out." J Capital continued that its:

> [I]nvestigators have been unable to establish that IDEX has a showroom in Qingdao, whence the contract announcements have been flowing. . . .
>
> * * *
>
> We had a hard time identifying this expo center but eventually found an IDEX subsidiary that has a mail drop at a 1 mln sqft shopping mall in Qingdao's Chengyang District. Renovations are news to the companies that operate there. In fact, the shopping mall is in financial distress and is not honoring contracts with people who bought shops there, according to a local news report. Neither the manager of the shopping mall nor two store owners we contacted in the center have ever heard of IDEX, any of its subsidiaries or joint ventures, or the EV showroom the company says it opened on May 1.

118.    J Capital further noted that:

> From June 11-22, IDEX announced five contracts for electric vehicles . . . . On June 23 and 24, we spoke with representatives from four of the five 'buyers.' All four denied there were contracts. One of them went as far as to tell our staff member that the IDEX press release is 'fake news.' . . .
>
> * * *
>
> We were unable to locate the fifth partner . . . .

119.    Also on June 25, 2020, Hindenburg issued a series of tweets starting at 11:00 a.m. characterizing Ideanomics as "an egregious & obvious fraud," and setting forth putative evidence, including its conclusion that the photographs of the MEG Center the Company had released in its June 9, 2020 press release were altered.  Specifically: (i) although the photograph included in the press release bears a "2020" timestamp, Hindenburg claimed that it "found a photo displaying the exact same cars and exact same layout from 2018, years before the supposed soft launch of [Ideanomics's] MEG center in 2020;" and (ii) a MEG logo appeared to have been photoshopped on a red arch, as the MEG letters form a straight line despite the logo ostensibly being printed on a curved surface.

120.    Hindenburg's tweets also reported that one of its investigators had visited the location of the supposed MEG Center, and found that "[t]he facility is actually operated by almost 100 sales groups. None of those we spoke with heard of [Ideanomics] or MEG. We spoke to the main office (in a recorded conversation) and they confirmed the same." Another of Hindenburg's investigators called five of Ideanomics's purported customers, none of whom were aware of Ideanomics or could confirm doing business with the Company.

121.    In an effort to comfort the market and bat back the analysts' assertions, Defendant Poor quickly responded to Hindenburg's tweets.  At 11:14 a.m., he tweeted: "Comedy gold out there this morning, we're building a REAL business, go fishing some place else."  Then at 12:14 p.m., he tweeted:  "Just reviewing my recent disclosures in Q2.  Long term debt down 50%. Check.

Orders. Check. Deliveries (Revenue).  Check.  Cashed Up. Check. Phew, that's a relief! Thought I'd missed something."

122.    Notably, Defendant Poor did not respond to Hindenburg's claim that Ideanomics used doctored photos in its press releases that purported to be of the MEG Center.   Hindenburg pointed this fact out by issuing tweets in response to Defendant Poor's tweets, which stated: "Notice how the CEO has once again avoided answering our simple question on whether photographs in $IDEX press releases were altered," followed by another tweet announcing that "we have clear evidence showing you altered old 2018 pictures to use in your 2020 PR about a supposed launch of the your [sic] EV Sales center," and asking: "Did you or did you not doctor the photos in your press releases?"

123.    Defendant Poor did not respond to Hindenburg's question about the doctored photographs, but that evening at 9:39 p.m., issued a tweet accusing the head of Hindenburg of belonging to the Ku Klux Klan, and displaying a picture of two hooded Klansmen.

124.    Then, at 8:30 a.m. the next day, on June 26, 2020—less than twenty-four hours after the analysts' reports were published—Ideanomics issued a press release in which it stated it "would like to clarify the status of" the MEG Center. In this release, Ideanomics effectively admitted that it had misrepresented the progress, scope, and operational status of the MEG Center. It stated:

> [T]he existing new and used sales business at the site was to be folded into the MEG center activities. Along with the commencement of our fleet sales division, this compromised [sic] Phase I. The MEG center had a soft launch on May 1, with a fuller opening on May 25, 2020, as announced in press releases dated March 20, 2020, May 18, 2020, and May 26, 2020, when the center was allowed to open fully after COVID-19 lockdown measures were eased in Qingdao. These activities occupy approximately 20,000 square meters, or 215,000 square feet, and the Company has detailed activity from both existing dealership business at the site and its commercial fleet sales in recent press releases.

Phase II of the opening will see an additional 20,000 square meters come online and is subject to renovation in preparation for MEG and its participating partners. This includes the MEG welcome center and executive offices. As previously communicated, the timeline for this phase will coincide with the ribbon cutting ceremony and official opening in the summer of 2020.

Phase III of the project, and the remaining 60,000 square meters will come online as further renovations are completed.

125.     This startling admission contradicted the Company's Class Period statements representing that the 1 million square foot MEG Center had opened on May 1, 2020, and had been operational since then, hosting a suite of EV-related services.  Indeed, Ideanomics's June 26, 2020 press release specifically walked back its earlier claims of a 1 million square foot center in Qingdao, stating that its current "Phase I" operation occupied only 215,000 square feet, or less than one quarter of what had been claimed.

126.     Also on June 26, 2020, Ideanomics issued another press release entitled "Ideanomics Qingdao Sales Center to be Officially Rebranded MEG Center by July 1 and Confirms Hindenburg's False and Misleading Communication." Despite having introduced the MEG Center in March 2020 and announced its opening on May 1, 2020, Ideanomics now asserted that it would rebrand its Qingdao sales center as the MEG Center by July 1, 2020.  The Ideanomics Twitter account also tweeted a link to the press release and attached a photograph of what it purports to be JV certificate between it and an entity known as "Fu Da Automobile Trading Center," which Ideanomics claimed was owned 51% by MEG and utilized a "20,000 square meter property within the Center."

127.     In response to the analyst reports, Company responses, and Company press releases published one after the other, Ideanomics's stock price fell $1.63 from its closing price of $3.09 on June 24, 2020, to close at $1.46 on June 26, 2020.  In two days, the price had declined by nearly 53%.

2.     **Plaintiff's Investigation Confirms that Ideanomics Lied about the MEG Center**

128.    Plaintiff's own investigation of the MEG Center in early 2021 confirms that Defendants' Class Period statements were materially false or misleading. Plaintiff's investigators repeatedly visited the purported MEG Center site in Qingdao and found that the purported MEG Center itself was not open, but still "under renovation"—despite numerous statements by Defendants that the MEG Center had a "soft launch," a supposed ribbon cutting in May, 2020, that it "hosts a full suite of car dealer services," and similar representations.

129.    In fact, interviews with individuals present onsite on January 25, 2021 indicated that the renovation of the MEG Center had begun only approximately three months prior, and not in the first half of 2020. Furthermore, conspicuously displayed on the outside of the MEG Center building were banners that read "MEG (Mobile Energy Global), New Energy Vehicle Exhibition Center, Future Coming for You, Coming Soon." The "Coming Soon" language further establishes that the MEG Center could not have been operating in the manner described in Defendants' public representations.

130.    In onsite visits between January 25 and 29, 2021, Plaintiff's investigators also found no evidence indicating any activity at the MEG Center at all. The Center was not open, but under renovation, and the only evidence of a planned EV retail space were temporary banners hung nearby, including at the adjacent Fuda International Trade City. Certainly there was no EV sales center providing end-to-end services, from financing to charging.

131.    The one sign of automobile-related business the investigation did reveal was the Fuda Second-Hand Car Trading Market, ( "Fuda Market"), housed within the Trade City premises, in which used vehicles and vehicle parts (largely for standard vehicles, only minimal EV) were sold. At the Fuda Market, investigators could not find any evidence of MEG Center operations

taking place. Investigators were able to find only banners hanging in the Fuda Market's main corridor stating: "Celebrate MEG Mobile Energy Global Sales Center, *soon to be located here*."

132. In summation, Plaintiff's own investigation corroborated points made by Hindenburg and J Capital, and unearthed additional pertinent facts: The MEG Center was not operating in a space 1 million square feet in size, renovations on the building that were supposed to have been the MEG Center began only roughly three months prior to the investigators' visits, no activities described in the press releases were taking place on site, and all promotional signage on site describing the MEG Center stated it was "Coming Soon," despite Defendants' numerous public statements to the contrary.

## V.   MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.   March 16, 2020

133. The Class Period begins on March 16, 2020, when Ideanomics released its fourth quarter results for 2019.

134. During the earnings call held on the same day, Defendant Poor reminded listeners that Ideanomics had already "*announced the MEG sales hub in the coastal port of Qingdao*."

135. Also on the call, Tim Moynihan, an analyst from Janney Montgomery Scott, asked for more information on the "status" of the MEG Center, to which Defendant Poor responded:

> Okay, so this is being provided by the city of Qingdao. It's an existing facility. Several of us were out there. It was already being refurbished to be an EV hub and they were looking to try and attract partners into it. MEG was the one that went in there.
>
> *The building is mostly finished*. It has obviously been slowed down because of the coronavirus. *But the idea of it is it's about 1 million square feet of space. The idea there will be there will be vehicles on the site, similar to what you would see in a very high-end showroom. There will be multiple manufacturers from across the EV industry. It will be a friendly competitive environment.*
>
> There will also be the administrative offices for MEG centrally for all of its processing for everything from invoicing through to rebates and accounting

systems, things like that, will be based there for MEG. It is rent-free, so the city of Qingdao has made that rent-free to us. They have also made an investment into us, as you probably are aware from the press releases.

But it is a very exciting project for us. For us, it doesn't matter if the building is new or old. ***It is being completely refurbished so the insides of it are going to be as new. It is all going to be glass-fronted and showroom kind of style in terms of the vehicle displays***. So for us, it is an incredible opportunity.

136.    Defendant Poor further added: "At the moment, the site is used for a number of

purposes, but a large portion of it currently already has a vehicle sales site."

137.    Also on March 16, 2020, in a YouTube video interview[7] with Midas Letter RAW, Defendant Wu boasted about the size of the MEG Center:[8]

[INTERVIEWER:] So you recently opened a 10,000 square foot facility in Qingdao. What kind of penetration do electric vehicles have in the Chinese market at this point?

[DEFENDANT WU:] ***Well we're actually opening up a hundred thousand sorry a - a million square feet a million square feet a hundred thousand square meters so it's a million square feet. So it's much bigger than what you just said***.



---

[7] Official transcripts of the videos quoted in the Complaint are not available.  The text comes from Plaintiff's transcription of the videos.
[8] https://www.youtube.com/watch?v=NPTp36Tj0Uw&list=PLtiK7meG4tZ2GBMRFLB1PuDOS4z3aewTk&index=4.

138.   The bolded statements in ¶¶ 134-37 above were materially false and misleading when made because they created the material misimpression that the MEG Center was "mostly finished" which it was not (indeed, it is still "Coming Soon") and that the MEG Center was 1 million square feet, which the Company later admitted was also untrue.

**B.    March 20, 2020**

139.   On March 20, 2020, Ideanomics issued a press release stating it was:

[P]leased to announce that the Qingdao-MEG Sales Center, branded as Mobile Energy Group Center, *is scheduled to start sales operations by May 1. The 1 Million square foot site has been renovated as a permanent EV expo center*, the cost of which has been met by development funds from the Chengyang business district of the city of Qingdao, in China's Shandong province.

*Ideanomics' Mobile Energy Global division ("MEG") will be joined at the site by more than 20 partners ranging from EV manufacturers, EV battery manufacturers, energy storage, energy management, and EV charging solutions, financial services, insurance, and license plate registration services, and others from Qingdao. The EV hub is designed to be a focal point for commercial fleet operators and the EV industry alike, with MEG headquartering its management, sales and marketing, and administrative operations at the site.*

The city of Qingdao currently operates an automotive sales and servicing center for a range of vehicle manufacturers at the site, *these operations are being assumed by MEG as part of the expanded plans and focus onto EV. This will see MEG assume the revenues derived from those activities, with a run rate of approximately RMB 1 Billion in 2019 ($140 Million USD), with profit margins in the 8% range*, as well as facilitate an expedited ramp-up of staff and operations at the site.

*Due to the successful development of the Mobile Energy Group Center* and the high demand for comprehensive EV services, MEG has received inquiries from several other cities with regards to establishing similar operations. Where there is financial support to do so, from local governments and manufacturers, and sufficient market demand as we have seen in Qingdao, MEG may decide to develop multiple regional centers in the future.

140.   The bolded statements in ¶ 139 above were materially false and misleading when made, because as has been admitted by Defendants, and corroborated by the reports of Plaintiff's investigators and the investigations of investment analyst firms Hindenburg and J Capital, at the

time of this statement: the MEG Center had not been fully renovated as a permanent EV expo center, was not operating on 1 million square feet of space, and was not an "EV hub." No parties interviewed at the MEG Center's supposed location could corroborate MEG's sustained presence there, and several of the MEG Center's purported customers had never heard of it.  Indeed, the MEG Center is not a 1 million square foot EV expo center to this day, and it remained under renovation in January 2021, with apparently no EV business activities onsite, and with the only evidence of any MEG presence being banners, including at a separate location hosting the used cars, not EVs.

### C.   May 11, 2020

141.   On May 11, 2020, Ideanomics released its earnings results for the first quarter of 2020 (later filed on a May 13, 2020 Form 8-K with the SEC).  In its Form 10-Q filed on May 11, signed by Defendants Poor and McCarthy, Ideanomics stated that "***[t]he Company anticipates that its MEG business unit will be the largest contributor to revenues in 2020.***"  In the Company's press release, Defendant Poor stated the following:  "***We look forward to Q2 and beyond, including an AGM in the summer of this year to showcase both the MEG business and the formal ribbon-cutting on our new 1MM square feet EV center in Qingdao.***"

142.   On the earnings call, Defendant Poor stated:

> Additionally, as mentioned in our recent press releases***, our EV hub in Qingdao had a soft launch on May 1 and as such, will be a contributor to our Q2 revenues. The existing business we assumed at our national sales center in Qingdao services both consumer and commercial inquiries***. And I am pleased to announce the orders for the center are already underway.

143.   Defendant Poor further announced that Ideanomics planned to move its annual general meeting up from the end of the year to this summer, for a "formal ribbon cutting" of the MEG Center:

With that in mind, I'd like to finish my remarks by announcing that we are planning to have our AGM in the summer this year, possibly as early as the end of June or mid-July to be held in New York City and Qingdao. ***The purpose of bringing it forward when we traditionally hold it at the end of each year is to showcase our MEG business and the commencement of meaningful orders as well as to align with the formal ribbon cutting for our Qingdao EV hub and to introduce select partners participating with us in Qingdao***. There is, of course, a dependency on pandemic tailing off, but our intention is to facilitate this interactively through videoconferencing if in person is not possible.

144.    Further on the call, analyst Peter Wright of Intro-act asked Defendant Poor if "it's possible still today that a profit is generated in the second half of 2020 for the MEG business unit." In response, Defendant Poor assured him:

Yes. Thanks for the question, Peter. It's an interesting one. ***Yes, I absolutely do believe that we'll achieve profitability this year***. The reason I say that is we're in a progressive industry. We're in an industry which is driven by regulation time lines, and a lot of the stimulus packages that have been put out at regional level as well as national level in China are accelerating the adoption of EV. Something unique happened when we put a pause on society through the COVID-19 outbreak, which was major cities like Chengdu and Beijing, which usually are just a thick smog in the winter months had blue skies. So there was no way to know just how bad the traffic was. A lot of the blame on the micropollutants was on the coal-powered energy electricity stations over there, but it looks like the automotive industry was having the traffic -- having a much greater impact and even the most skeptical analysts have put forward. So ***China is doubling down on those types of investments, and that leads us to the conversations that we're having with our partners at manufacturing level and with our customers to believe that we'll have a significant business in the second half of the year***.

145.    The bolded statements described in ¶¶ 141-44 above were materially false and misleading when made for the reasons set forth in ¶ 140, above.

**D.    May 26, 2020**

146.    On May 26, 2020, Ideanomics issued a press release stating that the Company's:

Mobile Energy Global (MEG) division is pleased to announced [sic] that its Qingdao subsidiary Qingdao Chengyang Ainengju New Energy Sales and Service Co. ***has officially launched the largest auto trading market in Qingdao at MEG's Qingdao EV hub***.

***The MEG Center in Qingdao now hosts a full suite of car dealer services for new energy and used cars with a capacity of 18,000 vehicles onsite. It offers a one-***

45

*stop buying experience that includes financial services and onsite vehicle registration services. The auto trading market, which was rolled into MEG as part of the investment from Qingdao City, attracts a large audience which MEG will leverage to help educate the general population through its upcoming EV-centric welcome center and onsite EV manufacturing partners.* Additionally, the Center will use influencer-based marketing of new energy and used cars to leverage the impact influences have on big ticket purchases in Asia.

*The MEG Center is a one million square foot EV expo center* in Qingdao, Shandong Province. *The Center announced a soft launch on May 1, 2020 and will house partners ranging from EV manufacturers, EV battery manufacturers, energy storage, energy management, and EV charging solution providers, financial services, insurance companies, vehicle and license plate registration services, and others including a state of the art MEG Welcome Center. Ideanomics will be holding a ribbon-cutting ceremony for the MEG Center in Qingdao in the summer in conjunction with its Annual General Meeting.*

147.    The bolded statements described in ¶ 146 above were materially false and misleading when made for the reasons set forth in ¶ 140, above.

**E.    May 28, 2020**

148.    On May 28, 2020, in a YouTube video interview with Steve Darling of Proactive,[9] Defendant Poor detailed the MEG Center's supposed functions and confirmed that it had completely launched:

> [DARLING:] An exciting day for the company, you have launched your MEG EV Centers in China. First off, tell me a little bit about where these centers are, and what exactly these centers are.

> [DEFENDANT POOR:] Obviously, we are heavily involved in the EV industry and we are looking to move big fleet operators onto EV away from gasoline and diesel, so what we were looking for a hub for the fleet industry to be able to focus itself. EV is very fragmented from battery makers to charging stations folks, to energy storage solutions to the EV manufacturers. *So we set out to create a hub where we could bring the best and [inaudible] partners and give the fleet operators a focal point where they could come and learn about EV*.

---

[9] https://www.youtube.com/watch?time_continue=1&v=-Axv9YZhwxE&feature=emb_logo.



149.    Defendant Poor also unequivocally represented that the MEG Center had begun

operating:

> [DARLING:] Now more importantly it is the opening and that means revenue for
> the company.

> [DEFENDANT POOR:] (Chuckling) Absolutely, yeah. ***We did a soft launch on
> May the 1st which we started selling vehicles outside. We were able to expand
> that this week and then this past Monday, we officially opened up a large center
> for both used cars and new EV vehicles. So both of those are up and running***.
> That's because Qingdao was able to relax its social distancing measures over the
> last weekend. We will be doing an official ribbon cutting in around a month, six
> weeks' time in which we'll be able to showcase the actual official opening and all
> the participating EV manufacturers.

150.    The bolded statements described in ¶¶ 148-49 above were materially false and

misleading when made for the reasons set forth in ¶ 140, above.

151.    The video interview also featured slides labeled 2020 that purported to be of the MEG Center, including the following pictures, which were the same photographs Hindenburg reported were fake:







152.    The slides shown in ¶ 151 above contributed to the false and misleading nature of Defendant Poor's statements, as they did not accurately represent the current state of the MEG Center, or Ideanomics's presence at the facility.  Plaintiff's investigation revealed some evidence of Ideanomics's MEG's upcoming presence in the Fuda Market through banners that announced that MEG was "Coming Soon."  However, the Fuda Market is only one of several buildings in a massive complex known as the Trade City, which houses several other businesses.  The photographs shown in ¶ 151 above show the main atrium of the Trade City, where MEG never had a presence, and ***do not*** show the Fuda Market.  Critically, the photos were not taken in the building purported to be the MEG Center, which was still under construction as of January 2021.

153.    Furthermore, the caption of the video bearing the time-stamp from 2020, "Ideanomics' massive EV expo center in Qingdao, China is starting to generate revenues" is misleading for the reasons set forth in ¶ 140 above.

F.     **June 9, 2020**

154.     On June 9, 2020, Ideanomics issued another press release, which among other things, quoting statements attributable to Defendant Wu, announced that "auto dealers operating in its subsidiary, Mobile Energy Global's (MEG) expo center in Qingdao, have sold 2,139 vehicles for a total value of RMB 235 Million or USD 33 Million." The press release continued:

> As a reminder, ***the MEG Center in Qingdao began operations on May 1***. Based on the level of ***sales activity*** in the first week of June, this month's sales are expected to exceed May levels. In China, the high season for car buying is from October to January. ***In its first five weeks of being operational***, the dealers at the MEG Center have received high levels of interest, and management is optimistic that it can achieve its previously stated RMB 1 Billion sales target in 2020.
>
> China, much like the rest of the world, has been negatively impacted by the shutdowns resulting from COVID-19. As the country has only begun to relax restrictions last month, many businesses are struggling to recover. The local government provided the facility rent-free to Ideanomics. Management felt that, during these unprecedented times, MEG should support local businesses and passed on savings from the government's generosity by not charging commissions or rent to its dealers for the month of May. As MEG's partners strengthen their financial positions, management will gradually implement its fee model starting in mid-June. Note that the May and early June sales were primarily used vehicles, and that MEG will be charging commissions for electric vehicles (EVs) with the manufacturers' direct sale model. MEG's total financing solutions will be available starting in July, and with its high-profit margins, should make a meaningful contribution to the Center's profitability.
>
> "The region loosened restrictions on business activities in early May, so we are very pleased with the Center's ***high levels of activity at this early stage***. The Center's ***solid customer foot traffic*** indicates that the country's economy is on a steady path to recovery and there is a strong appetite for passenger and commercial vehicle sales which bodes well for MEG," said Ideanomics Chairman Dr. Bruno Wu. "***The initial activity combined with the projected growth for the remainder of 2020 reinforces our belief that the MEG Center will be a material source of revenue for Ideanomics***."

155.     The bolded statements described in ¶ 154 above were materially false and misleading when made, for the reasons set forth in ¶ 140 above.

G.     **June 11, 2020**

156.    On June 11, 2020, Defendant Poor took part in an interview conducted by Steve Darling of Proactive wherein he made the following false and misleading statements:[10]

[DARLING:] First off, let's talk about what we talked about last time – that's the starting of your electric vehicle superstore so to speak. And just tell me a little bit about how things are going so far.

[DEFENDANT POOR:] *Yes so as you know we did a soft launch the beginning of May and then an official launch of our Qingdao EV hub towards later in May and it's been a very big success. It's met our expectations. We had aggressive goals for it, but we delivered more than 2,000 units sold vehicles in the first month*. So that's looking very promising for us as a revenue stream throughout the year.

[DARLING:] Absolutely, that's incredible and especially during the times we're in right now. Very impressive.



157.    The bolded statements described in ¶ 156 above were materially false and misleading for the reasons set forth in ¶ 140, above.

158.    Furthermore, according to Ideanomics's Form 10-Q for the period ended June 30, 2020, 85% of Ideanomics's sales originated from the sale of vehicles with traditional combustion

---

[10] https://www.youtube.com/watch?v=baCq9U25dMc.

engines, not EVs.  Only $695,000 of $4.7 million dollars in revenues were from the sale of EVs. Poor's statement that the Qingdao EV hub delivered more than 2,000 vehicles since opening in May, when made in the context of a discussion concerning EVs and Ideanomics's EV business, was false, misleading, and omitted material facts because none of these revenues were derived from EVs nor had Ideanomics delivered 2,000 EVs.

**H.    June 15, 2020**

159.    On June 15, 2020, Defendant Poor appeared in a YouTube video interview with Mike Elliot of CEO Roadshow, and responded to questions regarding the "recently" opened MEG Center:[11]

> [ELLIOT:] Ideanomics recently opened its electric vehicle center in Qingdao, can you tell us more about that?

> [DEFENDANT POOR:] Yeah, ***it's a really exciting opportunity for us***. One of the things we found in speaking to big fleet operators is the EV market is that it's a little bit different than traditional automobile market as we see here in the US and Europe. You know Tesla's the main player; it's a relatively new company and it's the same for commercial vehicles and the majority of the commercial fleet manufacturers are actually China based. ***So it's difficult as a fleet operator to understand which companies to work with, how to get the right kind of lease, financing terms, things like that. So we sat down with the automotive industry in China and we understood what it really needs is a focal point. We looked at a number of cities and chose Qingdao . . . because it is a coastal port city, it is an important city for the automotive industry because it sits just across the water from Japan and S. Korea, two big world players in automotive.  So really what we wanted to give China an expo center where they can go as fleet operators and learn the best about EV, about the charging battery technology and the types of savings in vehicle maintenance and energy demand***.

---

[11] https://www.youtube.com/watch?v=3F82SbAxTTI.



160.    The bolded statements described in ¶ 159 above were materially false and misleading when made because it was a material omission for Defendant Poor to have not corrected the interviewer when he said that Ideanomics's MEG Center in Qingdao was open, when in actuality, the MEG Center was still "Coming Soon" according to investigations conducted as late as January 2021. Despite being in a position to correct the interviewer's misstatement, Defendant Poor allowed the conversation to proceed, and went on to further promote the adoption of incorrect conclusions about the MEG Center by discussing the EV opportunities in China and explaining why Ideanomics chose Qingdao to host its MEG Center.  To speak in this manner without first correcting the false statement in the question asked by the interviewer was an omission of a material fact, and led investors to incorrectly believe that Ideanomics's had a functioning MEG Center in Qingdao.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

161.    In addition to the facts alleged above, the following facts, viewed holistically, provide a strong inference that Defendants knew or recklessly disregarded that the alleged misstatements they made during the Class Period were materially false or misleading when made.

Ideanomics was in dire straits, facing a NASDAQ delisting, loss of funding, and outright failure as a public company.  In response to these pressures, Ideanomics resorted to a barrage of false and misleading public statements related to its supposed new EV business in interviews and press releases in a concerted effort to inflate the price of its shares.  Such was the intensity of Ideanomics's promotion of the non-existent MEG Center and the underwhelming MEG division that out of thirty-eight press releases issued during the Class Period, only nine of them were unrelated to the MEG Center or MEG division. Each Individual Defendant made, signed, or disseminated statements concerning the MEG Center and MEG division, several of which, as alleged above, were shown to be materially false or misleading, including by the Company's admission of its fraud on June 26, 2020.

### A.   Defendants' Public Statements On June 26, 2020 Create A Strong Inference Of Scienter

162.   Defendants' public statements about the MEG Center at the conclusion of the Class Period are strongly indicative of their scienter.

163.   Each Individual Defendant either made, signed, or disseminated public statements during the Class Period meant to convince consumers that the MEG Center was open, functional, and engaging in sales. *See supra* Section V.

164.   Despite Defendants' various statements confirming the MEG Center's operational status in March through June, 2020, on June 26, 2020, Ideanomics issued a press release in which Defendants effectively admitted their prior statements extolling the MEG Center's size and scope of operations—some made mere days and weeks earlier—were false or misleading.  For example, Defendants admitted that the MEG Center was not operating throughout a 1 million square foot space, but in less than a quarter of that.

165.    Defendants' abrupt correction on June 26, 2020 of facts they had represented in recent promotional statements about the MEG Center, and the magnitude of the correction, supports a strong inference that Defendants knew, or were reckless in failing to know, that their prior alleged misstatements were materially false or misleading when made, and that these statements were designed to prop up Ideanomics's stock price to stave off delisting from the NASDAQ and the loss of its ability to raise additional funds through issuing additional shares of common stock to YA II.

### B.    Defendants' Positions Within Ideanomics Support A Strong Inference Of Scienter

166.    Ideanomics is a company with approximately sixty employees (as of December 31, 2019), and, during the Class Period, the Individual Defendants were the Company's top officers and Chairman who participated in a barrage of publicity designed to promote the MEG Center. Knowing that Ideanomics faced little to no revenues, Defendants made these false statements to rescue the value of Ideanomics's stock, so it could continue to be listed on the NASDAQ and so that the Company could rely on issuing common stock to YA II under the Equity Agreement to keep operating.   The Individual Defendants, due to their senior positions within Ideanomics, possessed the power and authority to control the content of the Company's various reports, financial disclosures, and press releases filed with the SEC and published to the investing public. In their capacities as officers (and in the case of Wu, Chairman) of the Company, the Individual Defendants authorized the publication of the press releases, video interviews, financial documents, and any other materials alleged to be misleading and also had the ability and opportunity to prevent the issuance of these statements or to correct them.

167.    Further, the Individual Defendants' positions with the Company gave them access to material non-public information, and the Individual Defendants knew that the truth behind their

false statements had not been disclosed to the public and that the positive representations being made about the MEG Center and MEG division were false and misleading.

168.    In particular, the Individual Defendants knew the actual facts and circumstances concerning the MEG Center at all relevant times, and personally made several detailed public statements and repeatedly answered specific questions in public or online appearances about it. They are liable as direct participants in all of the wrongs complained of in this Complaint.

169.    The Individual Defendants acted with scienter throughout the Class Period in that each knew or recklessly disregarded that statements concerning the MEG Center made in various press releases, SEC filings, promotional videos, or other forms of media disseminated to the market, were false and misleading as to material facts, including the actual operational status and scope of the MEG Center at given times.

170.    In addition, Ideanomics knowingly and/or recklessly made the materially false and/or misleading statements and omissions of material fact alleged herein based on the fact that the Individual Defendants knew and/or recklessly disregarded that the Company's statements were materially false and/or misleading, and/or omitted material facts at the times that such statements were made.  Each of these Defendants was among the most senior executives of the Company throughout the Class Period and a member of the Company's management, or a director, and their knowledge may be imputed to the Company.

171.    Defendant Wu, as Chairman, wielded a great degree of power within the Company. In Ideanomics's 2019 10-K, the Company disclosed "[w]e are highly dependent on the services of Dr. Bruno Wu, our Chairman and largest stockholder" and explained that "Dr. Wu spends significant time with Ideanomics and is highly active in our management."  Defendant Wu, through his own holdings, or shares he otherwise controls, holds at least a 21% stake in Ideanomics, and

the Company regularly conducts business with entities affiliated with Wu. According to the bylaws attached as Exhibit 3.1 to Ideanomics's 2019 Form 10-K (the "Bylaws"), as Chairman, Wu also had the responsibility to guide and assist the Corporation's CEO, a job Wu could not have performed without intimate knowledge of the inner workings of the Company. According to that same document, the Chairman has the power to direct the CEO to act.

172.    Defendant Poor was Ideanomics's CEO before and during the Class Period. Defendant Poor also spoke regularly about the MEG Center and the MEG division, such that the majority of the misleading statements made by Individual Defendants can be attributed to him personally.   According to the Bylaws, as CEO, Poor had the duty to see that all orders and resolutions of the Board of Directors were carried into effect.   The CEO was to be in regular communication with the Chairman, and have general supervision of the business of the corporation.   As part of the supervisory role, Poor would also have had the ultimate authority to determine which statements about the company were released to the public.   Furthermore, Poor, as CEO, signed and certified the periodic financial disclosures submitted to the SEC, including the Ideanomics Form 10-Q for the first quarter of 2020 alleged to contain false statements.

173.    Defendant McCarthy was Ideanomics's CFO before and during the Class Period. In that capacity, McCarthy was privy to information about the company's financial health unknown to the investing public.   According to the Bylaws, as CFO, McCarthy was subject to the direction of the Chairman, and had ultimate day-to-day managerial responsibility for the finances of the Company, including those related to the MEG Center and MEG division.   Furthermore, McCarthy, as CFO, signed and certified the periodic financial disclosures submitted to the SEC, including the Class Period Form 10-Q alleged to contain false statements.

174.     Defendant Sklar, through his various roles at Ideanomics as Senior Vice President of Communications, Head of Investor Relations, and as Corporate Secretary during the Class Period, disseminated false and misleading statements with knowledge or reckless disregard to the truth.   As Senior Vice President of Communications, it was his job to write, and/or approve the press releases that were issued by the Company, on which his name appeared—including all of the press releases alleged to be false herein.   Furthermore, Sklar's position as Head of Investor Relations underscores his responsibility to ensure the accuracy of the content of the statements provided to the market.

C.     **The Importance Of The MEG Center To Ideanomics Supports A Strong Inference Of Scienter**

175.     As alleged in this Complaint, Defendants acted with scienter throughout the Class Period in that each knew or recklessly disregarded that Ideanomics's public representations about the MEG Center's size, functionality, and operations were false or misleading.   The Individual Defendants—Ideanomics's senior-most executives and Chairman—regularly spoke to investors about the MEG Center, and made and repeated the alleged misstatements concerning its size, and the scope and extent of operations and progress at the MEG Center.

176.     The importance of the MEG Center to Ideanomics also supports a finding of scienter.   The MEG division was, asserted to be the main contributor of revenues for Ideanomics in 2020.   In its Form 10-Q for the period ended June 30, 2020, Ideanomics disclosed total revenues of $4.7 million, $4.6 million of which was attributable to the MEG division.   Defendants described the MEG Center as the showpiece for the MEG division, and stated that the MEG Center would largely house the MEG division's operations.

177.    In addition, in multiple public statements throughout the Class Period, Defendants regularly focused investors' attention on the MEG Center's sales and potential sales as evidence of Ideanomics's growth potential in the EV field.

178.    This raises a strong inference that the Individual Defendants knew or were reckless in failing to know that their statements about the MEG Center's size, operations, and activities were false and/or misleading or omitted material facts.

### D.    Defendants' Financial Pressures, Threat Of NASDAQ Delisting, And Reliance On Equity Issuances Further Raise A Strong Inference Of Scienter

179.    Despite the loans Ideanomics received throughout 2019, as set forth in its 2019 10-K filed March 16, 2020, Ideanomics disclosed that its accountant had determined that there was "substantial doubt" about whether the company would be able to continue as a "going concern."

180.    Compounding the financial pressures already known by the Company, on January 10, 2020, Ideanomics received a letter from the Listing Qualifications Staff of the NASDAQ exchange alerting the Complaint that, because it had traded below $1.00 for the past thirty consecutive days, Ideanomics's common stock was at risk of being delisted.  The letter went on to state that the Company had until July 8, 2020 to raise its per-share price to at least $1.00 for ten consecutive trading days.

181.    Ideanomics's financial problems continued in 2020 and its shares continued to trade below $1.00.  As disclosed on its Form 10-Q for the first quarter of 2020, "***the Company has incurred losses since its inception and must continue to rely on proceeds from debt and equity issuances to pay for ongoing operating expenses*** in order to execute its business plan."

182.    Ideanomics thus entered into the Equity Agreement with YA II, issuing more and more of its common stock at a discount to stay afloat.  Critically, it could not rely on the Equity Agreement if its stock delisted from the NASDAQ, further underscoring Defendants' desperation

to stay listed and keep the stock price over $1.00.  From April 28, 2020 through June 18, 2020, Ideanomics issued 30,083,891 shares of common stock to YA II for $30.5 million.

183.    Ideanomics's pressure to inflate its stock price so it could avoid NASDAQ delisting and continue to issuing stock to YA II for funds it needed to continue operate, shows that Defendants were motivated to make materially false and misleading statements as alleged herein.

> **E.    Defendant Wu And His Closely Held Affiliated Entities Structured Transactions To Personally Benefit From The Inflation They Created In Ideanomics's Stock Price**

184.    Defendant Wu and Wu's affiliates had extended millions in loans to Ideanomics in exchange for convertible debt.  Their only hope for repayment from Ideanomics, which had continually operated at a loss, came from the chance that they could convert this debt into Ideanomics shares, at a value greater than the conversion price for the debt, which was $1.00 or more.

185.    On June 5, 2020, Wu and his affiliates converted their debt to equity at only $0.59 a share, after Ideanomics had lowered the original $1.00+ conversion price.  This guaranteed Wu a windfall if the Defendants' scheme surrounding the MEG Center disclosures generated interest in Ideanomics's stock.  In fact, as a result of the fraud, just before Defendants were forced to reveal the truth about the status of the MEG Center, the stock Wu and his affiliates received—numbering in excess of 5 million shares and for only $0.59 a share—rose to over $3.00 a share.

## VII.    CONTROL PERSON LIABILITY

186.    As the Company's top leaders, Wu and Poor—the Chairman and CEO, respectively—controlled the Company's daily operations and were informed of and monitored Ideanomics's sales.

187.    As the Company's CEO and Chairman respectively, Poor and Wu were responsible for all aspects of the Company's daily operations.  Ideanomics's 2019 10-K stated that "[w]e are

highly dependent on the services of Dr. Bruno Wu, our Chairman and largest stockholder" and explained that "Dr. Wu spends significant time with Ideanomics and is highly active in our management."  In addition to being its senior-most executive officer, Poor was also a member of the Company's Board of Directors, and is currently its Interim Chairman.  Additionally, Poor certified the Company's financial reporting filed with the SEC.

188.    As Ideanomics's CFO, Defendant McCarthy oversaw the Company's financial and accounting functions, and had access to, and knowledge of, aspects of Ideanomics's financial status that were unavailable to the investing public. Additionally, McCarthy certified the Company's financial reporting filed with the SEC.

189.    As Senior Vice President of Communications for Ideanomics and Head of Investor Relations, Defendant Sklar had senior responsibilities related to Ideanomics's strategy and actions to inundate the public with boasts about the MEG Center and the MEG division, and, with knowledge of their falsity or with reckless disregard to their truth, either personally penned, reviewed, or approved for publication the numerous false or misleading press releases issued by Ideanomics during the Class Period.

190.    Statements made by Ideanomics and the Individual Defendants during the Class Period strongly and plausibly suggest each had access to the disputed information.  Indeed, the vast majority of Defendants' material misrepresentations and omissions explicitly or implicitly pertain to the MEG Center's size and scope of operations, and its ability to generate revenues, and could not have been made with any reasonable basis in fact, as is shown by the Company's effective admission in its June 26, 2020 press release that it had overstated the size and scope of the MEG Center.

## VIII.    CLASS ACTION ALLEGATIONS

191.    Plaintiff brings this action on his own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who purchased the common stock of Ideanomics from March 16, 2020, through and including June 25, 2020, and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of Ideanomics or any of Ideanomics's subsidiaries or affiliates, members of Ideanomics's Board of Directors, and members of the immediate families of each of the foregoing (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing individuals' and entities' legal representatives, heirs, successors, or assigns; and (iv) any entity in which any Defendant has a controlling interest.

192.    The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, Ideanomics had more than 150 million shares of common stock outstanding and actively trading on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery and procedure, Plaintiff believes that the proposed Class numbers in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

193.    Plaintiff's claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' alleged conduct in violation of the Exchange Act as complained of herein. Plaintiff has no interests that are adverse or antagonistic to the interests of other Class members.

194.    Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel competent and experienced in class and securities litigation.

195.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include:

a.   whether Defendants violated the federal securities laws by their acts and omissions as alleged herein;

b.   whether Defendants' statements to the investing public during the Class Period misrepresented and/or omitted material facts;

c.   whether and to what extent the market price of Ideanomics's common stock was artificially inflated and/or distorted during the Class Period due to the misrepresentations and/or omissions alleged herein;

d.   whether Defendants named under Section 10(b) of the Exchange Act acted with the requisite level of scienter;

e.   whether reliance may be presumed pursuant to the fraud-on-the-market doctrine (*see infra* Section IX) and/or the *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972) presumption;

f.   whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages; and

g.   whether the Individual Defendants were controlling persons of the Company.

196.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be

relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.    THE FRAUD–ON-THE-MARKET PRESUMPTION OF RELIANCE APPLIES

197.    At all relevant times, the market for Ideanomics's common stock was efficient for the following reasons, among others:  it was listed and actively traded on the NASDAQ, a highly efficient and automated market; as a regulated issuer, Ideanomics filed periodic public reports with the SEC, in addition to the Company's frequent voluntary public dissemination of information; and, Ideanomics regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of newswire services.

198.    As a result of the foregoing, the market for Ideanomics's common stock promptly digested current information regarding Ideanomics from all publicly available sources and reflected such information in the price of Ideanomics's stock. Under these circumstances, all purchasers of Ideanomics's common stock during the Class Period suffered similar injury through their purchase of Ideanomics's stock at artificially inflated prices and a presumption of reliance applies.

199.    Further, at all relevant times, Plaintiff and other members of the putative Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiff and the other members of the Class would not have purchased or otherwise acquired Ideanomics's common stock at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Plaintiff

and other members of the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute.*

## X.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY

200.    The Private Securities Litigation Reform Act's statutory safe harbor and/or the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

201.    None of the statements complained of was a forward-looking statement. Each was a historical statement or a statement of purportedly current facts and conditions at the time the statement was made.

202.    To the extent that any materially false or misleading statement alleged herein, or any portion thereof, can be construed as forward looking, such statement was a mixed statement of present and/or historical facts and future intent, and is not entitled to safe harbor protection with respect to the part of the statement that refers to the present and/or past.

203.    To the extent that any materially false or misleading statement alleged herein, or any portions thereof, may be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement or portion thereof. As alleged above in detail, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

204.    To the extent that the statutory safe harbor may apply to any materially false or misleading statement alleged herein, or a portion thereof, Defendants are liable for any such false or misleading statement because at the time such statement was made, the speaker knew the

statement was false or misleading, or the statement was authorized and approved by an executive officer of Ideanomics who knew that such statement was false or misleading.

## XI.   LOSS CAUSATION

205.   Defendants' wrongful conduct alleged herein directly and proximately caused the economic loss suffered by Plaintiff and the Class. During the Class Period, Plaintiff and the Class purchased Ideanomics's common stock at artificially inflated prices and were damaged thereby when the price of Ideanomics's common stock declined after the truth was revealed.

206.   Throughout the Class Period, the price of Ideanomics's common stock was artificially inflated and/or maintained as a result of Defendants' materially false or misleading statements and omissions. The price of Ideanomics's common stock significantly declined, causing investors to suffer losses, when information entered the market that revealed that Defendants' alleged misstatements had concealed material information from the market. *See supra* Section IV.D&E.

207.   As a result of the disclosure of the truth of Defendants' fraud, Ideanomics's stock price dropped $1.63 (nearly 53%) across June 25 and 26, 2020, on unusually heavy trading volume, to close at $1.46 on June 26, 2020.

208.   It was entirely foreseeable that Defendants' materially false or misleading statements and omissions discussed herein would artificially inflate and/or maintain the price of Ideanomics's common stock. It was also foreseeable to Defendants that the revelation of the truth would cause the price of the Company's common stock to fall when the artificial inflation caused or maintained by Defendants' misstatements and omissions was removed. Thus, the stock price decline described above was directly and proximately caused by Defendants' materially false or misleading statements and omissions.

## XII.    CAUSES OF ACTION

### COUNT I

#### Violation Of Section 10(b) Of The Exchange Act
#### And SEC Rule 10b-5 Promulgated Thereunder (Against All Defendants)

209.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

210.    During the Class Period, Defendant Ideanomics and the Individual Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

211.    Defendant Ideanomics and the Individual Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made or disseminated untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) carried out a plan, scheme, and course of conduct which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's common stock during the Class Period.

212.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### Violation Of Section 20(a) Of The Exchange Act
### (Against The Individual Defendants)

213.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

214.    The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents described above that contained statements alleged by Plaintiff to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

## XIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.   determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

b.   awarding compensatory and punitive damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

    c.   awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

    d.   awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury.

Dated:  February 26, 2021        Respectfully submitted,

        **KESSLER TOPAZ**
         **MELTZER & CHECK, LLP**

        *S/ Sharan Nirmul*
        Sharan Nirmul
        Joshua E. D'Ancona
        Raphael Janove
        Kevin E.T. Cunningham, Jr.
        280 King of Prussia Road
        Radnor, PA 19087
        Telephone: (610) 667-7706
        Facsimile: (610) 667-7056
        snirmul@ktmc.com
        jdancona@ktmc.com
        rjanove@ktmc.com
        kcunningham@ktmc.com

        *Counsel for Lead Plaintiff Rene Aghajanian*
        *and Lead Counsel for the Putative Class*

        **THE SCHALL LAW FIRM**
        Brian Schall
        2049 Century Park East, Suite 2460
        Los Angeles, CA 90067
        Tel: (310) 301-3335
        Fax: (877) 590-0482
        brian@schallfirm.com

        *Additional Counsel for Lead Plaintiff Rene*
        *Aghajanian*