UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE IDEANOMICS, INC. SECURITIES LITIGATION | No. 20-cv-04944-GBD |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
BRUNO WU'S MOTION TO DISMISS THE AMENDED COMPLAINT**

ARNOLD & PORTER KAYE SCHOLER LLP

250 West 55th Street
New York, New York 10019
Telephone: (212) 836-8000
Facsimile:  (212) 836-8689

*Attorneys for Bruno Wu*

**TABLE OF CONTENTS**

<u>Page</u>

PRELIMINARY STATEMENT .................................................................................................. 1

FACTUAL BACKGROUND .................................................................................................... 3

ARGUMENT .......................................................................................................................... 7

    I.      PLAINTIFF FAILS TO PLEAD A SECTION 10(b) CLAIM AGAINST DR. WU ............................................................................................................ 7

          A.     Plaintiff Does Not Allege That Dr. Wu Made a Misrepresentation or Omission of Material Information ............................................................ 7

                Dr. Wu's Statement on YouTube Was True ............................................... 8

                Dr Wu's Quote In the June 9, 2020 Press Release Was True .................... 9

                Dr. Wu's Statements Express Opinions ...................................................... 14

          B.     Plaintiff Does Not Adequately Plead That Dr. Wu Acted With Scienter ...................................................................................................... 15

                The Company's Transition to EV and Announcement of the MEG Division  Predates the NASDAQ Letter by Years. ....................... 17

                The Company's Unrelated And Legitimate Financial Deals Do Not Infer Scienter ............................................................................... 18

                Plaintiff Failed to Plead Recklessness ....................................................... 20

    II.     PLAINTIFF FAILS TO PLEAD A CLAIM FOR SECTION 20(a) LIABILITY AGAINST DR. WU ........................................................................ 21

CONCLUSION ....................................................................................................................... 23

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ................................................................................................. 21

*Beck v. Mfrs. Hanover Trust Co.*,
  820 F.2d 46 (2d Cir. 1987) ................................................................................................. 20

*City of Westland Police & Fire Retire. Sys. v. MetLife, Inc.*,
  129 F. Supp. 3d 48 (S.D.N.Y. 2015) .................................................................................. 14

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) .............................................................................................................. 7

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ......................................................................................... 15, 18

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
  794 F.3d 297 (2d Cir. 2015) ............................................................................................... 12

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011) .......................................................................... 19, 20

*In re Alstom Sec. Litig*,
  406 F. Supp.2d 433 (S.D.N.Y. 2005) ..................................................................... 21, 22, 23

*In re GeoPharma, Inc. Sec. Litig.*,
  399 F. Supp. 2d 432 (S.D.N.Y. 2005) ................................................................................ 19

*In re J.P. Jeanneret Assocs.*,
  769 F. Supp. 2d 340 (S.D.N.Y. 2011) ................................................................................ 22

*In re Livent, Inc. Sec. Litig.*,
  78 F. Supp. 2d 194 (S.D.N.Y. 1999) .................................................................................. 21

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014) .................................................................................. 12

*In re Lululemon Sec. Litig.*,
  604 F. App'x 62 (2d Cir. 2015) .......................................................................................... 13

*In re Merrill Lynch Auction Rate Sec. Litig.*,
  886 F. Supp. 2d 340 (S.D.N.Y. 2012) ................................................................................ 15

*In re ShengdaTech, Inc. Sec. Litig.,*
  2014 WL 3928606 (S.D.N.Y. Aug. 10, 2014) .................................................................... 22

*In re Tarragon Corp. Sec. Litig.*,
  2009 WL 10732259 (S.D.N.Y. Mar. 27, 2009) .................................................................. 20

*Inter-Loc. Pension Fund GCC/IBT v. Gen. Elec. Co.*,
  445 F. App'x 368 (2d Cir. 2011) ........................................................................................ 19

*Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*,
620 F.3d 137 (2d Cir. 2010) ......................................................................................... 10

*Jacobs v. Coopers & Lybrand, L.L.P.*,
1999 WL 101772 (S.D.N.Y. Mar. 1, 1999) .................................................................... 22

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
564 U.S. 135 (2011) ......................................................................................................... 8

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001) ................................................................................... 19, 20

*Kernaghan v. Franklin*,
2008 WL 4450268 (S.D.N.Y. Sept. 29, 2008) ............................................................... 15

*Kleinman v. Elan Corp., PLC*,
706 F.3d 145 (2d Cir. 2013) .......................................................................................... 14

*Levy v. Maggiore*,
48 F. Supp. 3d 428 (E.D.N.Y. 2014) ............................................................................... 8

*Long Miao v. Fanhua, Inc.*,
442 F. Supp. 3d 774 (2020) ........................................................................................... 12

*Novak v. Kasaks*,
216 F.3d 300, 314 (2d Cir. 2000) ............................................................................ 12, 19

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
575 U.S. 175 (2015) ....................................................................................................... 14

*One Commc'ns Corp. v. JP Morgan SBIC LLC*,
381 F. App'x 75 (2d Cir. 2010) ..................................................................................... 20

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*,
694 F. Supp. 2d 287 (S.D.N.Y. 2010) ........................................................................... 15

*Rich v. Maidstone Fin., Inc.*,
2001 WL 286757 (S.D.N.Y. Mar. 23, 2001) .................................................................. 16

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ............................................................................................ 7

*Ross v. Lloyds Banking Grp., PLC*,
2012 WL 4891759 (S.D.N.Y. Oct. 16, 2012) ................................................................. 21

*Ross v. Lloyds Banking Grp., PLC*,
546 F. App'x 5 (2d Cir. 2013) ....................................................................................... 21

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*,
75 F.3d 801 (2d Cir. 1996) .............................................................................................. 8

*SEC v. First Jersey Secs., Inc.,*
101 F.3d 1450 (2d Cir. 1996) ......................................................................................... 21

*Sec. & Exch. Comm'n v. Yorkville Advisors, LLC*,
305 F. Supp. 3d 486 (S.D.N.Y. 2018) ........................................................................... 22

iii

*Special Situations Fund III Qp, L.P. v. Deloitte Touche Tohmatsu CPA, LTD,*
    96 F. Supp. 3d 325 (S.D.N.Y. 2015) ...................................................................... 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...................................................................... 15, 16, 17, 18, 19

**Statutes**

Private Securities Litigation Reform Act of 1995,
    15 U.S.C. § 78u-4(b)...................................................................... 1, 7, 22, 23

Securities and Exchange Act of 1934, Section 10(b) .............................................. 7, 14

Securities and Exchange Act of 1934, Section 20(a)................................................ 21, 22

**Rules**

Fed. R. Civ. P. 12(b)(6)........................................................................................ 1

Fed. R. Civ. P. 9(b) ...................................................................................... 1, 7, 23

Dr. Bruno Wu submits this memorandum of law in support of his motion to dismiss the Amended Class Action Complaint filed by lead plaintiff Rene Aghajanian under Federal Rules of Civil Procedure 12(b)(6) and 9(b) as well as the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b).

## PRELIMINARY STATEMENT

Dr. Bruno Wu became Chairman of the Board of Ideanomics, Inc. in January 2016, and he remained in that position until December 31, 2020.  Plaintiff alleges that two statements that he made — one on March 16, 2020 and one on June 9, 2020 — contained materially false statements or omissions.  Both statements concerned Ideanomics, Inc.'s (the "Company" or "Ideanomics") operation of an electronic vehicle ("EV") sales and maintenance hub in Qingdao, China (the "MEG Center").  Those statements each contained two types of information: (1) what Dr. Wu knew about the MEG Center at that time, and (2) what Dr. Wu believed about how the MEG Center would perform in the future.  Neither category of information constitutes an actionable misrepresentation under the federal securities laws.

The first category of information attributed to Dr. Wu was objectively true, and plaintiff has not pled any facts — let alone the requisite specific, particularized facts — demonstrating that that information was incorrect.  In a YouTube video posted on March 16, 2020, Dr. Wu told an interviewer that the MEG Center would be expansive: "we're actually opening up a hundred thousand–sorry a, a million square feet, a million square feet–a hundred thousand square meters–so it's a million square feet."  True: the company's June 26, 2020, press release reaffirmed that the MEG Center would operate 100,000 square meters (more than 1 million square feet).  That is precisely what Dr. Wu said.

A June 9, 2020 press release also quoted Dr. Wu describing that the Qingdao region had loosened COVID-19 restrictions on business activities in May; stating the MEG Center had "high

levels of activity at this early stage"; and the MEG Center had "solid customer foot traffic."  Again, true: the June 26, 2020 press release confirmed that COVID-19 lockdown measures were eased in Qingdao, Shandong province, in May 2020.  The June 26, 2020 press release also confirmed that there was a preexisting new and used sales business at the MEG Center and that activities at that time occupied approximately 20,000 square meters.  That was entirely consistent with Dr. Wu's statement that this was "early stage" activity at this facility and that further development would be necessary.

Plaintiff alleges these statements were false in part based upon his alleged investigation of the MEG Center in January 2021, which does not address or contradict Dr. Wu's description of the hub's activity in June 2020.  To the contrary, plaintiff's alleged investigation confirmed that, as of January 2021, there was a vehicle business operating at the MEG Center, just as the Company reported in June.  Plaintiff also relies upon two short-seller reports which are unreliable, and one which also found vehicle sales activity at the MEG Center.  In addition, each of these so-called investigation reports were wholly devoid of specific facts from which anyone — let alone a court in applying the heightened pleading standard for falsity and scienter under the federal securities laws — could gain any understanding about the early stage activity concerning the MEG Center. That is particularly true since these short-sellers had a strong financial motive to depress the Company's stock price.

The second component of Dr. Wu's statements that Plaintiff challenges is his subjective belief that the MEG Center would benefit the Company's business.  That information was both forward-looking and an opinion about how the MEG Center would enhance Ideanomics' future prospects.  Dr. Wu's statement is not actionable because, among other things, plaintiff fails to

2

allege that Dr. Wu did not actually hold the opinion he expressed, or that he possessed any contradictory information.

In other words, Dr. Wu's statements were either objectively true or subjective opinions about future events. But even assuming otherwise, plaintiff has nevertheless failed to state a claim because the complaint does not allege particularized facts sufficient to support a cogent and compelling inference that Dr. Wu knew his statements were false or that he made them recklessly. In particular, Plaintiff does not contend that Dr. Wu — who served as Chairman of Ideanomics' Board of Directors and not in any management role during the putative class period — possessed any documents, reports, or other information that might have undermined his public statements. Nor does Plaintiff claim that Dr. Wu was aware of any "red flags" casting doubt on his statements about "early stage" activity at the MEG Center. How could he, when his own investigators and the so-called "research analysts" he relied on admitted that they found evidence of vehicle sales activity at the MEG Center?

Because Plaintiff has failed to allege with particularity that Dr. Wu made false statements or acted with scienter, the Court should dismiss the claims against him.

### FACTUAL BACKGROUND[1]

Dr. Wu held a variety of senior positions in the Company following his initial investment in 2011.[2] (Consolidated Amended Class Action Complaint ("Compl."), ECF No. 78, ¶ 41-42.) Dr. Wu became Chairman of the Board in January 2016 and — except for a brief hiatus from

---

[1]     A more detailed recital of the operative allegations is set forth in the memoranda of law submitted by Defendants Ideanomics, Inc., Alfred Poor, Conor McCarthy, and Anthony Sklar in support of their motions to dismiss, which are incorporated here by reference.

[2]     Dr. Wu served as CEO of Ideanomics from October 9, 2017 - November 14, 2018. (Compl. ¶ 42.)

November 2018 through February 21, 2019 — he remained in that position until December 31, 2020. (Compl. ¶ 37.)  Thus, he was Chairman during the putative class period of March 16, 2020 through June 25, 2020 (the "Putative Class Period").  (Compl. ¶ 37.)

In 2018, the Company announced a move into the EV industry; that strategy ultimately "evolved into the Company's [Mobile Energy Global ("MEG")] division"  (Compl. ¶ 60), which the Company formally launched in August 2019. (Compl. ¶¶ 64-67.)  By March 3, 2020, the Company announced its plans to develop the MEG Center facility in the City of Qingdao, which it envisioned as an EV hub where customers could finance, insure, register, and maintain their electric vehicles.  (Compl. ¶ 93.)

On March 16, 2020 — the first day of the Putative Class Period — Dr. Wu appeared on the "Midas Letter RAW" YouTube channel to discuss the Company's EV investments.  (Compl. ¶¶ 96, 137.)  The interview involved the following exchange:

> [Interviewer:] So you recently opened a 10,000 square foot facility in Qingdao. What kind of penetration do electric vehicles have in the Chinese market at this point?
>
> [Dr. Wu:] Well we're actually opening up a hundred thousand -- sorry a, a million square feet, a million square feet -- a hundred thousand square meters -- so it's a million square feet.
>
> [Interviewer:] Ah. I see. Sorry --
>
> [Dr. Wu:] So --
>
> [cross talk; inaudible]
>
> [Dr. Wu:] -- much bigger than what you just said.

See Midas Letter RAW, *The Exxon Mobil of Electric Vehicle and FinTech Revolution*, YouTube (Mar. 16, 2020), *see* https://youtu.be/NPTp36Tj0Uw?t=116.

Almost three months later, on June 9, 2020, the Company issued a press release that discussed early stage business activity at the MEG Center.  (Compl. ¶ 154.)  The release include a quote from Dr. Wu:

> "The [Qingdao] region loosened restrictions on business activities in early May, so we are very pleased with the Center's high levels of activity at this early stage. The Center's solid customer foot traffic indicates that the country's economy is on a steady path to recovery and there is a strong appetite for passenger and commercial vehicle sales which bodes well for MEG," said Ideanomics Chairman Dr. Bruno Wu. "The initial activity combined with the projected growth for the remainder of 2020 reinforces our belief that the MEG Center will be a material source of revenue for Ideanomics."

*Over 2,100 Vehicles Sold at Ideanomics' MEG Center in May*, Ideanomics (Jun. 9, 2020), https://investors.ideanomics.com/2020-06-09-Over-2-100-Vehicles-Sold-at-Ideanomics-MEG-Center-in-May.

On June 25, 2020, two short-sellers published reports denigrating Ideanomics and the MEG Center.  (Compl. ¶ 116.)  First, J Capital Research Limited ("J Capital") raised doubts about the MEG Center's very existence after they claimed that their investigator had attempted to visit but had been unable to locate the facility.  In addition, J Capital claimed that their investigator had interviewed an unspecified number of unnamed people, as well anonymous representatives of some unnamed MEG Center customers (Compl. ¶¶ 117-118), all of whom were unfamiliar with "IDEX,[3] or any of its subsidiaries or joint ventures, or the EV showroom the company says it opened on May 1." (*Id*.)  J Capital concluded that the Company "is a zero." (Compl. ¶ 117.)

Hindenburg Research ("Hindenburg"), another short seller, published tweets calling the Company a fraud and challenging the MEG Center's marketing materials as doctored.  (Compl. ¶ 119.)  Hindenburg, too, claimed it spoke to anonymous representatives of unnamed MEG Center

---

[3]    "IDEX" represents the Company's trading name on NASDAQ.

customers and sent unnamed investigators to the MEG Center where, again, an unnumbered amount of unnamed people had not "heard of [Ideanomics] or MEG." (Compl. ¶ 120.)

On June, 26, 2020, the Company addressed these short sellers' reports in a press release that discussed the three phases of the MEG Center's opening. *Ideanomics Clarifies Status of Its EV Hub in Qingdao*, PR Newswire (Jun. 26, 2020), https://www.prnewswire.com/news-releases/ideanomics-clarifies-status-of-its-ev-hub-in-qingdao-301084330.html. In particular, the June 26, 2020 press release clarified that Phase III would ultimately culminate in the MEG unit's operating a million square foot expo center, as previously reported.

Seven months later, from January 25 through 29, 2021, plaintiff's investigator visited the MEG Center, noted that it was under renovation at that time, that signs and banners were displayed advertising the MEG Center, and that a used car trading market selling EVs was operating at the site. (Compl. ¶¶ 128-131.) Plaintiff's investigator also supposedly spoke with an unnumbered amount of unnamed people who apparently said construction had begun three months earlier. (Compl. ¶ 129.) Notably, although the purported investigations into the MEG Center were devoid of critical particularized facts related to the Company's disclosures, both Hindenburg and plaintiff's investigators acknowledged — consistent with Dr. Wu's statements — that there were, in fact, vehicle sales operations at the site. And none of the investigators of plaintiff or short sellers made any claims about Dr. Wu's knowledge or understanding of activities at the Qingdao hub.

6

**ARGUMENT**[4]

## I.   PLAINTIFF FAILS TO PLEAD A SECTION 10(b) CLAIM AGAINST DR. WU

To state a claim pursuant to Section 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation (or omission), (2) scienter, *i.e.*, a wrongful state of mind, (3) a connection with the purchase or sale of a security, (4) reliance ..., (5) economic loss, and (6) 'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-342 (2005). In addition, to satisfy Federal Rule 9(b) and the heightened pleading requirement of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a plaintiff must "state with particularity the circumstances constituting fraud." Fed. R. Civ. Pro. 9(b); 15 U.S.C § 78u-4(b)(1)-(2). Here, plaintiff fails to adequately plead that Dr. Wu made any misrepresentations or omissions of material fact or that he acted with scienter. For these reasons, the Court must dismiss plaintiff's non-particularized Section 10(b) claim.

### A.   Plaintiff Does Not Allege That Dr. Wu Made a Misrepresentation or Omission of Material Information

Plaintiff's Section 10(b) claim fails because the amended complaint does not allege — let alone plead with the required particularity — that Dr. Wu made a false material misrepresentation or omitted to disclose material information in connection with his remarks about the MEG Center. *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (plaintiff must "(1) specify the statements that [he] contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 813 (2d

---

[4]   In addition to the arguments set forth below, Dr. Wu adopts the arguments set forth by defendants Ideanomics, Poor, McCarthy, and Sklar in their memorandum in support of their motion to dismiss.,

Cir. 1996) ("Plaintiffs do not, . . . enjoy a license to base claims of fraud on speculation and conclusory allegations." (internal quotations omitted)).

The amended complaint alleges that Dr. Wu made two alleged false statements to investors:[5]   First, in a YouTube interview, Dr. Wu responded to the interviewer's mistaken description the planned facility's size and clarified that the Company would open a million-square-foot facility in Qingdao. (Compl. ¶ 137.)  Second, the Company issued a press release on June 9, 2020 that included a statement from Dr. Wu highlighting the MEG Center's "high levels of activity at this early stage," "solid customer foot traffic," and expressing his personal belief "that the MEG Center will be a material source of revenue for Ideanomics." (Compl. ¶ 154.)  None of these statements were false when he made them, nor are they actionable under the federal securities laws.

### Dr. Wu's Statement on YouTube Was True

Dr. Wu's statement that "we're actually opening up a . . . million square feet" facility was objectively true.  First, plaintiff does not allege that the facility was not in fact one million square feet in size.  Second, the tense of the phrase "we're . . . opening" (the present continuous or present progressive tense) accurately conveyed that Ideanomics was engaged in a process that was ongoing at the time of Dr. Wu's statement and would be continuing into the future.  Indeed, in a subsequent press release plaintiff touts as a purported "startling admission" that contradicted early statements,

---

[5]     To the extent that plaintiff intends to argue that Dr. Wu is the maker of any statements by other Defendants, based upon the purported "power" ascribed to him as Chairman through the Company's Bylaws (*see* Compl. ¶ 171), this argument fails.  "For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011); *Levy v. Maggiore*, 48 F. Supp. 3d 428, 451 (E.D.N.Y. 2014) (dismissing Section 10(b) claims against directors for failure to plead that they were the "maker of a statement").

the Company confirmed that it was in the process of opening the MEG Center in three phases and that its operations would eventually cover one million square feet of space at the MEG Center. (Compl. ¶¶ 124-125.)  In other words, Dr. Wu's interview accurately described the immediate and continuous MEG Center opening plans.  (Compl. ¶ 124.)

Having failed to plead an actionable false statement in connection with the March 16, 2020 YouTube video, plaintiff falsely quotes a portion of that statement in an attempt to support its claim.  Plaintiff incorrectly transcribes Dr. Wu as having said, "[s]o it's much bigger than what you just said," as if indicating a present tense. (Compl. ¶ 96.)  But at the moment when Dr. Wu began this sentence, the interviewer spoke over Dr. Wu, and Dr. Wu's microphone cut out briefly, making it difficult to understand what was said.  A more accurate transcription is as follows:

> [Interviewer:] So you recently opened a 10,000 square foot facility in Qingdao. What kind of penetration do electric vehicles have in the Chinese market at this point?
>
> [Dr. Wu:] Well we're actually opening up a hundred thousand -- sorry a, a million square feet, a million square feet -- a hundred thousand square meters -- so it's a million square feet.
>
> [Interviewer:] Ah. I see. Sorry --
>
> [Dr. Wu:] So --
>
> [cross talk; inaudible]
>
> [Dr. Wu:] -- much bigger than what you just said.

*Compare* https://youtu.be/NPTp36Tj0Uw?t=116 *with* Compl. ¶ 96.  Nevertheless, even plaintiff's incorrect transcription of the YouTube interview truthfully described the size of the MEG Center and the Company's continuing plans to open the facility.

### Dr Wu's Quote In the June 9, 2020 Press Release Was True

Plaintiff similarly contends that Dr. Wu's references to "high levels of activity" and "solid customer foot traffic" at the MEG Center in the June 9, 2020 press release are materially false.

9

(Compl. ¶¶ 154-155.)  Plaintiff also alleges that Dr. Wu falsely stated that "[t]he initial activity combined with the projected growth for the remainder of 2020 reinforces our belief that the MEG Center will be a material source of revenue for Ideanomics."  (Compl. ¶ 154.)  Plaintiff relies on three sources in support of its claim that Dr. Wu's statements were false: (1) unreliable and hopelessly biased short seller reports; (2) the Company's June 26, 2020 press release about the MEG Center; and (3) plaintiff's own investigator's report.  (Compl. ¶¶ 116-120, 124, 140, 154-155.)

As an initial matter, Dr. Wu's quotes merely express forward-looking encouragement and are not actionable on that basis.  The statements themselves make clear that Dr. Wu was speaking hopefully and expressing a yet-unproven belief that the MEG Center would be a revenue generating venture. As the Second Circuit has declared, "[a] forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010).

Furthermore, plaintiff states no reliable basis for the conclusion that these statements are false, and as such, plaintiff has not pled with the requisite particularity.  Instead, plaintiff principally relies upon reports published by hostile short-seller analysts Hindenburg and J Capital. (Compl. ¶¶ 140, 154-155.)

Short sellers in their most innocuous form bet against companies they determine to be overvalued by borrowing a stock, selling it, buying it back when the price goes down, and keeping the difference. *See* Brian Beers, *How an Investor Makes Money Short Selling Stocks*, Investopedia (Jan. 28, 2021), https://www.investopedia.com/ask/answers/how-does-one-make-money-short-selling/.  Short sellers such as Hindenburg and J Capital, however, employ a business model of

10

targeting a company, shorting its stock, and then directly manipulating the market against it. J Capital, in fact, is currently defending a defamation lawsuit in the United States District Court for the Eastern District of New York for exactly this practice. *See NOVAGOLD Resources Inc. v. J Capital Research USA LLC*, 1:20-cv-02875-LDH-PK. J Capital was also named in an article reporting that Canada recently announced regulations to prevent "'short and distort' campaigns (spreading negative rumours about a company to artificially drive its value down) and other abusive forms of short selling." Kelsey Rolfe, *Regulators to take steps against short selling*, CIM Magazine (Apr. 23, 2021), https://magazine.cim.org/en/news/2021/regulators-to-take-steps-against-short-selling-en/. Thus, by nature of their business, these "analyst" reports are not reliable.

Worse, the purported reports are based upon confidential or unnamed and unidentifiable sources. On an unspecified date, J Capital purportedly interviewed an unnumbered amount of anonymous sources who were supposedly unfamiliar with the MEG Center or Ideanomics. (Compl. ¶ 117.) J Capital further claimed that it had "a hard time identifying this expo center," but did not bother to explain the efforts it took to locate it or even whether it was able to complete its review. (*Id*.) J Capital also claimed to have spoken to "representatives from four of the five 'buyers' . . . . [who] denied there were contracts" to purchase vehicles from the MEG Center. (Compl. ¶ 118.) Like all the "witnesses" with whom J Capital spoke, these four purported representatives are unnamed, as are the companies they supposedly represent, all of which make it impossible verify or rebut their conclusions and absurd that they should or would form the basis for a securities class action lawsuit. (*Id*.)

For its part, Hindenburg claimed to have performed its own "investigation," which was, in some respects, inconsistent with J Capital's conclusions. Though J Capital supposedly could not find the expo center, Hindenburg seemingly had no trouble doing so, but claimed without evidence

11

that it was "operated by almost 100 [unnamed] sales groups" who had supposedly not heard of MEG. (Compl. ¶ 120.) Once again, there is no way to verify where the Hindenburg investigator was, with whom that person spoke, whether the investigator actually exists, or what the anonymous, unidentifiable, and perhaps imaginary witnesses said in response.

These non-particularized "findings" are insufficient to satisfy plaintiff's pleading burden under the PSLRA. As Judge Englemayer recently found in *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774 (2020), concerning a similar report by J Capital, "the case law reflects a particular need for close scrutiny where a short-seller report relied upon by a securities plaintiff itself relies on 'confidential' or anonymous sources, without corroboration." That is because "the risk of motivated reporting by the author of the short-seller report is twinned with the reliability concerns presented by anonymous sourcing recognized in *Novak* [*v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)]." 442 F. Supp. 3d at 801.

The court's healthy skepticism in *Long Miao* is entirely justified here as well, where there are no well-pled independent and particularized facts to corroborate those attributed to anonymous sources in the short-seller reports. Rather, all of the purported investigations involved threadbare, vague allegations and are inconsistent in important respects with one another—most glaringly in connection with the time frame of the purported investigation.

To be fair, "[a] complaint may rely on information from confidential witnesses if 'they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (quoting *Novak*, 216 F.3d at 314). But the complaint here does not come close to satisfying that standard. Rather, it is much more like the allegations in *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553 (S.D.N.Y. 2014),

*aff'd*, 604 F. App'x 62 (2d Cir. 2015), where the court found that that none of the anonymous sources set "forth facts that suggest that any of the alleged statements were false when they were made." Nor, in that case, did the complaint "contain the kind of required specific factual allegations (by [confidential witnesses] or otherwise) that suggest if, when, or how [the defendants] knew about the issue (or its magnitude)."

Plaintiff's own investigation does not change the equation or lead to a different outcome. Like the Hindenburg investigator, plaintiff's investigator apparently had no issues locating the MEG Center. (Compl. ¶ 128.) To the contrary, the center was under construction for each of the five days the investigator visited between January 25 and 29, 2021. Yet, having observed no sales activities observed on those days, the investigator incorrectly concluded that "no activities described in the press releases [from months earlier] were taking place on site." (Compl. ¶¶ 128-132.)

This conclusion is misplaced and illogical. First, the fact that the expo center was closed for construction in January 2021 does not corroborate the short-seller reports, nor does it undermine Dr. Wu's statement about "foot traffic" in June 2020. Plaintiff's investigator's visit seven months after Dr. Wu's June 9, 2020 comment about sales activity and foot traffic cannot in any way challenge the truth of the statement when made. Nor can visits over just five days, or interviews with additional unnamed and unidentifiable persons support plaintiff's allegations of material misstatements.

Finally, plaintiff points to the Company's June 26, 2020 press release as yet another basis for his claims that Dr. Wu's statements were untrue. However, plaintiff's insinuation that the Company admitted to false statements is itself a fabrication. (Compl. ¶ 140.) The Company's June 26, 2020 press release only clarifies the expected stages of construction. *Ideanomics Clarifies*

13

*Status of Its EV Hub in Qingdao*, PR Newswire (Jun. 26, 2020), https://www.prnewswire.com/news-releases/ideanomics-clarifies-status-of-its-ev-hub-in-qingdao-301084330.html.  Plaintiff has failed to plead any material misstatements by Dr. Wu.

**Dr. Wu's Statements Express Opinions**

Moreover, even if Dr. Wu's statements could give rise to primary Section 10(b) liability—which neither can—both statements reflect his opinion or subjective belief in the future benefits of the MEG Center.  The Supreme Court made clear in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015) "that it is substantially more difficult for a securities plaintiff to allege adequately (or, ultimately, to prove) that a [statement of opinion] is false than it is to allege adequately (or prove) that a statement of pure fact is false."  *City of Westland Police & Fire Retire. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 68-69 (S.D.N.Y. 2015) (citing *Omnicare*, 575 U.S. 175).  In order to plead a Section 10(b) claim based upon a statement of opinion – such as Dr. Wu's statements – a plaintiff must do more than allege that the opinion was false; it must also allege with particularity that the "speaker did not actually hold the stated belief."  *Id*. at *11 (quotations omitted).  As the court explained in *Kleinman v. Elan Corp., PLC*, 706 F.3d 145 (2d Cir. 2013), "[s]ubjective statements can be actionable only if the defendant's opinions were both false and not honestly believed when they were made."  *Id.* at 153. (quotations omitted).

The amended complaint does not contain a single allegation suggesting that Dr. Wu's opinions were false or that he did not actually hold the beliefs, *i.e.*, that he expected the MEG Center to be a one million square foot facility that would be a material source of revenue for Ideanomics.  Plaintiff fails to plead a misrepresentation by Dr. Wu in anything but conclusory fashion, which is fatal to his 10(b) claim.  Instead plaintiff relies upon conjecture and speculation

14

based on unreliable and unnamed sources to imply that Dr. Wu had direct knowledge that his opinions were false. The law requires more.

To the extent plaintiff seeks to argue that Dr. Wu knew the statements were false simply by nature of his position as chairman, that argument also would fail to meet plaintiff's requisite particularized showing. As the court held in *Kernaghan v. Franklin*, No. 06-CV-1533, 2008 WL 4450268 (S.D.N.Y. Sept. 29, 2008) (Swain, J.) "repeated allegations that the director-Defendants, by virtue of their positions on the Board and/or the Audit Committee, knew or should have known of the material non-public information are also insufficient to meet the level of particularity required[.]" *Id.* at *8; *see also*, *e.g.*, *In re Merrill Lynch Auction Rate Sec. Litig.*, 886 F. Supp. 2d 340, 344 (S.D.N.Y. 2012) (dismissing 10b-5 claim against broker where "[p]laintiff speculate[d]"; presented allegations that were "entirely conclusory[]"; and "offer[ed] no concrete facts supporting" the allegation). In fact, "[c]ourts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight." *Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010).

### B. Plaintiff Does Not Adequately Plead That Dr. Wu Acted With Scienter

Under the PSLRA, plaintiff must "state with particularity facts giving rise to a strong inference" that the defendant acted with scienter -- that is, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 321 (2007). Plaintiff may meet this high burden only by pleading particularized facts showing "either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). The amended complaint is entirely devoid of any such allegations that Dr. Wu acted with scienter under either

15

theory.  Moreover, it improperly lumps Dr. Wu together with other defendants without specifying what, if anything, each of them purportedly knew and how and when they learned it.  (*See* Compl. ¶¶ 91, 100, 114, 161, 164-170, 175-183, 190.)  *See Rich v. Maidstone Fin., Inc.*, 2001 WL 286757, at \*6 (S.D.N.Y. Mar. 23, 2001) ("A complaint may not simply clump defendants together in vague allegations to meet the pleading requirements.") (quotations omitted).

The amended complaint relies on tenuous circumstance and conjecture to establish a motive.  In sum, plaintiff alleges that the Defendants promoted the MEG Center in order to bring up the Company's share price in early 2020.  Plaintiff connects this activity with an arms-length convertible debt equity deal the Company entered into with YA II PN, Ltd. and with a January 10, 2020 letter from NASDAQ regarding potential delisting.  Essentially, plaintiff attempts to draw an inference of motive to commit fraud because "Ideanomics was in dire straits, facing a NASDAQ delisting, loss of funding, and outright failure as a public company." (Compl. ¶ 161.)

These purported motives are fiction.  Plaintiff himself admits that the Company first announced MEG in 2018, which is entirely inconsistent with his allegation of a purported motive to promote the stock two years later in 2020 out of "desperation" to remain on NASDAQ.  Further, the YA II deal was a legitimate, unrelated deal that plaintiff cannot meaningfully connect with the MEG Center, and there is no allegation suggesting otherwise.

As *Tellabs* made clear, the relevant question is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  551 U.S. at 322–23.  In answering that question, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated

16

into the complaint by reference, and matters of which a court may take judicial notice." .  Indeed, in this case, the facts, taken collectively, *do not* support an inference of scienter.

### The Company's Transition to EV and Announcement of the MEG Division Predates the NASDAQ Letter by Years.

Plaintiff makes much of the allegedly circumstantial timing between a January 10, 2020 letter from NASDAQ and the Company's subsequent statements about the MEG Center. (Compl. ¶ 180.)  Plaintiff implies that Defendants began promoting EV and MEG because they learned that NASDAQ was threatening delisting, and that they only promoted MEG in order to raise share prices. (Compl. ¶ 10.)  Fatally to plaintiff's case, the timing of this implication does not fit.

Plaintiff admits that years earlier, "in late 2018 Ideanomics began to announce roles in business endeavors related to EV." (Compl. ¶ 60.)  Indeed, as plaintiff readily concedes, the 2018 announcement discussed transactions which "formed the basis of what, Ideanomics claimed, eventually evolved into the Company's MEG division, and then, the MEG Center." (*Id.*)  As further spelled out by plaintiff, between the 2018 announcement and the January 2020 NASDAQ letter, the Company was active in the EV market, regularly issuing press releases about it.  (Compl. ¶¶ 62-73.)  In fact, the MEG Division was created and announced on August 14, 2019, months before the NASDAQ letter.  (Compl. ¶ 64.)

Under the PSLRA, "Congress required plaintiffs to plead with particularity facts that give rise to a 'strong'—i.e., a powerful or cogent—inference. . . . [but t]he strength of an inference cannot be decided in a vacuum." *Tellabs, Inc.*, 551 U.S. at 323.  The Court must engage in a comparative test: "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. . . . the inference of scienter must be . . . cogent and compelling, thus strong in light of other explanations. A complaint will survive,

17

we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc.*, 551 U.S. at 323-24.  In other words, like here, where there is an innocent explanation that is stronger than plaintiff's allegations of scienter, the Court should dismiss the complaint.

In this case, plaintiff's assertions of scienter do not add up when considered in light of the contradictory admissions showing that the January 2020 NASDAQ letter could not possibly have motivated any alleged misstatements about the MEG Division or MEG Center.  Instead, the facts show that the company had long planned to and had consistently discussed its move into the EV industry, culminating in the MEG Center.  Thus, the temporal connection is entirely lacking.

Of course, it goes without saying that Defendants wanted to raise the Company's share price and to remain on NASDAQ. But that goal is true of all listed companies, and it certainly does not justify an inference of intentional misstatement or scienter.  As the Second Circuit has held, "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."  *ECA, Loc.*, 553 F.3d at 198.

Plaintiff's allegations of scienter are not cogent, they are fantasy.

**The Company's Unrelated And Legitimate Financial Deals Do Not Infer Scienter**

Plaintiff also asserts that the Court should find an inference of scienter against Dr. Wu in relation to a legitimate and unrelated convertible debt deal with YA II PN, Ltd ("YA II"). (Compl. ¶¶ 182-185.)   Although plaintiff mentions the YA II deal dozens of times, and claims in a conclusory manner that the agreement supports an inference of scienter, plaintiff does not even attempt to plead an actual connection between YA II and the challenged statements about the Qingdao MEG Center.  (Compl. ¶¶ 179-183.)  Instead, plaintiff asks the Court to draw broad inferences based on timing alone.  (Compl. ¶¶ 108-109, 111.)  In fact, the YA II deal allowed the

18

Company to raise needed equity around the same time the Company was expending resources to build a new division and the MEG Center.

Plaintiff baselessly alleges that Dr. Wu controlled and directed the YA II deal in order to convert debt owed to him and his related companies, resulting in a "windfall." (Compl. ¶ 185.) However, the fact that the Company agreed to convert debt owed to Dr. Wu—an agreement that benefitted the Company as well as Dr. Wu—does not support an inference of fraud. *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) ("an allegation that defendants were motivated by a desire to maintain or increase executive compensation is insufficient [to show scienter or a motive to defraud] because such a desire can be imputed to all corporate officers."). By all accounts, plaintiff has failed to allege that Dr. Wu "benefitted in a concrete and personal way from the purported fraud." *Inter-Loc. Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir. 2011) (quoting *Novak*, 216 F.3d at 311). Moreover, the debt conversion deal increased Dr. Wu's holdings, which itself cuts against any inference of scienter. *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011) (declining to find a plausible inference of motive, concluding "even if Zhu realized some proceeds (and profit) from stock sales during the Class Period, his holdings of The9 ADS actually increased during that period from 6.6 million shares to 7 million shares").

Under *Tellabs*, the Court must compare the allegations with a more reasonable explanation to determine whether a cogent allegation of scienter could be inferred. *Tellabs, Inc.*, 551 U.S. at 323-24. The most plausible explanation of the facts alleged in the complaint is that the Company negotiated and entered into a legitimate debt conversion deal, raised needed equity, and paid off debts, while pursuing a separate, and in its own right legitimate, business venture. *In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 450 (S.D.N.Y. 2005) ("allegations that a

19

defendant was motivated to commit securities fraud by a desire to reduce its debt burden, or otherwise reduce borrowing costs, are insufficient to raise a scienter inference."); *see also In re Tarragon Corp. Sec. Litig.*, No. 07-CV-7972, 2009 WL 10732259, at \*10 (S.D.N.Y. Mar. 27, 2009) (dismissing a securities claim based upon a debt conversion deal as not having adequately plead scienter where the "company sought to raise a share value in order to reduce debt via conversion of senior convertible notes").

### Plaintiff Failed to Plead Recklessness

Having failed to plead a motive to commit fraud, plaintiff's circumstantial allegations of conscious misbehavior or recklessness "'must be correspondingly greater.'" *Kalnit*, 264 F.3d at 142 (quoting *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987)). But plaintiff's recklessness allegations are even more deficient. The amended complaint merely alleges recklessness in conclusory fashion, as if an afterthought: alleging without specifics that "Defendants knew it (or recklessly disregarded the relevant facts)" (Compl. ¶ 114), "Defendants knew or recklessly disregarded that . . . " (Compl. ¶ 161), "Defendants knew, or were reckless in failing to know . . ." (Compl. ¶ 165, 178), and that "Defendants acted with scienter throughout the Class Period in that each knew or recklessly disregarded that . . ." (Compl. ¶ 169; *see also* ¶¶ 174, 175, 189.) Yet the amended complaint contains no allegations from which to infer that Dr. Wu knew any of these "facts," let alone that he disregarded them. *See One Commc'ns Corp. v. JP Morgan SBIC LLC*, 381 F. App'x 75, 81 (2d Cir. 2010) (affirming dismissal of securities fraud claims against outside directors because conclusory allegations of "involvement of outside directors" in improper billing practices were insufficient to state a claim); *Glaser*, 772 F. Supp. 2d at 591 ("conclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient."). To the contrary, as discussed, the statements made were not false, the is no basis to infer a motive

20

to commit fraud, and Dr. Wu simply took actions that supported the success of a Company in which he had faith.

**II.   PLAINTIFF FAILS TO PLEAD A CLAIM FOR SECTION 20(a) LIABILITY AGAINST DR. WU**

To state a *prima facie* case for control person liability under Section 20(a) of the Exchange Act, a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) "that the controlling person was in some meaningful sense a culpable participant" in the primary violation. *SEC v. First Jersey Secs., Inc.,* 101 F.3d 1450, 1472 (2d Cir. 1996) (citations omitted). The amended complaint fails to allege each of these required elements.

First, the amended complaint fails to state a claim for a primary violation against Dr. Wu or the other alleged controlled persons -- Ideanomics, Poor, McCarthy, and Sklar -- as addressed in their memorandum of law. Accordingly, the Section 20(a) claim against Dr. Wu must be dismissed. *Ross v. Lloyds Banking Grp., PLC*, 2012 WL 4891759, at \*11 (S.D.N.Y. Oct. 16, 2012), *aff'd*, 546 F. App'x 5 (2d Cir. 2013); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) (holding that, to establish a prima facie case of control person liability under section 20(a), a plaintiff must show, inter alia, "a primary violation by the controlled person").

Second, the amended complaint fails to plead that Dr. Wu had any control over the alleged primary violators. To withstand a motion to dismiss, a plaintiff must plead facts from which it can be inferred that the alleged controlling person possessed "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *In re Alstom Sec. Litig*, 406 F. Supp.2d 433, 486 (S.D.N.Y. 2005) (quotations omitted). Officer or director status alone does not constitute control. *Id*. at 487; *In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 221 (S.D.N.Y. 1999) (collecting cases). Nor does

membership on a committee.  *See id.*; *Jacobs v. Coopers & Lybrand, L.L.P.*, 1999 WL 101772, at *17 (S.D.N.Y. Mar. 1, 1999).

Here, there are no non-conclusory allegations that can support an inference that Dr. Wu had "actual control" over defendants.  Plaintiff does not allege that Dr. Wu controlled the Company, nor could he since Dr. Wu does not control a majority of the Company's stock or voting power.  Despite this, plaintiff insinuates that "Wu wielded control over Ideanomics" and was "responsible for all aspects of the Company's daily operations." (Compl. ¶¶ 37, 171, 186-187.) That is contradicted by Dr. Wu's non-management role as Chairman of the Board of Directors, a position that required him to "provide advice to, and guide and assist the Corporation's Chief Executive Officer."  *See* You on Demand Holdings, Inc., Second Amended and Restated Bylaws (Jan. 31, 2014), https://sec.report/Document/837852/000106299314000517/exhibit3-1.htm at 6.8. Rote recitations of the elements for control-person liability absent facts concerning Dr. Wu's specific actions are insufficient.  *In re Alstom,* 406 F. Supp. 2d at 490-91 (plaintiff must allege some involvement by outside directors "beyond just 'being there'").

Finally, the amended complaint fails to plead that Dr. Wu was a culpable participant in any misconduct.  The culpability element of a § 20(a) claim is subject to the PSLRA's heightened pleading standard.  *Special Situations Fund III Qp, L.P. v. Deloitte Touche Tohmatsu CPA, LTD*, 96 F. Supp. 3d 325, 345 (S.D.N.Y. 2015); *In re J.P. Jeanneret Assocs.*, 769 F. Supp. 2d 340, 376 (S.D.N.Y. 2011).[6]  To meet this burden, a plaintiff must, at minimum, plead facts that give rise to

---

[6]     While courts in this Circuit are split on the pleading requirements of "culpable participation," the majority apply the heightened pleading standards of the PSLRA to this prong. *See In re ShengdaTech, Inc. Sec. Litig.,* 2014 WL 3928606 at *10, n. 1 (S.D.N.Y. Aug. 10, 2014) (collecting cases); *see also Sec. & Exch. Comm'n v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 511 (S.D.N.Y. 2018) (Daniels, J.) ("Among the district courts in this Circuit, the weight of well-reasoned authority requires the plaintiff to prove some level of culpable participation at least approximating recklessness in the section 10(b) context." (internal citations omitted)).

a strong inference of recklessness, *i.e.* conduct that constitutes "an extreme departure from the standards of ordinary care … to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Alstom,* 406 F. Supp. 2d at 491 (citation omitted).    Recklessness may be established when plaintiff (1) specifically alleges defendants knew or should have known that the primary violator was engaging in fraudulent conduct, or (2) alleges facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud. *Id.*

As established above, the amended complaint does not allege that Dr. Wu engaged in any extreme conduct that could even approximate recklessness. To the contrary, plaintiff insufficiently pleads material misstatements, motive, and in the alternative "recklessness" as a throwaway. There are simply no facts alleged—much less with the particularity required—from which knowledge that any of Dr. Wu's statements were false. Accordingly, the Court should also dismiss this claim.

## CONCLUSION

The PSLRA, Rule 9(b), and extensive case law have raised the bar for plaintiffs who allege violations of the securities laws, particularly for fraud. In this case, plaintiff has utterly failed to clear that bar for any of his allegations. Defendant Bruno Wu respectfully requests that the Court dismiss with prejudice the claims against him.

Dated: New York, New York                Respectfully submitted,
       May 6, 2021


                                         By: /s/ Aaron F. Miner
                                             Aaron F. Miner
                                             Amanda Raines
                                             ARNOLD & PORTER KAYE SCHOLER
                                             LLP
                                             250 West 55th Street
                                             New York, New York 10019
                                             aaron.miner@arnoldporter.com
                                             amanda.raines@arnoldporter.com
                                             Telephone: (212) 836-8000
                                             Facsimile:  (212) 836-8689


                                  24


US 169706341v12