**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE IDEANOMICS, INC. SECURITIES
LITIGATION

No. 1:20-cv-04944-GBD-OTW

Oral Argument Requested

**MEMORANDUM OF LAW OF DEFENDANTS IDEANOMICS,**
**INC., ALFRED POOR, CONOR MCCARTHY, AND ANTHONY**
**SKLAR IN SUPPORT OF MOTION TO DISMISS THE**
**CONSOLIDATED AMENDED COMPLAINT**

VENABLE LLP
1270 Avenue of the Americas,
Twenty-Fourth Floor
New York, New York 10020

– and –

VENABLE LLP
600 Massachusetts Avenue NW
Washington DC 20001

*Counsel for Defendants Ideanomics, Inc.,*
*Alfred Poor, Conor McCarthy, and Anthony*
*Sklar*

**TABLE OF CONTENTS**

**Page**

I.   PRELIMINARY STATEMENT ................................................................................1

II.  STATEMENT OF FACTS ...................................................................................3

III. STANDARD OF REVIEW ................................................................................10

IV. ARGUMENT.....................................................................................................11

     A.   PLAINTIFF'S SECURITIES FRAUD CLAIM SHOULD
          BE DISMISSED. ..................................................................................11

          1.     The Complaint Fails to Plead a Material Misrepresentation. ..........................11

          2.     Plaintiff Has Not and Cannot Establish Loss Causation..................................18

          3.     Plaintiff Also Does Not Adequately Plead Scienter. ......................................21

     B.   PLAINTIFF'S SECTION 20(a) CLAIM MUST BE
          DISMISSED. ..................................................................................25

V.   CONCLUSION.....................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acticon AG v. China North East Petroleum Holdings Ltd.*,
 692 F.3d 34 (2d Cir. 2012).............................................................................................20

*Alaska Laborer Emps. Ret. Fund v. Scholastic Corp.*,
 No. 07-Civ.-07402 (GBD), 2010 WL 3910211 (S.D.N.Y. Sept. 30, 2010) ......................18, 19

*Alpha Capital Anstalt v. Schwell Wimpfheimer & Assocs. LLP*,
 No. 17-cv-1235-GHW, 2019 WL 1436993 (S.D.N.Y. Mar. 30, 2019)...................................21

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)........................................................................................................10

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
 493 F.3d 87 (2d Cir. 2007)............................................................................................3, 8

*In re Barrick Gold Corp. Sec. Litig.*,
 341 F. Supp. 3d 358 .......................................................................................................26

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007)........................................................................................................10

*Born v. Quad/Graphics, Inc.*,
 No. 19-CV-10376 (VEC), 2021 U.S. Dist. LEXIS 35675 (S.D.N.Y. Feb. 25,
 2021) .............................................................................................................................24

*C.D.T.S. v. UBS AG*,
 No. 12 Civ. 4924 (KBF), 2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) ...............................24

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
 543 F. App'x 72 (2d Cir. 2013) ......................................................................................19

*Construction Workers Pension Fund – Lake Cty. and Vicinity v. Navistar Int'l
 Corp.*,
 114 F. Supp. 3d 633 (N.D. Ill. 2015) ..............................................................................14

*Frankfurt-Trust Inv. Luxembourg AG v. United Techs. Corp.*,
 336 F. Supp. 3d 196 (S.D.N.Y. 2018)...............................................................................23

*Gissin v. Endres*,
 739 F. Supp. 2d 488 (S.D.N.Y. 2010)...............................................................................14

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)...............................................................................17, 23

*Greenhouse v. MCG Capital Corp.*,
    392 F.3d 650 (4th Cir. 2004) ..........................................................................................16

*Greenwald v. Orb Commc'ns & Mktg., Inc.*,
    192 F. Supp. 2d 212 (S.D.N.Y. 2002)...............................................................................11

*Harris v. AmTrust Fin. Servs. Inc.*,
    135 F. Supp. 3d 155 (S.D.N.Y. 2015)...........................................................................19, 22

*Hirsch v. Arthur Andersen & Co.*,
    72 F.3d 1085 (2d Cir. 1995).............................................................................................10

*Kalnit v. Eichler*,
    99 F. Supp. 2d 327 (S.D.N.Y. 2000)................................................................................25

*Koncelik v. Savient Pharm., Inc.*,
    No. 08-Civ.-10262 (GBD), 2010 WL 3910307 (S.D.N.Y. Sept. 29, 2010) ............................15

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    962 F. Supp. 2d 606 (S.D.N.Y. 2013)...............................................................................26

*Long Miao v. Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020).........................................................................16, 17, 24

*Lopez v. CTPartners Exec. Search, Inc.*,
    173 F. Supp. 3d 12 (S.D.N.Y. 2016).................................................................................16

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    289 F. Supp. 2d 429 (S.D.N.Y. 2003)..............................................................................7, 21

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    568 F. Supp. 2d 349 (S.D.N.Y. 2008)................................................................................6

*In re Nat'l Australia Bank Sec. Litig.*,
    No. 03 Civ. 6537(BSJ), 2006 WL 3844465 (S.D.N.Y. Oct. 25, 2006) .................................20

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)......................................................................................11, 17, 22

*ODS Capital LLC v. JA Solar Holdings Co. Ltd.*,
    No. 18-CV-12083 (ALC), 2020 WL 7028639 (S.D.N.Y. Nov. 30, 2020) .............................17

*In re Omnicom Group, Inc. Sec. Litig.*,
    597 F.3d 50 (2d Cir. 2010)...............................................................................................18

*Porwal v. Ballard Power Sys., Inc.*,
  No. 18-Civ.-1137 (GBD), 2019 WL 1510707 (S.D.N.Y. Mar. 21, 2019)..............................12

*In re PXRE Grp., Ltd. Sec. Litig.*,
  600 F. Supp. 2d 510 (S.D.N.Y. 2009)...................................................................................22

*Ramzan v. GDS Holdings, Ltd.*,
  No. 19-cv-9154 (LAK), 2020 U.S. Dist. LEXIS 61452 (S.D.N.Y. Apr. 7,
  2020) .......................................................................................................................................23

*Ross v. Lloyds Banking Grp., PLC*,
  Nos. 12-4600-cv (L), 13-729-cv, 546 F. App'x 5 (2d Cir. Sept. 19, 2013)...........................25

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
  573 F.3d 98 (2d Cir. 2009).....................................................................................................22

*In re Satyam Computer Servs. Sec. Litig.*,
  915 F. Supp. 2d 450 (S.D.N.Y 2013)....................................................................................24

*Schwab v. E\*Trade Fin. Corp.*,
  285 F. Supp. 3d 745 (S.D.N.Y. 2018)....................................................................................21

*Smith v. Antares Pharma, Inc.*,
  No. 17-8945 (MAS) (DEA), 2020 WL 2041752 (D.N.J. Apr. 28, 2020)...............................22

*Steamfitters Local 449 Pension Plan v. Sketchers USA, Inc.*,
  412 F. Supp. 3d 353 (S.D.N.Y. 2019)....................................................................................15

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008)...................................................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)....................................................................................................10, 11, 21

*Turner v. MagicJack VocalTec, Ltd.*,
  No. 13 Civ. 00448, 2014 WL 406917 (S.D.N.Y. Feb. 3, 2014) ............................................23

*Zhong Zheng v. Pingtan Marine Enter. Ltd.*,
  379 F. Supp. 3d 164 (E.D.N.Y. 2019) ...................................................................................24

**Statutes**

15 U.S.C. § 78u-4(b)(1), (2) ........................................................................................................11, 21

15 U.S.C. § 78u-5(i)(l).........................................................................................................................12

Fed. R. Civ. P. 12(b)(6).........................................................................................................................1

iv

Private Securities Litigation Reform Act of 1995,
15 U.S.C. § 78u-4(b).................................................................................................. *passim*

Defendants Ideanomics, Inc. (the "Company" or "Ideanomics"), Alfred Poor ("Poor"), Conor McCarthy ("McCarthy"), and Anthony Sklar ("Sklar") (collectively the "Individual Defendants," and together with Ideanomics, the "Defendants")[1] respectfully submit this memorandum of law in support of their motion to dismiss with prejudice the Consolidated Amended Complaint, Dkt. No. 78 (the "Amended Complaint"), in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).

## I.    PRELIMINARY STATEMENT

This putative class action is nothing more than an opportunistic effort to capitalize on a stock price drop caused by a concerted and temporarily successful campaign by two notorious short-sellers to artificially depress the Company's stock price. The short-sellers claimed that a facility the Company was developing in China called the MEG Center and orders from the Company's MEG business unit were both fake, that the Company only had three months of cash left, and that the Company was involved in a pump and dump scheme. These statements are demonstrably false—the Company does have a facility in Qingdao, orders from its MEG business unit are real and have been recognized in the Company's SEC filings, and the Company has survived well past three months.

Apparently recognizing the significant shortcomings of the short-sellers' statements, Plaintiff's Amended Complaint only alleges that the Company made false and misleading statements that purportedly misrepresented "the extent to which the MEG Center was ready for business and capable of delivering 2020 revenues to the Company." Plaintiff fails to provide any

---

[1]    Dr. Bruno Wu, who is also a named individual defendant, is represented by separate counsel. Dr. Wu is filing herewith a contemporaneous motion to dismiss that joins in the arguments set forth in this Memorandum of Law.

1

allegation sufficient under the PSLRA to show that any statement of fact was false. Further, the remaining statements—all of which are forward-looking—are not actionable under the PSLRA. Nor does Plaintiff offer any facts to dispute that the Company has actually delivered revenues from its MEG business and Center—thus, making Plaintiff's vague claim that Defendants misrepresented the extent to which the MEG Center was ready and capable of delivering 2020 revenues baseless. Additionally, Plaintiff relies on the short-sellers' statements and his counsel's own purported investigation, which do not meet the close scrutiny courts in this Circuit require when relying on such allegations that are based upon unnamed and unidentified sources. Finally, Plaintiff's own investigation confirms the Company's presence on the site and that renovations are ongoing.

Plaintiff also fails to plead loss causation. The only plausible reading of the Amended Complaint is that the decline in the Company's stock price was caused by the short-sellers' concerted and successful efforts to depress the stock price—not by any corrective disclosure. The Company's stock price rebounded just days after the short-sellers' statements and stayed above the Company's stock price during the majority of the Class Period—further supporting the fact that the temporary stock price drop was indeed caused by the short-sellers' false statements and not by any corrective disclosure. Additionally undercutting Plaintiff's loss causation claim is Plaintiff's acknowledgment that the allegedly false statements had no effect on the stock price. Am. Compl. ¶ 11. In fact, the Company's stock price rose on news of orders emanating from the Company's MEG business—a fact that Plaintiff does not challenge in the Amended Complaint— and conversion of debt into equity by two of the Company's directors.

In addition to the foregoing deficiencies, Plaintiff offers no specific allegations of scienter as to the Individual Defendants that meets the heightened pleading standards under the PSLRA. Plaintiff only offers general motivations of success that Courts have consistently found deficient.

Finally, because Plaintiff has failed to make allegations sufficient to sustain his Section 10(b)(5) claim, Plaintiff has also failed to establish a basis for his Section 20(a) claim.

## II.    STATEMENT OF FACTS[2]

### A.  IDEANOMICS, ITS MEG BUSINESS UNIT, AND THE MEG CENTER.

Ideanomics is a company that has transformed itself over the last couple of years. Am. Compl. ¶¶ 45-53. During 2018, the Company ceased operations in the trading of crude oil and electronic components business and found an opportunity in the Chinese electric vehicle ("EV") industry. Ex. 1[3] (Feb. 12, 2021 S-3 at 5). The Company established its Mobile Energy Global ("MEG") business unit, which is based in China. *Id*. On January 28, 2020, the Company announced that the City of Qingdao had made an initial investment in its MEG sales subsidiary. Am. Comp. ¶ 12. On March 3, 2020, the Company announced that, as a follow up to its partnership with Qingdao, the Company, through its Qingdao Mobile subsidiary, would open a facility with the total capacity of "100,000 square meters (1Million square feet)," now known as the MEG Center, that "*will* host a state-of-the-art sales and service center for new and used passenger and commercial Electric Vehicles (EV), and on-site financing, insurance, and vehicle registration

---

[2]    The allegations are drawn from the Amended Complaint as well as statements or documents incorporated into the complaint by reference and legally required public disclosure documents filed with the SEC. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted) ("[W]e may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.").

[3]    Unless otherwise indicated, all references to "Ex." herein refer to the exhibits attached to the Declaration of George Kostolampros dated May 6, 2021 ("Kostolampros Decl.").

services." Am. Compl. ¶¶ 93-94, 97 (emphasis added); Ex. 2 (Mar. 3, 2020 Press Release) (emphasis added).

Throughout 2020 and into 2021, the Company saw significant expansion and growth of its business. Ideanomics expanded to include, in addition to MEG, other acquisitions in ASEAN countries and acquisitions in the United States. Ex. 3 at 6, 28, F-32 (Mar. 30, 2021 2020 10-K). Further, the Company recognized revenue from sales from the MEG-related business, as acknowledged by the Complaint (Am. Compl. ¶ 154) and reported by the Company in its most recent SEC Form 10-K, filed on March 30, 2021, that its MEG-related revenue totaled over $25 million in 2020, as compared to $2.7 million in 2019. Ex. 3 at 32 (Mar. 30, 2021 2020 10-K). Additionally, for the first time since at least 2014, the Company did not include in its 2020 10-K a "going concern" qualification, which notes substantial doubt about a company's ability to continue as a going concern. *See id*. at 29.

### B. DEFENDANTS' STATEMENTS AT ISSUE.

Plaintiff claims that Defendants made false and misleading statements from March 16, 2020 through June 25, 2020 that purportedly "misrepresented, through gross exaggeration and lies, the extent to which the MEG Center was ready for business and capable of delivering 2020 revenues to the Company." Am. Compl. ¶ 18. The following is a representative sample of the alleged misstatements[4]—

- On March 16, 2020, Mr. Poor stated on an earnings call that Ideanomics had already "***announced the MEG sales hub in the coastal port of Qingdao***" and further commented that "[**t**]**he** *building is mostly finished . . . But the idea of it is it's about 1 million square feet of space . . . There will be multiple manufacturers from across the EV industry. It will be a friendly competitive environment."* Am. Compl. ¶¶ 134, 135. Mr. Poor further noted that the facility "***is being completely refurbished***" but "[a]t

---

[4]     The bolded/italicized portions are the portions that Plaintiff claims were false and misleading.

4

the moment the site is used for a number of purposes, but a large portion of it currently already has a vehicle sales site." *Id.* ¶¶ 135, 136. Plaintiff's Amended Complaint also focuses on a statement made by Dr. Wu that same day when he responded to a question about the Company announcing that it had recently opened a 10,000 square foot facility in Qingdao, stating that "***we're actually opening up . . . a million square feet.***" *Id.* ¶ 137.

- A March 20, 2020 press release stating that the MEG sales center "***is scheduled to start sales operations by May 1. The 1 Million square foot site has been renovated as a permanent EV expo center.***" *Id.* ¶ 139. The press release further announced that MEG "***will be joined at the site by more than 20 partners ranging from EV manufacturers, EV battery manufacturers, . . . and EV charging solutions . . .***" *Id.* It also explained that the "city of Qingdao currently operates an automotive sales and servicing center for a range of vehicle manufacturers at the site, ***these operations are being assumed by MEG as part of the expanded plans and focus onto EV.***" *Id.*

- On May 11, 2020, in the Company's 10-Q, the Company stated that it "***anticipates that its MEG business unit will be the largest contributor to revenues in 2020***." *Id.* ¶ 141. In the Company's press release that same day, Mr. Poor stated that "***We look forward to Q2 and beyond, including an AGM in the summer of this year to showcase both the MEG business and the formal ribbon-cutting on our new 1MM square feet EV center in Qingdao.***" *Id.* On the earnings call, Mr. Poor further elaborated that "***our EV hub in Qingdao had a soft launch on May 1 and as such, will be a contributor to our Q2 revenues.***" *Id.* ¶ 142. Mr. Poor further stated that the Company planned to have its annual general meeting at a formal ribbon cutting of the MEG Center at the end of June or mid-July to be held in New York City and Qingdao. *Id.* ¶ 143.

- On May 26, 2020 a press release announcing that its MEG subsidiary "***has officially launched the largest auto trading market in Qingdao . . . . The MEG Center . . . now hosts a full suite of car dealer services for new energy and used cars with a capacity of 18,000 vehicles . . . .***" *Id.* ¶ 146.

- On May 28, 2020, Mr. Poor commented in a YouTube interview that "***we set out to create a hub where we could bring the best and [inaudible] partners and give the fleet operators a focal point where they could come and learn about EV . . . . We did a soft launch on May the 1st which we started selling vehicles . . . . We were able to expand that this week and then this past Monday, we officially opened up a large center for both used cars and new EV vehicles. So both of those are up and running.***" *Id.* ¶¶ 148-149. The video interview included slides of photos of the MEG Center, which included a MEG label on a balloon over a vehicle which Plaintiff claims are fake and misleading. *Id.* ¶ 151. Plaintiff also claims that there is a time stamp on the photos from 2020. *Id.* ¶ 153. There is no time stamp on the photos; rather, there is a copyright tag label on the photos.

5

- On June 9, 2020, the Company issued a press release reminding that "*the MEG Center in Qingdao began operations on May 1.* Based on the level of *sales activity* in the first week of June, this month's sales are expected to exceed May levels." *Id.* ¶ 154. The release further commented that "*in its first five weeks of being operational"* there were *"high levels of activity at this early stage", "solid customer foot traffic"* and that *"The initial activity combined with the projected growth . . . reinforces our belief that the MEG Center will be a material source of revenue for Ideanomics."* *Id.*

- On June 11, 2020, consistent with prior statements, Mr. Poor commented in an interview that "*we did a soft launch the beginning of May and then an official launch of our Qingdao EV hub towards later in May and it's been a very big success . . . . We had aggressive goals for it, but we delivered more than 2,000 units sold vehicles in the first month."* *Id.* ¶ 156.

- On June 15, 2020 stating the MEG Center is *"a really exciting opportunity for us"* and *"[s]o it's difficult as a fleet operator to understand which companies to work with, how to get the right kind of lease, financing terms, things like that. So we sat down with the automotive industry in China and we understood it really needs is a focal point."* *Id.* ¶ 159.

In describing the MEG unit, the Company's SEC filings provided cautionary language regarding the development of its MEG Business. As an example, the Company warned that the division was "*still in the development stage* and its business model continues to evolve . . . ." Ex. 4 at 3, 4 (Mar. 16, 2020 2019 10-K) (emphases added); Am. Compl. ¶ 14. The Company also cautioned that "[t]he rate at which the MEG business unit grows is highly correlated with the development of financing structures . . .and the speed at which business in the PRC and the rest of Asia returns to pre Covid-19 levels." Ex. 5 at 40 (May 11, 2020 10-Q).

### C.  IDEANOMICS'S STOCK PRICE ROSE DURING THE CLASS PERIOD IN CORRELATION WITH STATEMENTS NOT AT ISSUE.

As Plaintiff alleges in the Amended Complaint, the initial statements regarding the MEG Center had little correlation to any movement in Ideanomics's stock price. *See* Am. Compl. ¶ 11. In fact, the stock price fluctuated—consistent with the Company's disclosed risk factors in its 10-Ks that its stock price is volatile—throughout the majority of the Class Period; at the beginning of

6

the class period (March 16, 2020), the stock price closed at 38 cents, on March 31, 2020, it closed at $1.34 and on June 4, 2020, the stock price also closed at 38 cents.[5] *See* Ex. 6 (Stock Price Data).

The Company's stock price did not begin to rise again until the Company disclosed on June 5, 2020 that it eliminated debt owed to Dr. Wu and director Shane McMahon through a conversion of debt to equity shares. Am. Compl. ¶ 103; *see also* Ex. 6 (Stock Price Data). The Company's stock price continued to rise between June 9 through June 22 when the Company announced multiple orders from its MEG business and elimination of an additional $10.6 million of debt through conversion of debt to equity. Am. Compl. ¶¶ 104, 109, 110; Ex. 6 (Stock Price Data). The Company also announced on June 18, 2020 that Yorkville Advisors, a global investment management company, purchased another $15 million of Ideanomics shares per its Standby Equity Distribution Agreement with Ideanomics. *Id.* ¶ 111. During the period of June 5 through June 19, the Company's stock price rose to close on June 19 at $2.22. *See* Ex. 6 (Stock Price Data).

On June 22, 2020, the Company's stock price and volume rose significantly. Aside from another report of sales from the MEG business, which Plaintiff does not challenge, the only other news report that day was a tweet at 12:35 pm, by David Portnoy, a celebrity with 2.4 million followers on Twitter, retweeting a post celebrating the Company's recent stock gains. *See* Ex. 7 (Portnoy Tweet).[6] The last trading day before the tweet, there was trading volume of 51,945,630 shares at a price of $2.22 per share; following the tweet, trading volume shot up to 362,851,300

---

[5]    It is well-established that the court may take judicial notice of trading data regarding the shares of a publicly traded corporation without converting a motion to dismiss into a motion for summary judgment. *See*, *e.g.*, *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 362 n.7 (S.D.N.Y. 2008).

[6]    *Cf. In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 433 n.3 (S.D.N.Y. 2003) ("The Court may take judicial notice of newspaper articles for the fact of their publication without transforming the motion into one for summary judgment.") (citation omitted).

shares at a price of $3.29 per share after the tweet. *See* Ex. 6 (Stock Price Data). The Company's

stock price then fluctuated over the next several days and closed on June 24 at $3.09. *Id.*

## D. SHORT-SELLERS' CONCERTED EFFORTS TO CAUSE THE STOCK PRICE TO DROP.

On June 25, 2020, a notorious short-seller, JCapital Research Limited ("JCap"), published

a "report" on Ideanomics, titled "Champion of Promotes." On its website, JCap states "Be warned.

We are activists, usually on the short side. We are biased. We do our best to find and present facts,

based on extensive primary research and using public sources. But we will profit if these stocks

decline or, when we are long, rise in value." Ex. 8 (JCap Homepage). JCap's report claimed that

"Ideanomics . . . is a zero," that the recent run-up on the Company's stock price "is nothing more

than a well-timed pump," and that the Company "has less than three months of cash in the bank."

Am. Compl. ¶¶ 116-117; *see* Ex. 9 at 3 (JCap Report).[7] It also stated that their "investigators have

been unable to establish that IDEX has a showroom in Qingdao" and stated it contacted unnamed

individuals at the facility and that purportedly none of them had heard of Ideanomics. *Id.* JCap

also alleged it contacted unnamed individuals at four of the five buyers of EVs announced in

Ideanomics's press releases and claimed that all four denied there were contracts. *Id.* at 5. JCap

then went on to take issue with the Company's past businesses, its auditor, and claimed that

Ideanomics is a "Shell game." *Id*. at 6-14.

Soon after the JCap report was issued, another notorious short-seller, Hindenburg Research

("Hindenburg"), tweeted a picture of the MEG Center, claiming that none of the unnamed people

its investigation purportedly spoke to had heard of Ideanomics or MEG. Ex. 9 (Hindenburg Tweet).

---

[7]      The short-seller statements, including the report by JCap and the tweet by Hindenburg, are cited in and/or integral to the Amended Complaint. As such, they may properly be considered on a motion to dismiss. *See ATSI Commc'ns, Inc.*, 493 F.3d at 98.

The next day, Hindenburg issued a statement on its website further disparaging the Company, including stating that "it's stock will wind up in the pennies or halted by regulators." Ex. 11 (Hindenburg Report on Ideanomics). Hindenburg also disclosed prominently that "**Disclosure: We Remain Short Shares of Ideanomics (NASDAQ: IDEX).**" *Id.* (emphasis in original).

Not surprisingly, given the short-sellers' false statements that the Company is a "zero" with no operations at the MEG Center, that the orders were fake, that there was a timed pump and dump and that Ideanomics's stock would "wind up in the pennies", the price of Ideanomics's stock price dropped—just as the short-sellers hoped—to close at $1.46 on June 26. Decl., Ex. 6 (Stock Price Data).

### E.  THE COMPANY'S RESPONSE TO THE SHORT-SELLERS.

On June 26, 2020, the Company issued several press releases refuting and correcting the misinformation disseminated by the short-sellers. As it had previously disclosed, the Company stated that the MEG Center had a soft opening on May 1 and a fuller opening on May 25, 2020, and that it had a 15-year rental agreement in Qingdao. Ex. 12 (June 26, 2020 "Clarifies Status" Press Release). The Company also described the various renovations at the MEG Center and the projected timing of those renovations. For example, the Company noted that "Phase II of the opening will see an additional 20,000 square meters come online and is subject to renovation in preparation for MEG and its participating partners. This includes the MEG welcome center and executive offices." *Id*. Further, a separate press release clarified that a junior sales manager who was approached by Hindenburg did in fact say he was familiar with the Company. Ex. 13 (June 26, 2020 "Qingdao Sales Center" Press Release).

**F.  THE  COMPANY'S  STOCK  PRICE  AFTER  THE  SHORT-SELLERS'
CONCERTED EFFORTS TO DRIVE THE STOCK PRICE DOWN.**

As discussed, the short-sellers' concerted efforts to drive the Company's stock price down were initially successful. The Company's stock price, however, rebounded to levels above the stock's price during the majority of the Class Period. For instance, on June 29, 2020 the stock price closed at $2.09—higher than any close from March 16 through June 18 and traded at a high of $2.48 on June 30, 2020, which was higher than any closing price prior to June 22—the day in which there was a spike in trading volume and price because of a celebrity tweet. *Id.* Moreover, for the 90-day period after the June 25 short-sellers' reports, the stock price average was $1.32—which is significantly higher than the average stock price of 85 cents during the whole Class Period. *Id.*

### III.    STANDARD OF REVIEW

To survive a motion to dismiss, the complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A pleading that merely recites conclusory allegations or a formulaic recitation of the elements of a cause of action fails to state a claim. *Iqbal*, 556 U.S. at 678. Well-pleaded allegations are assumed to be true only to the extent not contradicted by other allegations or documents incorporated by reference, including filings with the SEC and other materials as to which the Court can take judicial notice. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007); *see also Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995) (affirming dismissal because "the Complaint's attenuated allegations of control are contradicted both by more specific allegations in the Complaint and by facts of which we may take

judicial notice"). Under the heightened pleading requirements imposed by Rule 9(b) and the PSLRA, a securities fraud complaint must specify each alleged misstatement or omission, explain why it is false or misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted" with a fraudulent state of mind, that is, scienter. *Tellabs*, 551 U.S. at 321 (citing 15 U.S.C. § 78u-4(b)(1), (2)); *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000). A complaint will only survive a motion to dismiss "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

## IV.    ARGUMENT

### A.  PLAINTIFF'S SECURITIES FRAUD CLAIM SHOULD BE DISMISSED.

To state a Section 10(b) and Rule 10b-5 claim, Plaintiff must allege that the Defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *Greenwald v. Orb Commc'ns & Mktg., Inc.*, 192 F. Supp. 2d 212, 226 (S.D.N.Y. 2002) (citations omitted). As set forth below, Plaintiff's securities fraud claim should be dismissed for multiple independent reasons.

#### 1.  The Complaint Fails to Plead a Material Misrepresentation.

Plaintiff claims that Defendants misrepresented "the extent to which the MEG Center was ready for business and capable of delivering 2020 revenues to the Company." Am. Compl. ¶ 18. Strikingly absent from the Amended Complaint is any allegation (conclusory or not) challenging that the Company actually has a lease for the MEG Center, that the Company generated revenues from the MEG Center, or that the Company's MEG business has resulted in what the Company projected—the primary revenue generator for the Company in 2020. As set forth below, Plaintiff

11

fails to plead facts that would establish that the Company's statements were false and/or actionable under the PSLRA.

### a) Statements Regarding the Size of the MEG Center and Renovations.

Plaintiff challenges Mr. Poor's statements during a March 16, 2020 earnings call that "[t]he building is mostly finished" and that "it's about 1 million square feet," and Dr. Wu's statement in a March 16, 2020 YouTube interview that the Company was "opening up a million square feet," alleging they were false and misleading and gave a false impression that the MEG Center was mostly finished and that the MEG Center was 1 million square feet. Am. Compl. ¶¶ 135, 138. These statements are not false and are not actionable.

First, the collective statements do not refer to the MEG Center being operational throughout the full million square feet, but rather to the Qingdao facility being a full million square feet, which Plaintiff does not challenge—nor could challenge. Second, Dr. Wu's statements were forward-looking as they refer to the fact that the Company planned for the MEG Center to ultimately use all 1 million square feet of the facility. Plaintiff also ignores Mr. Poor's other statements within that same interview that make clear that these were also forward-looking statements. Specifically, Mr. Poor said "the *idea of it is* it's about 1 million square feet of space. *The idea there will be . . . vehicles on the site . . . . There will be multiple manufacturers . . .*" and *[i]t is being completely refurbished so the insides of it are going to be as new.*" *Id.* ¶ 135 (emphases added). These statements fall squarely within the PSLRA's definition of forward-looking and are not actionable.[8] 15 U.S.C. § 78u-5(i)(l) (any "statement of the plans and objectives of management for future operations"); *Porwal v. Ballard Power Sys., Inc.*, No. 18-Civ-1137

---

[8]    The Company's written statements were also accompanied by meaningful cautionary language. *See, e.g.*, Ex. 14 (May 11, 2020 Earnings Call Transcript) (containing safe harbor language and reminder about risks of COVID); *see also* Ex. 4 at 22-26 (2019 10-K).

12

(GBD), 2019 WL 1510707, at *6-7 (S.D.N.Y. Mar. 21, 2019) (Daniels, J.) (finding that forward-looking statements regarding joint venture's operational progress and ability to deliver were protected under the PSLRA).

Plaintiff also alleges that a March 20, 2020 statement by Mr. Poor that "[t]he 1 Million square foot site has been renovated as a permanent EV expo center" was false. Am. Compl. ¶ 139. But this statement is consistent with Mr. Poor's prior statement on March 16, 2020 (which Plaintiff does not contend was false) that the facility "was already being refurbished to be an EV hub." *Id.* ¶ 135. Read in context with the March 16, 2020 statements—*just four days earlier*—this statement did not mean that the anticipated renovations had been completed but rather that the Qingdao facility had been repurposed as an EV center.

### b) Statements Regarding the Soft Launch on May 1, 2020 and a Later Anticipated Ribbon-Cutting Ceremony.

Plaintiff alleges that Defendants' statements regarding the MEG Center that it "is scheduled to start sales operations by May 1," that it "had a soft launch on May 1," and that it planned a "ribbon-cutting ceremony . . . in the summer" were false. Am. Compl. ¶¶ 139, 142, 146, 154. Plaintiff, however, offers no allegation at all setting forth why these statements are allegedly false. Plaintiff offers no confidential witness or document that would support an allegation that there was no soft opening on May 1 or that the Company planned a ribbon-cutting ceremony. Further, the statement that the Company planned a ribbon-cutting in the summer is plainly a forward-looking statement.

13

c) **Statements Regarding Future Partners at the MEG Center and the Company's Anticipated Business from its MEG Business and MEG Center.**

Plaintiff alleges that the following statements regarding partners that ***will be*** on the site and *anticipated* business are false:

- "there ***will be*** vehicles on the site, similar to what you see in a very high-end showroom. There will be multiple manufacturers from across the EV industry." Am. Compl. ¶ 135 (emphasis added).

- "[MEG] ***will be*** joined at the site by more than 20 partners . . . ." *Id.* ¶ 139 (emphasis added).

- The Center announced a soft launch on May 1, 2020 that "***will*** house partners ranging from EV manufacturers, EV battery manufacturers, energy storage, energy management, and EV charging solution providers . . . ." *Id.* ¶ 146 (emphasis added).

- "[t]he Company ***anticipates*** that its MEG business unit will be the largest contributor to revenue in 2020." Am. Compl. ¶ 141 (emphasis added).

- "our EV hub in Qingdao had a soft launch on May 1 and as such, ***will be*** a contributor to our Q2 revenues." *Id.* ¶ 142 (emphasis added).

- "Yes, I absolutely do ***believe*** that ***we'll achieve profitability this year.***" *Id.* ¶ 144 (emphases added).

- "The initial activity combined with the projected growth for the remainder of 2020 reinforces our belief that the MEG Center ***will be*** a material source of revenue for Ideanomics." *Id.* ¶ 154 (emphasis added).

Inclusion of phrasing like "will" renders these statements non-actionable under the PSLRA. *See*, *e.g.*, *Gissin v. Endres*, 739 F. Supp. 2d 488, 507 (S.D.N.Y. 2010) (finding that because defendants' alleged misstatements were cast in predictive terms, they were "by definition forward-looking."); *see also Construction Workers Pension Fund – Lake Cty. and Vicinity v. Navistar Int'l Corp.*, 114 F. Supp. 3d 633, 647-48 (N.D. Ill. 2015) (noting definition of "will" as expressing the future tense and thus forward-looking).

#### d) **Statements Regarding the Success of the MEG Center.**

Plaintiff also claims that the following statements regarding the success of the MEG Center were false:

- "Yes so as you know we did a soft launch the beginning of May and then an official launch of our Qingdao EV hub towards later in May and *it's been a very big success*. *It's met our expectations*. We had aggressive goals for it, but we delivered more than 2,000 units sold vehicles in the first month. So that's *looking very promising* for us as a revenue stream throughout the year." Am. Compl. ¶ 156 (emphases added).

- "So we *set out* to create a hub where we could bring *the best and [inaudible] partners . . . .*" *Id.* ¶ 148 (emphases added).

- "we are very pleased with the Center's *high levels of activity at this early stage*. The Center's *solid customer foot traffic . . . ." Id.* ¶ 154 (emphases added).

The law is clear that such statements of hope, opinion, or belief about future performance or general market conditions are immaterial and not actionable. *See*, *e.g.*, *Steamfitters Local 449 Pension Plan v. Sketchers USA, Inc.*, 412 F. Supp. 3d 353, 363 (S.D.N.Y. 2019); *see also Koncelik v. Savient Pharm., Inc.*, No. 08-Civ.-10262 (GBD), 2010 WL 3910307, at *9 (S.D.N.Y. Sept. 29, 2010) (Daniels, J.) (noting that corporate optimism is not actionable under a claim of securities fraud).

#### e) **The Company's Photo Depictions of the MEG Center.**

Plaintiff alleges that a photograph in a slide shown during a presentation in a May 28, 2020 interview, and later used in a press release, "did not accurately represent the current state of the MEG Center, or Ideanomics' presence at the facility." Am. Compl. ¶¶ 104, 152. Specifically, that a MEG label on a balloon over a vehicle was photoshopped onto the photograph. *Id.* ¶ 119. The photograph, however, is a depiction and can only be viewed as such given the Company's statements just two weeks earlier that a "soft launch" occurred on May 1, 2020 and plans for a formal ribbon cutting in the summer. Ex. 14 (May 11 Earnings Call Transcript). Plaintiff claims

15

that the photograph included a "2020 timestamp," but the purported 2020 "timestamp" is actually a 2020 copyright notice, and when viewed in the context of Defendants' statements, no reasonable investor would have interpreted the May 28 photographs as representing that the MEG Center was fully up and running within the entire 1 million square feet of space, or that renovations to make it an "EV hub" were complete.

Moreover, Plaintiff acknowledges that these early statements had no effect on the Company's stock price. Am. Compl. ¶ 11. Whether the photo was labeled as a depiction or rendering or not does not alter the mix of information available to investors. The fact of the matter is that the Company's MEG business and center have generated revenues and Plaintiff does not even allege otherwise. Thus, the photo is simply immaterial. *See Lopez v. CTPartners Exec. Search, Inc.*, 173 F. Supp. 3d 12 (S.D.N.Y. 2016) (stating that the "securities laws . . . 'decidedly do *not* prohibit *any* misrepresentation . . . of *im*material facts, even if it induces reactions from investors that, in hindsight or otherwise, make the representation appear material'") (emphasis in original) (quoting *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 656 (4th Cir. 2004) (holding that executive's false statement as to his educational background was immaterial)). In fact, on May 28—the day the photo depiction was included in Mr. Poor's interview, the Company's stock price closed at 41 cents—lower than its prior close on May 27 at $0.43. Ex. 6 (Stock Price Data).

**f)   Plaintiff's Reliance on the Short-Sellers and his own "Investigation" Does Not Adequately Support Any Allegation of Falsity.**

The short-seller statements in this case, containing vague references to anonymized sources, is exactly why this Court has said there is a "particular need for close scrutiny" of such allegations. *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020) (dismissing allegations of falsity that rested upon short-sellers' report that "consist[ed] entirely of statements

16

made by anonymous—and often vaguely described—interviewees"). It bears reiterating that the short-sellers' statements claimed that the Company's orders were fake and that Ideanomics nor MEG had any presence at the Qingdao site.  Am. Comp. ¶¶ 117-120. Plaintiff, however, does not allege that the Company's orders were fake and its own investigation confirms that MEG has a presence on the site and that the site is under renovation. And, where, as here, a plaintiff has not corroborated the allegations (except through similarly uncorroborated anonymous sources), "the risk of motivated reporting by the author of the short-seller report is twinned with the reliability concerns presented by anonymous sourcing recognized in *Novak* [*v. Kasaks*, 216 F.3d 300 (2d Cir. 2000)]." *See Long* Miao, 442 F. Supp. 3d at 801.

Like in *Long Miao*, both the short-sellers' statements and Plaintiff's alleged investigation, rely entirely on anonymous, unnamed sources without sufficiently particular information regarding their positions or job responsibilities to "indicate a high likelihood that they actually knew facts underlying their allegations." *See Long Miao*, 442 F. Supp. 3d at 802-03 (quoting *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011)). As a result, since Plaintiff's purported investigation does not amount to "well-pled independent and particularized facts corroborating" the short-sellers' statements, neither it nor the short-sellers' statements can be relied upon. *Id.*; *see also ODS Capital LLC v. JA Solar Holdings Co. Ltd.*, No. 18-CV-12083 (ALC), 2020 WL 7028639, at *8-9 (S.D.N.Y. Nov. 30, 2020).

Even more damning, far from undermining Defendants' statements, Plaintiff's investigation actually confirms the accuracy of the Company's prior statements. For example, Plaintiff confirms a MEG presence by acknowledging that there are banners on-site referencing MEG and ongoing construction. Am. Compl. ¶¶ 128-132 (stating that banners were located outside of the MEG Center reading "MEG (Mobile Energy Global), New Energy Vehicle Exhibition

17

Center, Future Coming for You, Coming Soon" and that it was still 'under renovation'). Moreover, ongoing renovations and a "coming soon" sign are entirely consistent with the Company's prior statements that it had a "soft launch" of the facility in May 2020 and planned a wider formal ribbon-cutting opening ceremony later in the summer. *Id.* ¶¶ 142, 142, 146, 149. Further, the fact that Plaintiff's alleged investigators found that in January 2021 "no activities described in the press releases were taking place," (Am. Compl. ¶ 132), does nothing to establish that the Company's statements seven and eight months earlier in May-June 2020 about a "soft launch," "sales" and "foot traffic" were false.

### 2. Plaintiff Has Not and Cannot Establish Loss Causation.

As a second stand-alone basis for dismissal, the Amended Complaint fails to show, and in fact cannot establish, loss causation. The undeniable fact is that the stock price drop was caused by the successful efforts of the short-sellers to drive Ideanomics's stock price down and not by any alleged misstatement. In order to establish loss causation, Plaintiff must allege that "the 'particular misstatements alleged caused their alleged loss,' as well as 'a sufficient connection between those misstatements and the losses suffered as a result' of the decline in value . . . that is, that the 'misstatements concealed the risk' of the decline in value . . . ." *Alaska Laborer Emps. Ret. Fund v. Scholastic Corp.*, No. 07-Civ.-07402 (GBD), 2010 WL 3910211, at \*5 (S.D.N.Y. Sept. 30, 2010) (Daniels, J.) (citations omitted).

First, the short-sellers' statements are not corrective disclosures. For a disclosure to be "corrective," it must "reveal some then-undisclosed facts with regard to the specific misrepresentations alleged in the complaint." *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 50, 5111 (2d Cir. 2010). Aside from being demonstrably false, the short-sellers' unverified statements are not corrective disclosures because they provide "opinions" based upon "public sources." Ex. 9

at Terms of Service (JCap Report); Ex. 11 (Hindenburg Report on Ideanomics); *Omnicom*, 597 F.3d at 512 ("A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions."); *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013) ("[T]hird-party articles and reports [that] expressed negative opinions about [the Company] based on information that was already publicly available" is not a sufficient corrective disclosure).

Second, the Company's June 26 press release was not a corrective disclosure. The Company's "clarification" statement on June 26 corrected the misinformation distributed by the short-sellers that claimed the Company did not have any facility in Qingdao and that Ideanomics was a fraud. *See* Ex. 9 (JCap Report); Ex. 10 (Hindenburg Tweet). The Company's June 26, 2020 press release confirms its earlier statements that the MEG Center is housed in a building that is 1 million square feet, and that the center's activities "had a soft launch on May 1, with a fuller opening on May 25, 2020." Ex. 12 (June 26, 2020 "Clarifies Status" Press Release). While the press release adds context to explain when each portion of the 1 million square foot building is expected to open, this again was entirely consistent with prior statements by the Company about its plans for the MEG Center, including that a formal ribbon-cutting ceremony was planned for later in the summer. Am. Compl. ¶¶ 141, 143, 146, 149. Therefore, Ideanomics's clarification is not a corrective disclosure and cannot support Plaintiff's loss causation allegation. *See Harris v. AmTrust Fin. Servs. Inc.*, 135 F. Supp. 3d 155, 173 n.30 (S.D.N.Y. 2015) (dismissing securities class action and finding that short-seller report did not "correct" the information available to the market where "[r]ather than injecting new information into the market that was absorbed into a corrected stock price, the [short-seller's] Report caused a temporary price drop").

Further undercutting Plaintiff's loss causation allegation is Plaintiff's acknowledgment that the Defendants' initial statements regarding the MEG Center ***had little effect*** on the Company's stock price. Am. Compl. ¶ 11. In fact, it had no effect on the stock price. Ex. 6 (IDEX's stock price was $0.38 at the beginning of the Class Period, dipped to a low of $0.32 on March 18, 2020, and again closed at $0.38 on June 4, 2020). Further, the Company's stock price did not rise to and stay above $1 until two events unrelated to statements regarding the operational status of the MEG Center: (1) the conversion of debt owed to Dr. Wu and director McMahon on June 5 and (2) significant MEG orders announced between June 9 through June 22.

Moreover, after the short-sellers' concerted efforts to drive the stock price down, the Company's stock price bounced back to levels higher than the stock price during the majority of the Class Period. Ex. 6 (Stock Price Data).[9] Specifically, for the 90-day period post June 26, the Company's average stock price was $1.32—a price exceeded only once from March 16, 2020 through June 16, 2020. *Id*. Thus, those class members that purchased prior to June 17 would not be able to prove that they were damaged by the alleged fraud. *See*, *e.g.*, *Acticon AG v. China North East Petroleum Holdings Ltd.*, 692 F.3d 34, 39 (2d Cir. 2012) ("[I]f the mean trading price of a security during the 90–day period following the correction is greater than the price at which the plaintiff purchased his stock then that plaintiff would recover nothing under the PSLRA's limitation on damages."); *see also In re Nat'l Australia Bank Sec. Litig.*, No. 03 Civ. 6537(BSJ), 2006 WL 3844465, at *9 (S.D.N.Y. Oct. 25, 2006) (noting that plaintiff failed to allege he was damaged in any way by the alleged fraud because the mean trading price during the statutory lookback period was greater than what he had paid for the securities). And, for the stock price

---

[9]    The stock price closed at $1.34 on March 31, 2020 and then dropped and closed under $1 for every day until June 9. Ex. 6 (Stock Price Data).

20

during the six-day period from June 17 through June 24, the only plausible reading of the Amended

Complaint for the basis of the Company's stock price decline on June 25 is the misinformation put

out by the short-sellers that the Company was a fraud—including that the Company's orders from

its MEG business were fake and that the Company only had three months of cash to survive—

allegations that Plaintiff does not even make. For this reason, too, Plaintiff has not pled loss

causation and his claims should be dismissed. *See In re Merrill Lynch & Co., Inc.*, 273 F. Supp.

2d 351, 362 (S.D.N.Y. 2003) (granting motion to dismiss and finding that plaintiff had not pled

loss causation where the alleged omissions were not the legal cause of the plaintiff's losses because

there were other, larger market forces at play); *Alpha Capital Anstalt v. Schwell Wimpfheimer &*

*Assocs. LLP*, No. 17-cv-1235-GHW, 2019 WL 1436993, at *11 (S.D.N.Y. Mar. 30, 2019)

("[T]here are multiple salient factors that clearly contributed to the Company's failure[;] [t]hey bar

the conclusion that the alleged misrepresentations caused Plaintiffs' losses.").

### 3. Plaintiff Also Does Not Adequately Plead Scienter.

Finally, even if the Amended Complaint had alleged actionable misstatements and loss

causation, which it does not, it still must be dismissed because it fails to meet the heightened

pleading standards of Rule 9(b) and the PSLRA for pleading scienter. Plaintiff's allegations do not

give rise to a "strong inference" of scienter such that that "a reasonable person would deem the

inference of scienter cogent and at least as compelling as any opposing inference one could draw

from the facts alleged." *Schwab v. E\*Trade Fin. Corp.*, 285 F. Supp. 3d 745, 756 (S.D.N.Y. 2018)

(citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)) (dismissing putative

class action securities fraud complaint); *see also* 15 U.S.C. § 78u-4(b)(2)(A). To establish scienter,

Plaintiff must allege facts that either: (1) constitute strong circumstantial evidence of conscious

misbehavior or recklessness; nor (2) show that defendants had the motive and opportunity to

commit fraud. *See S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 108-10 (2d Cir. 2009); *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).

Here, Plaintiff's conclusory allegation that Defendants were under pressure to "inflate the price of [the Company's] shares" because it was "facing a NASDAQ delisting, loss of funding, and outright failure" are pressures faced by all similarly situated companies and as such do not meet the PSLRA pleading standards. Am. Compl. ¶ 161; *see*, *e.g.*, *Smith v. Antares Pharma, Inc.*, No. 17-8945 (MAS) (DEA), 2020 WL 2041752, at *9 (D.N.J. Apr. 28, 2020) (finding that plaintiff's allegations that defendants' significant financial motives, including a possible NASDAQ delisting did not support a strong inference of scienter); *In re PXRE Grp., Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 531-32 (S.D.N.Y. 2009) ("The alleged motivation of a corporation to raise money to prevent the negative ramifications of a resultant drop of a credit rating or a stock price . . . is far too generalized"). Furthermore, Plaintiff's central thesis for motive—that the Company had to get its share price to, or above, $1 for ten consecutive days on or before July 8, 2020 to maintain access to capital—is not true. Am. Comp. ¶¶ 180-83. On May 11, the July 2020 deadline was extended to September 2020, well beyond the Class Period. Ex. 14 (May 11, Earnings Call Transcript).

Plaintiff's separate, but related allegation that Plaintiff was motivated to inflate the price of its stock to avoid delisting and ensure access to capital through the Yorkville Advisors Equity Agreement also fails. Even if Plaintiff was correct on the timing as to NASDAQ's requirements, a company seeking to maintain access to capital does not establish scienter because every company shares that motivation. *See*, *e.g.*, *Harris*, 135 F. Supp. 3d at 177 (finding that complaint's allegations regarding desire to maintain access to capital is insufficient to allege scienter). Here, there are no allegations about any purported personal benefit to the Individual Defendants from

22

the supposed fraud. To the contrary, there are no allegations that any Defendants sold any stock during the Class Period. *See Frankfurt-Trust Inv. Luxembourg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 218 (S.D.N.Y. 2018).

Plaintiff's allegation that Dr. Wu's conversion of debt to equity somehow created a motive to inflate the Company's stock price is equally unavailing. Am. Compl. ¶¶ 184-185. The admission that Dr. Wu *acquired more stock* is fatal to Plaintiff's ability to establish motive. Indeed, it proves just the opposite—that Company management was, and is, confident in the Company's future. *See Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011) (declining to find a plausible inference of motive, concluding "even if Zhu realized some proceeds (and profit) from stock sales during the Class Period, his holdings . . . actually increased"); *Turner v. MagicJack VocalTec, Ltd.*, No. 13 Civ. 00448, 2014 WL 406917, at *11 (S.D.N.Y. Feb. 3, 2014) (finding that the fact that three of the four individual defendants did not sell stock during the class period, and two instead purchased stock during the class period rebutted an inference of scienter); *Frankfurt-Trust Inv. Luxembourg AG*, 336 F. Supp. 3d at 218 (same).

Plaintiff next claims that scienter can be inferred from Defendants simply making or signing off on "public statements during the Class Period to convince consumers that the MEG Center was open, functional and engaging in sales." Am. Compl. ¶ 163. But the law is clear that merely making or signing allegedly false statements does not by itself establish scienter under the PSLRA. *See Ramzan v. GDS Holdings, Ltd.*, No. 19-cv-9154 (LAK), 2020 U.S. Dist. LEXIS 61452, at *13 (S.D.N.Y. Apr. 7, 2020) (dismissing 10b-5 claim and finding that plaintiff's scienter allegations based on defendants' SOX certifications were insufficient to "raise an inference of fraudulent intent" where they did not allege "any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements" (citations omitted)); *see also*

23

*Zhong Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164, 181 (E.D.N.Y. 2019) (noting that courts in this circuit regularly hold that the signing of a SOX certification, without more, is insufficient to plead scienter and collecting cases).

Further, Plaintiff's scienter allegations are based on defective group pleading, which alone is a basis for dismissal. *See In re Satyam Computer Servs. Sec. Litig.*, 915 F. Supp. 2d 450, 477-78 (S.D.N.Y 2013); *C.D.T.S. v. UBS AG*, No. 12 Civ. 4924 (KBF), 2013 WL 6576031, at \*6 (S.D.N.Y. Dec. 13, 2013). And while Plaintiff dedicates two paragraphs to Messrs. McCarthy and Sklar—merely to detail their roles at the Company (Am. Compl. at ¶¶ 173-74)—these allegations are not sufficiently particularized to save the Amended Complaint. *See Long Miao*, 442 F. Supp. 3d at 806; *Born v. Quad/Graphics, Inc.*, No. 19-CV-10376 (VEC), 2021 U.S. Dist. LEXIS 35675, at \*44-45 (S.D.N.Y. Feb. 25, 2021) ("[A]bsent particularized allegations of specific information Defendants had at their disposal that rendered their statements false or misleading, allegations of circumstantial evidence — such as the individual Defendants' senior positions, control over Quad, regulatory certifications, and the relative importance of Quad 3.0 — are not sufficient to plead scienter, even considered in their totality."). The rest of the Amended Complaint repeatedly groups all Defendants together without pleading specific facts as to the scienter for each.

Finally, it is "practically hornbook law that" Plaintiff's generalized allegations that the fact of Individual Defendants' senior positions within the Company (*see* Am. Compl. ¶¶ 166-67, 171-74) means that defendants "knew, or should have known, that they were misrepresenting material facts, based on their senior positions in the company," are "insufficient, as a matter of law, to establish scienter." *See Long Miao*, 442 F. Supp. 3d at 806. Plaintiff must do more than simply plead, in a conclusory fashion, that Defendants had access to information—"[he] must specifically identify the reports or statements containing this information." *Teamsters Local 445 Freight Div.*

24

*Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008). Plaintiff does not identify even a single document or source; Plaintiff merely pleads that the "Individual Defendants' positions with the Company gave them access to material non-public information" that supposedly led the Individual Defendants to know that their statements were false. Am. Compl. ¶¶ 167, 171 (alleging Dr. Wu was responsible for guiding and assisting the CEO, which he could not have done "without intimate knowledge of the inner workings of the Company"); ¶ 172 (alleging Mr. Poor, as CEO, was responsible for generally supervising the company's business and dictating which statements would be released to the public); ¶ 173 (alleging Mr. McCarthy was "privy to information about the [C]ompany's financial health . . ."). Purely conclusory allegations like these do not establish scienter. *Kalnit v. Eichler*, 99 F. Supp. 2d 327, 341 (S.D.N.Y. 2000) ("[P]laintiffs do not 'enjoy a license to base claims of fraud on speculation and conclusory allegations [of scienter]'" (internal quotations omitted) (alteration in original)). For this reason, too, the Amended Complaint fails to state a claim and should be dismissed.

## B. PLAINTIFF'S SECTION 20(a) CLAIM MUST BE DISMISSED.

For the reasons set forth herein, Plaintiff has not pleaded a Section 10(b) and Rule 10b-5 claim, which is fatal to Plaintiff's Section 20(a) claim. Accordingly, Plaintiff's Section 20(a) claim should also be dismissed. *Ross v. Lloyds Banking Grp., PLC*, Nos. 12-4600-cv (L), 13-729-cv (Con), 546 F. App'x 5, 12 (2d Cir. Sept. 19, 2013).

## V.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the claims against them with prejudice.[10]

---

[10]    A court may deny leave to amend a complaint for "good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606,

Dated: Washington DC
      May 6, 2021

                           Respectfully submitted,

                           **VENABLE LLP**

By:      */s/ George Kostolampros*
           George Kostolampros
           600 Massachusetts Avenue NW
           Washington DC 20001
           Tel.: (202) 344-4426
           Fax: (202) 344-8300

                  - and -

           Xochitl S. Strohbehn
           Thomas J. Welling, Jr.
           Anna G. Dimon
           Dakota L. Kann
           1270 Avenue of the Americas
           Twenty-Fourth Floor
           New York, New York 10020
           Tel.: (212) 307-5500
           Fax: (212) 307-5598

           *Attorneys for Defendants Ideanomics, Inc., Alfred Poor, Conor McCarthy, and Anthony Sklar*

---

624-25 (S.D.N.Y. 2013). "An amendment . . . is futile if the proposed claim could not withstand a motion to dismiss pursuant to [Rule] 12(b)(6)." *Id.* at 625 (alteration in original). "Where the problems with a claim are 'substantive' rather than the result of an 'inadequately or inartfully pleaded' complaint, an opportunity to replead would be 'futile' and 'should be denied.'" *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 381 (S.D.N.Y. 2018).

26