**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE IDEANOMICS, INC. SECURITIES LITIGATION | Case No. 1:20-cv-04944-GBD-OTW<br><br><br>CLASS ACTION |

**LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**
**THE CONSOLIDATED AMENDED COMPLAINT**

# <u>TABLE OF CONTENTS</u>

**Page No.**

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS .................................................................................... 4

     A.    Following a Series of Failed Ventures under Wu's Leadership,
           Ideanomics Faces an Existential Threat at the Start of the Class Period ............... 4

     B.    Ideanomics Begins Aggressively Promoting the MEG Center ............................. 7

     C.    The Truth Is Revealed ......................................................................................... 11

LEGAL STANDARD ........................................................................................... 13

ARGUMENT ........................................................................................................ 14

I.    The Complaint Adequately Pleads False or Misleading Statements and Omissions ........ 14

     A.    Defendants Misrepresented the Current State of the MEG Center ...................... 14

          1.    Defendants' Arguments Regarding the Short-Seller Reports
               and Plaintiff's Investigation Ignore the Company's
               Admissions ............................................................................................. 17

          2.    Defendants' Attempts to Recast Their Statements Fail to
               Rebut the Complaint's Well-Pled Allegations ........................................ 21

     B.    Defendants' Materiality Challenges Fail .............................................................. 25

     C.    Defendants' Statements Are Not Protected by the PSLRA Safe Harbor .............. 28

     D.    Defendant Wu's Statements Are Not Inactionable Opinions .............................. 30

II.    The Complaint Alleges a Strong Inference of Defendants' Scienter ............................... 31

     A.    The Complaint Alleges Defendants' Conscious Misbehavior or
           Recklessness ...................................................................................................... 32

     B.    Defendants Were Financially Motivated to Commit Fraud ................................. 35

III.    The Complaint Adequately Pleads Loss Causation ........................................................ 39

IV.    The Individual Defendants Are Liable as Control Persons under Section 20(a) .............. 43

CONCLUSION ..................................................................................................... 45

**<u>TABLE OF AUTHORITIES</u>**

**Page No(s).**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)................................................................30

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
2012 WL 3758085 (S.D.N.Y. Aug. 29, 2012) ............................................. *passim*

*In re Alstom SA*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005)......................................16, 22-23, 44, 44-45

*In re Am. Apparel, Inc. S'holder Litig.*,
2013 WL 10914316 (C.D. Cal. Aug. 8, 2013).........................................44

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012)................................................................21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).........................................................................13

*In re Bank of Am. Corp. Sec., Derivative & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
281 F.R.D. 134 (S.D.N.Y. 2012) ...........................................................27

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988)....................................................................14, 24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).........................................................................13

*Billhofer v. Flamel Techs., S.A.*,
281 F.R.D. 150 (S.D.N.Y. 2012) ...........................................................42

*In re Braskem S.A. Sec. Litig.*,
246 F. Supp. 3d 731 (S.D.N.Y. 2017).....................................................16

*In re Bristol Myers Squibb Co., Sec. Litig.*,
586 F. Supp. 2d 148 (S.D.N.Y. 2008).....................................................39

*Brown v. China Integrated Energy, Inc.*,
875 F. Supp. 2d 1096 (C.D. Cal. 2012) ..............................................16, 20

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ...........................................42

*Chill v. Gen. Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996)...................................................................................33

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y.2012)...............................................................25, 45

*In re Complete Mgmt. Inc. Sec. Litig.*,
    153 F. Supp. 2d 314 (S.D.N.Y. 2001).............................................................36, 37

*In re Countrywide Fin. Corp. Derivative Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) ..................................................................38

*Das v. Rio Tinto PLC*,
    332 F. Supp. 3d 786 (S.D.N.Y. 2018).....................................................................45

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)...................................................................................39, 40

*Emergent Capital Inv. Mgmt., LLC. v. Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003)....................................................................................39

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
    469 F. Supp. 2d 88 (S.D.N.Y. 2006)......................................................................29

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
    986 F. Supp. 2d 428 (S.D.N.Y. 2013)..........................................................25, 26, 28

*Faulkner v. Verizon Commc'ns, Inc.*,
    156 F. Supp. 2d 384 (S.D.N.Y. 2001).....................................................................38

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*,
    873 F.3d 85 (2d Cir. 2017).....................................................................................14

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    104 F. Supp. 3d 441 (S.D.N.Y. 2015).....................................................................44

*Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017)................................................................26, 32

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)........................................................... *passim*

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)................................................... 14, 24, 25, 25-26

*Gissin v. Endres*,
    739 F. Supp. 2d 488 (S.D.N.Y. 2010).....................................................................28

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)....................................................................35

*Gross v. GFI Grp., Inc.*,
    162 F. Supp. 3d 263 (S.D.N.Y. 2016)....................................................................26

*Harris v. AmTrust Fin. Servs., Inc.*,
    135 F. Supp. 3d 155 (S.D.N.Y. 2015)....................................................................41

*Ho v. Duoyuan Glob. Water, Inc.*,
    887 F. Supp. 2d 547 (S.D.N.Y. 2012)..................................................18, 19, 34, 43

*In re Initial Pub. Offering Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003)....................................................................21

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
    251 F. Supp. 3d 596 (S.D.N.Y. 2017)....................................................................17

*Iowa Pub. Empls. Ret. Sys. v. MF Glob., Ltd.*,
    620 F.3d 137 (2d Cir. 2010)..................................................................................28

*Jacobs v. Coopers & Lybrand, L.L.P.*,
    1999 WL 101772 (S.D.N.Y. Mar. 1, 1999) ..........................................................44

*Janus Capital Group Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)...............................................................................................45

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)..................................................................................37

*King Cty., Wash. v. IKB Deutsche Industriebank AG*,
    708 F. Supp. 2d 334 (S.D.N.Y. 2010)....................................................................39

*Kleinman v. Elan Corp., plc*,
    706 F.3d 145 (2d Cir. 2013).................................................................... 16, 16-17

*Levy v. Maggiore*,
    48 F. Supp. 3d 428 (E.D.N.Y. 2014) ....................................................................45

*Lewy v. SkyPeople Fruit Juice, Inc.*,
    2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012)......................................................19

*In re Livent, Inc. Sec. Litig.*,
    78 F. Supp. 2d 194 (S.D.N.Y. 1999)......................................................................44

*Long Miao v. Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020)..............................................................20, 34

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) ..................................................... 19-20

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) .........................20

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ..........................................................35, 38

*In re MannKind Sec. Actions*,
835 F. Supp. 2d 797 (C.D. Cal. 2011) ..................................................36

*McIntire v. China MediaExpress Holdings, Inc.*,
927 F. Supp. 2d 105 (S.D.N.Y. 2013)................................................ 17-18, 18, 19

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 2741 (2019).....................................42

*In re Mylan N.V. Sec. Litig.*,
379 F. Supp. 3d 198 (S.D.N.Y. 2019)...................................................44

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
455 F. App'x 10 (2d Cir. 2011) ........................................................16

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000).........................................................32, 33

*Omnicare, Inc. v. Laborers Dist. Counsel Constr. Indus. Pension Fund*,
575 U.S. 175 (2015).....................................................................30

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010).............................................................42

*One Commc'ns Corp. v. JP Morgan SBIC LLC*,
381 F. App'x 75 (2d Cir. 2010) ........................................................35

*In re Pfizer Inc. Sec. Litig.*,
936 F. Supp. 2d 252 (S.D.N.Y.2013), *vacated in part on other grounds*,
819 F. 3d 642 (2d. Cir. 2016)...........................................................27

*Pirnik v. Fiat Chrysler Autos., N.V.*,
327 F.R.D. 38 (S.D.N.Y. 2018) ........................................................27

*Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*,
741 F. Supp. 2d 474 (S.D.N.Y. 2010)....................................................28

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*,
694 F. Supp. 2d 287 (S.D.N.Y. 2010).....................................................34

*Porwal v. Ballard Power Sys., Inc.*,
  2019 WL 1510707 (S.D.N.Y. Mar. 21, 2019) .................................................. 28-29

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007) ...................................................................34

*Rehm v. Eagle Fin. Corp.*,
  954 F. Supp. 1246 (N.D. Ill. 1997) .......................................................................33

*Rich v. Maidstone Fin., Inc.*,
  2001 WL 286757 (S.D.N.Y. Mar. 23, 2001) .........................................................33

*Rudani v. Ideanomics*,
  2020 WL 5770356 (S.D.N.Y. Sept. 25, 2020) ............................................... *passim*

*In re Salix Pharms., Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) .........................................................29

*In re Satyam Comput. Servs. Ltd. Sec. Litig.*,
  915 F. Supp. 2d 450 (S.D.N.Y 2013) ....................................................................33

*SEC v. e-Smart Techs., Inc.*,
  85 F. Supp. 3d 300 (D.D.C. 2015) ........................................................................17

*SEC v. Enters. Sols., Inc.*,
  142 F. Supp. 2d 561 (S.D.N.Y. 2001) ...................................................................17

*SEC v. Gabelli*,
  653 F. 3d 49 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 442 (2013)...........16

*SEC v. N. Am. Research & Dev. Corp.*,
  375 F. Supp. 465 (S.D.N.Y. 1974), *aff'd*, 511 F.2d 1217 (2d Cir. 1974) ...............22

*SEC v. StratoComm Corp.*,
  2 F. Supp. 3d 240 (N.D.N.Y. 2014), *aff'd* 652 F. App'x 35 (2d Cir. 2016) ...........17

*SEC v. Syron*,
  934 F. Supp. 2d 609 (S.D.N.Y. 2013)....................................................................22

*In re Silvercorp Metals, Inc. Sec. Litig.*,
  26 F. Supp. 3d 266 (S.D.N.Y. 2014) .....................................................................18

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010).............................................................................29, 30

*In re SLM Corp. Sec. Litig.*,
  740 F. Supp. 2d 542 (S.D.N.Y. 2010)....................................................................38

*Smith v. Antares Pharma, Inc.*,
  2020 WL 2041752 (D.N.J. Apr. 28, 2020) ............................................................36

*Snellink v. Gulf Res., Inc.*,
  870 F. Supp. 2d 930 (C.D. Cal. 2012) ..................................................................18

*In re Tarragon Corp. Sec. Litig.*,
  2009 WL 10732259 (S.D.N.Y. Mar. 27, 2009) ....................................................38

*Teamsters Local 445, Freight Div. Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008) ................................................................................35

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ..................................................................... 31, 37-38, 39

*In re Tenaris S.A. Sec. Litig.*,
  493 F. Supp. 3d 143 (E.D.N.Y. 2020) ..................................................................45

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993) ....................................................................................37

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) ................................................................................31

*Tutor Time Learning Ctrs., LLC v. GKO Grp., Inc.*,
  2013 WL 5637676 (S.D.N.Y. Oct. 15, 2013) ..............................................11, 30

*In re Veon Ltd. Sec. Litig.*,
  2018 WL 4168958 (S.D.N.Y. Aug 30, 2018) ......................................................44

*In re Vivendi Universal, S.A. Sec. Litig.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003) ............................................................14, 33

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ........................................................................16, 17, 42

*In re Winstar Commc'ns*,
  2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ................................................ *passim*

*In re WorldCom, Inc. Sec. Litig.*,
  2005 WL 375313 (S.D.N.Y. Feb. 17, 2005) ........................................................43

## Statutes

15 U.S.C. § 78t(a) ......................................................................................................43

15 U.S.C. § 78u-4(e)(1) ..............................................................................................43

15 U.S.C. § 78u-5(c) ..................................................................................................28

15 U.S.C. § 78u-5(c)(1)(B) ................................................................................................................30

**Other Authorities**

17 C.F.R. § 240.10b-5(b) ................................................................................................................14

# INTRODUCTION[1]

This case involves a classic securities fraud. During the Class Period, facing a de-listing of its common shares from the NASDAQ exchange because Ideanomics's stock price had languished below a dollar for many months, and with the Defendant insiders facing the prospect of losing millions of dollars in loans to the Company, Defendants began touting to the market a business that effectively did not exist. Seeking to capitalize on investor appetite for investments in EV-related businesses, Defendants trumpeted a brand new venture dubbed the "MEG Center," a supposed state-of-the-art EV hub they had developed in Qingdao, China. Defendants claimed they had built a 1 million-square-foot facility to convert fleet vehicles and sell EVs that would generate up to two billion RMB in revenue in 2020. Defendants also stated that the MEG Center would host the Company's annual shareholders meeting in summer of 2020, and, in May and June 2020, that it was "***opened***" and "***operational***," and was seeing "***high levels of activity***" and "***solid customer foot traffic***." Underscoring these purported descriptions of the current state of the MEG Center, Defendants published doctored photographs showing a bustling showroom, customers, gleaming cars, and "MEG" signage in the supposed EV sales hub. Employing YouTube and Twitter to pump this story, Defendants drove Ideanomics's share price from under $1 to over $3.00 per share during the Class Period.

Defendants' statements to the market were blatantly and indisputably false: there was no MEG Center occupying 1 million square feet; the center was not ready for a "ribbon cutting ceremony" to herald its opening; and the pictures Defendants published depicting the "MEG

---

[1] Unless otherwise noted: (i) all capitalized terms have the same definitions ascribed to them in the Consolidated Amended Complaint (ECF No. 78) ("Complaint"); (ii) "¶_" refers to paragraphs of the Complaint; (iii) "Wu Br." and "Def. Br." refer to Defendants' memoranda of law, ECF Nos. 86 and 59, respectively; (iv) "Ex. _" refers to the exhibits attached to the Declaration of George Kostolampros, ECF No. 88; (v) all internal quotation marks and citations are omitted; and (vi) all emphasis is added.

Center" were fabrications. All of this was a ruse by Defendants to pump up Ideanomics's stock price to avoid delisting and secure financing to save their personal investments. The scheme unraveled only because of intrepid investors who visited the supposed MEG Center in June 2020 and uncovered that the facility depicted in Defendants' photographs was a fantasy. When these charges were published on June 25, 2020, Defendants did not deny that they had disseminated fraudulent photographs to the market, but hurriedly issued press releases to "clarify" that the MEG Center was not, in fact, open for business in a 1 million-square-foot facility, but rather, occupied less than a quarter of that space, and had not yet even been branded as the MEG Center. The Company's stock price lost nearly 53% of its value on these disclosures, injuring investors. Rarely is securities fraud so clear. Indeed, Plaintiff's investigation in January 2021 confirmed that the MEG Center described by Defendants *still* did not exist.

Defendants' arguments in support of their motions to dismiss fail to contend with the well-pleaded allegations in the Complaint and should be rejected. *First*, Defendants contend that their alleged misstatements were in fact true, in arguments that either distort the Complaint or contradict it altogether. But Defendants are not entitled to substitute their preferred version of the allegations at the motion to dismiss stage. Moreover, Defendants fail to grapple with the fact that their alleged misstatements were demonstrably, and in some respects admittedly untrue, including the misleading photographs they now acknowledge were mocked-up "[d]epictions" of imaginary MEG Center activities, and statements about imagined levels of activity in a 1 million-square-foot space. Defendants suggest that the involvement of short sellers in partially revealing their fraud somehow immunizes their conduct, but this is contrary to the law, including a recent decision by this Court. It is well-established that information from short sellers can support a securities fraud complaint, particularly where, as here, the allegations are thoroughly corroborated.

2

*Second*, Defendants argue that many of their statements were protected by the statutory safe harbor for forward looking statements. Not so. Defendants' alleged misstatements referenced historical and present facts concerning MEG Center operations, including renovations, openings, sales transactions, and customer foot traffic. They were in some instances reinforced by photographs purporting to show such bustling activity. Defendants were emphatically talking about the here and now. Statements of historical and present fact fall outside the safe harbor.

*Third*, Defendants suggest their litany of statements about the MEG Center were immaterial as a matter of law. This is a quintessential fact question in Rule 10b-5 cases that is rarely resolved on a motion to dismiss. And here, no facts support such a finding. The Company's continued existence hinged on Defendants' ability to convince investors that the MEG Center was operational and poised to deliver massive 2020 revenues. Indeed, Defendants talked of little else during the Class Period, demonstrating the materiality of their statements.

*Fourth*, Defendants argue they lacked scienter. But their misstatements were either knowingly false or, at a minimum, severely reckless as to their falsity. The Complaint adequately alleges that Defendants were aware that, contrary to their detailed public statements, the MEG Center was in fact an unfinished shell, the photographs accompanying their public statements were photo-shopped fantasies, and whatever pre-existing operations there were on-site occupied less than 25% of the 1 million-square-foot space that Defendants trumpeted. Defendants' admissions that the MEG Center never operated in 1 million square feet during the Class Period and that they published altered photographs alone establish that they knowingly or recklessly spread misleading information. Moreover, the MEG Center was Company's lone source of potential revenues at all relevant times, and Defendants are charged with knowledge of the state of the Company's core operations. While Plaintiff is not required to plead motive in the face of these allegations,

Defendants were also clearly motivated to defraud investors. Defendants' false statements orchestrated a bailout of Wu's personal investment in the Company and allowed Ideanomics to avoid imminent delisting and the loss of necessary funding.

*Fifth*, Defendants suggest Plaintiff has not adequately alleged loss causation. But Plaintiff easily satisfies Federal Rule of Civil Procedure ("Rule") 8(a), explaining how information disclosed on June 25 and 26, 2020, revealed the relevant truth concealed by Defendants' false statements and omissions about the MEG Center, proximately causing a massive drop in Ideanomics's stock price. Nothing else is required.

Defendants' remaining arguments are equally flawed. Their motions should be denied.

**STATEMENT OF FACTS**

**A.      Following a Series of Failed Ventures under Wu's Leadership, Ideanomics Faces an Existential Threat at the Start of the Class Period**

Since 2011, the company now known as Ideanomics has had seven different CEOs, eight different CFOs, four different company names, and disparate areas of business focus ranging from providing video on demand services to trading consumer electronics and crude oil. ¶¶ 42, 47, 50-51. Through these iterations, one thing remained constant: Defendant Wu loomed large at the Company, either as Chairman or CEO. ¶¶ 42-43. More than a figurehead, by March 15, 2020, Wu was the Company's largest shareholder, controlling at least 21% of its shares, and also a financier: he was CEO of affiliated entity Sun Seven Stars, which lent Ideanomics $5 million in 2019, with the debt convertible to Ideanomics shares. ¶¶ 37, 171. Ideanomics emphasized Wu's hands-on leadership of the Company in its 2019 10-K, stating, "[w]e are ***highly dependent*** on the services

4

of Dr. Bruno Wu, our Chairman and largest stockholder," and noting that "Dr. Wu spends significant time with Ideanomics and *is highly active in our management*." *Id.*; ¶ 187.[2]

With Wu and Poor at the helm, the Company operated a string of unsuccessful business ventures in the years and months leading up to the Class Period. *See* ¶¶ 45-59. For example, in March 2019, Ideanomics announced a contract to manage "digital token assets" for GT Dollar for $170 million dollars' worth of GT Dollar tokens ("GTB"), a crypto currency. Before the year was out, however, the value of GTB had plummeted to near zero, requiring Ideanomics to take an impairment charge of $61.1 million in the fourth quarter of 2019 on the worthless asset. ¶¶ 56, 58. During 2019, Ideanomics's other main fintech-related business ventures also failed or were failing, and its obligation to publicly disclose the $61.1 million write down and other losses loomed near. *See* ¶¶ 73-76. As a result, Ideanomics increasingly pivoted toward yet another new focus—EV services in Asia. ¶¶ 59-64, 68.

On August 26, 2019, Ideanomics announced the creation of its new MEG division. ¶ 64. In November 2019, Poor explained that this division would apply Ideanomics's purported fintech prowess to provide EV financing solutions. ¶¶ 70-71. Ideanomics then stated in a November 11, 2019 press release that it expected the new division to generate two billion RMB in revenues in 2020 through nebulous "increased EV revenue activities." ¶ 69.

Despite announcing its ostensible involvement in a potentially lucrative new field, by 2020 Ideanomics was on life support. As reported in its 2019 10-K filed March 16, 2020, Ideanomics reported a net loss of nearly $97 million and had cash on hand of only $2.6 million at the end of 2019. ¶ 73. Starved for cash, from October to December 2019, Ideanomics sold bundles of debt-

---

[2] Highlighting Wu's continuous involvement in Ideanomics's management, on June 21, 2020, Defendant Poor, the Company's current CEO, posted a tweet touting a "5-hr strategy session" with Wu. ¶ 112.

to-equity securities to select investors at a sizeable discount, obtaining approximately $14.35 million. ¶¶ 78-81. Critically, on November 25, 2019, Wu's company Sun Seven Stars loaned the Company $1 million, in exchange for debt convertible to Ideanomics's common stock at the equivalent conversion price of $1.25 per share. ¶ 80. For Wu, recouping the money depended on Ideanomics's stock price rising above the conversion price.

Given Ideanomics's dire financial position, as disclosed in its 2019 10-K, Ideanomics's auditor determined there was "substantial doubt" about the Company's ability to continue as a going concern. ¶ 82. Compounding the financial pressures, on January 10, 2020, the Listing Qualifications Staff of the NASDAQ Stock Exchange alerted Ideanomics that its common stock had traded below $1.00 for thirty consecutive days, and was at risk of being delisted should Ideanomics be unable to raise its per-share price to at least $1.00 for ten consecutive days by July 8, 2020.[3] ¶ 83. Furthermore, Defendants knew they would soon need to disclose the $61.1 million impairment, and that the Company's fintech investments had failed. ¶¶ 75-76. Its business options vanishing, Ideanomics continued to present a rosy picture of its progress in the EV field: on January 24, 2020, it announced an arrangement with the City of Qingdao for investment in the MEG division subsidiary Qingdao Mobile New Energy Vehicle Sales Co. Ltd. ¶¶ 85, 93.

In the first quarter of 2020, Ideanomics again earned almost no revenues, subsisting on capital raised from issuing debt and equity. On May 11, 2020, the Company disclosed in its Form 10-Q that by "March 31, 2020, the Company had cash and cash equivalents of $5.9 million and an accumulated deficit of $260.8 million," and warned that "the Company has incurred losses

---

[3] Defendants claim that on May 11, 2020, Ideanomics received notice that the deadline for compliance had been extended until September 2020. Def. Br. at 22. Even if true, this is irrelevant, as Defendants' false statements began before the notice of the deadline extension, and continued throughout the Class Period. *See infra* note 25.

since its inception and must continue to rely on proceeds from debt and equity issuances to pay for ongoing operating expenses." ¶ 87. In short, Ideanomics remained on the brink of collapse.

Forced to rely on financing deals to raise the capital needed to continue operations, on April 3, 2020, the Company entered into an Equity Agreement with YA II, a Cayman Island investment fund of New Jersey private equity firm, Yorkville Advisors, through which Ideanomics obtained the right to sell up to $50 million of newly registered common stock to YA II over the next three years, and YA II obtained the right to purchase such shares at 90% of the then-prevailing market price—contingent upon the company retaining its NASDAQ listing. ¶¶ 15, 81, 89.

### B.    Ideanomics Begins Aggressively Promoting the MEG Center

Desperate to avoid delisting and generate funds to cover debt held by Wu and others, Defendants began relentlessly touting Ideanomics's MEG Center. ¶ 93. In a March 3, 2020 press release, Wu extolled the facility's planned "1Million square feet," and the Company made lofty promises of the MEG Center's earnings potential, claiming that the enterprise was projected to reach "¥1 Billion RMB (approx. $144M US) by year-end 2020 and grow to over ¥2 Billion RMB (approx. $288M US) in 2021 . . . ." ¶ 93-94.

Having primed the market, on March 16, 2020, the first day of the Class Period, Defendants started to mislead investors through increasingly bold misrepresentations about the current state of the MEG Center. On this date, Wu participated in a promotional YouTube interview in which he claimed that the Company was already "***actually opening up***" the MEG Center, and that it currently comprised 1 million square feet:

> [INTERVIEWER:] So you recently opened a 10,000 square foot facility in Qingdao. . . .
>
> [WU:] ***Well we're actually opening up*** a hundred thousand sorry a - a million square feet ***a million square feet*** a hundred thousand square meters ***so it's a million square feet***. ***So it's much bigger than what you just said***.

¶ 96.

Defendants expanded upon Wu's claims about the state of the MEG Center in a March 20, 2020 press release which claimed that the "*[t]he 1 Million square foot site has been renovated* as a permanent EV expo center," was "*scheduled to start sales operations by May 1*," and that EV operations then-occurring at the site that were "being assumed by MEG" had "*a run rate of approximately RMB 1 Billion in 2019 ($140 Million USD), with profit margins in the 8% range*." ¶ 97. The purported current operations included "automotive sales and servicing center for a range of vehicle manufacturers," and the Company represented that Ideanomics's MEG division "will be joined at the site by more than 20 partners ranging from EV manufacturers, EV battery manufacturers, energy storage, energy management, and EV charging solutions, financial services, insurance, vehicle and license plate registration services, and others from Qingdao." *Id.*

Defendants soon stepped up their claims about the current status of the MEG Center. In a May 11, 2020 press release, Poor announced that Ideanomics would change the date of its annual general meeting to the summer, and hold it, in part, at the MEG Center "*to showcase both the MEG business and the formal ribbon-cutting on our new 1MM square feet EV center in Qingdao*." ¶¶ 141, 143. Poor further claimed on May 11 that orders for the Center were "already underway" and that "*our EV hub in Qingdao had a soft launch on May 1 and as such, will be a contributor to our Q2 revenues*." ¶ 142.

Defendants then began touting the MEG Center as fully-operational and open for business. On May 26, 2020, Defendants issued a press release announcing that Ideanomics had "*officially launched the largest auto trading market in Qingdao* at MEG's Qingdao EV hub." ¶¶ 101, 146. Defendants further claimed that "*[t]he MEG Center in Qingdao now hosts a full suite of car dealer services for new energy and used cars*" and "*offers a one-stop buying experience that includes financial services and onsite vehicle registration services*." *Id.*

During a May 28, 2020 interview, Poor unequivocally represented that the MEG Center had fully begun operations, stating that: "*We did a soft launch on May the 1ˢᵗ which we started selling vehicles outside. We were able to expand that this week and then this past Monday, we officially opened up a large center for both used cars and new EV vehicles. So both of those are up and running*." ¶ 149. The interview included photographs that purported to show the current state of the MEG Center, including numerous vehicles for sale and customers. ¶ 151. Each of the photographs included a "©2020 Ideanomics" legend and banner stating: "Ideanomics's massive EV expo center in Qingdao, China is starting to generate revenues." *Id.*

Defendants continued their media blitz, including press releases, promotional interviews on YouTube, and Twitter postings touting the MEG Center. On June 5, 2020, Ideanomics posted on its Twitter account that "*[t]he MEG Center in Qingdao is a 1 million sq ft EV expo center with the capacity to hold 18,000 vehicles. The official ribbon-cutting ceremony will be held later this summer*," which was accompanied by purported drone footage of the MEG Center. ¶ 102.

On June 9, 2020, Defendants issued a press release stating that the MEG Center had "sold 2,139 vehicles for a total value of RMB 235 Million or USD 33 Million." ¶ 154. The press release added that "[a]s a reminder, *the MEG Center in Qingdao began operations on May 1*," and touted the "*sales activity*" to date, including "high levels of interest" during "*its first five weeks of being operational*." *Id*. Wu's statement in the press release touted the MEG Center's "*high levels of activity*" and "*solid customer foot traffic*." *Id.* The press release was accompanied by one of the purported photographs of the MEG Center presented during Poor's May 28, 2020 interview, presented without any disclaimers and with the same "©2020 Ideanomics" legend:



¶ 104.

The impact of Defendants' June 9, 2020 statements was immediate. Ideanomics's share price rose from a close of $0.62 on June 8, 2020 to a close of $1.02 on June 9, 2020, and trading volume skyrocketed over 300%. ¶ 105. As a result, shares held by Wu and his affiliates—which had been converted from debt to equity just before the June 9, 2020 announcement at a steeply-reduced conversion price—were worth additional millions. *Id*.

Defendants continued their media campaign. In a June 11, 2020 interview, Poor described the MEG Center as "***a very big success***," claiming that the Company "***delivered more than***

*2,000 units sold vehicles in the first month*." ¶ 156.[4] In a series of press releases between June 11 and June 22, 2020, the Company announced five sales contracts for EV vehicles. ¶ 110. As a result of this media onslaught, the Company's share price nearly tripled to close at $3.09 on June 24, 2020. ¶ 113. Meanwhile, Ideanomics capitalized on its inflated share price, eliminating tens of millions of dollars in debt by converting debt to equity and selling shares to entities such as YA II. ¶¶ 107-09, 111. As of June 18, 2020, Ideanomics had issued $30.5 million worth of shares to YA II. ¶ 90. Ideanomics's share price also exceeded $1.00 for ten consecutive trading days in June, staving off NASDAQ delisting. ¶ 106. However, the Company's share price soon came crashing down when Defendants stunned investors through admissions, both tacit and explicit, that they had grossly exaggerated the state of the MEG Center during the Class Period.

   C.   **The Truth Is Revealed**

   On June 25, 2020, analysts at Hindenburg and J Capital, two investment firms that had taken short positions on Ideanomics's stock, issued reports about the Company. ¶ 116. Both firms stated that they had conducted independent investigations, and both came to the same conclusion: Ideanomics's claims about its MEG Center were not based in fact. ¶¶ 115-20. Indeed, representatives of both firms visited the area in Qingdao where the MEG Center was supposedly located, and neither could confirm the existence of a "*1 million square foot site that ha[d] been renovated as a permanent EV expo center*" or that hosted a "*a full suite of car dealer services for new energy and used cars with a capacity of 18,000 vehicles onsite*." ¶¶ 97, 101-02, 146. Hindenburg also spoke to several employees of sales groups operating at the supposed MEG

---

[4] Contrary to Poor's claim, Ideanomics admitted in its second quarter 2020 Form 10-Q that 85% of its sales were derived from traditional combustion vehicles, and that only $695,000 of its $4.7 million dollars in revenues were from the sale of EVs. ¶ 158. This allegation is not addressed by Defendants, and any arguments concerning this misrepresentation are waived. *See Tutor Time Learning Ctrs., LLC v. GKO Grp., Inc.*, 2013 WL 5637676, at *1 (S.D.N.Y. Oct. 15, 2013).

Center, who claimed not to have heard of either Ideanomics or the MEG Center. ¶ 120. Furthermore, J Capital could not confirm the existence of any of the five EV contracts recently announced by the Company. ¶ 118. Critically, Hindenburg asserted that the purported photograph of the MEG Center Defendants had included in Ideanomics's June 9, 2020 press release (and May 28, 2020 YouTube interview) was "an egregious & obvious fraud," claiming that Defendants had altered a photograph taken in 2018 by adding "MEG" and "2020 Ideanomics" to the image. ¶ 119.

Rather than categorically deny the charges, Defendants attempted to dismiss them. For example, Poor described the reports as "Comedy gold," and accused the head of Hindenburg of belonging to the Ku Klux Klan. ¶¶ 121, 123. Significantly, Defendants *did not respond* to Hindenburg's claim that Ideanomics used doctored photos in its press releases that purported to show a busy MEG Center, not even after Hindenburg called out Defendants' conspicuous failure to provide any explanation, tweeting on June 25, 2020: "Notice how the CEO has once again avoided answering our simple question on whether photographs in $IDEX press releases were altered," followed by another tweet stating that "we have clear evidence showing you altered old 2018 pictures to use in your 2020 PR about a supposed launch of the your [sic] EV Sales center," asking: "Did you or did you not doctor the photos in your press releases?" ¶ 122.

The next morning, on June 26, 2020, Defendants admitted that their prior statements did not accurately describe the true state of the MEG Center. In a pre-market press release, Ideanomics stated that it "would like to clarify the status of" the MEG Center, disclosing that the MEG Center was still in "Phase I" of development, occupying only about 20% of the facility:

> [T]he existing new and used sales business at the site was to be folded into the MEG center activities. . . . These activities occupy approximately 20,000 square meters, or 215,000 square feet, and the Company has detailed activity from both existing dealership business at the site and its commercial fleet sales in recent press releases.

> Phase II of the opening will see an additional 20,000 square meters come online and is subject to renovation in preparation for MEG and its participating partners. . . .
>
> Phase III of the project, and the remaining 60,000 square meters will come online as further renovations are completed.

¶ 124. Ideanomics issued another press release the same day announcing "Ideanomics Qingdao Sales Center to be Officially Rebranded MEG Center by July 1," confirming that there never had been any structure named the MEG Center during the Class Period. ¶ 126.

The firms' accusations of fraud and Defendants' tacit admission on June 25, 2020, that they had misled the market (including through doctored photographs), followed within hours by Defendants' admissions that they had grossly exaggerated the current state of the MEG Center and its operations, caused a steep stock price decline. Ideanomics's share price tumbled nearly **53%** from a closing price of $3.09 on June 24, 2020, to a closing price of $1.46 on June 26, 2020. ¶ 127.

Plaintiff's investigation in early 2021 confirmed that renovations on the supposed MEG Center began in late 2020 and were still not completed, and no activities described in Defendants' Class Period statements were taking place on the site. ¶¶ 128-32. Indeed, all promotional signage on-site in January 2021 described the MEG Center as "Coming Soon." *Id.*

Finally, before this Court, Defendants admit that the photographs published on May 28 and June 9, 2020, were altered and did not actually show the MEG Center. *See* Def. Br. at 15-16.

## LEGAL STANDARD

To withstand a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The factual allegations pled must . . . 'be enough to raise a right to relief above the speculative level.'" *Rudani v. Ideanomics*, 2020 WL 5770356, at *5 (S.D.N.Y. Sept. 25, 2020) (Daniels, J.) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Court must

accept all factual allegations as true and "draw[] all reasonable inferences in the plaintiff's favor." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). To satisfy Rule 9(b) and the PSLRA, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rudani*, 2020 WL 5770356, at *5.

## ARGUMENT

## I.    The Complaint Adequately Pleads False or Misleading Statements and Omissions

Rule 10b-5 makes it unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). A fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). Plaintiff need only plead facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 184 (S.D.N.Y. 2003). The Complaint readily satisfies this standard, as "an examination of defendants' representations, taken together and in context," establish that they were materially false or misleading. *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 140 (2d Cir. 2017).

## A.    Defendants Misrepresented the Current State of the MEG Center

Throughout the Class Period, Defendants issued a series of false or misleading statements touting the MEG Center as a complete or nearly-complete "EV hub" that was fully renovated, increasingly operational, and by May, open for business. At the start of the Class Period, Defendants claimed that the MEG Center "***has been renovated as a permanent EV expo center***," was "***mostly finished***," that it currently occupied "***a million square feet***," and that it was set to

begin sales operations by May 1. *See* ¶¶ 97, 135, 137, 139. In May and June, Defendants'
statements—both verbal and photographic—represented that the MEG Center was "***operational***,"
"***officially opened***," "***up and running***," currently hosting "***a full suite***" of EV services, and that
the site was seeing "***high levels of activity***" and "***solid customer foot traffic***." *See* ¶¶ 146, 149,
154; *see also* ¶¶ 104, 151 (purported photographs of vehicles for sale at MEG Center); ¶ 102
(touting "***official ribbon-cutting ceremony***" and showing purported aerial footage of facility).

In truth, the MEG Center as described to investors did not exist at any point during the
Class Period. As the Company admitted on June 26, 2020, the MEG Center was still in "Phase I"
of development, occupying approximately 20% of the much-touted 1 million-square-foot facility.
¶ 124. The Company also admitted that there was, in fact, no structure branded as the "MEG
Center" in Qingdao, ¶ 126, directly contradicting their numerous statements touting the MEG
Center as "***renovated***," "***mostly finished***," and "***officially opened***." ¶¶ 135, 139, 146, 149. Further,
as Defendants now admit—and tacitly admitted on June 25, 2020, in public exchanges with
Hindenburg—Ideanomics altered photographs and passed them off as showing the current state of
the MEG Center. *See* ¶¶ 119, 122-24; Def. Br. at 16 (admitting that, unbeknownst to investors, the
photographs were actually "a depiction or rendering").[5] Plaintiff's investigation also confirmed
that in January 2021, renovations on the MEG Center had only just begun and that none of the
activities described in Defendants' statements or photos were taking place at the site. ¶¶ 128-32.

These facts decisively plead falsity. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp.
2d 171, 192 (S.D.N.Y. 2010) (falsity alleged based on "numerous contemporaneous facts . . . and
subsequent admissions" that were inconsistent with public statements). Defendants' "public

---

[5] As further detailed in the J Capital and Hindenburg reports, numerous individuals interviewed in June 2020, including
individuals at the purported MEG Center site and the Company's purported EV customers, had not even heard of
Ideanomics or the MEG Center. ¶¶ 117-18, 120.

statements . . . were at odds with the [C]ompany's actual condition," and were therefore materially false or misleading. *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 13 (2d Cir. 2011); *see also Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1117 (C.D. Cal. 2012) (claims that factory in China was operating at "full capacity" were false or misleading where an investigation "revealed no meaningful production at the facility"). "Such a selective portrait, if not inescapably misleading, is certainly plausibly alleged to have been so." *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 759 (S.D.N.Y. 2017).

Defendants now claim that the MEG Center existed in *some form* during the Class Period and therefore all of Defendants' statements describing the current state of the MEG Center are inactionable. Def. Br. at 12-13; Wu Br. at 10. These fact-based arguments are inappropriate on a motion to dismiss. *See In re Advanced Battery Techs., Inc. Sec. Litig.*, 2012 WL 3758085, at *9 (S.D.N.Y. Aug. 29, 2012) ("Defendants' motion to dismiss rests primarily on their assertion that the things they said were true . . . [b]ut this is not an appropriate argument to make on a motion to dismiss a Complaint that alleges falsity; it is a defense on the merits."). Moreover, these arguments disregard the Complaint's actual allegations, and ignore the standard for pleading falsity.[6]

Defendants' descriptions of the MEG Center as fully operational, whether assessed as blatant lies (which they were) or misleading half-truths, "affirmatively creat[ed] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *In re Alstom SA*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005) (alterations in original); *Freudenberg*, 712 F. Supp. 2d at 180. Plaintiff is not required to allege that the MEG Center never existed in any form or that

---

[6] Moreover, the "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013). "[R]epresentations that state the truth only so far as it goes, while omitting critical qualifying information[,] can be actionable misrepresentations[.]" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239-40 (2d Cir. 2016); *see also SEC v. Gabelli*, 653 F. 3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 442 (2013) ("so-called half-truths—literally true statements that create a materially misleading impression—will support claims for securities fraud").

Ideanomics did not generate any revenue in order to state a claim. *Kleinman* 706 F.3d at 153; *Vivendi*, 838 F.3d at 240. As numerous courts have held, exaggerated claims regarding the current state of a company's business segment may serve as the basis for a claim of securities fraud. *See, e.g.*, *SEC v. StratoComm Corp.*, 2 F. Supp. 3d 240, 253 (N.D.N.Y. 2014), *aff'd* 652 F. App'x 35 (2d Cir. 2016) ("[s]tatements that create a false impression that a company has a developed, tested and presently available product," when it does not, are actionable); *In re Inv. Tech. Grp.*, *Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 611-12 (S.D.N.Y. 2017) ("Having chosen to speak about specific features of its business model and the advantages it offered, [defendant] had an obligation to ensure its statements were both accurate and complete.").[7] Defendants' claims about the MEG Center are indistinguishable from the exaggerated claims found actionable in such cases.

Faced with the clear contradiction between their public statements regarding the MEG Center and the admittedly undisclosed reality, Defendants raise a series of marginal, fact-intensive defenses to specific statements and allegations, all of which are meritless.

### 1. Defendants' Arguments Regarding the Short-Seller Reports and Plaintiff's Investigation Ignore the Company's Admissions

Defendants argue that the Court should reject Plaintiff's allegations based on the J Capital and Hindenburg reports because their authors were financially motivated and the reports included allegations that Plaintiff has not adopted wholesale. Def. Br. at 16-18; Wu Br. at 11-12. Defendants also argue that Plaintiff's investigation in January 2021 does not support the falsity of their statements. Def. Br. at 17-18; Wu Br. at 13. These fact-intensive arguments should be rejected.

As an initial matter, the argument that short-seller reports "are inherently unreliable" because the authors "hold short positions . . . has been repeatedly rejected in prior cases." *McIntire*

---

[7] *See also SEC v. Enters. Sols., Inc.*, 142 F. Supp. 2d 561, 576-77 (S.D.N.Y. 2001) (descriptive phrases created a materially false impression of current state of product); *SEC v. e-Smart Techs., Inc.*, 85 F. Supp. 3d 300, 318 (D.D.C. 2015) (statements about product were false as a matter of law where the product was merely "aspirational").

*v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013); *see also, e.g.*, *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 276 (S.D.N.Y. 2014) ("Courts routinely credit analyst and investor reports like those at issue here, even those of short-sellers, as sufficiently reliable for allegations of scienter against a company."); *Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 939 (C.D. Cal. 2012) ("It is permissible for Plaintiffs to rely on a short seller report . . . to allege falsity at the pleading stage."). Indeed, this Court has held that short-seller reports can support a claim for securities fraud. *See Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 564 (S.D.N.Y. 2012) (Daniels, J.) ("Even though Defendants claim that Muddy Waters is a biased party, and that it openly admits the possible inaccuracy of the Report, the reliability of the report is a question of fact."). As with any factual allegation, "[t]he truth of the [short-seller] report . . . is a factual dispute not appropriate for resolution at [the pleading] stage." *Advanced Battery*, 2012 WL 3758085, at \*9 (first alteration in original). "[A]t this stage of the proceedings, the Court must accept the factual allegations contained in the [reports] as sufficiently reliable as a factual source for Plaintiff['s] allegations." *McIntire*, 927 F. Supp. 2d at 124.

    The fact that Plaintiff has not adopted all of the short sellers' allegations is also irrelevant. Defendants ignore the Company's response to the reports on June 25 and 26, 2020. *See* Def. Br. at 16-18. The central thrust of the reports was that the Company misrepresented the current state of the MEG Center and its EV operations. ¶¶ 117-20. Defendants tacitly admitted this to be true on June 25, 2020, by failing to deny Hindenburg's insistent charges regarding Ideanomics's use of doctored photographs, then admitted on June 26, 2020, that the Company's prior descriptions of the MEG Center were inaccurate, and now expressly admit that the Company misrepresented the MEG Center through a misleading "depiction or rendering" (presented without any

qualification regarding its authenticity). ¶¶ 119, 122-24, 126; Def. Br. at 16.[8] If Defendants' tacit and express admissions were not enough, Plaintiff's investigation in January 2021 confirmed that Defendants had misrepresented the true status of the MEG Center. ¶¶ 128-31.

As this Court held in *Ho*, 887 F. Supp. 2d at 568, allegations based on a short-seller report may support a claim for securities fraud where the allegations are corroborated by other well-pled facts. In *Ho*, similar to the present case, the complaint alleged that "Muddy Waters . . . accused DGW of," *inter alia* "astronomically inflat[ing]" the company revenues, and alleged "that many of DGW's sales office phone numbers were inoperable." *Id.* at 560. The defendants argued that allegations based on the "unreliable and unsubstantiated" short-seller report "should be stricken." *Id.* at 563. However, these allegations were immediately followed by a tacit admission of wrongdoing—the abrupt resignation of the company's CFO. *Id.* at 560. Moreover, as in the present case, core allegations in the report were corroborated by facts developed in the plaintiff's investigation. *See id.* at 567-68. Accordingly, this Court found certain allegations in the report sufficiently particularized to support the falsity of the defendants' statements. *Id*.

The same result should apply here, particularly given the corroboration by Defendants' admissions and Plaintiff's investigation. *See, e.g.*, *McIntire*, 927 F. Supp. 2d at 125 (crediting short-seller reports where the allegations were corroborated by "a multitude of additional allegations that, viewed holistically, adequately allege" the falsity of defendants' statements); *Lewy v. SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916, at *14 (S.D.N.Y. Sept. 10, 2012) (crediting short-seller reports where they were "described with adequate particularity, and their statements are corroborated by other facts"); *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,

---

[8] Wu argues the June 26, 2020 press release merely "clarifie[d] the expected stages of construction" of the MEG Center. Wu Br. at 13. However, as Wu concedes, the press release is titled, "*Ideanomics Clarifies **Status** of Its EV Hub in Qingdao.*" *Id*. at 13-14. This "clarif[ication]" is directly contrary to Wu's prior statements touting the current status of the MEG Center. ¶¶ 96, 154.

2014 WL 285103, at *2 (S.D.N.Y. Jan. 27, 2014) (crediting short-seller reports where "[p]laintiffs' investigators independently corroborated these reports through similar interviews, photographs, and visits"); *Advanced Battery*, 2012 WL 3758085, at *3 (crediting short-seller reports where the plaintiffs "sent investigators to China, who visited ABAT's plants" and confirmed many of the allegations).[9] Given the extensive corroboration of the reports, including above all, by Defendants' admissions, the Complaint is readily distinguishable from the complaint in *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774 (S.D.N.Y. 2020), which Defendants rely on. Def. Br. at 16-17, 24; Wu Br. at 12. There, the plaintiffs based their allegations entirely on anonymous short-seller accounts, none of which were independently corroborated. *Long Miao*, 442 F. Supp. 3d at 803.[10]

Defendants' argument that Plaintiff's investigation does not support the falsity of their statements is equally misguided. For example, Defendants argue that the presence of "Coming Soon" banners and ongoing construction in January 2021 "actually confirms the accuracy of the Company's prior statements." Def. Br. at 17; *see also* Wu Br. at 13. However, the state of the MEG Center as documented by Plaintiff's investigation, ¶¶ 128-32, starkly contradicts Defendants' Class Period claims that the MEG Center was "***officially opened***," "***operational***," and seeing "***solid customer foot traffic***." ¶¶ 149, 154. By contrast, Plaintiff's investigation is fully consistent with Defendants' admission on June 26, 2020, that the MEG Center was still in "Phase I" of development and had yet to even be branded as the MEG Center. ¶¶ 124, 126.

More absurdly, Defendants also argue that the ***lack*** of any observed commercial activities in January 2021 does not prove the falsity of Defendants' statements "seven and eight months

---

[9] Even without corroboration, short-seller reports may be credited where the authors disclose the factual basis for their allegations. *See Brown*, 875 F. Supp. 2d at 1117 (crediting allegations where report described surveillance conducted of purported plant in China); *compare id.*, *with* ¶¶ 117-20 (J Capital and Hindenburg describing their investigations).
[10] *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015), cited by Wu (Wu Br. at 12) is inapposite. Unlike the anonymous sources in *Lululemon*, which did not "suggest that any of the alleged statements were false when they were made," 14 F. Supp. 3d at 579 (emphasis omitted), Defendants' admissions establish both that the short sellers' allegations were true and that Defendants' statements were false.

earlier in May-June 2020." Def Br. at 18. However, Defendants fail to explain their implausible assertion that a facility that was fully "***renovated***" in March 2020, ¶ 139, had a "***soft launch***" in May 2020, ¶ 142, and was "***operational***" in June 2020, ¶ 154, could somehow revert back to a work-in-progress by January 2021. Plaintiff is entitled to the far more reasonable inference, corroborated by Defendants' admissions, that the MEG Center never existed as described during the Class Period. In any event, "[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).

## 2.   Defendants' Attempts to Recast Their Statements Fail to Rebut the Complaint's Well-Pled Allegations

Defendants advance a series of strained interpretations of their statements in an effort to avoid the conclusion that their descriptions of the MEG Center were materially misleading. However, "Defendants must take the Complaint[] as [it is] written." *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 333 (S.D.N.Y. 2003). Under any reasonable interpretation of Defendants' statements, they were materially false or misleading when made.

Incredibly, Defendants contend that admittedly doctored photographs presented—without any qualifications—during a May 28, 2020 interview and in a June 9, 2020 press release, ¶¶ 104, 148-51, 154,[11] were not materially false or misleading because the photographs were "a depiction and can only be viewed as such" and further, "[w]hether the photo was labeled as a depiction or rendering or not does not alter the mix of information available to investors." Def. Br. at 15-16.

---

[11] Defendants' brief refers to a single "photograph in a slide shown during a presentation in a May 28, 2020 interview, and later used in a press release." Def. Br. at 15. However, the Complaint alleges that Poor's May 28, 2020 interview included multiple photographs purporting to show the current state of the MEG Center, ¶¶ 148-51, one of which was included in the Company's June 9, 2020 press release. ¶¶ 104, 154. Significantly, Hindenburg alleged that Defendants issued multiple doctored photographs, which Defendants failed to deny. ¶¶ 122-23.

Defendants' spin on the photographs cannot be credited on a motion to dismiss. In presenting the photographs, Poor stated:

> *We did a soft launch on May the 1st which we started selling vehicles outside*. *We were able to expand that this week and then this past Monday, we officially opened up a large center for both used cars and new EV vehicles*. *So both of those are up and running*.

¶ 149. Similarly, on June 9, 2020, Wu described "*high levels of activity*" and "*solid customer foot traffic*" at the MEG Center, which the press release described as "*operational*." ¶ 154.

Defendants clearly meant for the photographs to confirm visually what they had verbally represented to the market as the current state of affairs at the MEG Center. Indeed, the slides presented by Poor included a banner that read "Ideanomics's massive EV expo center in Qingdao, China is starting to generate revenues." ¶ 151. Defendants admit that the photographs do not actually show the MEG Center in May and June 2020, and that their accompanying descriptions were inaccurate. ¶¶ 124, 126; Def Br. at 15-16. In fact, as uncovered in Plaintiff's investigation, the photographs shown by Poor were not even taken in the building purported to be the MEG Center, which was still under construction as of January 2021. ¶ 152.

Where companies do not provide clarifying information along with their statements, investors are entitled to rely on context. *See SEC v. Syron*, 934 F. Supp. 2d 609, 627 (S.D.N.Y. 2013) (finding statements misleading where defendants' disclosures did not qualify use of "subprime" to describe loan quality and "investors had nothing to go on but context"); *SEC v. N. Am. Research & Dev. Corp.*, 375 F. Supp. 465, 470-71 (S.D.N.Y. 1974), *aff'd*, 511 F.2d 1217 (2d Cir. 1974) (finding, after bench trial, that purported photographs of plant were misleading where they "conveyed the false impression that the plant was in operation" and were presented "with the implication of an ongoing operation and current activity"). Here, the purported

photographs of the MEG Center clearly conveyed a materially false impression that the MEG Center was fully operational. *Alstom*, 406 F. Supp. 2d at 453.[12]

Wu's argument that his statements in the June 9, 2020 press release (which were accompanied by an admittedly misleading photograph), ¶¶ 104, 154, were true misses the mark. Wu Br. at 10. The June 9, 2020 press release described the MEG Center's "***first five weeks of being operational***," ¶ 154, and included a doctored image purporting to show the current state of the facility. ¶ 104. Wu's statements clearly created a false impression of the MEG Center's operations, as evidenced by the 64% increase in Ideanomics's share price on this date. ¶ 105.

Defendants next argue that their statements regarding the MEG Center's purported "***soft launch***" and "***ribbon-cutting ceremony***," ¶¶ 141-42, 146, 149, 156, are not adequately pled as false because Plaintiff does not specifically allege that the Company did not conduct a "soft launch" on May 1, and any statements regarding a planned ribbon-cutting ceremony are forward-looking. Def. Br. at 13.[13] These arguments ignore the crux of the Complaint's allegations. Defendants' statements regarding a "***soft launch***," the "***start [of] sales operations***," and a "***ribbon-cutting ceremony***" conveyed concrete (and false) information regarding the current state of the MEG Center, and were accompanied by claims that the MEG Center had "***officially launched***," "***now hosts a full suite of car dealer services***," and was "***operational***." ¶¶ 97, 142, 146, 154. As the Company admitted and Plaintiff's investigation confirmed, the MEG Center was not yet existent at the end of the Class Period, let alone ready for a "***ribbon cutting ceremony***" to celebrate the *completion* of the project. ¶¶ 124, 126, 128-32. These statements, considered in the context of

---

[12] Whether the "2020 Ideanomics" legend on the photographs is a timestamp or copyright symbol, as Defendants argue, is irrelevant. Def. Br. at 16. By labelling the photographs "2020" and adding the Company's name and "MEG" to the images, Defendants misrepresented that the photographs depicted the current state of the MEG Center, which they now admit was untrue. Def. Br. at 15-16.
[13] Defendants' statements are not protected by the safe harbor, as explained below in Section I.C.

Defendants' admittedly doctored photographs (one of which accompanied two of the challenged statements, *see* ¶¶ 104, 151, 154), clearly created a false impression of the state of affairs.

Defendants also argue that their statements on March 16, 2020, describing the MEG Center as "***1 million square feet of space***" and "***a million square feet***," ¶¶ 135, 137, reflected the planned dimensions of the MEG Center, and were therefore accurate. Def. Br. at 12; Wu Br. at 8-9. However, Defendants' statements did not disclose that the MEG Center occupied only a fraction of the 1 million-square-foot facility, as the Company later admitted. ¶ 124. Moreover, these statements were accompanied by language describing the current state of renovations at the MEG Center. *See* ¶ 135 ("***It is being completely refurbished . . . .***"); ¶ 137 ("***it's much bigger than what you just said***"). Indeed, Wu's statement was in response to the question "***[s]o you recently opened*** a 10,000 square foot facility in Qingdao," ¶ 137, and did not disclose that Ideanomics was "***actually opening up***" only a small fraction of the facility, as he now claims. Wu Br. at 8.[14]

Similarly, Defendants argue that Poor's statement on March 20, 2020, that "***[t]he 1 Million square foot site has been renovated as a permanent EV expo center***," ¶ 139, was not false or misleading because on March 16, 2020, Poor stated that the facility "was already being refurbished to be an EV hub." ¶ 135. Def. Br. at 13. At best, this argument raises factual questions for a jury as to whether a reasonable investor would be misled by the claim that the MEG Center "***ha[d] been renovated***" in the context of Defendants' prior statements about the facility (e.g., that it was "operational"). Such questions must be resolved in Plaintiff's favor at this stage. *See Basic*, 485 U.S. at 240 ("materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information," which is a "fact-specific inquiry").

---

[14] Wu also argues that an alternative transcription of the March 16, 2020 interview shows that Wu did not say "it's much bigger." Wu Br. at 9. This is a classic disputed issue of fact, and Plaintiff's allegations are presumed true at this stage. *Ganino*, 228 F.3d at 161. Under any transcription, Wu gave a false impression that the Company had "recently opened" up a "***million square feet***" facility in response to the interviewer's question. ¶ 137.

Finally, Defendants cite the Company's risk disclosures, contending that they sufficiently warned investors that the MEG Center was "*still in the development stage*" so as to counteract any misleading impression created by Defendants' statements. Def. Br. at 6 (emphasis in original). This is a fact-intensive, and thus premature, "truth on the market" defense. *Ganino*, 228 F.3d at 167 ("truth on the market" defense requires that truth be disclosed "with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements"). In any event, this argument fails. In the Company's 2019 10-K issued on first day of Class Period, prior to the majority of Defendants' false statements, Defendants stated that the *MEG division* was "still in the development stage." Ex. 4 at 3. Similarly, in the Company's May 11, 2020 Form 10-Q, Defendants stated that "[t]he rate at which the MEG *business unit* grows is highly correlated with the development of financing structures . . . and the speed at which business in the PRC and the rest of Asia returns to pre Covid-19 levels." Ex. 5 at 40. Defendants said nothing about the current status of the *MEG Center*, the subject of their false statements. Defendants cannot establish, as a matter of law, that these disclosures "counter-balance effectively any misleading information created by the alleged misstatements." *Ganino*, 228 F.3d at 167.

## B. Defendants' Materiality Challenges Fail

"The materiality requirement poses a very low burden" at the pleadings stage, *Freudenberg,* 712 F. Supp. 2d at 181, and is a fact-intensive inquiry that "is rarely a basis for dismissal on the pleadings." *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368 (S.D.N.Y.2012); *see also In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 465 n.22 (S.D.N.Y. 2013) ("disputes over the materiality of allegedly false or misleading statements are generally reserved for the trier of fact").

*First*, with respect to several statements, Defendants contend that they are "immaterial and not actionable." Def Br. at 15 (citing ¶¶ 148, 154, 156). To prevail, Defendants must establish that

each of the statements were "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino*, 228 F.3d at 162. Even if couched in optimistic language, statements can nonetheless be actionable "if shareholders could reasonably interpret them as material misstatements." *Gross v. GFI Grp., Inc*., 162 F. Supp. 3d 263, 268 (S.D.N.Y. 2016). Here, each of the statements Defendants challenge as "immaterial" conveyed concrete information about the current status of the MEG Center, which was readily capable of verification, and objectively false. *See* ¶ 156 (describing the MEG Center as a "very big success" on account of it purportedly "***deliver[ing] more than 2,000 units sold vehicles in the first month***"); ¶ 154 (describing "***high levels of activity***" and "***solid customer foot traffic***" in MEG Center's "***first five weeks of being operational***"). These verifiable statements about the MEG Center's purported operations cannot be deemed immaterial as a matter of law. *See, e.g.*, *Facebook*, 986 F. Supp. 2d at 465 (statements that "were readily capable of verification" were not immaterial).

Moreover, Defendants' arguments are belied by the common sense point that the current state and level of activity at the MEG Center was the focus of virtually everything Defendants said publicly during the Class Period, ¶¶ 133-60, underscoring its importance to the Company, and hence to investors. *See Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 548 (S.D.N.Y. 2017) (statements that were "grounded in historical facts" and "plausibly designed to mislead investors into believing that [company's]'s present (as well as its future) was rosier than reality" were not immaterial); *Freudenberg*, 712 F. Supp. 2d at 186 (statements were "actionable and material" where they "related to the fundamental nature of E*TRADE's most important business sector and [were] belied by detailed allegations directly contradicting the assertions").

*Second*, Defendants raise a number of premature arguments that their alleged misstatements did not impact Ideanomics's stock price. Def. Br. at 6-8, 16, 20. These arguments,

which speak to the applicability of the fraud-on-the-market presumption of reliance, contradict Plaintiff's allegations that Defendants' statements inflated the stock price or maintained inflation. *See* ¶ 105 (alleging that the June 9, 2020 press release and doctored photograph caused a 64% increase in Ideanomics's share price). Plaintiff also alleges a price decline when the truth was revealed. *See* ¶¶ 127, 205-08 (alleging the price declined "when information entered the market that revealed that Defendants' alleged misstatements had concealed material information").[15]

Furthermore, Defendants' fact-intensive arguments regarding the fluctuations in the Company's stock price, such as the June 22, 2020 tweet by blogger David Portnoy, are properly the subject of expert testimony at later litigation stages, Def. Br. at 7, are premature, and cannot provide a basis for dismissal. *See Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 46 (S.D.N.Y. 2018) ("[I]t is Defendants' burden to show, by a preponderance of the evidence, the absence of price impact, and they cannot meet that burden by pointing to a handful of dates and suggesting, without further explanation, that one should have seen price impact on those dates but did not."); *In re Bank of Am. Corp. Sec., Derivative & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 143-44 (S.D.N.Y. 2012) (stock price decline following alleged corrective disclosures defeated arguments regarding a lack of price impact); *In re Pfizer Inc. Sec. Litig.*, 936 F. Supp. 2d 252, 264 (S.D.N.Y.2013), *vacated in part on other grounds*, 819 F. 3d 642 (2d. Cir. 2016) ("[A] misstatement may cause inflation simply by maintaining existing market expectations, even if it does not actually cause the inflation in the stock price to increase . . . ."). Without discovery, the

---

[15] Defendants claim "Plaintiff acknowledges that [Defendants'] early statements had no effect on the Company's stock price." Def. Br. at 16 (citing ¶ 11). However, paragraph 11 clearly refers to Defendants' *pre-Class Period* statements about future plans for the MEG Center, not Defendants' Class Period statements about its current state. ¶ 11.

extent to which Defendants' statements inflated or maintained Ideanomics's stock price cannot be resolved on a motion to dismiss.[16]

### C. Defendants' Statements Are Not Protected by the PSLRA Safe Harbor

Defendants argue that several of their statements are forward-looking and protected by the PSLRA safe harbor, 15 U.S.C. § 78u-5(c). *See* Def. Br. at 12-14 (citing ¶¶ 135, 139, 141, 142, 144, 146, 154). Each of the statements Defendants challenge as forward-looking is actionable.

*First*, the statements Defendants challenge as forward-looking "involved the representation of existing facts" and thus, do not qualify for safe harbor protection. *Facebook*, 986 F. Supp. 2d at 465. Many of the challenged statements were accompanied by statements of *historical* fact, which obviously fall outside the safe harbor. *See, e.g.*, ¶ 139 ("*The 1 Million square foot site has been renovated*[.]"); ¶ 142 ("*our EV hub in Qingdao had a soft launch on May 1* . . ."); ¶ 154 ("*the MEG Center in Qingdao began operations on May 1*"). Other statements included representations of present fact, which are also not forward-looking. *See, e.g.*, ¶ 135 ("*The building is mostly finished*"); ¶ 146 ("*The MEG Center in Qingdao now hosts a full suite of car dealer services*[.]"). While "a statement of confidence in a firm's operations may be forward-looking . . . statements or omissions as to the operations in place (and present intentions as to future operations) are not." *Iowa Pub. Empls. Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010); *see also Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 485 (S.D.N.Y. 2010) ("[P]ositive descriptions of [a product's] ongoing performance . . . were statements of specific, present-day fact, not optimistic predictions of the future.").[17]

---

[16] Defendants suggest their fact-intensive arguments can be considered at this stage on the theory that "[t]he Court may take judicial notice of newspaper articles for the fact of their publication." Def. Br. at 7 n.6. However, even if the underlying documents were sufficiently reliable, Defendants ask this Court to draw factual conclusions regarding the effect such publications had on the Company's stock price. Def. Br. at 7, 10. This is improper at this stage.

[17] Defendants' cited cases make clear that such statements of past and present facts are not protected by the safe harbor. *See, e.g.*, *Gissin v. Endres*, 739 F. Supp. 2d 488, 505 (S.D.N.Y. 2010) ("Where a statement contains references to both future and past or present conditions, safe harbor protection may only extend to the prognostic portion."); *Porwal v.*

*Second*, to the extent any of Defendants' statements could be construed as purely forward-looking (they cannot), "Plaintiff alleges that Defendants omitted material information" and "[c]ourts in this circuit have consistently held that material omissions are not protected by the PSLRA safe harbor." *Rudani*, 2020 WL 5770356, at *6 (statements regarding revenue guidance were not protected by the safe harbor where defendants omitted facts undermining the accuracy of the statements). Specifically, Plaintiff alleges that Defendants omitted that "the MEG Center had not been fully renovated as a permanent EV expo center, was not operating on 1 million square feet of space, and was not an 'EV hub.'" ¶¶ 140, 145, 147, 150, 153, 155. These material omissions "seriously undermine[d] the accuracy of [Defendants'] statements," *Rudani*, 2020 WL 5770356, at *6, including any portions of Defendants' statements that can properly be considered forward-looking, making the safe harbor inapplicable. *See* ¶ 144 ("***we'll achieve profitability this year***"); ¶ 154 ("***the MEG Center will be a material source of revenue for Ideanomics***").

*Third*, the safe harbor does not apply because the challenged statements were not accompanied by meaningful cautionary language. "To be meaningful, cautionary language must precisely address the substance of the specific statement or omission that is challenged." *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102 (S.D.N.Y. 2006). Defendants fail to explain how any of the Company's purported cautionary language "conveyed substantive information" about the current state of the MEG Center, *Slayton v. Am. Express Co.*, 604 F.3d 758, 772 (2d Cir. 2010), or "directly address[ed] exactly the risk that [P]laintiff[] claim[s] was not disclosed." *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016). Indeed, the only cautionary language Defendants specifically discuss concerns the MEG *division*, not the

---

*Ballard Power Sys., Inc.*, 2019 WL 1510707, at *5 (S.D.N.Y. Mar. 21, 2019) (Daniels, J.) (applying safe harbor to statements that "speak predictively about the future, rather than stating present facts").

MEG Center, or otherwise fails to address the subject of Defendants' misstatements. *See* Def. Br. at 6 (quoting Ex. 4 at 3-4); *Id.* at 12 n.8 (citing Ex. 14 & Ex. 4 at 22-26).[18]

### D.   Defendant Wu's Statements Are Not Inactionable Opinions

Wu contends that his statements in the June 9, 2020 press release "express[ed] a yet-unproven belief that the MEG Center would be a revenue generating venture," and "reflect his opinion or subjective belief in the future benefits of the MEG Center." Wu Br. at 10, 14. Wu's misstatements are not opinions as they claim to represent the current state of affairs at the MEG Center and contain "embedded factual statements that can be proven false." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020) (citing *Omnicare, Inc. v. Laborers Dist. Counsel Constr. Indus. Pension Fund*, 575 U.S. 175, 185 (2015)). The June 9, 2020 press release claimed that "***the MEG Center in Qingdao began operations on May 1***," and described activity during its "***first five weeks of being operational***." ¶ 154. Wu's statements touting "***high levels of activity***" and "***solid customer foot traffic***," *id.*, thus conveyed factual information about the current status of the MEG Center, not any "subjective" or "unproven belief." Wu Br. at 10, 14. Indeed, Wu's statements were accompanied by admittedly doctored photographs purporting to show the current state of the facility. ¶ 104. These factual representations were false when made. *See supra* § I.A.

Even if Wu's statements could be construed as opinions, they are nonetheless actionable because Wu: (i) omitted material facts about the basis for the opinion, which rendered the statements misleading in context; and (ii) the Complaint adequately alleges that Wu did not genuinely hold the purported opinions. *Omnicare*, 575 U.S. at 184-86, 194.[19] Far from relying on

---

[18] To the extent Defendants contend that other risk disclosures in Ideanomics's 10-K were sufficiently meaningful, they have not developed this argument, and it is waived. *Tutor Time*, 2013 WL 5637676, at *1. The safe harbor is also unavailable because Plaintiff adequately alleges that the challenged statements were made with actual knowledge that they were false or misleading. 15 U.S.C. § 78u-5(c)(1)(B); *Slayton*, 604 F.3d at 775. Plaintiff's scienter allegations—including Defendants' admissions—adequately plead an inference of actual knowledge. *See infra* § II.

[19] Relying on pre-*Omnicare* decisions, Wu incorrectly argues that Plaintiff must allege that his purported opinions were "not honestly believed." Wu Br. at 14. However, *Omnicare* holds that even if opinions are sincerely believed,

"conjecture and speculation," Wu Br. at 14, the Complaint alleges in detail why Wu's statements were either not honestly held or lacked a reasonable basis. A reasonable investor would expect Wu's statements to "fairly align[] with the information" in Ideanomics's possession regarding the current state of the MEG Center and result from "some meaningful inquiry." *Tongue*, 816 F. 3d at 210. Given Defendants' admissions—two weeks later—that the MEG Center was in "Phase I" of development and occupying only a fraction of the MEG facility, and their admission that the photograph accompanying Wu's statements misrepresented the current state of the MEG Center, ¶¶ 124, 126; Def. Br. at 15-16, the most plausible inference is that Wu either did not genuinely believe his statements, or that he conducted no inquiry whatsoever before issuing them.[20]

## II.     The Complaint Alleges a Strong Inference of Defendants' Scienter

The scienter analysis is a holistic inquiry. The question is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). The inference "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences,'" but only "cogent and at least as compelling as any opposing inference." *Id*. at 324. "Plaintiffs are not required to plead scienter with great specificity, rather plaintiffs must allege sufficient facts to support a strong inference of fraudulent intent." *In re Winstar Commc'ns*, 2006 WL 473885, at *6 (S.D.N.Y. Feb. 27, 2006) (Daniels, J.). Scienter may be pled by showing "that the defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had

---

they "may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 209-10 (2d Cir. 2016) (*Omnicare* "altered the standard" requiring plaintiffs to plead that a "statement was *both* objectively false *and* disbelieved by the defendant").

[20] Additional facts supporting Wu's scienter are set forth below in Section II.

access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Rudani*, 2020 WL 5770356, at *6.

Defendants argue that the Complaint fails to raise a strong inference that Defendants had a motive and opportunity to commit fraud or plead facts supporting strong circumstantial evidence of conscious misbehavior or recklessness. Def Br. at 21; Wu Br. at 15-16. The Complaint includes ample allegations supporting a strong inference of scienter, under either theory.

### A.    The Complaint Alleges Defendants' Conscious Misbehavior or Recklessness

Ideanomics issued a barrage of false or misleading statements related to the MEG Center during the Class Period. *See* ¶¶ 133-60. Indeed, out of 38 press releases issued during the three-month Class Period, only nine were unrelated to the MEG Center or MEG division. ¶ 161. Moreover, each Individual Defendant issued or disseminated statements concerning the MEG Center, some of which included photographs purporting to show scenes from the MEG Center, which Defendants now admit were fraudulent. Def. Br. at 15-16. "When managers deliberately make materially false statements . . . with the intent to deceive the investment community, they have engaged in conduct actionable under the securities laws." *Novak v. Kasaks*, 216 F. 3d 300, 312 (2d Cir. 2000). It is implausible that Defendants—each of whom regularly spoke to investors on conference calls or in interviews and/or signed or disseminated the Company's SEC filings— were unaware of the current state of the MEG Center. And, if they were, they were reckless. *See, e.g.*, *Fresno*, 268 F. Supp. 3d at 552-53 (scienter pled where defendants spoke "extensively" about subject of misstatements); *Freudenberg*, 712 F Supp. 2d at 199 ("reassurances to investors . . . regarding the key issues in [the] case" supported inference of scienter).[21]

---

[21] Defendants rely on irrelevant cases involving SOX certifications, and suggest that their repeated false statements do not support an inference of scienter. Def. Br. at 23-24. However, unlike in those cases, Defendants' own admissions establish that their repeated statements—both verbal and photographic—were knowingly or recklessly false or misleading when made. The "Second Circuit has explicitly recognized that plaintiffs may rel[y] on post-class period

Beginning on June 25, 2020, Defendants implicitly admitted that they had misled investors by failing to deny Hindenburg's accusations that they had published doctored photographs of the MEG Center. ¶¶ 119, 122-23. Defendants now admit that, unbeknownst to investors, the photographs were actually a "depiction or rendering." Def. Br. at 15-16. Further, the Company admitted on June 26, 2020, that the MEG Center occupied a small fraction of the "*1 million square foot*" facility touted to investors, was still in the early stages of development, and that there was not even a facility named the "MEG Center" as of that date. ¶¶ 124, 126. The glaring inconsistency between these disclosures and Defendants' prior statements is sufficient to raise a strong inference of scienter. *See Freudenberg*, 712 F Supp. 2d at 199 n.9 ("The more serious the error, the less believable are defendants' protests that they were completely unaware of [the Company's] true financial status and the stronger the inference that defendants must have known about the discrepancy.") (alterations in original) (quoting *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997)).[22]

The Complaint also alleges that Defendants "ignored obvious signs of fraud," including the publication of admittedly doctored photographs. *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000); *see Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (scienter may be inferred by a defendant's "egregious refusal to see the obvious, or to investigate the doubtful"). The unmistakable fact that the MEG Center was not as described by Defendants, as uncovered by the short sellers and confirmed by Plaintiff's investigation, ¶¶ 115-20, 128-32, underscores the

---

[statements] to confirm what a defendant should have known during the class period." *Vivendi*, 381 F. Supp. 2d at 181 (first alteration in original). To hold otherwise would "reward [Defendants] for their successful concealment." *Id.*

[22] The Complaint does not rely on impermissible "group pleading." Def. Br. at 24; Wu Br. at 16. Unlike in Defendants' cited cases, each named Defendant either personally uttered, signed or disseminated false statements concerning the MEG Center which are directly contradicted by Defendants' admissions. *See, e.g.*, *Rich v. Maidstone Fin., Inc.*, 2001 WL 286757, at *6 (S.D.N.Y. Mar. 23, 2001) (complaint "provide[d] no details regarding the time and place that [defendant] made statements that were in any way misleading"); *see also In re Satyam Comput. Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 481 (S.D.N.Y 2013) (scienter not adequately pled where "majority of the allegations . . . only reinforce[ed] the inference that the [defendants] were themselves victims of the fraud").

obviousness of Defendants' fraud. *See Ho*, 887 F. Supp. 2d at 575 (allegations based on short-sellers reports "may be relied upon as evidence of [defendants'] scienter" where defendants' statements "were in complete opposition to the alleged facts that were uncovered about [the company] by [the short seller], as well as Plaintiff['s] private investigators"). Such "reasonably available facts," taken together, "should have put [Defendants] on notice that [their] public statements were false." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007).

Furthermore, the Complaint alleges additional circumstantial evidence of Defendants' knowledge or recklessness. The MEG Center was not just one among many revenue-producing segments during the Class Period, ***it was effectively the only revenue-producing segment in the Company***. ¶¶ 175-78; *see Ho*, 887 F. Supp. 2d at 575 ("[k]nowledge . . . can be imputed to key officers who should have known of facts relating to the core operations of their company . . ."). Given the importance of the MEG Center, the Individual Defendants' positions within the Company may also be considered as part of a holistic scienter analysis, notwithstanding Defendants' arguments to the contrary. Def. Br. at 24; Wu Br. at 15.[23] As this Court held in *Rudani*, where the undisclosed information is readily accessible and "easily determinable," and the business line is sufficiently "critical" to the Company such that Defendants "had a duty to monitor" it, the Individual Defendants' high positions and roles at the Company support an inference of scienter. 2020 WL 5770356, at *7. While Wu characterizes Plaintiff's allegations as "conclusory" and based solely on his position, Wu Br. at 15, 20, as the Company admits, Wu was "highly active in [Ideanomics's] management," ¶ 171, and Wu's role as Chairman included "provid[ing] advice

---

[23] Defendants' cases involved complaints that sought to infer scienter primarily or solely through a defendant's position. *See, e.g.*, *Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010) ("Plaintiff alleges perfunctorily that Defendants received information contradicting their public statements because they held management roles and monitored CIBC financial reports."); *Long Miao*, 442 F. Supp. 3d at 806 (similar).

to, and guid[ing] and assist[ing] the Corporation's Chief Executive Officer." Wu Br. at 22; *see also* ¶ 112. Wu could not have performed these management functions without intimate knowledge of the inner workings of the Company, including its only potentially viable business segment.[24]

The foregoing facts are more than sufficient to plead a strong inference of Ideanomics's scienter. "[T]he most straightforward way to [plead corporate scienter] . . . will be to plead it for an individual defendant," as the Complaint does for all Individual Defendants. *Teamsters Local 445, Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). However, "[i]t is [also] possible to raise the required [scienter] inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Id.* Ideanomics's misstatements concerning the status of the MEG Center, including its publication of photographs falsely portraying the MEG Center as operational, raises such an inference. *Id.* at 195-96 (corporate scienter may be inferred where "so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false") (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)).

### B.   Defendants Were Financially Motivated to Commit Fraud

Plaintiff alleges that at the time of Defendants' misstatements, Ideanomics was on the brink of collapse, desperate for financing, facing NASDAQ delisting, and fighting for its continued existence as a going concern. *See* ¶¶ 72-83, 87, 89-91. In addition, Wu and his Seven Stars entity had loaned the Company millions in exchange for convertible debt whose value was contingent on

---

[24] These facts readily distinguish the Complaint from the cases cited by Wu. *See One Commc'ns Corp. v. JP Morgan SBIC LLC*, 381 F. App'x 75, 81 (2d Cir. 2010) (rejecting unsupported allegation regarding "involvement of outside directors"). Furthermore, unlike in *Glaser v. The9, Ltd.*, the Complaint identifies "specific contradictory information [that] was available to the defendants . . . *at the same time* they made their misleading statements," most notably Defendants' admitted manipulation of photographs in an effort to portray the MEG Center as fully operational. 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) (emphasis and alteration in original).

Ideanomics raising its stock price above $1.00 per share. ¶¶ 37, 80, 184-85. These facts are well-pleaded and indeed, indisputable, and provide ample support for an inference that Defendants were financially motivated to commit fraud. *See In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001) ("[A]rtificial inflation of a stock price in order to achieve some more specific goal may satisfy the pleading requirement."); *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 813 (C.D. Cal. 2011) ("Defendants' short-term need to keep their stock price above $6.50 per share provides a plausible motive for Defendants' actions, and supports a finding of scienter"). Defendants attempt to minimize these allegations by suggesting that these are "pressures faced by all similarly situated companies," Def Br. at 22; *see also* Wu Br. at 18, but these arguments ignore the Complaint's well-pleaded allegations regarding Ideanomics's dire financial health and pressing need to raise the Company's stock price to avoid delisting and the loss of its financing. ¶¶ 161, 179-83.[25]

Similarly, Wu argues that because the Company began promoting its initial investments in EV in 2018, and the MEG Center was first announced in 2019, Ideanomics's dire financial condition in 2020 "could not possibly have motivated any alleged misstatements about the MEG Division or MEG Center." Wu Br. at 18. However, Defendants' increasingly aggressive misstatements regarding the MEG Center only began after the January 2020 NASDAQ letter and in connection with the Company's need to report its dismal 2019 results in March. ¶¶ 82-83. Moreover, the fact that Wu and his affiliates stood to lose their investments in Ideanomics in the face of the Company's imminent delisting provided Wu a powerful personal incentive to inflate

---

[25] Unlike *Smith v. Antares Pharma, Inc.*, 2020 WL 2041752, at *9 (D.N.J. Apr. 28, 2020), where the allegations concerning the company's desire to avoid NASDAQ delisting were "not supported by particularized facts," Defendants do not dispute Ideanomics's dire financial condition, and only raise a factual dispute concerning the timing of the potential delisting. *See* Def. Br. at 22. Even if true—which is a question of fact—this is irrelevant because the purported extension occurred during the Class Period, after Defendants are alleged to have embarked on their fraud and made many of their alleged misstatements. *See* ¶¶ 92-98, 133-40.

the Company's stock price so he could convert his notes to equity at a profit, which he later did. ¶ 105. Such a temporal link supports an inference of scienter. *Complete Mgmt.*, 153 F. Supp. 2d at 328 (citing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 270 (2d Cir. 1993) (motive adequately pled where defendant sought to maintain inflated stock price prior to upcoming offering)).

The Complaint includes additional allegations supporting an inference that Defendants were financially motivated to commit fraud. At the start of the Class Period, the Company entered into the YA II agreement, through which it obtained $50 million in financing enabling the Company to repay the its indebtedness to Wu and his affiliates and continue operations. ¶¶ 15-16, 23, 88-90, 108-09, 111. Because the YA II agreement was contingent on the Company maintaining its NASDAQ listing, this provided additional motivation to Ideanomics, its executives, and Wu to inflate the Company's stock price. ¶¶ 165-66, 182-83. As these allegations demonstrate, Defendants' arguments that Plaintiff has failed to "allege that Dr. Wu benefitted in a concrete and personal way from the purported fraud," Wu Br. at 19, and that "there are no allegations about any purported personal benefit to the Individual Defendants," Def. Br. at 22-23, are meritless.[26] These arguments are further belied by Wu's admission that the YA II deal "benefitted the Company as well as Dr. Wu." Wu Br. at 19.[27]

In light of the compelling corporate financial motive for Defendants to fraudulently inflate the Company's stock price, as well as the personal financial motive of Wu, the absence of stock sales by the Individual Defendants is not fatal to Plaintiff's scienter allegations, as Defendants contend. Def. Br. at 22-23; *see Tellabs*, 551 U.S. at 324 ("the absence of a motive allegation is not

---

[26] Wu's reliance on *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) is unavailing. Wu Br. at 19. There, the court found that the desire to maintain or increase *executive compensation* was insufficient to support scienter. *Id* at 140.

[27] Defendants argue that the timing of the YA II deal does not support an inference of scienter because it "allowed the Company to raise needed equity around the same time the Company was expending resources to build a new division and the MEG Center." Wu Br. at 18-19; *see also* Def. Br. at 22. These arguments disregard the Complaint's allegations that Defendants falsely touted the current state of the MEG Center to inflate the Company's stock price, thereby gain access to additional financing and avoid financial ruin. *See* ¶¶ 182-83.

fatal; . . . the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint"). Indeed, whether Wu sold shares in Ideanomics is largely irrelevant given the Complaint's allegations that he capitalized on Ideanomics's inflated share price to convert his debt to equity at a profit. ¶ 105.[28]

Moreover, given Defendants' admitted issuance of materially false or misleading statements, Defendants' retention of Ideanomics stock during a period in which they were actively inflating that stock *supports* an inference of scienter—even if Defendants' fraud ultimately proved unsuccessful. *See Makor*, 513 F.3d at 710 ("The fact that a gamble . . . fails is not inconsistent with it[] having been a considered . . . [and] reckless[] gamble."); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1068 (C.D. Cal. 2008) (purchasing shares could be probative of scienter if done with intent to continue the fraud).[29] By the same token, the increase in Wu's holdings through the YA II Equity Agreement and resultant repayment of loans to Wu, standing alone, does not rebut the otherwise strong inference of his scienter. Wu Br. at 19. Wu's additional holdings were inflated through his own false statements, and he stood to receive a windfall profit had Defendants' fraud gone undetected. *See In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 558 (S.D.N.Y. 2010) (motivation of "reaping a windfall payout . . . contribute[d] to an inference of scienter").

---

[28] *In re Tarragon Corp. Sec. Litig.*, 2009 WL 10732259 (S.D.N.Y. Mar. 27, 2009) is inapposite. Here, Plaintiff alleges that Wu's conversion of debt to *receive equity* at inflated prices personally benefitted *Wu*. ¶¶ 80, 103, 105. *Tarragon* addressed the defendant company using inflated stock to *retire* debt for the benefit for the *company*. 2009 WL 10732259, at *12.

[29] Notably, Wu's personal loan transactions were carried out by his wholly owned affiliated entity, Sun Seven Stars, which is not required to disclose the transactions on Form 4s. Plaintiff believes that discovery may reveal that those shares in fact entered the market soon after Wu's conversions, effectively constituting a sale and generating yet another personal benefit to Wu. *See Faulkner v. Verizon Commc'ns, Inc.*, 156 F. Supp. 2d 384, 393 (S.D.N.Y. 2001) (allegations based on information and belief may be considered in assessing scienter).

Confirming that Plaintiff has adequately pled a strong inference of scienter, Defendants fail to identify any plausible, non-culpable explanations for their repeated misstatements. Significantly, other than Wu, Defendants do not even suggest an alternative explanation for their repeated misstatements. Wu asserts that he "simply took actions that supported the success of a Company in which he had faith." Wu Br. at 20-21. However, Wu fails to explain how his issuance of numerous false or misleading statements—including in press releases which Defendants admit did not accurately portray the current state of the MEG Center—is in any way consistent with his purportedly innocent motivations. Absent a cogent and *more* compelling competing inference, Plaintiff's scienter allegations are sufficient. *Tellabs*, 551 U.S. at 324.

## III. The Complaint Adequately Pleads Loss Causation

Loss causation allegations "need only meet the lesser Rule 8(a) standard." *King Cty., Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 339 (S.D.N.Y. 2010). The Complaint need only provide "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). This causal connection is satisfied where the complaint alleges that "the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Winstar*, 2006 WL 473885, at *13 (emphasis in original). "*Dura* did not set forth any requirements as to who may serve as the source of the information, nor is there any requirement that the disclosure take a particular form or be of a particular quality." *Id.* at *14. A corrective disclosure "can occur through a series of disclosing events." *In re Bristol Myers Squibb Co., Sec. Litig.*, 586 F. Supp. 2d 148, 165 (S.D.N.Y. 2008). Whether a disclosure is "corrective" should not be resolved at the pleading stage. *Emergent Capital Inv. Mgmt., LLC. v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) (loss causation "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss").

Defendants falsely touted the MEG Center as complete and operational, and when the contrary truth was disclosed, the Company's stock price plummeted. The Complaint identifies the new information revealed to the market across roughly 24 hours in the alleged disclosures, how the information was corrective of information concealed by Defendants' misrepresentations and omissions, and the decline in Ideanomics's stock price in response. *See* ¶¶ 115-27, 205-08. These allegations connect the alleged fraud to investors' losses, and adequately plead loss causation under Rule 8(a). Nothing more is required.

Defendants argue that the J Capital and Hindenburg reports do not constitute corrective disclosures because they included some allegations that have not been proven and because the authors of the reports relied on "public sources." Def. Br. at 18. These arguments ignore the relevant law, omit critical facts—including Defendants' responses (and non-responses) and admissions that the core allegations were true—and otherwise fail to rebut Plaintiff's allegations.

To be corrective, a disclosure need not be proven or fully substantiated at the time it is made. "Allegations that the market reacted negatively to an opinion or speculation which in fact exposes the falsity of defendants' representations can be sufficient to plead loss causation." *Winstar*, 2006 WL 473885, at *14. To require that revelations of a defendant's false statements be "verifiably truthful" when made "would place a prohibitively unreasonable burden on a plaintiff." *Id.* at *15 (citing *Dura*, 544 U.S. at 347). Numerous courts, including this Court, have sustained loss causation allegations on virtually identical facts. *See, e.g.*, *id.* (loss causation pled where plaintiffs alleged "that the price of Winstar securities sharply declined after the issuance of the [short-seller] reports"); *Advanced Battery*, 2012 WL 3758085, at *6, *12 (short-seller report based on information then available and resultant stock drop sufficient to plead loss causation).

As these cases make clear, even unsubstantiated allegations that connect to a fraud may serve as corrective and suffice to plead loss causation. However, the Complaint pleads much more. Defendants' resounding failure to deny the core allegations in the short-seller reports—that Defendants had misrepresented the current status of the MEG Center, including through doctored photographs—constituted a tacit admission that these allegations had merit. ¶¶ 122-23. These allegations were then confirmed by Defendants' admission, the following day, that the MEG Center was not as described in Defendants' statements to investors. ¶¶ 124, 126. Plaintiff's investigation also confirmed the substance of the reports. ¶¶ 128-32. Finally, Defendants now confirm Hindenburg's claim that the purported photographs of the MEG Center were altered. Def. Br. at 15-16. As in *Advanced Battery*, this "confirmatory evidence . . . ma[kes] clear that the market had reacted correctly to the earlier, less complete information provided by [the short report]." 2012 WL 3758085, at *12; *accord Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 173 n.30 (S.D.N.Y. 2015) ("a short seller's report can constitute a corrective disclosure if the report reveals accurate information about a company that exposes actual misstatements by the company").

Further, J Capital and Hindenburg did not rely entirely on public sources. *See* ¶¶ 117-18 (J Capital "conducted an investigation into Ideanomics, including by visiting the supposed site of the MEG Center," "interviewing people there, and contacting the entities identified as buyers of EV services in Ideanomics's June 2020 press releases"); ¶ 120 ("one of [Hindenburg's] investigators had visited the location of the supposed MEG Center" and "[a]nother of Hindenburg's investigators called five of Ideanomics's purported customers"). To the extent the authors of the reports did rely on public sources, this alone does not defeat loss causation. *Winstar*, 2006 WL 473885, at *15 ("The claimed ability of [the short seller] to arrive at its findings by an examination of the publicly reported financials does not mean that a reasonable investor could

41

have drawn those same conclusions based on the total mix of the available information."); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *7 (S.D.N.Y. Mar. 23, 2020) ("third-party's analysis of a company's already-public financial information can[] contribute new information to the marketplace"). Most notably, Hindenberg analyzed the purported photographs of the MEG Center and found an identical photograph taken in 2018, which Defendants admit was altered. ¶ 119; Def. Br. at 15; *see Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 160 (S.D.N.Y. 2012) (information not "publicly available" if it is "posted in an obscure location" online).[30]

Defendants next argue that the Company's "clarification" of its prior statements regarding the current state of the MEG Center in the June 26, 2020 press releases cannot serve as a corrective disclosure because it was "entirely consistent" with its prior statements. Def. Br. at 19. This argument fails. The June 26, 2020 press releases plainly admitted that Defendants had misrepresented the progress, scope, and operational status of the MEG Center. ¶¶ 124, 126. Even if this were not so, an outright admission of fraud is not required. "[N]either the Supreme Court in *Dura*, nor any other court addressing the loss causation pleading standard, require a corrective disclosure be a 'mirror image' tantamount to a confession of fraud." *Freudenberg*, 712 F. Supp. 2d at 202; *see also Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 2741 (2019) ("Disclosure of the fraud is not a sine qua non of loss causation[.]"). Indeed, a plaintiff need not allege a corrective disclosure at all. *See Vivendi*, 838 F.3d at 262 ("Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, *or through events constructively disclosing the fraud*, does not alter the basic loss-causation calculus.").

---

[30] *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501 (2d Cir. 2010), which affirmed a summary judgment decision, is plainly distinguishable. Unlike here, a full discovery record, including expert reports and testimony, established that the alleged disclosure reflected *only* facts previously known to the market. *Id.* at 513-14.

Finally, Defendants argue that because Ideanomics's stock price partially recovered *after* the June 25 and 26, 2020 corrective disclosures—for whatever reason—this proves, as a matter of law, that the "stock price drop was indeed caused by the short-sellers' false statements and not by any corrective disclosure" and that "there were other, larger market forces at play." Def. Br. at 2, 20-21. Defendants' unsupported conjecture does not disprove a causal connection between the new information related to Defendants' misstatements released on the corrective disclosures and the decline in the Company's stock price. Moreover, such fact-intensive questions cannot be resolved on a motion to dismiss, without the benefit of discovery (particularly expert discovery). *See Winstar*, 2006 WL 473885, at *16 (argument that "that intervening events . . . broke the chain of causation" is "a matter of proof at trial") *In re WorldCom, Inc. Sec. Litig.*, 2005 WL 375313, at *4 (S.D.N.Y. Feb. 17, 2005) (whether "misstatements were partially disclosed" is "a disputed issue of fact that will be resolved by the jury").[31]

## IV.   The Individual Defendants Are Liable as Control Persons under Section 20(a)

As set forth above, the Complaint adequately pleads a primary violation of Section 10(b) against Ideanomics and Defendants Wu, Poor, McCarthy, and Sklar. The Individual Defendants are also liable under Section 20(a) based on their control of Ideanomics. 15 U.S.C. § 78t(a). With the exception of Wu, the Individual Defendants do not separately challenge Plaintiff's allegations of control. *See* Def. Br. at 25. Accordingly, these allegations should be sustained. *Ho*, 887 F. Supp. 2d at 575. Wu argues that the Complaint fails to adequately plead either his "actual control" or "culpable participation." Wu Br. at 22-23. Both arguments are meritless.

---

[31] Defendants also contend that the average stock price in the 90-day period after the initial corrective disclosure on June 25, 2020, exceeded the average stock price *during* the Class Period. Def. Br. at 10, 20. This is irrelevant, particularly at this stage. To the extent any Class member cannot establish damages for certain purchases during the Class Period based on the 90-day lookback provision under the PSLRA, which caps damages based on the average trading price following a corrective disclosure, 15 U.S.C. § 78u-4(e)(1), such purchases would, by definition, be excluded from the Class.

*First*, the Complaint is replete with allegations establishing Wu's control over Ideanomics. Throughout the Class Period, Wu was Ideanomics's Chairman and the Company's largest shareholder. ¶¶ 37, 171, 187. Wu also exercised significant management functions during the Class Period. *See* ¶ 37 ("Dr. Wu . . . *is highly active in our management*."); ¶ 171 (Company bylaws stated that Wu had "the power to direct the CEO to act"); *see also* ¶ 122; Wu Br. at 22. These admissions, coupled with Wu's role as Chairman and 21% ownership interest in the Company, ¶¶ 37, 171, readily establish Wu's control over Ideanomics at this stage. *See Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc*., 104 F. Supp. 3d 441, 576 (S.D.N.Y. 2015) (element of "control" must be assessed based on the totality of a plaintiff's allegations); *Alstom*, 406 F. Supp. 2d at 503 (dismissal is improper as long as it is at least plausible that plaintiff could develop facts that would give rise to a Section 20(a) claim); *see also In re Am. Apparel, Inc. S'holder Litig*., 2013 WL 10914316, at *37 (C.D. Cal. Aug. 8, 2013) ("traditional indicia of control" include "owning stock in the target company, or having a seat on the board").[32]

*Second*, while courts in this District disagree whether "culpable participation" is required at the pleading stage to establish a Section 20(a) claim, Plaintiff's scienter allegations as to Wu readily establish his liability under Section 20(a). *See In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 216 (S.D.N.Y. 2019) (defining culpable participation as "approximating recklessness in the section 10(b) context"). At a minimum, the Complaint pleads that Wu "knew or should have known" that the Company was engaged in fraud, *In re Veon Ltd. Sec. Litig.*, 2018 WL 4168958, at *21 (S.D.N.Y. Aug 30, 2018), or that Wu "failed to review or check information that [he] had a

---

[32] Wu's "*highly active*" role in management, ¶ 37, distinguishes him from the *outside directors* at issue in the cases he cites. Wu Br. at 21-22 (citing *In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 221 (S.D.N.Y. 1999); *Jacobs v. Coopers & Lybrand, L.L.P.*, 1999 WL 101772, at *17 (S.D.N.Y. Mar. 1, 1999)). Wu is also incorrect that control of a "majority of the Company's stock or voting power" is necessary to establish a non-executive defendant's control. Wu Br. at 22; *see Jacobs*, 1999 WL 101772, at *18 (outside director who issued false statement was a control person).

duty to monitor, or ignored obvious signs of fraud," and was therefore a culpable participant in the fraud. *Alstom*, 406 F. Supp. 2d at 491; *see also supra* § II. As discussed above, Wu personally issued false or misleading statements touting the MEG Center, including statements on June 9, 2020, that were accompanied by admittedly doctored photographs.

Relatedly, Wu also contends, in a footnote, that under *Janus Capital Group Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), he can only be held liable for his oral statements and those specifically attributed to him. Wu Br. at 8 n.5. However, as the foregoing demonstrates, given his role as Chairman and the fact that he was "***highly active in [Ideanomics's] management***," ¶¶ 37, 171, 187, Wu is also liable for each of the Company's statements in SEC filings and press releases containing false or misleading statements regarding the MEG Center. *See, e.g.*, *Lockheed Martin*, 875 F. Supp. 2d at 374 ("It is not inconsistent with *Janus Capital* to presume that multiple people in a single corporation have the joint authority to 'make' an SEC filing, such that a misstatement has more than one 'maker.'"); *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 807 (S.D.N.Y. 2018) (finding that high-ranking officers were makers of company statements in press releases); *In re Tenaris S.A. Sec. Litig.*, 493 F. Supp. 3d 143, 166 (E.D.N.Y. 2020) (finding that a defendant chairman had ultimate authority over public statements by company).[33]

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions in their entirety.

---

[33] *Levy v. Maggiore*, 48 F. Supp. 3d 428, 451 (E.D.N.Y. 2014), which Wu relies on, Wu Br. at 8, is inapposite. The *Levy* court held that *oral* statements made by a defendant could not be attributed to another. *Levy*, 48 F. Supp. 3d at 451. However, the court acknowledged that "a misleading statement may be attributable to a corporate insider by virtue of [his] high level position" where the complaint includes non-conclusory allegations concerning the defendant's role in the company's operations. *Id.* at 451-52 (alteration in original). Ideanomics and Wu both acknowledge Wu's control over and day-to-day involvement in the Company's operations. ¶¶ 37, 171; Wu Br. at 22.

Dated: June 17, 2021                    Respectfully submitted,

                                        **KESSLER TOPAZ**
                                        **MELTZER & CHECK, LLP**

                                        *S/ Sharan Nirmul*
                                        —————————————————
                                        Sharan Nirmul
                                        Joshua E. D'Ancona
                                        Nathan A. Hasiuk
                                        Kevin E.T. Cunningham, Jr.
                                        280 King of Prussia Road
                                        Radnor, PA 19087
                                        Telephone: (610) 667-7706
                                        Facsimile: (610) 667-7056
                                        snirmul@ktmc.com
                                        jdancona@ktmc.com
                                        nhasiuk@ktmc.com
                                        kcunningham@ktmc.com

                                        *Counsel for Lead Plaintiff Rene Aghajanian*
                                        *and Lead Counsel for the Putative Class*

                                        **THE SCHALL LAW FIRM**
                                        Brian Schall
                                        2049 Century Park East, Suite 2460
                                        Los Angeles, CA 90067
                                        Tel: (310) 301-3335
                                        Fax: (877) 590-0482
                                        brian@schallfirm.com

                                        *Additional Counsel for Lead Plaintiff Rene*
                                        *Aghajanian*