LACsLUNc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

RENE AGHAJANIAN, et al.,

                Plaintiffs,

        v.                              20 Civ. 4944 (GBD)

IDEANOMICS, INC., et al.,

                Defendants.

------------------------------x
                                        New York, N.Y.
                                        October 12, 2021
                                        1:00 p.m.

Before:

                HON. GEORGE B. DANIELS,

                                        District Judge

                        APPEARANCES

KESSLER TOPAZ MELTZER and CHECK LLP
     Attorneys for Plaintiffs
BY:  NATHAN HASIUK

VENABLE LLP
     Attorneys for Defendants Ideanomics, Poor & McCarthy
BY:  GEORGE KOSTOLAMPROS

ARNOLD & PORTER KAYE SCHOLER LLP
     Attorneys for Defendant Wu
BY:  AMANDA J. RAINES

LACsLUNc

(The Court and all parties appearing telephonically)

THE COURT:  I apologize for the delay.  We had some technical difficulties that held up a client settlement hearing.

Who is going to argue, Mr. Kostolampros?

MR. KOSTOLAMPROS:  Yes, sir.  Good afternoon, your Honor.

THE COURT:  Yes, sir.

MR. KOSTOLAMPROS:  George Kostolampros on behalf of defendants Ideanomics, Mr. Poor, Conor McCarthy and Tony Sklar.

Your Honor, as you know, we have moved to dismiss the complaint on the grounds that it does not satisfy the strict standards in pleading securities fraud claim under the PSLRA.

THE COURT:  Right.

MR. KOSTOLAMPROS:  Plaintiff seeks to take advantage here of the stock price drop caused by what appears to be concerted short-sellers reports in June of 2020.  Those short-sellers reports claim that the company's facility in China, which is a joint venture auto mall, and orders from the company's MEG business were fake, that the company only had three months of cash, and that it was all in an elaborate pump-and-dump scheme.

All of those statements are demonstratively false now with the passage of time.  The company has a lease at the MEG Center.  The company has generated revenues from the MEG

business, as reported in its 2020 10-K, which has forecasted what the majority of the company's revenues for 2020, and the company has survived past three months and none of the defendants here dumped any shares.

Although plaintiffs' amended complaint hinges on the stock price drop by the short-sellers reports, I'm not surprised that plaintiff does not allege that the MEG revenues were fake, nor do they allege that the MEG Center is nonexistent.  But plaintiffs, in fact, plaintiffs own investigation confirmed that the MEG Center actually exists.

Now, plaintiffs' cobbled together a theory of a misstatement of scienter alleging vaguely that defendants misstated the degree to which the MEG Center was ready for business and capable of delivering revenues in 2020.  Now, plaintiffs' vague allegations that defendants exaggerated the operational status of the MEG Center suffers from three fundamental deficiencies, your Honor.

First, plaintiff does not offer any allegations sufficient to support that any statement of actual fact was false.  Defendants never said that the center's renovations were completed in full and reiterated a number of times that there would be a soft opening in May of 2020.

The remaining alleged misstatements are not actionable because they are forward-looking statements or opinions.

THE COURT:  Can you give me -- it would be helpful if

LACsLUNc

you could give me a timeline --

MR. KOSTOLAMPROS:  Sure, your Honor.

THE COURT:  -- with regard to the statements by the company, with regard to the drop in the stock price, the rise in the stock price, and with regard to the statements from outside.

MR. KOSTOLAMPROS:  OK, your Honor.  Let me take you there.

So the class period starts in March 16, 2020, with the statements.

THE COURT:  Which statement?

MR. KOSTOLAMPROS:  Sure.

THE COURT:  Whose statement is that?

MR. KOSTOLAMPROS:  That is an interview by Mr. Poor conducted on March 16, 2020, and that's in paragraph 133 to 135 of the amended complaint.

THE COURT:  OK.

MR. KOSTOLAMPROS:  In that interview, Mr. Poor reminded listeners that Ideanomics had already announced the MEG sales hub in the Qingdao.  Mr. Poor went on to say that the building is mostly finished.  But the idea of it is, it is about one million square feet.  The idea that there will be vehicles on site, there will be multiple manufacturers, there will also be administrative offices.

He went on to say it is being completely refurbished,

LACsLUNc

so the inside of it are going to be as new.  It is all going to be glass-fronted and showroom kind of style in terms of the vehicle displays.  All of those statements speak of what the building is going to be in the future, your Honor.

THE COURT:  All right.

MR. KOSTOLAMPROS:  Now, the price of the stock in March of 16, the close is 37 cents on March 16.  The next day it closes at 38 cents.  March 18, it closes at 32 cents, your Honor.

The next statement -- let me also add, on March 16, plaintiff also alleges that Mr. Wu made a similar statement, where he was questioned about the facility and he corrected the interviewer in saying, look, the facility wasn't 10,000 square feet, but would or was actually 100,000 square feet, one million square feet, ultimately.

So the next date of a press release where the plaintiffs allege was a misstatement was the March 20 press release.  In that press release, the company stated that the MEG sales center is scheduled to start sales operation by May 1.  The one million square foot has been renovated as a permanent expo center, and the statement goes on to say that MEG will be joined at the site by particular partners.  There are further statements made there.

Now, the key point here, your Honor, on this statement is plaintiffs allege that the company's statement that the

million square foot site has been renovated as a permanent expo center needs to be taken into context.  In the March 16, 2020, interview that Mr. Poor gave, he explained that the city of Qingdao was already in the process of renovating that center as an EV center, meaning it was re-purposed as an EV center.  The company never said that this EV center would not have normal gas-powered vehicles there.  There are.  There are used car sales there as well as EV.  There is no statement here, no allegation made that any government official from China is contradicting the company's representation that this was an EV center and it was being re-purposed, and re-purposed as an EV center.

Now let's go to the stock price on March 20.  The March 20 stock price, March 19 stock price was 41 cents.  March 20, it is at 56 cents, your Honor.  And the stock basically goes up and down throughout the time period.

So I'll go to the next alleged misstatement, your Honor.  That is in May of 2020.  The company --

THE COURT:  What date?

MR. KOSTOLAMPROS:  May 11, 2020.

THE COURT:  OK.

MR. KOSTOLAMPROS:  At that date, the company put out its 10-K for the first quarter of 2020.  What plaintiffs allege is that the company's statement that the company anticipates that its MEG business unit will be the largest contributor to

revenues in 2020 was false.

In an earnings call or a press release that same day, Mr. Poor was quoted as saying, We look forward to Q2 and beyond, including having their shareholder meeting in the summer of this year, to showcase both the MEG business and the formal ribbon-cutting on our new one million square feet EV center in Qingdao.

Now, the company had put out some statements that it planned on having a ribbon-cutting at some point in the summer of 2020 at the facility. Plaintiffs allege that those statements are false. But there is no supporting allegations that would show that those statements were false.

Plaintiffs don't take issue with defendants or with the company's revenues for that year, which, again, as I mentioned, the MEG business was the majority of the company's revenue, totaling over $19 million for that year, your Honor.

Nor is there any support to the allegation that the company wasn't planning a ribbon-cutting at that point in time. There is no confidential witness here. No documents saying, look, there wasn't going to be a ribbon-cutting here.

So I will go to what the stock price was doing at that point in time as well, your Honor. May 11, the stock price now is back down to 49 cents. May 12, it is at 43 cents. May 13, it is at 40 cents.

Now, the next alleged statement is, again, on May 11,

LACsLUNc

where there is an earnings call.  Mr. Poor said that our EV hub in Qingdao had a soft launch on May 1, and as such will be a contributor to our Q2 revenues.  The existing business we assumed at Qingdao services both consumer and commercial inquiries.  Again, there is nothing in the amended complaint that would support that those statements were actually false.

I'll turn to the next date, your Honor.  That is May 26, 2020, which a press release.  The press release stated that the facility had officially launched, now host a full suite of car dealer services and used cars with a capacity of 18,000 vehicles on site.  Again, it went on to say that the MEG Center is one million square feet.

Now, this is in May 26, your Honor, and the price of the stock, the stock price is now at 41 cents.  May 22 through, I would say through June, the beginning of June, it's at 40 cents to 38 cents for that time period.  Your Honor, that's set forth in our Exhibit 6 to our opening motion.

I'll turn to the next statement.

THE COURT:  What's the date?

MR. KOSTOLAMPROS:  May 28, your Honor.

Mr. Poor gave an interview again.  Again, just discussing the MEG Center.  Plaintiffs point out and bold as what they claim is a misstatement, this is from Mr. Poor, so we set out to create a hub where we can bring the best and -- it is inaudible -- partner to give the fleet operators a focal

LACsLUNc

point where they could come and learn.  They, again, stated that we did a soft launch on May 1, which we started selling vehicles outside.  We were able to expand that this week, and then this past Monday we officially opened a large center for both used cars and new EV vehicles.

The next date, your Honor, is June 9, 2020.  On that date, the company issued a press release, again, reminding that the MEG Center began operations on May 1.  It stated that based on the level of sales activities, this month's sales are expected to exceed May levels.  It states, in its first five weeks of being operational, the dealers the at MEG Center have received high levels of interest.  There is no allegation that there were no sales activity on the site.

I'll note, too, in that press release, the company also stated that no May and June sales were primarily used cars and that MEG will be charging commissions for EVs with manufacturers direct sale.  I bring that up because plaintiffs in their investigation claim that there -- that the facility was running, but it primarily included the JV partner which was called Fu Da.  Fu Da primarily sells used cars, but also EVs, but Fu Da is part of the MEG Center.  It's not like it is the MEG Center and then the Fu Da Center.  All of this is under one main center here.  The main center is active.  So that was a statement, your Honor, the last one that I read was on June 9.

THE COURT:  What was the stock price on May 28 and

LACsLUNc

June 9?

MR. KOSTOLAMPROS:  June 9, it was 62 cents, your Honor.  I'm sorry.  June 8 was 62 cents.  On June 9, it was a dollar.

But what happens, your Honor, and this is set forth in our motion papers, is the company's chairman, Mr. Wu, and the company's director, Mr. Shane McMahon, who had a convertible note, both had convertible notes that were converted into equity.  So what that meant was that they effectively bought more shares.  They converted their debt into equity, and that's what caused the price of the stock price to move higher at that point in time, your Honor.

THE COURT:  What was it on May 28?

MR. KOSTOLAMPROS:  On May 28, the stock price was 40 cents, your Honor.

THE COURT:  All right.

MR. KOSTOLAMPROS:  Then at the same time that -- we've set this forth in our motion papers, your Honor, along with the press releases touting the opening of the MEG Center.  There are also separate press releases touting that the company is getting sales.  There are sales being delivered.  So with the conversion of the equity and with the sales numbers, the stock price now starts to go up.

Now, plaintiffs, again, don't allege that the sales numbers were fake or not real, which is what the short-sellers

LACsLUNc

said.  And, again, like I said, the 10-K has come out.  The company's revenues or the majority of the revenues were from the MEG business itself, your Honor.

Let me turn to June 15, another alleged misstatement. Again, there is nothing really in this.  What plaintiffs had bolded, they both -- it's a really exciting opportunity for us. There is no allegation here that Mr. Poor didn't actually believe that the MEG Center was an exciting opportunity, especially when it turned out that it ended up being the company's main driver of revenues for 2020.

That's all we have, your Honor, as the alleged misstatements.

THE COURT:  What's the stock price at June 15?

MR. KOSTOLAMPROS:  June 15, your Honor, the stock price is at $1, $1.10 --

THE COURT:  OK.

MR. KOSTOLAMPROS:  -- at the close of that.

THE COURT:  Where does the short-sellers statements fit into this?

MR. KOSTOLAMPROS:  Sure, your Honor.  The short-seller statements come in, in June.

Let me get that here.  Hold on one second.  I believe it is June 20, your Honor, if I have that correctly.

THE COURT:  Not before June 20?

MR. KOSTOLAMPROS:  No, not before June 20.

LACsLUNc

Let me make sure I've got that date correct, your Honor.  June 25, your Honor, is when the short-sellers reports come out.  It is a JCAP report.  And, again, that's in our motion papers as well as an exhibit, your Honor.

THE COURT:  OK.

MR. KOSTOLAMPROS:  That's Exhibit Number 9.  If you read through that, I mean, that report just goes after the company in every which way claiming it is an outright fraud.  It is a complete pump and dump.  There is no MEG Center.  There is no MEG business.  Just takes issue with the whole company.

At that same day, Hindenburg Tweets, and they say that they actually went to the facility and that the facility is actually operated by almost 100 sales groups.  None of those we spoke with heard of Ideanomics were MEG.  That really isn't -- that really doesn't answer any question, frankly, because Ideanomics, it is the JV running it.  The JV is not named Ideanomics, frankly.  Frankly, Hindenburg doesn't even say who they spoke with.

What this does show -- they do have a picture, Hindenburg.  It does show the facility is active.  It shows that the facility is open at that point in time.  if this is correct, this photo, this photo was taken in June of 2020.

THE COURT:  Which photo is that?

MR. KOSTOLAMPROS:  This is the Hindenburg photo, your Honor.  That's in Exhibit 10 to our motion papers.

THE COURT:  That's not the photo in the complaint?

MR. KOSTOLAMPROS:  That's not the photo in the complaint.

So the photos in the complaint, your Honor, those are two photos, or several photos, that were included in a press release, and then also in an interview that Mr. Poor had.  The photos plaintiffs claim are fake, not real photos.  They are real photos.  They are photos of the facility.

The problem with the photos, from plaintiffs' perspective, is that they weren't labeled as depictions.  The fact of the matter is, even if they are not labeled as depictions -- because what happened is, is that defendants basically photo-shopped an MEG label on it.  Basically, there was Chinese letters on a balloon, and to make it more understandable to investors, it was labeled as MEG.  It was photo-shopped with MEG.

Now, plaintiffs take that photo and try to make it, you know, as sort of the linchpin of their complaint, I think.  The problem with their theory is that the photo doesn't assert any statement that the MEG Center was fully operational, that it was at 100 percent capacity.  And at the end of the day, the photo, even though it is not labeled as a depiction, doesn't mean that the MEG Center wasn't operational.

The point is, through these statements that the company was making, is that the MEG Center was operational.

LACsLUNc

The MEG bus would be a driver of the company's revenues, and that's ultimately what it was.  This complaint is not about the fact that the MEG business is nonexistent or that any statements about it being a revenue generator were false.  They are not.  There is not any allegation about that here, your Honor.

THE COURT:  And what was the stock price on June 25?

MR. KOSTOLAMPROS:  On June 25, your Honor, on June 25, the stock price had gone up, your Honor, over a time period from June 17 to June 25 to -- June 24 to $3, right.

THE COURT:  Right.

MR. KOSTOLAMPROS:  Now, we set forth in our complaint what happened there is, there were a couple of orders that came out in public statements that the company made, press releases.  And then on June, I believe it was June 24, a celebrity had Tweeted it.  I'm blanking on the guy's name.  He is from Barstool Sports.  He Tweets.  He has one million plus followers.  The stock price goes up even further.

But then on June 25, the short-seller's reports come out, and then the stock price stumbles to 2.44.  And then the next day to $1.46.  But then the stock price goes back up on June 29 to $2.09, your Honor.  Basically it goes back above what it had been for the majority of the class period.  Then it continues to hover, at that point, well over a dollar, your Honor.

So our point is, is that what made the stock price drop was the short-seller's reports, which plaintiff does not adopt.  Plaintiff only adopts that the MEG Center claims that the MEG Center was exaggerated, whatever that may be.  I mean, at what point is there an actual hard statement of fact here that there is an alleged misstatement.

Your Honor, I think there are several cases that we have cited that I think are helpful to support our motion to dismiss, one of which is Judge Engelmayer's decision in Long Miao v. Fanhua.  In that case, the very similar type of allegations as to a short-seller's report that Judge Engelmayer didn't find credible.

There, the court cautioned that when anonymous reports are used, they should be scrutinized, and that is what we have here.  If you look at the JCAP report, they say that they spoke to the manager of the mall and two store owners.  Who were those individuals?  Were they -- I mean, what mall?  What store owners?  Was it the vendors on site, or was it somebody else?  Someone selling food?  I have no idea.

If you go to Hindenburg's statement, there is nothing there.  Similarly, with plaintiffs' own investigation -- now, with all due respect to plaintiffs, I mean, their investigation is set forth in maybe three paragraphs of the complaint.  They said they were there over four days.  They don't say how many of those four days they were there.  They don't say who they

LACsLUNc

talked to.  One thing they do confirm is that there is an MEG Center, there is signs there.  And what you see from the Hindenburg statement is that there were one, however, sales agent on site in the photo there.  So at least as of May of 2020, the site was active.

Also, plaintiffs' investigator found that Fu Da was active there.  Well, of course, they are.  Fu Da is part of the MEG Center.  So, your Honor, from our perspective, there is no misstatement here that's actionable.

Then I also want to turn to, we also believe there have a glaring deficiency in scienter here as well as loss causation.  For scienter, your Honor, plaintiffs cobbled together a theory that because the company faced an eminent delisting from the NASDAQ and because it had a financing arrangement with Yorkville that was dependent on a dollar share price and not losing the company's delisting that Yorkville wouldn't have funded the 50 million.  Well, it doesn't pan out.

First of all, the delisting wasn't eminent.  It turned out to the delisting wasn't actually -- the company had an extended time to September, but that's beside the point.  The main point here is that Yorkville funded the company when the company's stock price was under a dollar.  They entered into the contract with them when the company's stock price was under a dollar.  It just doesn't pan out.

Moreover, the case law here says scienter has got to

be more than just a delisting or wanting to go through this kind of funding transaction.  These are motives that are general and they simply are described to every executive. Every executive is going to want to make sure that the company is not delisted from NASDAQ.  That doesn't provide proof of scienter.  So to us, there is a glaring deficiency here, your Honor, in scienter.

Then going to each of the individual defendants, there is nothing here.  We represent, your Honor, defendants -- Poor, McCarthy, and Sklar -- there is no allegation supporting scienter on their basis.  Again, this is run by a JV in the middle of COVID.  Plaintiff has not presented any documents, any confidential witness statement, that would ascribe that Mr. Poor's statements were false when he made it.  Mr. Poor actually knew that those statements were false.  What was reckless in not knowing that.  Mr. Poor is here in the United States.  There is a JV running it.  There is absolutely no basis to think that he thinks that closing operating the underlying operational status of the MEG Center.

Similarly, with Mr. McCarthy and Mr. Sklar, actually, plaintiffs don't even allege a misstatement that was made by them.  All they allege is that Mr. Conor's statement, because he signed the 10-K -- well, remember the 10-K said they expected the MEG business as a whole would provide revenues. Mr. Sklar, the only thing we can see is that they allege that

LACsLUNc

Mr. Sklar disseminated the underlying statements because he is an investor relations persons and communications person. But that is not enough, your Honor. You know that. The case law here makes clear that simply because of their position and titles, that is not enough to allege scienter on the basis of a particular defendant. That is what they do here.

So my final point, your Honor, is as to loss causation. This is not a case about a material risk not being disclosed. This case is about a corrective disclosure that plaintiffs allege. There is no corrective disclosure, and that is fatal to plaintiffs' case as to loss causation.

Plaintiffs here want to shoestring the short-seller's report as causation, your Honor. But I would ask the court,

Your Honor, to look at Harris v. Amtrust. There are very similar type of allegations where plaintiffs relied on some statements of a short-seller, but didn't rely on others that turned out to be not true. And there, the court found -- this is what the court said, your Honor, in quotes, "The amended complaint fails to allege any facts to show that the price decline was caused in whole or in part by the cherrypicked pieces of the report it contends are true, and not the allegations that lead plaintiff has cast aside."

Well, that is what we have here, your Honor. Plaintiffs are not claiming that the MEG Center or business are make fake. They are claiming that it was exaggerated. What

short-sellers did were completely opposite.  They claim that this was a pump and dump.  Everything was fake.  It's not surprising that a company's stock like this, which is a volatile stock, it is a company that is masons, changed its business as you know, that its stock price would be heavily affected and moved because of the short-sellers report, your Honor.

So those are our arguments, your Honor.  The same arguments are similar arguments for the control liability claim here.  Plaintiffs do not allege, number one, they don't allege a violation.  But even if they did, your Honor, to show that these particular defendants had control.  Plaintiffs don't make any support for a number of these defendants, including Mr. McCarthy, Mr. Sklar, as to the underlying JV itself.

THE COURT:  And you're representing everyone except Mr. Wu?

MR. KOSTOLAMPROS:  Yes, your Honor.

THE COURT:  All right.  Did you want to add anything, Ms. Raines on Mr. Wu?

MR. RAINES:   Good afternoon, your Honor.  I would like to.  Thank you for the opportunity.  I'm Amanda Raines of Arnold & Porter Appearing on behalf of Dr. Bruno Wu, the shareholder and the former chairman of Ideanomics.  I would like to start by reiterating and adopting the arguments just made by Mr. Kostolampros moments ago.  Forgive me if there is

some honking outside.

But when it comes to the claims asserted against Dr. Wu specifically, this matter is actually very simple.  I essentially have one point to make here, and that is that plaintiff has not done enough to meet its pleading standard because he hasn't pled, not even once, your Honor, that Dr. Wu was aware that either of the two statements at issue -- again, we will talk about it -- there is are only two statements attributed to Dr. Wu.  So plaintiff has not alleged that Dr. Wu was aware that these were allegedly false.

For that reason, both of his claims under Sections 10(b) and 20(a) fail.  Plaintiffs' amended complaint mentions Dr. Wu's name many, many times and in an apparent attempt to paint him as a puppet master he cannot and has not succeeded under the law to do so.  Plaintiffs' entire theory as to Dr. Wu hinges on just two comments, as I said.  And as Mr. Kostolampros argued, these statements were true and plaintiff disagrees, but fatally, plaintiff has not made any particularized allegations that if they were false, Dr. Wu knew it.

Plaintiff has not once alleged that Dr. Wu visited the expo center or that he reviewed any of the reports or photos or spoke to anybody about any of it.  So instead, his entire case is propped up on the empty insinuation that since Dr. Wu held "a senior position with Ideanomics,"  he probably knew.  But

LACsLUNc

this is not enough under the law.

Plaintiff also argues that, in his memorandum on page 32, that it is "implausible that Dr. Wu was unaware that these statements were allegedly false." again implausibility is not enough under the law.

Plaintiffs' failure is foundational, and we ask that you dismiss the complaint against Dr. Wu. Again, plaintiff hasn't pled any fact to show that Dr. Wu knew his allegedly false statements were false, and this a halo allegation that fails to meet its pleading standard for scienter. And because plaintiff has not adequately pled scienter, he also has failed to plead that Dr. Wu was a culpable participant under Section 20(a).

So as I stated, there are two statements which are attributed to Dr. Wu.

THE COURT: Before you go there, Dr. Wu is the chairman of the board of directors, is that correct?

MR. RAINES: That's correct.

THE COURT: And when you go to these statements, in what way would Dr. Wu be in a position to make those statements without knowing whether they were true or false?

MR. RAINES: I don't know if I understand your question.

THE COURT: Well, you said that they haven't alleged that he knew the statements were false. He was either in a

position to affirmatively make a statement and he was either in the position of making that statement because he had confidence in the truth of that statement because he was claiming that he had some personal knowledge of that.

What is it about the statements that you say could possibly be interpreted that Mr. Wu made a statement that was false, but he didn't know it was false?

MR. RAINES:  OK.  Well, to answer your question, I'll just talk about what the statements were.

THE COURT:  OK.

MR. RAINES:  So he was interviewed on YouTube on March 16, 2020, and when the interviewer had asked Dr. Wu, he had mentioned something about, You recently opened a 10,000 square foot facility in Qingdao.  And Dr. Wu responded, correcting him, saying, Well, we're actually opening up -- and then he corrects himself a couple times -- a million square feet, a million square feet.  So it is a million square feet. And plaintiff asserts that the falsity is in the size of the facility.

And on June 9, Dr. Wu was quoted in a press release where he talks about his subjective beliefs and opinions that the MEG Center would be a material source of revenue for Ideanomics.  And he talks about this subjective belief and subjective opinion based on the fact that there was "high levels of activity at an early stage," referring to some sales

LACsLUNc

figures, and "solid customer foot traffic related to the lifting of COVID restrictions."

However, you know, Dr. Wu -- I'm sorry -- these statements were true. They are statements of opinion. They are forward-looking statements and they have factual truthful factual elements to it. However, the fact that plaintiff is alleging that these are false, that is plaintiffs' burden to make that allegation that Dr. Wu knew that these were false. And plaintiff cannot rely solely on pointing to his position as chairman as a reason why he should know.

Again, you know, this circuit and this court has held many times that when it comes to scienter, a plaintiff has to make an actual allegation about knowledge more so than just pointing to a position or a defendant's position.

In any event, these are truthful statements that are forward-looking and opinion based.

THE COURT: Well, if he's correcting his statement, wouldn't he obviously be trying to give the impression that he knows better and that he has some personal knowledge that would give him the basis to correct the statement with regard to what was going on at the center?

MR. RAINES: Yes, your Honor. And his statement, again, is truthful. He corrected the interviewer by saying, We are actually opening up a million square feet, which is true. They opened up the MEG Center which is a million square

feet, and it was the knowledge that he had at the time, it is the plaintiffs' burden to plead was false.  And the plaintiff has not done that.

The plaintiff has made zero allegations at all to prove that Dr. Wu was aware that any of these allegations, any of these statements were allegedly false.  They are not, but they have not made that allegation, and that does not satisfy their pleading standard.

THE COURT:  Well, wouldn't that -- I mean, isn't there at least some argument that Dr. Wu, in making that correction, Dr. Wu was in a position and was trying to give them the impression that he was in a position to know about the true facts of how much of the facility was being -- how large the facility was and how much of the facility was being utilized?

Shouldn't an investor and the person who is being corrected take his word for it, that he knows better when he corrects them about what the true size of the facility was and its utilization?

Isn't that inherent in the manner in which he made that representation?

MR. RAINES:  Yes, your Honor.  I apologize for jumping in too quickly there.

Yes.  But Dr. Wu did not make any comments about the amount, how much of the facility was being utilized.  He simply corrected the interviewer as to how large of a facility the

LACsLUNc

company was opening.

In any event, it is plaintiffs' burden to make a particularized allegation that this was not a truthful statement, and plaintiff has not done that.

THE COURT:  And that part of your argument I readily understand, that your position is that he made a truthful statement, but you can only make a truthful statement if you know what the true facts are.

So I understand more so, your argument is sort of, well, he made a true statement, but if it turns out that that statement was false, he didn't really know what was true or false.  I mean, you can't have it both ways.  He can't make a true statement if he doesn't know the true fact.

MR. RAINES:  I don't see our argument as making both -- as trying to make both of those arguments.  Really what our argument boils down to is that he was either expressing his opinion or reciting truthful statements, and plaintiff has not made his particularized showing that at the time that he spoke, he was not being truthful.

THE COURT:  But the other part about that, that aspect of the argument, is that I don't understand how that statement is an opinion.  Just as you say that they have the burden to allege what were the false facts that they are saying that the company is putting out and the defendants are putting out.  It was either a true or false fact.  It cannot be a true or false

LACsLUNc

opinion.

So I'm trying to understand, it seems to me that he was at least trying to give them the impression that he knew the true facts, not that, oh, well, in my opinion, I think it is a little different.  Let me go back and check it.  And even if he didn't know the true facts and that was his opinion, the critical point isn't whether or not what he said was his opinion.  The question is whether or not what he said that he wanted to put out, wanted them to rely on it as a fact, even though it was only his opinion.

MR. RAINES:  Well, I want to clarify the two statements.  The first statement on March 16 was the statement where he corrected the interviewer and said, We are actually opening up a million square feet facility.

THE COURT:  Right.

MR. RAINES:  And the second statement --

THE COURT:  When you say it like that, I'm not sure he said it like that.

MR. RAINES:  He did.  I'm reading the transcript.

THE COURT:  If you say he said, We are actually, that doesn't put it in the realm of opinion.

MR. RAINES:  Yes.  So let me, your Honor, so on June 9 is when he talked about his subjective opinion about how well the MEG -- he expects the MEG Center will do, based on the lifting of COVID restrictions and based on his belief, and he

even talks about his belief that it will be a material source of revenue. That's the two statements in my prior discussion.

THE COURT: That's not a statement about the current set of the facts. That's a statement about the future. I understand that argument.

My question is whether or not he has, he is trying to support that future conclusion based around a set of current true facts or a set of false facts, and whether or not the true facts that existed would lead one to the conclusion about what is going to happen in the future. Because you're right, they have a different burden. Plaintiffs have a different burden on what he's predicting as to what is going to happen tomorrow as opposed to what he is saying about what has already occurred.

MR. RAINES: Well, focusing only on the March 16 statement, which is not an opinion where he says -- I'm quoting -- well, we're actually opening up -- and then I'll just read the whole thing. Well, we're actually opening up --

THE COURT: I'm sorry. Where are you reading from?

MR. RAINES: It is quoted in the complaint. I'm reading it from my notes. I can tell you where it is in the complaint. And there is a dispute about what the actual transcript is, but I'm not going to get into that right now.

Paragraph 96 of the complaint.

THE COURT: All right. Go ahead. I got it.

MR. RAINES: He says, Well, we're actually opening up

100,000 -- sorry -- a million square feet.  A million square feet.  100,000 square meters.  So it is a million square feet.

And then there is a dispute as to how that statement ends, but the fact is that that is a forward-looking statement.  We read that grammatically as a future perfect tense, where he is talking about we're in the process of opening up a million square feet facility.  Not that at this present moment in time, on March 16, a million square feet has already been opened.

THE COURT:  OK.

MR. RAINES:  So that is a factual, forward-looking statement that, again, plaintiff has not made any allegation Dr. Wu believed to be false at the time, or in general, because as Mr. Kostolampros has already argued, there is a million square feet facility open operating as the MEG Center.

THE COURT:  OK.

MR. RAINES:  Just a few more points I wanted to mention.  The short-seller reports that plaintiff relies upon to argue that these statements were not true.  We agree that plaintiff cherrypicks, points out of these reports, and we also agree that plaintiff -- or that these short-seller reports rely on unreliable and unidentifiable mysterious sources, which makes it inadmissible at the pleading stage, because these sources cannot be identified.

Plaintiff argues that, you know, we were challenging reliability, and that's a fact question.  But we're not

LACsLUNc

challenging it as a fact question.  We are challenging it from the standpoint that these witnesses that were spoken to are not named and they are not identifiable.  And not only that, but the reports are inconsistent with each over.

In the J capital report, they state that the investigator was not able to find the MEG Center.  Hindenburg apparently had no issues finding it.  And plaintiff also tries to ascribe motive to Dr. Wu based on the debt conversion deal that Mr. Kostolampros mentioned, and without really any discussion or any explanation, tries to talk about how Dr. Wu, it was a strong personal incentive for Dr. Wu to commit fraud because he was benefiting from it.

But the fact that the company was taking debt off of its books at a time when they were opening a new business venture and trying to raise stock prices, which is a goal that every company has itself, is not -- it's just a conclusory circular argument that does not support scienter and certainly does not support motive.

For a lot of the same reasons, the Section 20(a) claim also fails.  As I mentioned briefly, there is a key element in Section 20(a) that requires that plaintiff plead that Dr. Wu is a culpable participant in the alleged violation.  You yourself, Judge Daniels, has previously held that the heightened PSLRA pleading requirement applies to this prong of Section 20(a).

But in order to meet that heightened pleading

requirement, again, plaintiff must prove recklessness, which requires a showing that Dr. Wu was aware that the statements were untrue.  And to reiterate my main point, they have not done that.  They have not done enough to meet their stringent pleading standard, which, again, is their burden.

We urge the court to read the long complaint for just a single allegation that Dr. Wu had any knowledge that any of these alleged, two alleged statements were false, that it does not exist in the complaint.  So because plaintiff has not pled these facts imputing knowledge on Dr. Wu's part and because plaintiffs' memorandum, he stresses the defendants have to take the complaint as it is written.

But the plaintiff has to do that as well.  This is their second bite at the apple.  They fail to meet the pleading standard.  And where it fails is that it is here, the complaint should be dismissed, and we ask that your Honor do so.

THE COURT:  OK.  Thank you.

Mr. Hasiuk.

MR. HASIUK:  Good afternoon, your Honor.  Nathan Hasiuk on behalf of the plaintiff.

Your Honor, defense counsel made a number of arguments about the complaint and the alleged insufficiency of the allegations, but they fail to mention a few critical points.

First is that the Hindenburg report, which was issued on June 25, as well as Tweets by Hindenburg on that day,

LACsLUNc

accused the company Ideanomics of misrepresenting the current state of the MEG Center, including by publishing doctored photographs.  We allege in the company that on June 25, Defendant Poor Tweeted back at Hindenburg, denying some of the allegations in the report, but failing to deny the critical allegation that the company had misrepresented the current state of the MEG Center, including by publishing doctored photographs.

On June 26, the company -- neither of defense defendants' attorneys mention this on June 26.  The company publishes two press releases to the market.  The first sought to clarify the status of the MEG Center and disclosed for the first time that the MEG Center only occupied 200,000 square feet of the one million square foot facility which had been repeatedly represented to investors during the class period, and also that the MEG Center was in Phase 1 of a multi-phase development process.

The second press release on this date admitted that there was no facility in Qingdao, China called the MEG Center. Defendants' counsel ran through a number of the statements in the case, and as your Honor may have noticed, if you look at the complaint, it is clear as day, they repeatedly describe the MEG Center as a facility that exists in Qingdao, China, that is one million square feet, that is operational, there is sales activity occurring at the site.  They are selling EV vehicles.

LACsLUNc

And for the first time on June 26, the company admitted that there was no such facility and there would be a facility later branded as the MEG Center at a future date.

THE COURT:  Give me, in your complaint, the strongest representation that you say is the false statement or the misrepresentation about the MEG Center.

MR. HASIUK:  Sure.  On June 9, the company --

THE COURT:  Where are you looking at?

MR. HASIUK:  This is paragraph 154 of the amended complaint.

THE COURT:  154?

MR. HASIUK:  Yes, your Honor.

June 9, plaintiff issued a press release.  The press release stated that, as a reminder, the MEG Center in Qingdao began operations on May 1.  That press release describes the first five weeks of the MEG Center being operational.  That press release also contained a quote attributed to Defendant Wu that describes the situation on the ground in Qingdao, the loosening of COVID restrictions.  He describes high level of activity at this early stage.

THE COURT:  So point to me the exact fact that you say is being represented that you say has been demonstrated to be false.

MR. HASIUK:  Sure.

The fact is that the MEG Center, a facility named the

LACsLUNc

MEG Center exists.

THE COURT:  You say a facility named the MEG Center, it doesn't say that.

MR. HASIUK:  It say the MEG Center in Qingdao began operations on May 1.

THE COURT:  OK.  So you take that as the material misrepresentation?  I'm sure you're not saying the material misrepresentation is that the facility is a MEG facility, but it is named something different.

What is the material misrepresentation that one would have significantly affected the stock price?

MR. HASIUK:  Sure, your Honor.

So I should point out that this June 9 press release included a photograph purporting to be the MEG Center, and that appeared in a different section of the complaint, paragraph 104.  And if you look at the paragraph 104, you'll see --

I'm sorry, your Honor.  I actually just got a little confused for a moment.  If you actually just turn to paragraph 148, 49, 51, you'll see there is a number of photographs that are published in the complaint.  And one of those photographs which shows new vehicles in a sales lot with a balloon with the MEG logo on it was included in the press release that was issued on June 9.

THE COURT:  I'm sorry.  I want to make sure I'm following you.  That's paragraph 151?

MR. HASIUK:  Yes.  So paragraph 151 shows three photographs of the MEG Center.  Now, these were taken from a YouTube interview that Defendant Poor gave on May 28.

THE COURT:  So what is misrepresented in this photo?

What does this photo purport to be and what is it actually?

MR. HASIUK:  The photo purports to be a representation of the current state of the MEG Center.  As reflected by the company's language accompanying that photo that says, as a reminder, the MEG Center in Qingdao began operations on May 1, describing level of sales activity in the first week of June, the first five weeks of being operational.

The clear import of a company publishing a press release with a photograph accompanied by descriptions of that facility and describing sales activity in the first five weeks of operational is that this is an accurate portrayal of the current MEG Center as it then existed.

THE COURT:  What makes this photograph fake?

MR. HASIUK:  So the defendants in their submissions to the court have admitted that the photograph was, in fact, a depiction or a rendering that included photo-shopped logos of the MEG Center, and this photograph is actually not of the facility that's operated in Qingdao.  It is a photograph that Hindenburg alleged was from 2018, that they had simply modified to make it appear as if it depicted the current state of the

LACsLUNc

MEG Center.  There is no dispute, though, that this photograph, which was presented without any disclaimers, did not represent the current state of the MEG Center and was, in fact, a doctored photograph that had been photo-shopped --

THE COURT:  When you say this photograph, I have two photographs here.

MR. HASIUK:  Yes.

THE COURT:  Which one?

MR. HASIUK:  So the three photographs that appear at paragraphs 151 to 152 --

THE COURT:  Right.

MR. HASIUK:  -- are all still from an interview that Defendant Poor gave on May 28.

Now, your Honor asked me for what I thought was the clearest example of an objective statement or false statement of fact.  I cited the June 9 press release.  There are other --

THE COURT:  Do you contend that this is that location or not that location?

MR. HASIUK:  We contend that this is not the MEG Center as it appeared on June 9 of 2020.

THE COURT:  That wasn't my specific question.

Do you contend that these, what's depicted in these photographs, is that location or is not that location?

MR. HASIUK:  We allege in the complaint that it is not the MEG Center, that it is not the facility in Qingdao that was

LACsLUNc

operated by Ideanomics.

THE COURT:  So you're saying that these photographs are not that location?

MR. HASIUK:  Correct.

THE COURT:  OK.

MR. HASIUK:  That was alleged by Hindenburg on June 25 that contributed to the over 50 percent stock price drop.

THE COURT:  You don't claim that it is just a picture of this location doctored, you claim that this is not a photo of that location?

MR. HASIUK:  That's what was alleged by Hindenburg and this is what is alleged in the complaint, that the photograph of this atrium is actually a photograph of a different location and that this is not the facility that was operated by Ideanomics --

THE COURT:  In all of these three pictures?

MR. HASIUK:  Yes.  If you look at paragraph 152 of the complaint, we specifically allege that plaintiff's investigation demonstrated that the Fu Da market, which is what this atrium that is depicted in the photograph, is one of several buildings in this massive trade city which houses several other businesses in the photographs.  And that appeared in the June 9 press release.  And in Defendant Poor's May 28 interview, it does not show the portion of that massive facility that was operated in any respect by the company during

LACsLUNc

the class period.

THE COURT:  OK.

MR. HASIUK:  So this is simply a false statement that was issued that did not portray accurately the current state of the center and that is the plaintiffs' claim.

THE COURT:  So what is the false statement that you say this photograph is, false material statement that this photograph is representing?

MR. HASIUK:  So taken in the context of defendant's descriptions of the MEG Center during the class period as a one million square foot facility that was operational, had been renovated, had been refurbished, was open for business, was ready for a ribbon-shutting ceremony and, of course, a ribbon-cutting ceremony commemorates the completion of a building --

THE COURT:  Except the way you just characterized it, I understand that that is what you want me to infer from that. But I don't see those specific statements the way you just said it, that it's fully functional, that it's fully operational, that they are using one million square feet currently.

I mean, what is the specific representation other than, well, they -- you know, they said they, you know, they said that they were -- I said I had a picture of me at Disney World and it really turned out to be a picture of me at Disneyland.

LACsLUNc

What is the falseness that is material to investors that you say exists?  And what is it --

I'm trying to understand in what way an investor lost money because of the photographs as opposed to the statements that were specifically being made.

Now, I understand that you could say that, well, they said that, oh, we have a beautiful facility, and they showed a picture.  Obviously, one would infer that if they showed a picture of a beautiful facility, that they are trying to represent to you that this is the beautiful facility that they are tracking.  But I'm not quite sure --

I mean, I'm still having some difficulty articulating the fact that you articulate that they articulate.  What is the most important fact, thing that they said, that you say is actionable against each one of these defendants?

MR. HASIUK:  So there is a number of questions there, your Honor.  I'll try to answer all of them.

But speaking of, you know, to answer the question about materiality and why it was important to an investor making an investment decision in Ideanomics during the class period, the focus of all defendants' public statements to the market, almost every statement they made between March and June concerned the MEG Center as something that was in development, that was actually opening up, that was going to be the main contributor to revenues during 2020.

And if you look at paragraph 151, Defendant Poor's interview is accompanied by slides, and those slides have a banner that says Ideanomics' massive EV expo center in Qingdao, China, is starting to generate revenues.  Revenues, obviously, material to investors.

THE COURT:  All right.  So you say that when they said it was starting to generate revenues, that that was a false statement?

MR. HASIUK:  We allege that this statement, among the many others in the complaint, created the impression that the facility depicted in these photographs, the facility described by defendants was, in fact, in operation.

THE COURT:  That's not what you just said.  That's not my question.

You said you pointed me to what is the false statement that they should be held accountable for.  You said that the center was starting to generate revenues was the false statement.  That's not really what your complaint says.

MR. HASIUK:  We don't dispute the fact that whatever operations the company had in Qingdao did generate revenue.  It generated 47 million of the 4.8 total revenue in the second quarter of 2020.

THE COURT:  You don't claim that that statement, that the facility is starting to generate revenue is in itself a false statement?

LACsLUNc

MR. HASIUK:  No.  We allege that the description of the MEG Center as a fully operational EV hub --

THE COURT:  Who said that it was a fully operational EV hub?

MR. HASIUK:  Sure.

THE COURT:  Where do you get that?

Where is that language?

MR. HASIUK:  I quoted this earlier, so I should have identified it.

On May 26 of 2020, the company issued a press release, this is paragraph 146 of our complaint, that states that Ideanomics "is officially launching the largest auto trading market in Qingdao at MEG's Qingdao EV hub."  It goes on to say, The MEG Center in Qingdao now hosts a full suite of car dealer services for new energy and used cars with the capacity of 18,000 vehicles onsite.

THE COURT:  OK.  What part of that is false?

MR. HASIUK:  The representation that the company was operating a facility that --

THE COURT:  It doesn't say that.  You didn't read those words to me.  That's not what you read to me.

You said that they have officially launched the market.  You don't say it is fully functional.

Where does it say -- who says that it was fully functional?

MR. HASIUK:  So in this paragraph, paragraph 146, there is a sentence that says the MEG Center is a one million square feet EV expo center in Qingdao.  We allege in the complaint that on June 26, the company admitted that there was no such facility called the MEG Center, and that whatever operations they had occupied 200,000 square feet of the one million square foot facility.

THE COURT:  I know, they did have a one million square foot facility.

MR. HASIUK:  The MEG Center --

THE COURT:  That wasn't utilized at the time, but you don't disagree that the capacity was one million square feet?

MR. HASIUK:  No.  I don't disagree that the capacity of the building that existed in Qingdao was one million square feet, but the MEG Center and a purported EV hub did not occupy anything close to one million square feet.

THE COURT:  I know.  But where is the statement that you say is implied here that the MEG Center is a fully functional facility there called the MEG Center?

MR. HASIUK:  Well --

THE COURT:  You're using all of this one million square feet.  Where do you get that?

MR. HASIUK:  Well, the statement is the MEG Center is a one million square feet EV expo center in Qingdao.

THE COURT:  That would be true if it had one car,

1,000 cars, or no cars, wouldn't it?

MR. HASIUK:  If they had one car within a million square foot facility, I think that would be -- it would certainly be a material misrepresentation, when you consider these statements alongside the photograph depicting car lots with multiple vehicles with the MEG Center balloon, customers milling around, descriptions of high levels of sales activity and solid customer foot traffic.

And I think, your Honor, parsing these statements, when you consider the fact that throughout this time period in May, they are issuing press release after press release just talking about moving up the company's annual general meeting to be hosted in Qingdao to showcase this facility that --

THE COURT:  What's wrong with that?

In what way was that false?

MR. HASIUK:  Well, it was false because the company is stating to investors that this facility is complete, that it is a functioning one million square foot EV expo center that is able to host --

THE COURT:  That's what I'm trying to find in your complaint, that they made that kind of representation, that they have a one million square foot facility that's fully functional and it is full of cars.

That's why I ask you, well, where is it that this complaint says that anybody said that?

LACsLUNc

MR. HASIUK:  So, I think I quoted a number of examples of language where they are representing that it officially launched is the language that they used.

THE COURT:  But if I officially launch Apollo 13, it doesn't mean they have landed on the moon.

MR. HASIUK:  If you presented a photograph of Neil Armstrong on the moon, I think at that point, you know, you would be representing that the mission is complete.

THE COURT:  But that's what I'm trying to understand. I'm trying to understand whether or not that is critical to your argument, that I must interpret the photos and the language to be that kind of representation, or is there someplace in fact where I can say, aha, they can't deny that, that's the specific representation they made.  Not that what they said should be interpreted that way.

You may be right.  You may be able to convince me that overall, the kinds of things that they said would constitute them trying to make the public believe a certain thing.  But the first thing I look at is to try to figure out whether or not, whether they specifically said what you want me to conclude that they wanted the public to understand.

MR. HASIUK:  Certainly, your Honor.

THE COURT:  And when you say to me it is fully functional, I'm going to look for those words fully functional. If you say that we're using the million square feet at the

moment, I want to look for those words that somebody said, We are utilizing the million square feet at the moment.  And if I don't see that, then I go to the next step to say, OK, did you say something that was equivalent of that, or did you say something that was meant to lead people to believe that when you knew that, that wasn't true.

So far, the way you've characterized what they said are not the words that they used.  And I'm trying to figure out the strongest support for your position would be to -- tell me what false statement they made, and to quote that false statement word for word the way you have stated it, and you haven't done that part of it.

I understand your other argument that, Oh, judge, don't tell me that you just bought a fancy car and show me a picture of a Rolls Royce, and then argue to me that you weren't trying to convince me that you don't own the Rolls Royce.  But that is a little different than simply saying, I own a Rolls Royce.

MR. HASIUK:  I agree with that, your Honor.  I'm not seeking to repackage what defendant said, but the language that they used described sales activity, followed customer foot traffic, they use the words in the complaint.  These are quoted press releases, officially launched an operational renovated refurbished -- this is language pulled from the --

THE COURT:  You can't do it that way.  You can't just

LACsLUNc

give me words.  You've got to give me a statement.

MR. HASIUK:  Sure.

THE COURT:  Give me your strongest statement that I don't have to interpret.

MR. HASIUK:  So I quoted the June 9 press release which was accompanied by a photograph purporting to depict the MEG Center.

THE COURT:  All right.  But it says here that the center announced a soft launch on May 1, 2020.

You don't claim that that statement is false?

MR. HASIUK:  No, not the fact that they had a soft launch.

THE COURT:  OK.

MR. HASIUK:  That's not the basis for our claim.

THE COURT:  So when they made reference to a launch, why should I assume it is anything other than the reference to the soft launch?

MR. HASIUK:  Well, I think --

THE COURT:  It doesn't say full launch anyplace, does it?

MR. HASIUK:  It does say that the company has -- that the MEG Center is operational, it says, in its first five weeks of being operational.

THE COURT:  But it is operational, isn't it?

You don't claim that that is a false statement, do

LACsLUNc

you?

You claim that it was totally inoperable?

There was no operation at the site when they said it was operational?

MR. HASIUK:  So this case is not about whether or not there was any operation in Qingdao --

THE COURT:  If you say the false statement is they said it is operational, and you say -- you can't say it is not about whether or not it was operational.  It was either operational, fully operational, or partially operational.

You want me to interpret this as being fully operational?

MR. HASIUK:  I want your Honor to look at the context of these statements, accompanying the photographs, as being a representation to investors about this is the current state of affairs with respect to our primary business line during the class period, the MEG Center.

And we cite a number of cases in the complaint, in our opposition brief, where courts have found that exaggerated claims about the current state of a business or the current state of a product are actionable.

We even cite a case --

THE COURT:  I agree with that, but that is where I wanted you to point me to the exaggerated claim, the words.

MR. HASIUK:  The photograph.

THE COURT:  Not the photograph.  I understand that argument.  I'm accepting that argument as you stated it.  But I'm trying to figure out whether or not you have literally exaggerated claims word for word and if you can tell me what those exaggerated claims were.

So far, it is difficult for me to say that, you know, if I told you -- if I told you that I was 21 years old, you could say to me, Judge, that is a false statement.  Now, if I said that, Here's a picture of me and shows me when I'm 21 years old, that's a different thing to argue that.  Well, what you were trying to do, even though you didn't say it, was give me the impression that that is what you look like in the picture, but I understand all of that.

But I'm just trying to -- I will review the case based on your statements that I should look at these photographs and look at the statements and I should conclude that they are trying to give a false impression to the investor, a false impression that they have a fully operational facility here when they know they did not.

But my first question is, obviously, well, did they ever say that?

If they said that, then that makes it easy for me and I don't have to go through analyzing the pictures and the words that go with the pictures.  You can just tell me, I've alleged, Judge, they said fact X, and at the time they knew that those

words were false.

I'm trying to see how much of that you have, because that would be the strongest evidence of the falseness of the statements, the scienter, the loss causation.  It would be, you know, if you say -- it's what I always use.  If you have a facility and you say, at the warehouse, we have 20 trucks and, you know, in the warehouse there are no trucks, then saying that there are 20 trucks are false.  It's false.

MR. HASIUK:  We do have that in this case, your Honor.

THE COURT:  So give me an example of where that is in this complaint.

MR. HASIUK:  Sure.  So the company described the MEG Center --

THE COURT:  Show me in what way they describe the MEG Center that you say is clearly a false description of the MEG Center.

MR. HASIUK:  Sure.  On May 26, this is paragraph --

THE COURT:  I'm sorry.  Where are you?

MR. HASIUK:  Paragraph 146.

THE COURT:  146.  All right.

MR. HASIUK:  Paragraph 146, yes.  In paragraph 146, this is a press release.

THE COURT:  All right.

MR. HASIUK:  It states that the company officially launched the largest auto trading market in Qingdao at MEG's

LACsLUNc

Qingdao EV hub.

THE COURT:  OK.  All right.  So the way I would dissect this is, I would say, OK, one of these things has to be false, that they officially launched it, that it was the largest auto trading market.

MR. HASIUK:  Well, the statement goes on.

THE COURT:  Or it was at MEG's Qingdao EV hub.

Which one of those facts do you say was false?

MR. HASIUK:  Well, certainly that there was such a thing as the MEG Center.  A facility dubbed the MEG Center was not in existence as of this time because on June 26 --

THE COURT:  I'm not sure what you say -- I'm not sure what you characterize as the MEG Center, and to what extent that is a false statement about what they are doing at that facility.

You're not claiming that they don't own it, right?

You're just claiming it is not yet called the MEG Center?

MR. HASIUK:  It was not.  It was not, in fact, called the MEG Center.

THE COURT:  I know.  That can't be your only argument, because they called it the MEG Center and that wasn't its official name.

MR. HASIUK:  No, but it certainly is part of the falsity.  When a company says that we have a facility that is

LACsLUNc

now operational, it had a soft launch, and they fail to disclose the fact that that facility is actually in Phase 1 of development and is not even called the MEG Center, I think that's certainly material information that a reasonable investor would want to know.  Because this is their primary contributor to revenues in the year, and they are vastly overstating the current operational status in that same paragraph, paragraph 146.  They say that the MEG Center now hosts a full suite of car dealer services for new energy and used cars.

Now --

THE COURT:  OK.

MR. HASIUK:  -- we allege in the complaint, based in part on facts uncovered by the short-sellers who visited the site, who spoke with people at the site, who had never heard of Ideanomics, who were unaware of any renovations, that the facility was actually operated by hundreds of different vendors, as well as plaintiffs' own investigation, who sent investigators to China, and in January of 2021, viewed the facility and saw that they had no -- that the activities described that prior summer were not occurring at the time.

THE COURT:  What activity?

MR. HASIUK:  The fact that it now hosts a full suite of car dealer services for new energy and used cars with the capacity of 18,000 vehicles.

LACsLUNc

THE COURT:  What do you claim was at the facility; nothing?

MR. HASIUK:  Well, we went and visited it, and we saw that there is a facility in Qingdao.  It's a massive facility. It has not undergone renovations, as of January 2021.

THE COURT:  It didn't have any cars?

MR. HASIUK:  We were not able to identify any activity that met the descriptions.

THE COURT:  So my specific question was:  It didn't have any cars?

MR. HASIUK:  Um, I can't speak to whether or not -- so there was a preexisting auto market in Qingdao, the Fu Da market, but that is not what the company is describing, and it certainly was not what the company is depicting in these photographs.

THE COURT:  Well, I'm trying to figure out what seems to be critical or the most important thing is whether or not there were automobiles on site that were available for purchase.

Do you claim that there wasn't?

MR. HASIUK:  Not as described by defendants and certainly --

THE COURT:  Again, you keep modifying my question.  I didn't say as described by defendant.

So are you implying that there was, but not as

LACsLUNc

described by defendant?

MR. HASIUK:  The company assumed operations that were previously in existence at the Fu Da auto market in Qingdao. But throughout the class period, they are not describing these preexisting operations.  They are saying they described the fact that they renovated the facility, that it is being serviced.  Then they say they had a soft launch.  It is thought operational.  In June, they say the first five weeks of operations.  They describe customer foot traffic --

THE COURT:  Was that true?  Was that true?

MR. HASIUK:  That what?

THE COURT:  That for five weeks it was operational?

MR. HASIUK:  There may have been operation in Qingdao. It wasn't the MEG Center and this EV hub with a capacity for 18,000 vehicles, that was not operational.  That was not in existence as of the time of the class period, and the company has admitted to that.

The company admitted that they assumed -- on June 26, they say that we assumed operations, that there was a facility that would ultimately be dubbed the MEG Center, and that it's in Phase 1 of development.

THE COURT:  OK.

MR. HASIUK:  I obviously have emphasized the photographs in this case, but a picture is worth 1,000 words. If you look at the photographs and you consider that alongside

their descriptions of this new facility, this one million square foot facility that is going to be an EV hub, all these different features, and you look at the photograph, the photograph is clearly portraying to investors that this is what we have in Qingdao.

THE COURT:  Yes.  But the photo doesn't show a one million square foot facility with thousands of cars.

MR. HASIUK:  So one of the allegations in the complaint, there is actually multiple photographs that are published.  And in one of the photographs, on June 5, this is paragraph 102, the Ideanomics Twitter account says that the MEG Center -- this is paragraph 102, the MEG Center in Qingdao is a one million square foot EV expo center with the capacity to hold 18,000 vehicles.  And that Tweet was accompanied by an aerial photograph of the facility which clearly, given the description in the Tweet, indicates that the facility pictured in the photograph is the MEG Center.

THE COURT:  Which paragraph are you talking about?

MR. HASIUK:  In paragraph 102, your Honor.

THE COURT:  Which photograph are you talking, where you say that the photograph in photograph 102 is a doctored photo?

MR. HASIUK:  It is an aerial photograph of the Fu Da auto trading center in Qingdao.

THE COURT:  OK.  It's not a doctored photograph?

LACsLUNc

MR. HASIUK:  No.  This is not one of the doctored photographs.

THE COURT:  OK.

MR. HASIUK:  Presented alongside the description --

THE COURT:  You claim that they don't have a financial interest in any of those, anything that is depicted in this photograph?

MR. HASIUK:  We don't claim they had no financial interest.  We allege that they did not occupy the full one million square feet.

THE COURT:  OK.  But that's what I'm trying to understand, whether that is critical to your argument.  Because I don't see any place -- and that's what gives me difficulty.  I don't see any place where they say they occupy the full one million square feet.

MR. HASIUK:  In the Tweet, I just said, the MEG Center in Qingdao, paragraph 102, the MEG Center in Qingdao is a one million square feet expo center.

THE COURT:  Is it?  It's not.

MR. HASIUK:  No, it's not.  The MEG Center occupied any operations the company had as of June.  Per their admission on June 26, they occupied 200,000 square feet of the one million care foot facility.

THE COURT:  But they owned the one million square foot facility, no?

LACsLUNc

MR. HASIUK:  Your Honor, that's not -- there are no facts in the complaint to suggest that the company has owned the full one million square feet facility.

THE COURT:  I just don't know.  That's not a trick question.  I don't know.  I'm trying to get the answer to what the genuine dispute here is.

Do they own the full one million square foot?

It's difficult for them to be utilizing a one million square foot facility they don't have any financial interest in, the one million square foot facility.  But that's not the allegation that you are making, that they didn't have a one million square foot facility that they could have and did ultimately utilize.

Is that true, that they did ultimately utilize the total one million or the majority of the one million square foot facility for the purpose of which they said that they were going to utilize it?

MR. HASIUK:  No.  As of June 26, the end of the class period, they admit that they only occupied 200,000 square feet of that facility.  So when they present an ariel paragraph of a one million square foot facility and say, the MEG center is one million square feet, they admitted only a few weeks later that, in fact, the MEG Center, whatever its operations were, occupied 200,000 square feet of that facility and it is in Phase 1 of development.

So there was effectively a car flee market in Fu Da China that had a preexisting operation that primarily involved the sale of gas-powered vehicles.  The company is not touting to investors we assumed operations at this car flee market and buy our stuff because we're an exciting new company with EV operations.  We allege that Ideanomics was seeking to capitalize on the high level of interest in EV vehicles by saying, we have this facility in Qingdao that's a million square feet.  We have this facility that is an EV hub.  Here is a picture of new vehicles for sale.  Here is a picture of a one million square foot facility.

And that those statements were false because in truth, the company only occupied a small fraction of the facility.  In truth, that facility did not exist as described by defendants. That is the core allegation in the complaint.

THE COURT:  Should my analysis start with the statements that were made by the short sellers --

MR. HASIUK:  Your analysis --

THE COURT:  -- as a corrective disclosure?

I could very easily figure out what it is that they said that is false if you tell me what was the disclosed in the corrective disclosure that wasn't accurately disclosed previous to that.

So what do you say that Hindenburg or the other -- I forget the name of the other.

LACsLUNc

MR. HASIUK:  JCAP.

THE COURT:  JCAP.  What did they reveal that you're relying upon that had been misrepresented?

MR. HASIUK:  So for purposes of loss causation, as your Honor knows, the question is whether the subject of the fraudulent statement was the cause of the stock price decline.

THE COURT:  Right.

MR. HASIUK:  There are many cases that hold that short-sellers --

THE COURT:  Now, I think you didn't characterize that correctly.  It is whether the corrective disclosure revealed the falsity of the previous statement.

MR. HASIUK:  Yes.  The misstatement we're missing concealed something from the market that when disclosed negatively effected the value of the security.

THE COURT:  OK.  That's what I'm trying to figure out. What is it that they disclosed?

MR. HASIUK:  So the short-sellers accused the company of misrepresenting --

THE COURT:  Don't tell me what they accused them of, tell me what they disclosed.

MR. HASIUK:  They disclosed the photographs published to the market were doctored.  That is one of the core allegations.

THE COURT:  OK.  You say one of the four allegations,

LACsLUNc

they say that the photographs were doctored. OK. I got that.

What else did they say that was done that they are now setting the record straight?

MR. HASIUK: They said that they visited the facility and that the people at the facility had not heard of Ideanomics and had not --

THE COURT: That doesn't tell me what corrective disclosure was made. What is the evidence, what is the fact that they revealed through that statement?

MR. HASIUK: They revealed that the company had exaggerated their presence in Qingdao and had misrepresented the current operations at that facility.

THE COURT: And they did so how and what was the statement that revealed that?

MR. HASIUK: Hindenburg accused the company, they said we have evidence that you misrepresented the current state of the facility, the photographs you published to the market were doctored. OK. So that is one critical allegation.

THE COURT: OK. I understand the photographs. We went past that already.

What else?

What is it that they said that they represented that they demonstrated was false, that they corrected the market?

MR. HASIUK: Right. So you have the photograph, you have the fact that they visited the site and they couldn't

LACsLUNc

locate any operations that matched the company's descriptions.

THE COURT:  Well, again, that's a little vague for me.
It tells me what they did, but it doesn't tell me what they put
the lie to.  When they visited, what is it that they say that
they discovered that was different than what was represented?
That's what I'm trying to find.

MR. HASIUK:  If you look at paragraph 117 and 118 of
our complaint, we actually quote the language from these short
sellers, and J Capital on paragraph 117 says that investigators
have been unable to establish that Ideanomics has a showroom in
Qingdao.

THE COURT:  OK.  So when did any defendant make a
statement that they had a showroom in Qingdao?

MR. HASIUK:  Well, they published a photograph of the
purported showroom we have gone over multiple times today.

THE COURT:  That's a showroom?

MR. HASIUK:  Yes.  It's a photograph of a car sales
lot in an atrium with a balloon that says MEG.  I mean, it's
unquestionably representing that we have an EV showroom in
Qingdao, and J Capital --

THE COURT:  I don't see this as a showroom.  I see --
first of all, it looks like this is an indoor or outdoor
location?

MR. HASIUK:  Well, there is multiple photographs.
Some are indoors and some are outdoors.

LACsLUNc

THE COURT:  What is the indoor location.  That's what I'm trying to find out.

MR. HASIUK:  Sure.  Just to kind of flip back to some of these statements, I believe they appear at photographs 148 through 51.  So you have a number of photographs.

THE COURT:  Which one of these photographs is an indoor location?

MR. HASIUK:  That would be on paragraph 151.

THE COURT:  Could the first photograph, second photograph, or the third photograph of the outdoor location.

MR. HASIUK:  The third paragraph.  The first two are outdoors.  It actually looks like this is an enclosed atrium. There is a roof on the photograph.

THE COURT:  OK.

MR. HASIUK:  You can see it more clearly in the third photograph.  This is an indoor location.  This is like a massive expo center that you see in a convention center or something like that.

So J Capital --

THE COURT:  They said photos are doctored and they say they have a showroom, but they don't have a showroom.

MR. HASIUK:  Yes.  And then they continue and say that we spoke to people who had stores in this flee market, this auto flee market in Qingdao, and they never heard of Ideanomics.

LACsLUNc

THE COURT:  OK.  So what does that prove, as they say?

What do they say?  What are they correcting at that point?  That because the people that they spoke to never heard of the defendants, that demonstrates what?

You're relying on that as proof that they said they had a location there, but they really don't.

MR. HASIUK:  It goes to --

THE COURT:  Don't tell me what it goes to.  Tell me what it says.

What statement that was previously made does that correct?

MR. HASIUK:  So the statements that we have reviewed today about an operational facility --

THE COURT:  OK.  So they said they went there.  They said they have an operational facility.  We went there, and we found that there is no operational facility?

MR. HASIUK:  Yes.  That would be a clear example of a statement that was made and now the relevant truth is emerging to the market as these short-sellers are saying the photographs are doctored.  And we went there and we couldn't find this facility as described by defendants.

THE COURT:  All right.  So photo misrepresents their location and we went to the location to see it and it wasn't there.

MR. HASIUK:  Yes.  Importantly, on June 25, Defendant

Poor, the CEO of the company, Tweets back at the short-sellers and denies the allegations, but does not address the allegation about the doctored photographs. And that is an allegation in our complaint. This is part of the mix of information that's being released to the market that this company is not saying, no, we didn't doctor photographs, because that would be a misrepresentation. They are silent on that point.

And on June 26, and these two disclosures have to be read in tandem because that is how we allege it in the complaint, on June 26, they publish a press release and they say, We want to clarify the status of the MEG Center.

THE COURT: When does the stock price adjust?

MR. HASIUK: It drops 50 percent over those two trading days from June 26 --

THE COURT: June 24 to June 26?

MR. HASIUK: Yes. I can give you the exact. Paragraph 127 we cite this. So the closing price on June 24, before the J Capital Hindenburg reports was $3.09. On June 25, the short-sellers come out and say, You doctored the photographs, we went to the facility, it's not as described. On June 25, Defendant Poor fails to deny the fact that they did, in fact, doctor these photographs. And on June 26, the company comes out and says, We want to clarify the status. It is only 200,000. It's in Phase 1. And on June 26, the stock price closes at $1.46. That is a 53 percent decline over two

LACsLUNc

trading days.

It is important to point out defense counsel acknowledges that the stock price decline was due, in part, to the short-seller allegations.  So there is no question that this is news that came to the market that caused the stock price reaction.

The question is, does it constitute a corrective disclosure.  And I think when you have a photograph that's fraudulent and then a short-seller saying that photograph is fraudulent, followed by an admission that the photograph was fraudulent, you could not -- mirror image is not required, but that is a pretty clear corresponding statement and disclosure. Here is a photograph of the MEG Center, that photograph is fake.  And now they are admitting to your Honor in their papers that this was, in fact, a doctored photograph.

If you look at the cases that have addressed short-sellers, there is no requirement that the short-sellers be 100 percent accurate.  In Re Windstar, your Honor, in one of your cases, you state that allegations that the market reacted negatively to an opinion or speculation which, in fact, exposes the falsity of defendant's representations can be sufficient to plead loss causation.  That is exactly what happened here.

THE COURT:  But what I was addressing there is that that is dependent on that, in fact, even if they speculate about it.  It turns out that that was true.

LACsLUNc

MR. HASIUK:  That's what we have here.  We have corroboration by defendant's own admissions, first their failure to deny that the photograph was doctored on June 25, followed by their admission on June 26 that we need to clarify the status of the MEG Center because of these allegations from the short-seller.  And now in their papers to your Honor, they admit that this was, in fact, a doctored photograph.

So there has been corroboration in Windstar.  I believe there was allegations that the CFO resigned in response to some of the short-seller allegations.  That is a form of corroboration.  here, we have very clear explicit corroboration that the short-sellers got it right.  The photograph was, in fact, doctored.  The relevant truth that's concealed by the misstatement in this case is that the MEG Center was not as described by defendants.  That is what the photograph and the allegation regarding the photograph constructively disclosed to the market.  It tells investors that Ideanomics and defendants have misrepresented the state of the MEG Center.  That is why the stock price declines, because investors justifiably rely on their statements about how great the MEG Center was and how it was this new and shiny EV hub, and that was going to be a material source of revenues.

Bear in mind, of course, in the background, this company is on life support financially.  They are facing delisting.  They have extreme difficulty meeting their

LACsLUNc

obligations.  There is --

THE COURT:  That never played itself out.  They weren't delisted.

MR. HASIUK:  No, they weren't ultimately delisted.

THE COURT:  By your estimate, they ended up doing better than what they represented.

MR. HASIUK:  So my point there was that investors would certainly be banking any hopes on this MEG Center as being the way that this company is going to turn around, and they come out on June 25 and 26, and they learn that the facility as described by defendants was not what they had been led to believe.

It is understandable and reasonable that investors would be -- that there be a negative stock price reaction.  And, of course, your Honor, we are not required to prove our claims at this stage of the case.  We are simply required to give defendants some indication of a loss that we have in mind.  And so for loss causation purposes, given the cases that have been before your Honor and many other judges in this district, we cite a number of cases in our opposition brief by Judge Castel, Marrero, many others, McMahon, Judge Behr, all involving short-sellers, where a short-seller allegation, even if it is not completely adopted by the plaintiff, even if it involved allegations that weren't ultimately proven, if there is something that that short-seller report, that is

LACsLUNc

subsequently corroborated and that reveals the relevant truth, that that short-seller report can serve as a corrective disclosure.  And we have exactly that in this situation and much more, because we have defendants' admissions, first their admission failing to deny that the photographs were doctored, and now their admission in this court that the photographs were, in fact, doctored.

If you look at these other cases that have addressed the question of under what circumstances can a short-seller be a corrective disclosure, we think we check all the boxes in this case.  It doesn't matter, quite frankly, for purposes of loss causation whether or not we have adopted every allegation in the short-seller report.  The point is that this is a corrective disclosure because it is relevant -- it is the relevant truth.  And today, in fact, exposed the falsity of defendant's reactions, and the market reacted correctly as evidenced by the fact that defendants now admit the photographs were doctored.

Your Honor, if you have more questions about loss causation, I would be happy to address them.  I would really like to turn to scienter, because that was the focus of some of defendant's arguments.  We have talked a lot about falsity.  I think have a couple of points on scienter would be warranted.

THE COURT:  All right.  Go ahead.

MR. HASIUK:  Sure.  I want to emphasize that on

scienter, this case is built primarily on allegations that defendants made statements that were inconsistent with the true state of affairs.  This is not a case where we're primarily relying on motive and financial motives.

Your Honor, I think there are at least four reasons why the court can infer conscious misbehavior recklessness in this case.  I just want to very briefly run through them.

First, you have defendant's admissions.  The Second Circuit has explicitly recognized that plaintiffs may rely on post-class period admission to confirm whether a defendant should have known during the class period.  On June 25 and 26, the company failed to deny has now admitted that the photograph they published to the market were doctored.  So that admission establishes that defendants during the class period knew that when that photograph was published to the market, it did not accurately depict the current state of the MEG Center.

Significantly, defendants do not argue that this photograph was mistakenly published, that it was some innocent explanation.  Defense counsel readily explained today that we photo-shopped it.  We doctored it.  So there is no question here that this was somehow mistaken negligent publication to the market, and it is simply implausible to suggest that it was because they are publishing the photograph alongside the descriptions that say high levels of sales activity, solid customer foot traffic.

LACsLUNc

First and foremost, I think the court can rely on defendant's admissions to establish that there were undisclosed facts about the MEG Center the defendants knew during the class period.  It wasn't a million square feet.  It wasn't called the MEG Center and the photographs were doctored.  I think that is point one.

Point two, defendants made repeated statements about the MEG Center.  There are cases visited in the application brief, Comscore, Lockheed Martin and others.  Courts in this district have found that when a defendant repeatedly makes statements about a particular issue or particular profit or a business line, that there is the reasonable inference that that defendant made it his or her business to look into that issue.

That is exactly what your Honor, I think, was getting to with defense counsel when Mr. Wu is stating -- talking about high levels of sales activity and solid customer foot traffic. Well, then certainly it is reasonable to infer that he has conducted some investigation and knows what is happening on the ground in Qingdao, because otherwise how could a defendant possibly make a statement about what is going on in the other side of the world, about what's actually happening at the MEG Center, if they are not apprising themselves of the relevant facts.

So as courts have held, it is reasonable to infer that a defendant, the facts they speak about on a regular basis.  It

is a very reasonable inference, it doesn't require an inferential leap in this case.  And as in the many cases we cite in our opposition brief, there are very plausible reasonable grounds in this case to believe that defendants were repeatedly discussing the MEG Center, had information about its current state.

Third, I think the photographs standing alone provide a basis for the court to infer scienter.  We cite a case China Integrated Energy which is a case involving short-sellers.  It is a case in the Central District of California.  But in that case, there was a similar allegation that the defendants had taken steps to actively conceal the current state of a plant that was in China.  In that case, a bio-diesel plant in China.  They gave the investors the impression that they had a high level of activity at the site, and that is no different than the photographs here.

THE COURT:  Except you don't.  I'm not even sure you make a statement about who saw these photographs or who had anything to do with publishing these photographs.

MR. HASIUK:  It was published on June 9 in a press release by the company.

THE COURT:  Right, but that doesn't wrap up everybody who works at the company.

MR. HASIUK:  Not even who --

THE COURT:  Individually, how do you -- in what way am

LACsLUNc

I supposed to infer that Mr. Wu is responsible for that?

MR. HASIUK: Mr. Wu's statements that I quoted about high levels of sales activity and solid customer foot traffic accompanied the photograph in the June 9 press release, and it does not require any leap to infer that a defendant who has statements attributed to him in a press release reviewed and approved, he is a chairman of the company, the photograph that accompanied that press release. And remember, Defendant Poor gave an interview on May 28 that included the very same photographs.

So no question Defendants Poor and Wu, at a minimum, and I would also argue Defendant Sklar, who is the vice president of investor relations, his job is to approve communications to investors, his name appears in that press release as a contact person, and Mr. McCarthy, who is the CFO of the company, is certainly reasonable to infer that the highest level executives in the company knew that when that photograph went out to the market, it did not accurately depict the current state of affairs.

And it is a far more plausible inference to infer that they did it to conceal the true state of affairs. This wasn't accidental or innocent. They are telling investors, we have this great new facility in China, invest in our company, and here is a photograph. It is advertising. It is marketing.

And the reason you do it is to conceal the fact that

LACsLUNc

the MEG Center, you know, the question is, why wouldn't they just put a photograph of the actual MEG Center as it then existed?  Because that wouldn't have been exciting.  Because that wouldn't have attracted investors.  They doctor a photograph and present that to the investors.  I think that standing alone is a basis to infer scienter.

And fourth, these are really two related points, but core operations in this case is not a standing alone, sufficient basis to infer scienter, but it certainly should be considered.  Because defendants concede in the reply brief that the MEG division was "core to the company's operations."  This is not a typical case where we're saying the MEG Center was some far-flung division.  It was not within our core business, Ideanomics, 2020, 10-K, the second quarter, this is quoted in the complaint, photograph 176, discloses that the 4.6 million of revenue of the total 4.7 million for the quarter came from the MEG division.

So this is the only viable business segment for our company, and defendants are making statements about that division, as your Honor found in Rudani, another case involving Ideanomics, where that information is readily accessible and easily determinable and the business line is sufficiently, quote, critical to the company, such that the defendants had a duty to monitor it, the defendants' positions and roles of the company can comport an inference of scienter.

So here, you have the CEO, the CFO, the VP of investor relations, and the chairman all making statements about the MEG Center, publishing photographs of the MEG Center, and that center comprises the -- is the primary operation of the company. Not just one of many, but it is the primary. The only viable business segment. It is certainly more plausible than any competing inference, to infer the defendants knew about the facts from the ground in Qingdao, were aware of those facts when they made their statements, and were aware of the fact that the photograph did not accurately depict the MEG Center as it then existed.

So that is the primary basis for inferring scienter in this case. The defendants had a duty to monitor it, this information. They knew facts that undermined the accuracy of their statements. They recklessly disregarded that information when they issued these statements. We also allege a number of additional bases to infer scienter, including the fact that the company was facing delisting, whether that deadline was extended or not.

The fact is this is a company that, you know, is on life support. The auditor stated that there is a danger to the company, would not be able to continue as a going concern. They are desperate to raise capital. And as defense counsel noted when he was describing the stock price reaction during the class period, defendants did, in fact, inflate the stock

price during the class period.  And so we allege that this is not a general motive that is possessed by all companies.  This is a specific motive to Ideanomics.  They have an eminent risk of delisting, and they are desperate to increase their stock price.

And, in fact, they had agreements, financing arrangements, that were contingent upon the company maintaining a NASDAQ listing, which was contingent on them increasing the stock price above a dollar.  So those facts we're not saying that they, standing alone, establish scienter.  We are saying that they provide context for why was the company so aggressively touting the MEG Center during the class period, because they needed something to increase their stock price so that they could maintain access to capital.

So they could maintain their NASDAQ listing, and it is during the very period in which their stock price is increasing that they are issuing increasingly aggressive statements up to the point that they actually publish photographs that they admit were doctored to the market.  Those came out on June 9.

So there is a very plausible explanation for why, why would defendants embark on this fraud, and it is because of the financial condition of the company.  And so we would argue that scienter can be inferred, or for all of those reasons, but certainly most importantly the company's admissions, their statements, the fact that this was a core operation, the fact

that they are the most senior executives of the company in addition to the financial motivations we just described.

Obviously, whether any of the individual defendants are liable, this is a case that really meets the Second Circuit's hypothetical in Dynex, which is the publication of these photographs, is so blatantly false and obviously untrue that somebody at the company approved the publication of that photograph with scienter.

So the court can infer corporate scienter against Ideanomics independent of the scienter of any individual defendant.  I argue that we pled individual scienter because Defendants Wu and Defendant Poor are actually making statements accompanying these photographs.  But at a minimum, such a dramatic announcement must have been approved by an officer with knowledge of the fact that this was false, because the company admits that the photograph was not an accurate depiction.  And defendants, at the very end of their presentation, they discuss control person liability.  I think it warrants some response.

I know, your Honor, we have been going for a while.  I do want make the point that Defendant Wu is the only defendant who challenges his actual control of Ideanomics.  If you look at their papers, Defendants poor, McCarthy, and Sklar and Ideanomics, they do not challenge control.  They say that there is no primary violation and, therefore, control person

LACsLUNc

liability doesn't follow.  It is only Defendant Wu that challenges the actual allegations of control.

Control is a flexible standard.  There no bright line test.  He is a 21 percent shareholder.  He is the chairman of the company, and the company's own 10-K says that he's actively involved in management.  We cite a Tweet from Defendant Poor stating that he had a five-hour strategy session with Defendant Wu.  He's making statements as a spokesperson for the company about the MEG Center on March 16.  He makes a statement saying it's a one million square foot facility.  On June 9 statements attributed to him are included in a press release, accompanying the photograph, describing high levels of sales activity and solid customer foot traffic.

So this is not an outside director who sits on an audit committee.  No.  This is an insider, a company insider, who is the active chairman, who is involved in management and is making statements about the MEG Center.  Those allegations are more than sufficient to establish his control.

With respect to the other defendants, they don't challenge the element of control.  Defendants Conor and McCarthy do argue that there is no specific statements attributed to them.  That is simply untrue.  We argue Conor and McCarthy signed the company's 10-K, which included an alleged false statement.  And Defendant Sklar is a vice president of investor relations whose name appears on the press releases,

including the press releases with the doctored photographs, and he can be liable as a primary violator because corporate statements like press releases can have more than one author under Janice.

There is well-established case law.  We cite the Lockheed Martin case by Judge Rakoff, discusses how Janice didn't alter the fact that a press release, a 10-K, a 10-K can have multiple authors.  It is certainly reasonable to infer that Defendant Sklar was an author and a person with ultimate authority over the press releases in this OK.  Even if he is not a primary author, he is involved in the dissemination of false statements.  And under 10(b)(5)(A) and (C), which we plead as a basis for liability in the complaint under scheme liability, the dissemination of a false statement can constitute -- can give rise to primary liability.

So we believe that we have established liability for each and every individual defendant, but certainly Defendants Poor and Wu and the company who are most directly responsible for the publication of these photographs, we would argue, really establishes each of the elements of our claim.

There were arguments made your Honor about safe harbor and opinion statements.  I want to reiterate very briefly the points in our briefing, that they challenge seven of the statements in the complaint as forward-looking.  And if you look at every one of those statements, there are statements of

LACsLUNc

present or past fact that are included among those statements.

We cite this in our brief, but the statements are framed in terms of the MEG Center began operations, is mostly finished, now hosts a full suite of car dealer services, has been renovated.  Under binding Second Circuit precedence, statements that include both forward-looking aspects and present aspects are not protected under the safe harbor with respect to the present or past aspect.

But even if that were not the case, even if you were to look at these statements and say these are 100 percent forward-looking, the safe harbor wouldn't apply because there is no meaningful cautionary language.  Defendants cite risk disclosures that concern working capital requirements, competitive business conditions, risk related to block chain technology and digital assets.  There is no disclosure that defendants point to that relate specifically to the MEG Center or the fact that the company was publishing photographs that were doctored, that they were only occupying a small fraction of the facility, that it was in Phase 1 of development.  They have not tied the risk disclosures in this case to the actual statements, and that is necessary.

And furthermore, we allege omissions in this case. The statement that we expect the MEG division to be a material source of revenues, to the primary source of revenues, that is a projection.  I'll concede that.  Those are not the primary

statements we plead in the case.  But that projection is no different than the projection that your Honor addressed in the Rudani case.  And your Honor found that the omissions in that case rendered that statement false and those omissions were not protected by the safe harbor.

It is no different here.  We allege that they claim that the MEG Center would be -- the MEG division would be a material source of revenues, but they failed to disclose that it was only in Phase 1 of development, they failed to disclose that they only occupied 200,000 square feet of the facility, and they failed to disclose that accompanying many of these statements there were photographs of a falsely portrayed current state of the MEG Center.  So these are really marginal challenges.

THE COURT:  I want to wind this up.

MR. HASIUK:  Last point, your Honor.  Under Omnicare, a statement of opinion, even if you were considered some statements of opinion can be false under three circumstances:

One, the statement was subjectively disbelieved.  And we, as I just outlined, we allege scienter for each defendant.

Two, that statement contained embedded factual representations that were themselves subjectively false.

Or three, the statement omitted material information. It didn't fairly align with the information that defendants possession.

LACsLUNc

Defendant Wu, on June 9, he makes a statement that defendants challenge as an opinion statement.  He describes high levels of sales activity and solid customer foot traffic.  Those statements are falsifiable, objective, and at the very least, they omitted material information going to the basis of that opinion that we allege rendered the statement false.

Your Honor, I know I've taken up a lot of time.  I do appreciate the court's attention, and thank you very much.  If you have any questions, I am happy to address them.

THE COURT:  No.  I think exhausted my court reporter.

MR. KOSTOLAMPROS:  Your Honor, I do have some points to raise.  I probably won't take more than ten minutes.  Ten to 15 minutes, if that.  I don't know if the court reporter...

THE COURT:  No, I don't think so.  We'll take a five-minute break, and then I'm going to limit you to five or ten minutes.

MR. KOSTOLAMPROS:  Perfect, your Honor.  I'll do that.

(Recess)

THE COURT:  Let's try to wind up.  Yes, sir.

MR. KOSTOLAMPROS:  Yes, sir, your Honor.  I'll keep this brief.

I believe plaintiffs' counsel said in the May 26 press release was his strongest misstatement.  I would like to take your Honor to that statement, and if you go to page 46 of the complaint, which is paragraph 146, and cross over paragraph

into page 46, the first full sentence there, it states the auto trading market, which was developed into MEG as part of the investment from Qingdao city, attracts a large audience with MEG will leverage to help educate the general population through its upcoming EV centric welcome center and onsite EV manufacturing partners.

It does not say there that its center is open.  It says that it's upcoming.  The photos don't show that this was the MEG welcome center.  There is no representation, your Honor, no matter what plaintiffs try to infer from these photos, the facts remain itself.  Plaintiffs have to be -- they can't infer facts that are contradicted by the very documents they rely upon, your Honor.  The photos themselves, like I said, there is no representation from the photos that the full million square foot has been renovated.

What the photos show is that there is activity on this site.  And if you look, your Honor, I would venture to say, if you look at Exhibit 10, which is the Hindenburg statement, it includes a photo that Hindenburg claims was a pic from that week in June of the MEG Center.  That photo is not very different, if you look at it and compare it to the photos in plaintiff's complaint.

THE COURT:  Which exhibit?

MR. KOSTOLAMPROS:  Exhibit 10 to our motion papers, to our opening brief.  It is a Tweet from Hindenburg, and it has a

LACsLUNc

photo of the MEG Center or the Qingdao facility.  And it looks very similar, frankly.  It's got a bunch of cars and an open space.  That's what was there.

So when plaintiffs say that the photo itself is the linchpin here, it is not.  The photo simply shows that there is activity on the site.  Plaintiffs say that we have made some admission about a doctored photo.  We have not.  What we have admitted --

THE COURT:  I'm not sure I understand that argument. In what way does this photo show that there is presently activity on the site?

MR. KOSTOLAMPROS:  No, not the photos.  The statements in the press releases are, look, we've had a soft opening. It's active.  We are generating revenues.  That's what the statements are.

THE COURT:  I'm not talking about the statement.  You argued about the photographs.  I'm not clear from even from what you say.  I'm not sure what you say the photos are supposed to represent.

MR. KOSTOLAMPROS:  The photos are only of the facility itself.  When plaintiffs say that that's not the facility in their argument, that's not in the complaint.  I have never represented that that photo is not of the MEG Center.  That's not true.

THE COURT:  So what is it about this photo that was

LACsLUNc

not currently exists --

MR. KOSTOLAMPROS:  The photo-shop of the MEG label on it is what we have stated in our complaint -- not in our complaint, in our motion papers -- that it was photo-shopped. The MEG label on a balloon, your Honor.

THE COURT:  OK.  I don't understand.

Are you representing, trying to represent that that is the only thing that is added to this photograph?

MR. KOSTOLAMPROS:  That's it, your Honor.  That's it.

Your Honor --

THE COURT:  The people, cars, the background, all of that you say is an accurate representation of what that location looked like other than the MEG on the balloon?

MR. KOSTOLAMPROS:  Your Honor, what the company has said in its June 26 press release, is that photo was provided by Fu Da.  Those photos were provided by the joint venture partner Fu Da.  And what the company photo-shopped on that photo is the MEG label on there, your Honor.

And like I said, if you go back, the statements that are made by the company is that the facility was operational. There is no statements that -- there is no misstatement that -- there is no allegation that it wasn't operational, your Honor, whatsoever.

And plaintiffs seem to admit that it was operational. They are saying it is exaggerated because they are claiming

these statements somehow inferred that the full million square feet was operational.

THE COURT:  But I just want to make sure I'm clear. Your representation is that the only thing that has been changed about this photograph is the MEG on the balloon?

MR. KOSTOLAMPROS:  The MEG is what the company photo-shopped on there, your Honor.

THE COURT:  Nothing else?

MR. KOSTOLAMPROS:  Nothing else, your Honor.  And what I would say, your Honor, too, is to look at your decision in Caldwell v. Power Systems, which, again, on scienter, there, your Honor, you said there plaintiff relied on the short-seller report to show the defendant's statements regarding the number of bust appointments were false.  There you held, even if one could infer that defendants knew the number of buses reported weren't accurate, there is a permissible competing inference that the statements were the result of merely careless mistakes by the defendants based on false information fed to them by others.

Now, what my point is, plaintiffs say, well, look, you admit that the photos are photo-shopped.  That gets you scienter.  Well, it doesn't, your Honor.  The fact is the labels could have been labeled and disclaimed.  The photos could have been disclaimed.  Look, it was photo-shopped.  That could have been just a mistake by a low-level employee.  That

LACsLUNc

doesn't lead to the inference there must have been scienter because somebody was trying to mislead the market.

And ultimately, your Honor, what I want to come back to is the point is, through the statements about the MEG Center which plaintiffs acknowledge was, look, they were touting the MEG Center for the hope of revenues. Ultimately, it did generate revenues. It generated what the company said it would, which was the majority of its revenues. Over $19 million for 2020. There is no allegation that that is not correct, and that there was operations on the facility.

My final point, your Honor, was on the control liability claim. We did not say that the only basis was for securities violation. There is no securities violation. We said for the same reasons the securities violations fail, that's the basis for our control liability arguments as well.

So the same reasons apply that there is no culpable conduct here as to each of the individual defendants, your Honor. So that's all I wanted to add, your Honor.

If you have any other questions...

THE COURT: No.

MR. KOSTOLAMPROS: Thank you, your Honor.

I appreciate your time.

THE COURT: Ms. Raines, did you have anything?

MR. RAINES: Your Honor, there are points I could reiterate, but they are stated in our brief. So unless your

LACsLUNc

Honor would like to hear them or have any further questions, I will rest on our briefs and on my argument.  But I thank you for the opportunity.

THE COURT:  Thank you very much.  I don't have anything further.

All right.  I'm going to try to get back to you as quickly as possible in the next 30, 60 days, depending on -- we do have some holidays in between, and I have a trial -- at least by the latest of the new year.

All right.  Thank you very much.

(Adjourned)