**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE IDEANOMICS, INC. SECURITIES     :
LITIGATION     :
    :
    :        <u>MEMORANDUM DECISION &</u>
    :               <u>ORDER</u>
    :
    :          20 Civ. 4944 (GBD)
    :
    :
    :
    :
    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, District Judge:

## I.    INTRODUCTION

Lead Plaintiff, Rene Aghajanian, brings this action against Defendants Ideanomics, Inc.,

Alfred Poor, Conor McCarthy, Anthony Sklar, and Bruno Wu pursuant to Section 10(b) of the

Securities Exchange Act of 1934, and Rule 10b-5(b) promulgated thereunder, and Section 20(a).

(*See* Consolidated Amended Complaint ("Am. Compl."), ECF No. 78.) By two separate motions,

Defendants move to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure ("FRCP") and the Private Securities Litigation Reform Act of 1995

("PSLRA"), 15 U.S.C. § 78u-4(b) (ECF Nos. 85, 87).    Defendants' motions to dismiss are

GRANTED.

## II.    FACTUAL BACKGROUND

### A. Ideanomics' Business

Ideanomics (NASDAQ ticker "IDEX") is a global company focused on facilitating the

adoption of commercial electronic vehicles ("EV") through its Mobile Energy Global ("MEG")

division. (Am. Compl. ¶ 2.) Defendant Poor is Ideanomics' Chief Executive Officer ("CEO") and Interim Chairman of the Board of Directors. (*Id.* ¶ 36.) Defendant Wu, a Chinese media mogul and purported billionaire, is Ideanomics' Chairman of the Board of Directors. (*Id.* ¶ 37.) Defendant McCarthy is Ideanomics' Chief Financial Officer. (*Id.* ¶ 38.) Defendant Sklar is currently Senior Vice President of Communications and has served as Head of Investor Relations and Corporate Secretary. (*Id.* ¶ 39.) Plaintiff brings this federal securities class action on behalf of all investors (the "Class") who purchased or otherwise acquired Ideanomics' common stock between March 16, 2020 and June 25, 2020, inclusive (the "Class Period"). (*Id.* ¶ 1.)

Ideanomics announced the MEG division on August 26, 2019. (*Id.* ¶ 64.) The company stated that the "MEG business operates as an end-to-end solutions provider for the procurement, financing, charging and energy management needs for fleet operators of commercial Electronic Vehicles." (*Id.* ¶ 71.) The MEG Center would be in the City of Qingdao, China ("Qingdao"). (*Id.* ¶ 13.) However, by the end of 2019, Ideanomics reported a net loss of $97 million and the company began issuing debt convertible to securities. (*Id.* ¶ 73, 78.) On December 19, 2019, Ideanomics obtained $5 million in exchange for debt convertible to Ideanomics' common stock at $1.50 per share from offshore investment fund YA II PN, Ltd. ("YA II"), operated by Yorkville Advisors Global, LP. (*Id.* ¶ 81.) Further, on January 10, 2020, the Listing Qualifications Staff of the NASDAQ Stock Exchange alerted Ideanomics that its common stock had traded below $1.00 for the past thirty consecutive trading days, that Ideanomics' common stock was at risk of being delisted, and that it had until July 8, 2020 to raise its per-share price to at least $1.00 for ten consecutive trading days. (*Id.* ¶ 83.) In April 2020, Ideanomics entered into an equity agreement with YA II where it sold newly issued shares to YA II at 90% of the stock's market price. (*Id.* ¶ 89.) Per the agreement, YA II did not need to purchase IDEX shares if the Ideanomics lost its

NASDAQ listing. (*Id.*) Plaintiff alleges that, during the Class Period, Defendants made numerous misstatements about the MEG center that artificially increased the stock price and eventually caused financial loss the Class.

## B. Alleged Misstatements

The alleged misstatements occurred during earnings calls, YouTube interviews with Defendants Poor, Wu, McCarthy, and Sklar (collectively, "Individual Defendants"), and press releases spanning the Class Period. Plaintiff alleges that the bolded statements are material misrepresentations:

### March 16, 2020

During a March 16, 2020 earnings call regarding the MEG Center, Poor stated that Ideanomics had already "*announced the MEG sales hub in the coastal port of Qingdao.*" He said that "*[t]he building is mostly finished. . . it's about 1 million square feet of space. The idea there will be there will be vehicles on the site, similar to what you would see in a very high-end showroom. There will be multiple manufacturers from across the EV industry. It will be a friendly competitive environment. . . It is being completely refurbished so the insides of it are going to be as new. It is all going to be glass-fronted and showroom kind of style in terms of the vehicle displays.*"

During a YouTube interview that same day, Wu clarified the size of the MEG Center in response to an interviewer's question: "*[w]ell we're actually opening up a hundred thousand sorry a - a million square feet a million square feet a hundred thousand square meters so it's a million square feet. So it's much bigger than what you just said.*" (Am. Compl. ¶¶ 134-137.) Ideanomics' stock price closed on March 16, 2020 at $0.3753. (Kostolampros Decl., ECF No. 88-6, at 2.)

### March 20, 2020

On March 20, 2020, Ideanomics released a press release stating that "Mobile Energy Group Center, *is scheduled to start sales operations by May 1. The 1 Million square foot site has been renovated as a permanent EV expo center. . . Ideanomics' Mobile Energy Global division ("MEG") will be joined at the site by more than 20 partners ranging from EV manufacturers, EV battery manufacturers, energy storage, energy management, and EV charging solutions, financial services, insurance, vehicle and license plate registration services, and others from Qingdao. The EV hub is designed to be a focal point for commercial fleet operators and the EV industry alike, with MEG headquartering its*

*management, sales and marketing, and administrative operations at the site.* The city of Qingdao currently operates an automotive sales and servicing center for a range of vehicle manufacturers at the site, *these operations are being assumed by MEG as part of the expanded plans and focus onto EV. This will see MEG assume the revenues derived from those activities, with a run rate of approximately RMB 1 Billion in 2019 ($140 Million USD), with profit margins in the 8% range. . . Due to the successful development of the Mobile Energy Group Center* and the high demand for comprehensive EV services, MEG has received inquiries from several other cities with regards to establishing similar operations. . . . (Am. Compl. ¶139.) Ideanomics' stock price closed on March 20, 2020 at $0.5605. (Kostolampros Decl., ECF No. 88-6, at 2.)

## May 11, 2020

On May 11, 2020 via its 10-Q, a press release, and an earnings call Defendants represented that *"[t]he Company anticipates that its MEG business unit will be the largest contributor to revenues in 2020." "We look forward to Q2 and beyond, including an AGM in the summer of this year to showcase both the MEG business and the formal ribbon-cutting on our new 1MM square feet EV center in Qingdao." "[O]ur EV hub in Qingdao had a soft launch on May 1 and as such, will be a contributor to our Q2 revenues. The existing business we assumed at our national sales center in Qingdao services both consumer and commercial inquiries. . . The purpose of bringing it forward when we traditionally hold it at the end of each year is to showcase our MEG business and the commencement of meaningful orders as well as to align with the formal ribbon cutting for our Qingdao EV hub and to introduce select partners participating with us in Qingdao. . . I absolutely do believe that we'll achieve profitability this year. . . China is doubling down on those types of investments, and that leads us to the conversations that we're having with our partners at manufacturing level and with our customers to believe that we'll have a significant business in the second half of the year.* (Am. Compl. ¶¶ 141-144.) Ideanomics' stock price closed on May 11, 2020 at $0.49. (Kostolampros Decl., ECF No. 88-6, at 2.)

## May 26, 2020

A press release issued on May 26, 2020 stated that:
Mobile Energy Global (MEG) division is pleased to announced [sic] that its Qingdao subsidiary Qingdao Chengyang Ainengju New Energy Sales and Service Co. *has officially launched the largest auto trading market in Qingdao at MEG's Qingdao EV hub.*

*The MEG Center in Qingdao now hosts a full suite of car dealer services for new energy and used cars with a capacity of 18,000 vehicles onsite. It offers a one- stop buying experience that includes financial services and onsite vehicle registration services. The auto trading market, which was rolled into MEG as part of the investment from Qingdao City, attracts a large audience which MEG*

*will leverage to help educate the general population through its upcoming EVcentric welcome center and onsite EV manufacturing partners. . . .*

*The MEG Center is a one million square foot EV expo center in Qingdao, Shandong Province. The Center announced a soft launch on May 1, 2020 and will house partners ranging from EV manufacturers, EV battery manufacturers, energy storage, energy management, and EV charging solution providers, financial services, insurance companies, vehicle and license plate registration services, and others including a state of the art MEG Welcome Center. Ideanomics will be holding a ribbon-cutting ceremony for the MEG Center in Qingdao in the summer in conjunction with its Annual General Meeting.* (Am. Compl. ¶ 146.)  Ideanomics' stock price closed on May 26, 2020 at $0.4176. (Kostolampros Decl., ECF No. 88-6, at 3.)

**May 28, 2020**

On May 28, 2020, Defendant Poor stated in a YouTube interview that "*we set out to create a hub where we could bring the best and [inaudible] partners and give the fleet operators a focal point where they could come and learn about EV. . . We did a soft launch on May the 1st which we started selling vehicles outside. We were able to expand that this week and then this past Monday, we officially opened up a large center for both used cars and new EV vehicles. So both of those are up and running.*" (Am. Compl. ¶¶ 148-149.)

The video interview of Poor included three photographs of an expo center depicting cars on display, people milling around, and 'MEG' appears on a large balloon. (Am. Compl. ¶ 151.)  In each of the photographs, '2020 Ideanomics' is stamped on the far-right corner. (*Id.*)  Ideanomics' stock price closed on May 28, 2020 at $0.4087. (Kostolampros Decl., ECF No. 88-6, at 3.)

**June 9, 2020**

On June 9, Defendants issued a press release that said "**the MEG Center in Qingdao began operations on May 1**. Based on the level of **sales activity** in the first week of June, this month's sales are expected to exceed May levels. In China, the high season for car buying is from October to January. **In its first five weeks of being operational**, the dealers at the MEG Center have received high levels of interest, and management is optimistic that it can achieve its previously stated RMB 1 Billion sales target in 2020."

It also included a quote by Wu: "The region loosened restrictions on business activities in early May, so we are very pleased with the Center's **high levels of activity at this early stage**. The Center's **solid customer foot traffic** indicates that the country's economy is on a steady path to recovery and there is a strong appetite for passenger and commercial vehicle sales which bodes well for MEG," . . . "**The initial activity combined with the projected growth for the remainder of 2020 reinforces our belief that the MEG Center will be a material source of revenue for Ideanomics.**" (Am. Compl. ¶ 154.)

Notably, Ideanomics' stock price rose above $1 for the first time since March 2020 and closed at $1.02 on June 9, 2020.  (Kostolampros Decl., ECF No. 88-6, at 3.)

**June 11, 2020**

On June 11, 2020, Poor explained in a YouTube interview that **"we did a soft launch the beginning of May and then an official launch of our Qingdao EV hub towards later in May and it's been a very big success. It's met our expectations. We had aggressive goals for it, but we delivered more than 2,000 units sold vehicles in the first month.** So that's looking very promising for us as a revenue stream throughout the year.  (Am. Compl. ¶ 156.)  Ideanomics' stock price closed on June 11, 2020 at $1.09. (Kostolampros Decl., ECF No. 88-6, at 3.)

**June 15, 2020**

On June 15, 2020, Poor explained in a YouTube interview that "Yeah, **it's a really exciting opportunity for us.** One of the things we found in speaking to big fleet operators is the EV market is that it's a little bit different than traditional automobile market as we see here in the US and Europe. You know Tesla's the main player; it's a relatively new company and it's the same for commercial vehicles and the majority of the commercial fleet manufacturers are actually China based**. So it's difficult as a fleet operator to understand which companies to work with, how to get the right kind of lease, financing terms, things like that. So we sat down with the automotive industry in China and we understood what it really needs is a focal point. We looked at a number of cities and chose Qingdao . . . because it is a coastal port city, it is an important city for the automotive industry because it sits just across the water from Japan and S. Korea, two big world players in automotive. So really what we wanted to give China an expo center where they can go as fleet operators and learn the best about EV, about the charging battery technology and the types of savings in vehicle maintenance and energy demand.** (Am. Compl. ¶ 159.) Ideanomics' stock price closed on June 15, 2020 at $1.1. (Kostolampros Decl., ECF No. 88-6, at 3.)

## C. Investment Firm Reports

On June 25, 2020, J Capital Research Limited ("J Capital") issued a report and Hindenberg Research ("Hindenberg") issue a series of tweets regarding Ideanomics. (Am. Compl. ¶ 117, 119.) Both investment firms had taken short positions on Ideanomics' stock. (*Id.* ¶ 116.)

The J Capital report stated that its investigators were:

[U]nable to establish that IDEX has a showroom in Qingdao. . . but eventually found an IDEX subsidiary that has a mail drop at a 1 mln sq ft shopping

mall in Qingdao's Chengyang District. Renovations are news to the companies that operate there. . . Neither the manager of the shopping mall nor two store owners we contacted in the center had ever heard of IDEX, any of its subsidiaries or joint ventures, or the EV showroom the company says it opened on May 1.

(*Id.* ¶ 117-18.)   The report also noted that representatives from four of five EV vehicle "buyers" Ideanomics had announced that it had contracted denied the contracts. (*Id.* ¶ 118.)   The investigators were unable to locate the fifth buyer. (*Id.*)

Hindenberg's tweets concluded that the photographs Ideanomics had released on June 9 (and displayed in the May 28 YouTube interview) were not from 2020, but 2018. (*Id.* ¶ 119, 151.) Hindenburg claimed that it 'found a photo displaying the exact same cars and exact same layout from 2018, years before the supposed soft launch of [Ideanomics'] MEG center in 2020;' and (ii) a MEG logo appeared to have been photoshopped on a red arch, as the MEG letters form a straight line despite the logo ostensibly being printed on a curved surface." (*Id.*) The tweets also reported that Hindenberg's investigators had visited the site of the "supposed MEG sales center. . . The facility is actually operated by almost 100 sales groups.  None of those we spoke with heard of [Ideanomics] or MEG.  We spoke to the main office (in a recorded conversation) and they confirmed the same." (*Id.* ¶ 120; Kostolampros Ex. 10.)  Ideanomics' stock price closed on June 25, 2020 at $2.44. (Kostolampros Decl., ECF No. 88-6, at 3.)

### D. Ideanomics' June 26, 2020 Press Releases

On June 26, 2020, Ideanomics released two press releases.   The first stated that "Ideanomics would like to clarify the status of its one million square feet EV hub. . . ." (Am. Compl. ¶ 124; Kostolampros Ex. 12.)   It then detailed how the total 1 million square feet of the MEG Center would be opening in three phases over time. (*Id.*)

The second press release stated that Ideanomics' Qingdao sales center would be rebranded as the MEG Center by July 1, 2020. (*Id.* ¶ 126.) The Ideanomics Twitter account also tweeted a

link to the press release and attached a photograph of what it purports to be JV certificate between it and an entity known as "Fu Da Automobile Trading Center," which Ideanomics claimed was owned 51% by MEG and utilized a "20,000 square meter property within the Center." (*Id.*) Ideanomics' stock price closed on June 26, 2020 at $1.46. (Kostolampros Decl., ECF No. 88-6, at 3.)

### E. Plaintiff's Investigation into Ideanomics

Finally, in January 2021, Plaintiff's investigators repeatedly visited the site in Qingdao and reported that the MEG Center was still "'under renovation'" and there was a banner depicting, "Coming Soon". (Am. Compl. ¶ 128-29.) Individuals interviewed at the site "indicated that the renovation of the MEC Center has begun only approximately three months prior, and not in the first half of 2020." (*Id.* ¶ 129.) Plaintiff alleges that during this investigation, it learned that the photographs displayed during the May 28 You Tube interview, were actually of the main atrium of a massive complex named Trade City where, in addition to several other businesses, the Fu Da Automobile Trading Center was located. (*Id.* ¶ 152.)

## III.   LEGAL STANDARDS

### a.   Rule 12(b)(6) Failure to State a Claim.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully"; stating a facially plausible claim requires the plaintiff to plead facts that enable the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). The factual

allegations pled must therefore "be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted).[1]

A district court must first review a plaintiff's complaint to identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. The court then considers whether the plaintiff's remaining well-pleaded factual allegations, assumed to be true, "plausibly give rise to an entitlement to relief." *Id.*; *see also Targum v. Citrin Cooperman & Co., LLP*, No. 12 Civ. 6909 (SAS), 2013 WL 6087400, at *3 (S.D.N.Y. Nov. 19, 2013). In deciding the 12(b)(6) motion, the court must also draw all reasonable inferences in the non-moving party's favor. *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 119–20 (2d Cir. 2013).

### b. Rule 9(b) Heightened Pleading Standard and the PSLRA.

Allegations of fraud, including securities fraud, must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b); *see ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. J.P. Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Under Rule 9(b), a complaint alleging securities fraud must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). In particular, "the plaintiff must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir.

---

[1] In deciding a motion to dismiss under Rule 12(b)(6), a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

2004)).  Additionally, the PSLRA expands upon Rule 9(b) by requiring the plaintiff to "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading; and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (internal citation omitted).

### c.   Section 10(b) of the Securities Exchange Act of 1934 and Corresponding Rule 10b-5(b).

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe," 15 U.S.C. § 78j(b); *In re Aphria, Inc. Sec. Litig.*, No. 18 CIV. 11376 (GBD), 2020 WL 5819548, at *7 (S.D.N.Y. Sept. 30, 2020).  Under Rule 10b-5(b), it is unlawful for any person to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading." 17 C.F.R. § 240.10b-5.  To prevail on a Section 10(b) and Rule 10b-5 claim, Plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* (quoting *GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016)). The materiality requirement requires a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *S.E.C. v. Greenstone Holdings, Inc.*, No. 10 CIV. 1302 MGC, 2012 WL 1038570, at *5 (S.D.N.Y. Mar. 28, 2012), *aff'd in part sub nom. Sec. & Exch. Comm'n v. Frohling*, 851 F.3d 132 (2d Cir. 2016).

### d.  Section 20(a)

Section 20(a) of the Exchange Act imposes liability on "[e]very person who, directly or indirectly, controls any person" directly liable under the Exchange Act. 15 U.S.C. § 78t(a).  To establish a prima facie case of control person liability pursuant to Section 20(a), a plaintiff must sufficiently allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI Comma'ns*, 493 F.3d at 108). Further, a plaintiff must demonstrate primary liability under Section 10(b) prior to making out a control person liability claim. *See Rombach*, 355 F.3d at 177–78 ("Because we have already determined that the district court properly dismissed the primary securities claims against the individual defendants, [plaintiffs' control person liability claims] must also be dismissed."). "[A] determination of § 20(a) liability requires an individualized determination of a defendant's control of the primary violator as well as a defendant's particular culpability." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998).

## II.  PLAINTIFF FAILED TO ALLEGE SECURITIES FRAUD

### a.  <u>Material Misstatements</u>

The Exchange Act "requires that the complaint shall specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69 (2d Cir. 2001) (internal quotation marks omitted). Plaintiff cannot merely state that the statements are false or misleading, "they must demonstrate with specificity why and how" they are so. *Rombach*, 355 F.3d at 174. "An allegedly material misstatement must have been false at the time that it was made." *In re Magnum Hunter Res. Corp.*

*Sec. Litig.*, 26 F. Supp. 3d 278, 290 (S.D.N.Y. 2014); *see also In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 392 (S.D.N.Y. 2006). "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (internal quotation marks omitted). "[I]t bears emphasis that § 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, (2011). "Disclosure of an item of information is not required ... simply because it may be relevant or of interest to a reasonable investor." *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir.2002). "Disclosure is required ... only when necessary 'to make statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b–5(b)). *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152–53 (2d Cir. 2013). Statements of literal truth "can become, through their context and manner of presentation, devices which mislead investors." *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir.1990). "Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor[,] may properly be considered a material misrepresentation." *Kleinman*, 706 F.3d at 153 (quoting *McMahan & Co.*, 900 F. 2d at 579).

As outlined above, Plaintiff alleges that Defendants' statements about the size of the MEG Center and its level of operation were false or misleading. Out of several alleged misstatements, Plaintiff's counsel focused this Court on the following statements during oral argument: (1) the MEG Center "has been renovated as a permanent EV expo center," (¶ 97, 139); (2) Ideanomics had "officially launched the largest auto trading market in Qingdao," (¶ 146); (3) the MEG Center "hosts a full suite of car dealer services" "with a capacity of 18,000 vehicles onsite," (¶ 146); (4) the MEG Center "is a one million square foot EV expo center" which had a "soft launch on May

1, 2020" (¶ 146); (5) the MEG Center had "high levels of activity at this early stage" and "solid customer foot traffic." (¶ 154).  Plaintiff also alleges that Defendant Wu's statement that "we're actually opening up a hundred thousand sorry a -a million square feet. . ." was misleading. (¶ 137).

### i.  The J Capital Report, Hindenberg Tweets, and Plaintiff's Own Investigation are Reliable

To establish the falsity of the alleged misstatements, Plaintiff's complaint relies primarily the J Capital report and tweets issued by Hindenberg on June 25, 2020.

As Plaintiff notes, the reliability of an analyst's report is a question of fact. *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 564 (S.D.N.Y. 2012).  Concurrently, as Defendants acknowledge, the case law reflects a particular need for close scrutiny where a short-seller report relied upon by a securities plaintiff itself relies on "confidential" or anonymous sources, without corroboration. . . where courts have found that well-pled independent and particularized facts corroborate those attributed to anonymous sources in short-seller reports, courts have sustained such complaints. *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020).  Under the PSLRA,

> [w]here plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false. Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.

*Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11 CIV. 2700 PKC, 2012 WL 3957916, at *14 (S.D.N.Y. Sept. 10, 2012) (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)).  The J Capital report and Hindenberg tweets meet the PSLRA standard here—albeit slightly.  J Capital's conclusion that its own investigator was "unable to establish that [Ideanomics] has a showroom in Qingdao. . ." is inconclusive — "unable to establish" does not necessarily mean that the facility

does not exist. However, the report includes specific dates (June 23 and 24) on which investigators spoke with representatives of four of the five electronic vehicles buyers Ideanomics contracted with and includes a screenshot of one of those conversations. (Kostolampros Decl. Ex. 9; *cf. Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d at 801 (Complaint's allegations did not corroborate J Capital report statements, there was no date given for when interviews took place, and plaintiff's counsel did no independent investigation.))

The Hindenberg tweet does not describe who the investigators spoke with (only that the conversation was recorded) but the tweet does include a picture of the Qingdao site taken that same week. Finally, Plaintiff's investigation, while conducted seven months after the June 2020 reports, did corroborate the majority of the J Capital and Hindenberg claims.[2]

### ii. The Complaint Plausibly Alleges That Statements Made On May 26, May 28, June 9, And June 11 Were Misleading To the Class

Defendants' statements were not false. For instance, J Capital, Hindenberg, and Plaintiff's investigation did not reveal that the MEG Center in Qingdao had *not* been renovated or undergone a soft launch—they only disclosed that the investigators were unable to confirm those facts. There are a myriad of reasons—other than the MEG Center "did not exist"—for why other store owners at the Qingdao site may not have heard of the EV hub. (Pl. Opp. at 15.) That the first half of 2020 happened to be the start of a global pandemic is just one of them. Plaintiff did not allege that no "soft launch occurred on May 1, 2020" nor do the report, tweets, or their investigation purport that some other auto center was actually the "largest auto trading market in Qingdao". (Am. Compl. ¶¶ 135, 142, 146.) Moreover, the "MEG Center is a one million square foot EV expo center" is not false. (*Id.* ¶ 146.) Defendants do not purport that the MEG Center was *fully operational* in all

---

[2] The fact that seven months later Plaintiff's investigators still found the site "under renovation" with "Coming Soon" signage further supports reliability.

one million square feet of the Qingdao site. (Transcript of Oral Argument, dated Oct. 12, 2021, ("OA Tr."), ECF No. 106, 13: 20-21, 37:9-44:19.)

Further, many of the statements made on March 16 during the earnings call ("will be vehicles on the site", "will be multiple manufacturers", "will be a friendly competitive environment"), in the March 20 press release ("will be joined at the site by more than 20 partners") and on May 11 in the 10-Q ("[t]he Company anticipates that its MEG business unit will be the largest contributor to revenues in 2020") are inactionable forward-looking statements. (*Id.* ¶ 139, 141.)

However, some of the Defendants statements were, as Plaintiff argues, misleading when read in context. *See In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 759 (S.D.N.Y. 2017) ("To be sure, these statements were not literally false. . . [h]owever, the SAC validly alleges that each filing was misleading. . . .").

First, accepting Plaintiff's allegations as true[3], Defendants May 26th statements ("[MEG]. . . has officially launched the largest auto trading market in Qingdao at MEG's Qingdao EV hub", "now hosts a full suite of car dealer services for new energy and used cars with a capacity of 18,000 vehicles onsite", "attracts a large audience which MEG will leverage" (*Id.* ¶ 146)) could mislead an investor to believe that the MEG center was operating, producing, and servicing at a larger scale than it actual was at the time. It is plausible that in March, April, and early May 2020, an investor believed Defendants had only partially launched the MEG Center based on Defendants forward-looking, anticipatory statements. (*Id.* ¶ 139, 141.) But that on May 26, 2020, the MEG Center had "officially launched" (¶146); *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d

---

[3] For example, "no trace of an Ideanomics or MEG Center bustling with EV business" (Am. Compl. ¶ 26), that Defendants had grossly misrepresented the MEG Center and its supposed ability to provide revenues for Ideanomics (*Id.*), and that "all promotional signage on site describing the MEG Center stated it was "Coming Soon" (*Id.* ¶ 132).

120, 137-141 (S.D.N.Y. 2021) (Defendant's claim, that it had "no visibility" into its' client's diverted funds, when "taken together" with Plaintiff's claims, that Defendant was the only underwriter of the client, had access to its financials, and engaged in discussions about the funds, was an actionable misstatement.)

Second, Defendant Poor's May 28th statement made during a YouTube interview is potentially misleading:

> We did a soft launch on May the 1st which we started selling vehicles outside. *We were able to expand that this week and then this past Monday, we officially opened up a large center for both used cars and new EV vehicles.* So both of those are up and running. That's because Qingdao was able to relax its social distancing measures over the last weekend. We will be doing an official ribbon cutting in around a month, six weeks' time in which we'll be able to showcase the actual official opening and all the participating EV manufacturers. (¶149) (emphasis added).

This statement, particularly the italicized sentence, differentiates between what existed on May 1, 2020 and what existed on May 28, 2020. A reasonable investor could plausibly believe that by the end of May, the MEG Center had "expanded", "officially opened", and was "up and running." *In re Alstom SA*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005) ("The omission of adequate disclosure of the loan financing "affirmatively creat[ed] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]," and therefore it is actionable.") Plaintiff's allegation that the pictures Defendants included in the May 28th YouTube interview were taken in 2018 with "MEG" superimposed on them further plausibly alleges the misleading nature of May 26th and May 28th statements.

The third potentially misleading statement was that the MEG Center had "high levels of activity at this early stage" and "solid customer foot traffic" in the June 9, 2020 press release.

Plaintiff's plausibly use J Capital, Hindenberg, and their own investigation to allege the misleading nature of this statement.

Finally, Defendant Poor's June 11, 2020 statement ("we did a soft launch the beginning of May and then an official launch of our Qingdao EV hub towards later in May and it's been a very big success." (Am. Compl. ¶ 156)) differentiated between the early May soft launch and the official launch in later May.  Thus, the statements made about the MEG Center on May 26, May 28, June 9, and June 11 are actionable under Section 10(b).

### b.  Scienter

Plaintiff has failed to allege scienter for all Defendants.  "A strong inference of fraudulent intent may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. Importantly, an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, No. 19-CV-8720 (AJN), 2021 WL 4481119, at *4 (S.D.N.Y. Sept. 30, 2021).

### i.  Motive and Opportunity

"A complaint has sufficiently alleged motive and opportunity to commit fraud if it pleads facts showing that the defendant benefited in some concrete and personal way from the purported fraud . . . While [t]he opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer, general motives common to most corporate officers do not constitute motive for the purpose of establishing scienter. Therefore, the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation do not suffice to establish a motive." *Francisco v. Abengoa, S.A.*, No. 15 CIV. 6279 (ER), 2021 WL

4136899, at *22 (S.D.N.Y. Sept. 10, 2021).  "Motive is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit."  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).

Here, Plaintiff only provides specific motive allegations against Defendant Wu.  (Am. Compl. ¶¶ 171, 184-85.)  Plaintiff alleges that Defendant Wu was the largest stockholder with at least a 21% stake in Ideanomics and that he and his affiliates loaded Ideanomics with millions of dollars in exchange for convertible debt.  (*Id.* 171, 184.)  Plaintiff asserts that on June 5, 2020, Defendant Wu and his affiliates converted their debt into equity at only $0.59 a share—a few days before the June 9, 2020 press release.

Those allegations are insufficient to plead motive and opportunity because Plaintiff does not allege that Defendant Wu sold his Ideanomics stock before the J Capital and Hindenberg publications and realized a profit.  Thus, no alleged facts show that Defendant Wu "benefited in some concrete and personal way" from the alleged misstatements.  As for Plaintiff's claims that a NASDAQ delisting motivated the Defendants, "the general desire to maintain a high credit rating or make a company appear attractive to potential buyers may be 'too thin a reed on which to hang an inference of scienter.'"  *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 894 (8th Cir. 2002). Details outlined by Defendants regarding the extension of the delisting timeline and specifics of the Yorkville Advisors Equity Agreement (Defs' Reply Br. at 8-9) further buttress the insufficiency.[4]

### ii.  Conscious Misbehavior and Recklessness

"In order to establish scienter under the conscious misbehavior or recklessness theory, Plaintiff "must show conduct by defendants that is at the least highly unreasonable and which

---

[4] During oral argument on Defendants' motions to dismiss, Plaintiff's counsel even noted that "[t]his is not a case where we're primarily relying on motive and financial motives."  (OA Tr. at 67:3-4.)

represents an extreme departure from the standards of ordinary care to the extent that the danger

was either known to the defendant or so obvious that the defendant must have been aware of it . .

. To the extent that plaintiffs assert that defendants had access to contrary facts, the complaint must

"specifically identify the reports or statements containing that information. Recklessness in the

scienter context [, however,] cannot be merely enhanced negligence. Moreover,

> unlike statements about historical facts, in which the scienter inquiry
> focuses on whether the defendants "knew facts or had access to information
> suggesting that their public statements were not accurate" or "failed to check
> information they had a duty to monitor," the recklessness inquiry as to forward-
> looking projections focuses on whether the defendants knew at the time they
> made these projections that they were unrealistic or unlikely to come true."

*Francisco v. Abengoa, S.A.*, No. 15 CIV. 6279 (ER), 2021 WL 4136899, at *22 (S.D.N.Y.

Sept. 10, 2021).

Overall, Plaintiff contents that Defendants must have known about the current status of the

MEG Center and that it differed from what they told investors. (Pl. Opp. at 32.) Plaintiff argues

that Defendants "'ignored signs of fraud'" in publishing "2020 Ideanomics" stamped photographs

that had been taken in 2018. (*Id.* at 33.) The MEG Center, Plaintiff asserts, was part of

Defendants' core operations and "effectively the only revenue-producing segment in the

Company." (*Id.* at 34.)

Even in conjunction, these allegations are insufficient. To begin, outside of Defendant Wu

and his motive, Plaintiff's allegations for the other Individual Defendants are wholly insufficient.

That the Individual Defendants were top officers at Ideanomics is of no matter as "it is practically

hornbook law that "accusations" such as these, which are "founded on nothing more than a

defendant's corporate position[,] are entitled to no weight." *In re Rockwell Med., Inc. Sec. Litig.*,

No. 16 CIV. 1691 (RJS), 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (citations omitted);

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006). Absent from the complaint are "concrete allegations" as to each Individual Defendants' particular knowledge of the MEG Center status. Plaintiff has not alleged any specific reports, or alleged that any Individual Defendant had access to a report, that outline the MEG Center status. *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) ("[T]hey have not specifically identified any reports or statements that would have come to light in a reasonable investigation and that would have demonstrated the falsity of the allegedly misleading statements."); *cf. Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019) (Scienter adequately alleged because "[p]laintiffs have pointed to specific numbers in CEO Call slide decks throughout the Class Period and alleged that Defendants reviewed them. Moreover, Plaintiffs enumerate statements by each Individual Defendant regarding channel inventory.")

Even if Plaintiff had included the requisite specifics for each Individual Defendant, releasing the 2018 photographs did not give rise to a strong inference of scienter—the photographs were not, for example, of a wholly different EV site or location and, as Defendants explained in their July 26th press release, the Fu Da Automobile Trading Center had been at the location since 2018 and was in a joint venture with Ideanomics. (Kostolampros Decl. Ex. 13; *see Metzler Asset Mgmt. GmbH v. Kingsley*, 928 F.3d 151, 163 (1st Cir. 2019) (Failure to correct previously misleading statements was insufficient "to create the 'strong inference' of scienter".)) Finally, that the MEG center was "asserted to be the main contributor or revenues for Ideanomics in 2020" falls short of alleging scienter. (Am. Compl. ¶ 176; *Behrendsen v. Yangtze River Port & Logistics Ltd.*, No. 19CV00024DLILB, 2021 WL 2646353, at *12 (E.D.N.Y. June 28, 2021) ("Absent

allegations that independently give rise to a strong inference of scienter . . . [Plaintiff] cannot rely on the core operations doctrine to establish scienter.") (citation omitted)).

### c. <u>Causation</u>

Plaintiff has failed to adequately allege loss causation. To establish loss causation, a plaintiff must allege ... that the subject of the fraudulent statement or omission was the cause of the actual loss suffered. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005) (quotations omitted). A corrective disclosure will "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint. . . ." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010). The "plaintiff must allege that when truthful word revealing the falsity of defendant's representation reached the public, the market reacted negatively causing plaintiff to suffer an injury." *In re Winstar Commc'ns*, No. 01 CV 11522, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006). "A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions." *Zhong Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164, 177 (E.D.N.Y. 2019).

The J Capital and Hindenberg reports were not corrective disclosures. Neither short seller report revealed a *fact* previously undisclosed in the four misleading statements made on May 26, May 28, June 9, and June 11. They only disclosed that investigators were "unable to establish" the Ideanomics showroom existed in Qingdao and that individuals at the site had not heard of Ideanomics or MEG. (Am. Compl. ¶¶ 117, 120.) Those are not facts. If anything, the only ascertainable fact would be that Defendants' photograph of the Qingdao site was from 2018—not 2020—with 'MEG' superimposed. However, assuming this was a corrective disclosure, the causal connection between this and the stock price decline is too attenuated because the complaint does not detail reliance on the photo being from 2020 and including 'MEG' and thus cannot allege that

the photograph's 2020 depiction caused the dip in stock price.[5]  Plaintiff has not adequately alleged

that the photograph being from 2018, not 2020, was a "but-for cause or cause-in-fact of the losses

suffered".  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d at 510.  Further, by the close of June 29,

2020, the stock price rose above $2 and stayed over $2 until July 1, 2020 closing at $1.725.

Plaintiff provides no explanation for this upward fluctuation just four days after the J Capital and

Hindenberg publications.  *See In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 103 (S.D.N.Y.

2011) (Plaintiff's failure to address a rebound in stock price after the alleged corrective disclosure

rendered their loss causation allegation implausible.)

### d.  **20(a)**

Absent a primary violation of the securities laws, Plaintiff's claim for control person

liability against the Individual Defendants also fails.  *Porwal v. Ballard Power Sys.*, Inc., No. 18

CIV. 1137 (GBD), 2019 WL 1510707, at *10 (S.D.N.Y. Mar. 21, 2019).

## III.   CONCLUSION

Defendants' motions to dismiss, ECF Nos. 85 & 87, are GRANTED.  The Clerk of Court

is directed to close the motions accordingly.[6]

Dated: New York, New York
      March 15, 2022

SO ORDERED.

*George B. Daniels*

GEORGE B. DANIELS

United States District Judge

---

[5] On June 24, 2020, the day before the J Capital and Hindenberg publications, the stock price was $3.09.
By the close of June 25, it was $2.44 and by June 26, it was $1.46.

[6] Plaintiff may seek leave to amend the Consolidated Amended Complaint, by letter application with a
proposed amended complaint attached, within thirty (30) days of this decision.