KESSLERTOPAZ
MELTZERCHECK LLP

ATTORNEYS AT LAW

May 5, 2022

**VIA ECF**

The Hon. George B. Daniels
United States District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

Re:   *In re Ideanomics, Inc. Securities Litigation*, Case No. 1:20-cv-04944-GBD-OTW
      <u>Letter in Further Support of Application for Leave to File Second Amended
      Complaint</u>

Dear Judge Daniels:

We write on behalf of Lead Plaintiff Rene Aghajanian ("Plaintiff") in further support of Plaintiff's Letter Application for Leave to File Second Amended Complaint (ECF No. 109, "Application"). The Application sought leave to file the proposed Consolidated Second Amended Complaint (ECF No. 109-1, "SAC"), and demonstrated how the SAC cured each of the pleading deficiencies identified in this Court's March 15, 2022 Memorandum Decision & Order (ECF No. 108, "Order"). Defendants'[1] letters opposing the Application (ECF No. 111, "IDEX Ltr."; ECF No. 110, "Wu Ltr.") fail to articulate why leave to amend should not be "freely given" here, *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008),[2] and in fact, demonstrate that any dismissal motion under Federal Rule of Civil Procedure 12(b)(6) would be unsuccessful, supporting leave to amend. *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 122 (2d Cir. 2012) (vacating denial of motion to amend where there was "little difficulty concluding" that amendment adequately alleged claim).

### A.   <u>The SAC Pleads a Strong Inference of Scienter</u>

Defendants argue that none of the SAC's new allegations, standing alone, gives rise to an inference of scienter. IDEX Ltr. at 2-4; Wu Ltr. at 3-4. But this urges an improper analysis. The question before the Court is, instead: "When the allegations [in the SAC] are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as

---

[1] Defendants are Ideanomics, Inc. ("Ideanomics" or the "Company"), and Alfred Poor ("Poor"), Bruno Wu ("Wu"), and Anthony Sklar ("Individual Defendants"). Unless otherwise noted, all emphasis is added, and internal citations and quotations are omitted.

[2] Defendants incorrectly suggest a "more exacting" standard applies to post-dismissal amendments, IDEX Ltr. at 2, but this standard only applies if a plaintiff "waited until after judgment before requesting leave." *In re Gildan Activewear, Inc. Sec. Litig.*, 2009 WL 4544287, at *3 (S.D.N.Y. Dec. 4, 2009) ("District courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b).").

280 King of Prussia Road, Radnor, Pennsylvania 19087   T. 610-667-7706   F. 610-667-7056   info@ktmc.com
One Sansome Street, Suite 1850, San Francisco, California 94104   T. 415-400-3000   F. 415-400-3001   info@ktmc.com
WWW.KTMC.COM

May 5, 2022
Page 2



any opposing inference?"  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 326 (2007). Here, the inference of scienter is the **only** plausible one.  As this Court found, in May and June 2020, Defendants made numerous public statements about the so-called MEG Center that "could mislead an investor to believe that [it] was operating, producing, and servicing at a larger scale than it actual[ly] was at the time."  Order at 14-17; *see, e.g.*, SAC ¶¶ 107, 115, 119 (MEG Center had "**officially launched**," "**officially opened**," was "**up and running**," and had "**high levels of activity**"); *id.* ¶¶ 108, 114, 119 (accompanying digitally-altered photographs that were misdated and mislabeled, *inter alia*, "**MEG Center Vehicle Display May 2020**"); *see also id.* ¶¶ 123, 170-88.  In truth, Ideanomics's purported "one million square foot EV expo center" was nothing more than a "shopping mall . . . in financial distress" that was "operated by almost 100 sales groups," with no evidence of the activities described in Defendants' statements occurring as late as January 2021.  *Id.* ¶¶ 138, 141, 156-63, 171-72.  Further, as the Company ultimately admitted in late June 2020, the MEG Center was in "Phase I" of development, and the much-touted "official opening" **had yet to occur**.  *Id.* ¶ 145; *see also id.* ¶ 147.  Defendants have also admitted that the photographs they repeatedly disseminated to the market did not accurately depict the MEG Center as it appeared in May 2020, notwithstanding their false dates and captions.  ECF No. 89 at 15-16.

In light of the SAC's new allegations, there is overwhelming support for the inference that Defendants had "knowledge of facts or access to information contradicting their public statements," and therefore "knew or, more importantly, should have known that they were misrepresenting material facts."  *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).

**<u>Defendants' Direct Knowledge or Access to Information</u>**.  Defendants Wu and Poor had first-hand knowledge of the current operational status of the MEG Center.  As newly alleged in the SAC, in November 2019 and March 2020, Poor touted **personally visiting** the MEG Center, along with "[s]everal" of Ideanomics's approximately sixty executives and employees.  SAC ¶¶ 92, 99, 191, 210.  Poor also described "**key meetings in China**" in a September 2019 press release discussing the MEG division.  *Id.* ¶ 90.  A Company press release on November 27, 2019 featured a photograph of Wu meeting with officials in Qingdao in connection with negotiations regarding MEG Center economic incentives.  *Id.* ¶¶ 93-94, 191.  In his statements, Poor reported on the current state of the facility based on his visits, *see, e.g.*, *id.* ¶ 99 ("**The building is mostly finished**."), and on May 11, 2020, Poor described "**strategic discussions [that] continue on a daily basis with Qingdao officials**" and emphasized that "sales derived from our hub in Qingdao" were Ideanomics's "**main priority**."  *Id.* ¶¶ 105, 192.

Defendants brush aside these new allegations as not being relevant to Poor's and Wu's state of mind at the time Defendants issued their statements and the accompanying false depictions of the current state of the MEG Center, arguing that Poor's statements occurred prior to the Class Period (as defined in the SAC) and "do not relate to the actual operational status of the facility." IDEX Ltr. at 2-3.  Similarly, Wu argues his pre-Class Period visit to Qingdao does not establish he "ever visited the MEG Center."  Wu Ltr. at 3.  Contrary to Defendants' implausible arguments, the SAC's "concrete allegations" showing Poor's and Wu's active personal involvement in the development and operations of the MEG Center in 2019 and 2020 establish, at a minimum, Poor's

May 5, 2022
Page 3



and Wu's "particular knowledge of the MEG Center status" during the Class Period. Order at 20. Indeed, these are precisely the type of facts from which courts in this Circuit (including this Court) regularly infer scienter. *See, e.g.*, *In re Aphria, Inc. Sec. Litig.*, 2020 WL 5819548, at *3, *8-9 (S.D.N.Y. Sept. 30, 2020) (scienter adequately pled for statement that "Marigold is fully operational[]" based in part on defendants' site visit **five months** earlier and "meeting with local authorized representatives") (alteration in original)[3]; *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 472 (S.D.N.Y. 2013) (pre-class period statements reflecting knowledge of undisclosed plan "render[ed] [defendants'] repeated [statements] during the [c]lass [p]eriod . . . knowingly or recklessly false"); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (pre-class period sales data "establish[ed] that at the start of the class period, defendants had a basis for knowing" about likely sales declines).

Defendants disregard the SAC's allegations that, during the Class Period, they repeatedly provided specific descriptions of the current state of the MEG Center's purported operations, and professed to have specific personal knowledge about the current state of the Company's operations at the MEG Center. SAC ¶¶ 193-96. This further shows Defendants' knowledge or recklessness. *See, e.g.*, *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 552-53 (S.D.N.Y. 2017) (scienter pled where defendants spoke "extensively" about subject of misstatements); *Plumbers & Pipefitters Local Union No. 630 Pension–Annuity Tr. Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 491 (S.D.N.Y. 2010) (executive who expressed familiarity with and was the "primary person who spoke about" an issue, "was at least reckless in speaking so positively"); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 239 (S.D.N.Y. 2010) (similar). Defendants make no attempt to distinguish these cases, which demonstrate that the SAC is not futile. Similarly, Wu's efforts to disclaim any knowledge concerning the MEG Center cannot be squared with the SAC. Wu Ltr. at 4. Unlike the outside directors in *One Communications Corp. v. JP Morgan SBIC LLC*, 381 F. App'x 75 (2d Cir. 2010), prior to the Class Period, Wu personally made statements promoting the MEG Center, visited Qingdao, and met with officials, and during the Class Period, he **described the current levels of activity at the site**. SAC ¶¶ 93, 100, 119, 181-82, 191. The Company also explained that "Dr. Wu spends significant time with Ideanomics and is **highly active in our management**," as evidenced by a "**5-hr strategy session**" between Wu and Poor in June 2020. *Id.* ¶¶ 130, 215. These non-conclusory allegations are more than sufficient to infer Poor's and Wu's access to information concerning the MEG Center, and as explained in the Application, cure the pleading deficiencies the Court previously identified with regard to specific facts available to the Individual Defendants that contradicted Defendants' public statements.[4]

---

[3] In addition to virtually identical allegations concerning defendants' statements, site visits, and meetings with local officials, as in the SAC, the *Aphria* complaint alleged that defendants had access to financial data and forecasts for the company's overseas assets, and that a post-class investigation "showed that the [Marigold] building was empty or under repair, and not occupied by Aphria," which supported an inference of scienter. 2020 WL 5819548, at *3-5; *compare id. with* SAC ¶ 101 (Defendants describing "run rate" of existing revenues at Qingdao facility) and *id.* ¶¶ 156-63 (Plaintiff's investigation revealed that the MEG Center was "COMING SOON" as of January 2021).

[4] These facts also establish Wu's control of Ideanomics and culpable participation under Section 20(a). 15 U.S.C. § 78t(a); *see In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 216 (S.D.N.Y. 2019).

May 5, 2022
Page 4



**Defendants' Admitted Publication of Misleading Photographs**.  The SAC pleads that on ***three separate occasions***, Defendants published doctored photographs that did not depict the current state of the MEG Center, and which included blatantly misleading captions that were designed to dupe investors, SAC ¶¶ 107-09, 113-15, 119-20, 171-73, 176-78, 181-83, 197-99, and that did so, *id.* ¶¶ 110-12, 133-134.  Defendants gloss over these allegations, IDEX Ltr. at 3; Wu Ltr. at 3-4, but are forced to admit these images did not accurately depict the MEG Center.  IDEX Ltr. at 4.[5]

The Court previously found that Defendants' publication of the images and related statements were "plausibly allege[d]" to be misleading, but held that Plaintiff alleged insufficient facts from which the Court could infer that the Individual Defendants published these images with knowledge of their falsity.  Order at 16, 19.  Given the SAC's new allegations concerning the images' false captions, SAC ¶¶ 107-09, 113-15, 119-20, the Court can now infer that Defendants acted at least recklessly in repeatedly publishing these misleading photographs alongside statements and presentations from Poor, Wu and Ideanomics.  *See SEC v. StratoComm Corp.*, 2 F. Supp. 3d 240, 251, 259-60 (N.D.N.Y. 2014), *aff'd* 652 F. App'x 35 (2d Cir. 2016) (inferring scienter where statements "expansively described, in the present tense" the company's systems, and included "pictures and artist's renderings . . . presented in a manner suggesting that they represented existing . . . systems," but were "indisputably false and misleading" because defendants "conceded" the images did not depict current systems).  Even if, as Defendants argue, the images were not of a "wholly different" site, IDEX Ltr. at 3, but were digitally-altered images from ***two years earlier***, publishing the misleading images still gives rise to an inference of scienter because the most plausible inference to be drawn from these alleged facts is that Defendants intended to wrongly convey to the market that the MEG Center was at a more advanced stage of development than it actually was.  *See SEC v. N. Am. Rsch. & Dev. Corp.*, 375 F. Supp. 465, 470-71 (S.D.N.Y. 1974), *aff'd*, 511 F.2d 1217 (2d Cir. 1975) (defendants acted with scienter by publishing photographs labeled "Scenes of Pilot Plant" that "conveyed the false impression that the plant was in operation in July 1967," when in truth "the pilot plant had not been operated since 1964"); *SEC v. Cook*, 2015 WL 5022152, at *21 (S.D. Ind. Aug. 24, 2015) (finding scienter based on misdating of photographs of purported "business premises" on company website).  Indeed, Defendants' alteration of the photographs was particularly reckless here:  Defendants' statements, including Wu's June 9, 2020 statement, were made during "the start of a global pandemic," Order at 14, and highlighted the "loosened restrictions on business activities in early May" that purportedly "allowed [the MEG Center] to open fully after COVID-19 lockdown measures were eased in Qingdao."  SAC ¶¶ 145, 181.  Under these circumstances, Defendants knew or recklessly disregarded that images from 2018 would mislead investors as to the status of the MEG Center in May 2020.[6]

---

[5] Wu argues that the SAC fails to allege that he "ever saw . . . any photograph" in the June 9, 2020 press release.  Wu Ltr. at 4.  However, given his "***highly active***" role in the Company's operations, SAC ¶ 215, the Court may "presume" that Wu exercised "joint authority to make" the statements in the June 9, 2020 press release, including the doctored image.  *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012).

[6] Ideanomics fails to address the SAC's allegations that its publication of admittedly doctored, misdated, and mislabeled photographs in its May 26, 2020 and June 9, 2020 press releases independently gives rise to an inference

May 5, 2022
Page 5



**Defendants' Response to the Short-Seller Reports**.  The SAC newly alleges that following the revelations by J Capital and Hindenburg and Defendants' failure to deny the allegations concerning the doctored images, Defendants engaged in a concerted effort to placate the market, which further supports an inference of scienter.  SAC ¶¶ 140-47, 204-09.  On June 28, 2020, Poor posted additional photographs to Twitter purporting to show the *outside* of the MEG Center, which Hindenburg debunked as fraudulent, and on June 29, 2020, Ideanomics issued a press release that sought to "Refute[e] [the] Claims Made by Short-Selling Companies," which was also silent as to the doctored images.  *Id.* ¶¶ 151-54.  Defendants argue that the short-sellers challenged "the very existence" of the MEG Center, and that their post-Class Period efforts were "focused on challenging those allegations."  IDEX Ltr. at 4.  But this is inconsistent with the SAC, which alleges that the core claim by the short-sellers was that Defendants misrepresented the current state of the MEG Center *including* by publishing "doctored photographs."  SAC ¶ 149; *see also id.* ¶¶ 138, 140-41, 152.  Regardless of their motivations, Defendants' efforts to mollify investors through partial denials and misdirection supports an inference that they knew or recklessly disregarded that their statements were false when made.[7]

**Ideanomics's Sudden Abandonment of the MEG Center**.  After aggressively promoting the MEG Center during the Class Period, Ideanomics abruptly scrubbed any reference to the facility and its ongoing development thereafter.  SAC ¶¶ 164-69.  It requires no "inferential leap," IDEX Ltr. at 4, to conclude that the Company's silence was because the facility was not "operating, producing, and servicing" at the level Defendants claimed during the Class Period.  Order at 15.

Taken collectively, the SAC's allegations, old and new, readily plead a strong inference of scienter.  *Tellabs*, 551 U.S. at 322-23.  Defendants repeatedly over-hyped and misrepresented the Company's only potential source of revenue in an effort to inflate the Company's stock price and stave off delisting.  SAC ¶¶ 71-87, 121-24, 131-32, 189, 218-20; *see Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012).  Defendants, tellingly, fail to suggest *any* non-culpable explanation for their repeated misleading statements, including their dissemination of admittedly inaccurate images.  The SAC's scienter allegations are not futile.

---

of corporate scienter.  SAC ¶ 199; *see Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020).  At a minimum, the Court may infer "that someone whose intent is attributable to [Ideanomics] was, at the least, reckless in failing to recognize the risks" that the photographs would mislead investors.  *Citigroup*, 753 F. Supp. 2d at 237.

[7] Defendants fail to distinguish Plaintiff's cited cases, *see* IDEX Ltr. at 4 n.3, which hold that Defendants' efforts "to placate the market" and "obstruct the [short-seller's] investigation[s]" support an inference of scienter.  *Fresno*, 268 F. Supp. 3d at 552; *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 274 (S.D.N.Y. 2008).

May 5, 2022
Page 6



## B.    The SAC Adequately Pleads Loss Causation

Defendants misconstrue the Court's Order and the SAC's loss causation allegations, arguing that the SAC "fails to address the Court's finding that the reports by the short sellers . . . are not corrective disclosures." IDEX Ltr. at 5; *see also* Wu Ltr. at 4-5. However, the Court did not foreclose any finding that the short-seller reports or Defendants' response thereto could constitute corrective disclosures. Rather, the Court found that the short-sellers revealed an "***ascertainable fact***," i.e., "that Defendants' photograph of the Qingdao site was from 2018—not 2020—with 'MEG' superimposed," which preceded the stock price declines on June 25, 2020 and June 26, 2020. Order at 21-22, 22 n.5. The only deficiency, according to the Court, was that "the complaint does not detail reliance on the photo being from 2020 and including 'MEG'" and therefore the "causal connection between this and the stock price decline is too attenuated." *Id.* at 21. The SAC's new allegations fully remedy this deficiency.

*First*, while not required at this stage, *Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 172 (2d Cir. 2005), the SAC specifically pleads the market's reliance on Defendants' photographs and accompanying inaccurate descriptions of the MEG Center, including market commentary attributing the rise in Ideanomics's stock price to Defendants' statements and images. SAC ¶¶ 110-12, 122, 133-34.[8] *Second*, the SAC alleges that on June 25, 2020, Hindenburg demonstrated through a series of tweets that the photograph contained in the Company's June 9, 2020 press release (and in Poor's May 28, 2020 interview) was a doctored image from 2018, and specifically cited the image's caption that "***lists a date of May 2020***" in support of its claim that the MEG Center was an "egregious & obvious fraud." *Id.* ¶¶ 140-41. *Third*, the SAC cites market commentary attributing the decline in Ideanomics's stock price on June 25, 2020 and June 26, 2020 to the short-sellers' allegations that "***accused the company of using two-year-old photos . . . and photoshopped promotional material***," and to Defendants' efforts "***to refute Hindenburg's short-seller report accusing the company of doctoring press release photos***." *Id.* ¶ 149. These new allegations plead "that the photograph being from 2018, not 2020" was the linchpin of the revelation of Defendants' misrepresentations about the MEG Center, i.e, a 'but-for cause . . . of the losses suffered." Order at 22. They amply satisfy Plaintiff's burden to plead that "the *subject* of the fraudulent statement or omission was the cause of the actual loss." *Lentell*, 396 F.3d at 173 (emphasis in original). Defendants' suggestion that the SAC's loss causation allegations are "circular," rely solely on the stock price decline, or fail to sufficiently link the corrective disclosures to the subject of Defendants' statements, IDEX Ltr. at 5; *see also* Wu Ltr. at 5, simply ignore the SAC's new allegations.[9] Likewise, Defendants' claim that the short-sellers made other allegations against the Company is irrelevant, since the SAC need only support a "reasonable

---

[8] Defendants claim that some of these sources are "non-mainstream." IDEX Ltr. at 5. This ignores that Defendants utilized these same channels to communicate with investors. *See* SAC ¶¶ 110, 113-16, 130, 142-44, 151.

[9] Wu's argument that the SAC does not "connect[] the short seller reports" to his June 9, 2020 statement, Wu Ltr. at 5, ignores that in accusing Defendants of fraud on June 25, 2020, Hindenburg cited the June 9, 2020 press release that included Wu's statement "tout[ing] the launch of [Ideanomics's] MEG EV sales center." SAC ¶ 140.

May 5, 2022
Page 7



inference that some part of the decline was substantially caused by the disclosures about the fraud itself." *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 162 (2d Cir. 2012).

*Finally*, the SAC plausibly explains the two-day, partial recovery in Ideanomics's stock price in the week after the corrective disclosures. *See* SAC ¶¶ 151, 154-55, 249. Contrary to Defendants' convoluted alternative explanation, IDEX Ltr. at 6, the SAC plausibly pleads that the short-lived increase in the Company's stock price on June 29, 2020 and June 30, 2020 was attributable to Defendants' statements attempting to refute the short-sellers' allegations, and that the resumed, extended decline beginning on July 1, 2020 reflected the market's recognition that the MEG Center was not what Defendants had claimed during the Class Period. SAC ¶¶ 155, 249.

We thank Your Honor for the Court's attention to this matter.

Respectfully submitted,

*S/ Sharan Nirmul*
Sharan Nirmul

cc: All Counsel of Record (via ECF)