UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------- x

IN RE IDEANOMICS, INC. SECURITIES       :
LITIGATION                              :
                                        :
                                        :
                                        :    MEMORANDUM DECISION &
                                        :         ORDER
                                        :
                                        :    20 Civ. 4944 (GBD)
                                        :
--------------------------------------- x

GEORGE B. DANIELS, United States District Judge:

## I.   INTRODUCTION

Lead Plaintiff Rene Aghajanian brought this action against Defendants Ideanomics, Inc.,

Alfred Poor, Anthony Sklar, and Bruno Wu pursuant to Section 10(b) of the Securities Exchange

Act of 1934, and Rule 10b-5(b) promulgated thereunder, and Section 20(a). (*See* First

Consolidated Amended Complaint ("FAC"), ECF No. 78.)  Before this Court is Plaintiffs' letter

motion for leave to file a Second Amended Complaint, which is hereby DENIED.[1]

## II.   FACTUAL AND PROCEDURAL BACKGROUND[2]

Plaintiffs brought this class action on behalf of all investors (the "Class") who purchased

or otherwise acquired Ideanomics' common stock between March 16, 2020 and June 25, 2020,

---

[1] For ease of reference, this Court refers to Plaintiffs' memorandum of law in support of their motion for leave to file a Second Amended Complaint as "Pl. Letter," (ECF No. 109), to Plaintiffs' Proposed Second Amended Complaint as "PSAC" (ECF No. 109, Ex. 2), to Defendants Ideanomics, Poor, and Sklar's letter in opposition to Plaintiffs' application as "Ideanomics Opp." (ECF No. 111), to Defendant Wu's letter in opposition to Plaintiffs' application as "Wu Opp." (ECF No. 110), and to Plaintiffs' reply in support of their application for leave to file a second amended complaint as "Pl. Reply." (ECF No. 112.)

[2] The relevant factual and procedural background is set forth in greater detail in this Court's March 15, 2022 Memorandum Decision and Order ("Order"), (ECF No. 108), which is incorporated by reference herein.

1

inclusive (the "Class Period"). (*Id.* ¶ 1.) Defendants moved to dismiss Plaintiffs' First Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure ("FRCP") Rule 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b) (ECF Nos. 85, 87). Following oral argument, this Court dismissed Plaintiffs' First Amended Complaint for failure to state a claim pursuant to FRCP Rule 12(b)(6) and the PSLRA. (March 15, 2022 Memorandum Decision and Order on Defendant's Motion to Dismiss ("Order"), (ECF. No. 108 at 17, 21–22.)) Plaintiffs were permitted to seek leave to amend by letter application. (Order at 22.) Plaintiffs subsequently submitted a Proposed Second Amended Complaint ("PSAC") (ECF No. 109, Ex. 2). Defendants filed multiple letters in opposition to Plaintiffs' application for leave to file a second amended complaint (ECF Nos. 110–12.)

### III.   LEGAL STANDARD

The decision whether to grant or deny a motion for leave to amend a complaint is within "the sound discretion of the court," *O'Hara v. Weeks Marine, Inc.*, 294 F.3d 55, 70 (2d Cir. 2002) (citation omitted), although leave to amend should be "freely give[n] when justice so requires." Fed. R. Civ. P. 15(a). In determining whether leave to amend should be granted, courts consider whether the proposed amendment would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Grace v. Rosenstock*, 228 F.3d 40, 53 (2d Cir. 2000). "An amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1955 (2007)). The

2

plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A facially plausible claim pleads facts that enable the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). The factual allegations pled must therefore "be enough to raise a right to relief above the speculative level." *Twombly*, 127 S. Ct. at 1965 (citation omitted). [3]

Leave to amend should be denied where a plaintiff's proposed revisions "are essentially recharacterizations of the claims in the first amended complaint, and, thus, would suffer from the same defects as those claims." *Lehmann v. Ohr Pharm. Inc.*, No. 18 Civ. 1284 (LAP), 2020 WL 6729116, at *3 (S.D.N.Y. Nov. 16, 2020), *aff'd*, No. 20-4185-CV, 2021 WL 5986761 (2d Cir. Dec. 16, 2021) (citation omitted). Denial of a motion seeking leave to amend is appropriate where the "proposed amendments are merely recycled versions of claims which have already fallen victim to a motion to dismiss." *Lehmann*, 2020 WL 6729116, at *3 (citing *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007)) (brackets omitted).

### IV.   PLAINTIFFS FAIL TO ALLEGE SECURITIES FRAUD

#### a.   Plaintiffs Fail to Plausibly Allege Scienter

"To state a claim under Rule 10b–5 for misrepresentations, a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI Commc'ns, Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007) (citation omitted). This Court found that although Plaintiffs may have

---

[3] In deciding a motion to dismiss under Rule 12(b)(6), this Court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

plausibly alleged that Defendants' statements on four occasions in May and June 2020 regarding Ideanomics' MEG Center were misleading to the Class, Plaintiffs had failed to plausibly allege scienter and loss causation.  (Order at 17–21.)  This Court therefore focuses its inquiry on Plaintiffs' additional pleadings regarding scienter and loss causation.

Plaintiffs have failed to allege scienter for all Defendants.  "A strong inference of fraudulent intent may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. Importantly, an inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504–05 (2007); *see also City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, No. 19 Civ. 8720 (AJN), 2021 WL 4481119, at *4 (S.D.N.Y. Sept. 30, 2021). The Supreme Court has defined the required state of mind as a mental state "embracing intent to deceive, manipulate, or defraud." *Tellabs*, 127 S. Ct. at 2507 (internal quotation marks and citation omitted).  The Second Circuit has also concluded that "recklessness is a sufficiently culpable mental state in the securities fraud context." *Teamsters Loc. 445 Freight Div. Pension Fund*, 531 F.3d at 194 (citing *Novak v. Kasaks*, 216 F.3d 300, 308–09 (2d Cir. 2000)).

### i. Motive and Opportunity

"A complaint has sufficiently alleged 'motive and opportunity to commit fraud' if it pleads facts showing that the defendant benefited in some concrete and personal way from the purported fraud." *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 468 (S.D.N.Y. 2013) (quoting *Novak*, 216 F.3d at 307–08).  "[T]he opportunity to commit fraud is generally assumed where the

4

defendant is a corporation or corporate officer[.]" *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 317 (S.D.N.Y. 2021) (citation omitted) (collecting cases). However, general motives common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high, "do not constitute 'motive' for the purpose of establishing scienter." *Id.* (citation omitted). Rather, "the 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting *Novak*, 216 F.3d at 308).

Plaintiffs' Proposed Second Amended Complaint reiterates the same factual allegations regarding the Defendants' motive and opportunity that this Court already deemed insufficient. Plaintiffs argue that the Defendants had sufficient motive and opportunity to commit fraud because their positions within Ideanomics "motivated [them] to make false and materially misleading statements" to "inflate its stock price" and "avoid NASDAQ delisting." (PSAC ¶¶ 214–15, 219–21, 227, 229–30.) Likewise, Plaintiffs reassert that Defendant Wu "structured transactions" to "personally benefit from the inflation" of Ideanomics' stock price. (*Id.* ¶¶ 231–32.) Wu was the largest stockholder with at least a 21% stake in Ideanomics, and Plaintiffs contend that Wu and his affiliates loaded Ideanomics with millions of dollars in exchange for convertible debt. (*Id.* ¶ 219.) Plaintiff asserts that on June 5, 2020—a few days before Ideanomics issued one of the press releases alleged to be false or misleading—Defendant Wu and unnamed affiliates converted their debt into equity at only $0.59 a share. (*Id.* ¶ 232).

Plaintiffs' allegations are insufficient to plead motive and opportunity. Plaintiffs do not allege that Wu sold his Ideanomics stock before the J Capital and Hindenburg publications and realized a profit. Thus, no facts purport to show that Wu "benefited in some concrete and personal

way" from the alleged misstatements. *See Novak*, 216 F.3d at 307–08. As for Plaintiffs' claims that a NASDAQ delisting motivated the Defendants, "the general desire to maintain a high credit rating or make a company appear attractive to potential buyers may be too thin a reed on which to hang an inference of scienter." *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 894 (8th Cir. 2002) (citation omitted). That the Defendants were Ideanomics executives is far from dispositive, as "it is practically hornbook law that accusations which are founded on nothing more than a defendant's corporate position[,] are entitled to no weight." *In re Rockwell Med., Inc. Sec. Litig.*, No. 16 Civ. 1691 (RJS), 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (citations omitted); *see also In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006). Plaintiffs have therefore failed to plausibly allege motive and opportunity to commit fraud.

### ii. Conscious Misbehavior and Recklessness

To establish scienter under the conscious misbehavior or recklessness theory, Plaintiffs "must show conduct by defendants that is at the least highly unreasonable" and which represents "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 216 (S.D.N.Y. 2004) (internal citation and quotation marks omitted). "Where, as here, a plaintiff fails to allege a motive to commit fraud, the plaintiff's allegations that indicate a defendant's conscious misbehavior or recklessness 'must be correspondingly greater.'" *Abengoa, S.A.*, 559 F. Supp. 3d at 318 (citing *Kalnit*, 264 F.3d at 142). In the conscious misbehavior and recklessness context, the scienter inquiry focuses on whether the defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *Id.* (quoting *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 301 (S.D.N.Y. 2013)) (citation

6

omitted). "To the extent that plaintiffs assert that defendants had access to contrary facts, the complaint must 'specifically identify the reports or statements containing that information.'" *Id.* (quoting *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 659 (S.D.N.Y. 2012) (quotation omitted). "Recklessness in the scienter context cannot be merely enhanced negligence." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005) (citation omitted).

Here, Plaintiffs allege that Defendants Poor and Wu had "first-hand knowledge" of the MEG Center's status and knew that it differed from what Ideanomics told investors in May and June of 2020. (PSAC ¶¶ 101, 105, 192.) In Plaintiffs' telling, Defendants Wu and Poor knew about the Center's "operational status" when the misleading statements were made because Poor visited the MEG Center in October 2019, and Wu visited the city of Qinqdao in November 2019. (*Id.* ¶¶ 92–94, 99, 191, 210, Pl. Reply at 2.) Notably, Plaintiffs do not allege that Defendant Wu personally *visited* the MEG Center but merely assert that Wu met with officials in Qinqdao to discuss the facility. (*Id.* ¶¶ 92–93, 191, 195, Wu Opp. at 3.) Finally, Plaintiffs argue that Defendants Poor and Wu's repeated publication of digitally altered photographs of the MEG Center indicates that the Defendants intentionally or recklessly misrepresented the true state of the facility in May and June of 2020. (*Id.* ¶¶ 201–02.)

Again, even in conjunction, these allegations are insufficient. At the outset, Plaintiffs' argument that scienter may be "readily inferred" from the Defendants' visits does not make sense. (Pl. Letter at 3.) It is unclear how Defendant Poor's visit to the MEG Center and Defendant Wu's visit to Qinqdao could have briefed either Defendant on the current status of the MEG Center in May and June 2020, when their visits occurred seven and eight months before the misleading statements were made. Still absent from the complaint are "concrete allegations" as to each Individual Defendants' particular knowledge of the MEG Center's operational status in May and

7

June 2020. Plaintiffs have not alleged any specific reports, or alleged that any Individual Defendant had access to a report, that outlined the MEG Center's status in or around the period when the statements were made. *Teamsters Loc. 445 Freight Div. Pension Fund*, 531 F.3d at 196 ("they have not specifically identified any reports or statements that would have come to light in a reasonable investigation and that would have demonstrated the falsity of the allegedly misleading statements."); *cf. Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019) (scienter adequately pled where plaintiffs alleged "specific numbers in CEO Call slide decks throughout the Class Period and alleged that Defendants reviewed them.")

In addition, the Defendants' publication of the 2018 photographs did not give rise to a strong inference of scienter. The photographs were not of a wholly different location, and, as Defendants clarified in a July 2020 press release, the Fu Da Automobile Trading Center had been at the location since 2018 and was in a joint venture with Ideanomics. (Order at 20–21); *Metzler Asset Mgmt. GmbH v. Kingsley*, 928 F.3d 151, 163 (1st Cir. 2019). Defendants' response to the Hindenburg and J Capital Reports' allegations regarding the photographs also did not give rise to a strong inference of scienter. [8]

Finally, Plaintiffs' reliance on the "core operations" doctrine is insufficient to establish scienter. *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 424 (S.D.N.Y. 2020). That the MEG Center was "the only identified source of revenues for

---

[8] Plaintiffs argue that Defendants' response to the allegations in the Hindenburg and J Capital reports supports an additional inference of scienter. (Pl. Letter at 4.) Plaintiffs assert that Defendants "launched a campaign on social media" in an effort to refute the Reports' allegations that included photos "debunked as fraudulent." *Id.* Plaintiffs argue that Defendants' efforts "tacitly admitted that the short-sellers were correct" by failing to deny Hindenburg's allegations regarding the photographs. This assertion is a boilerplate reiteration of Plaintiffs' prior argument that this Court previously found insufficient to plausibly allege scienter. (ECF No. 96 at 18, Order at 19–20.) *Metzler Asset Mgmt. GmbH v. Kingsley*, 928 F.3d 151, 163 (1st Cir. 2019) (defendant's failure to correct previously misleading statements insufficient "to create the 'strong inference' of scienter."))

Ideanomics in and around the Class Period" cannot by itself support a finding of scienter. (PSAC ¶ 223); *see Behrendsen v. Yangtze River Port & Logistics Ltd.*, No. 19 Civ. 00024 (DLI) (LB), 2021 WL 2646353, at *12 (E.D.N.Y. June 28, 2021) ("[a]bsent allegations that independently give rise to a strong inference of scienter . . . [Plaintiff] cannot rely on the core operations doctrine to establish scienter.") (citation omitted)); *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015) ("the 'core operations' doctrine may provide support for but not an independent basis of scienter.").

### b. Plaintiffs Fail to Plausibly Allege Loss Causation

Plaintiffs have failed to plausibly allege loss causation. "Loss causation in the context of a private securities fraud action refers to a 'causal connection between the material misrepresentation and the loss.'" *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 455 (S.D.N.Y. 2018) (quoting *Dura Pharms., Inc. v. Broudo*, 125 S. Ct. 1627 (2005) (citations omitted); *see also In re Vivendi, S.A. Securities Litigation*, 838 F.3d 223, 260 (2d Cir. 2016) ("Loss causation 'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'" (quoting *Lentell*, 396 F.3d at 172)). A plaintiff is required to plead "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms.*, 125 S. Ct. at 1627.

A corrective disclosure will "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010). The "plaintiff must allege that when truthful word revealing the falsity of defendant's representation reached the public, the market reacted negatively causing plaintiff to suffer an injury." *In re Winstar Commc'ns*, No. 01 Civ. 11522 (GBD), 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006). "A negative journalistic characterization of previously disclosed facts

9

does not constitute a corrective disclosure of anything but the journalists' opinions." *In re Omnicom*, 597 F.3d at 512.

In addition, the corrective disclosure "must possess a sufficient nexus to a prior misstatement such that it reveals at least part of the falsity of that misstatement." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008); *see, e.g., In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 679 (S.D.N.Y. 2007) ("[w]ithout providing a nexus between the alleged fraud and their losses, either by demonstrating the materialization of a concealed risk or the existence of a corrective disclosure, the plaintiffs fail to plead loss causation . . . "); *Dura*, 125 S. Ct. at 1627 (a complaint must provide "some indication of the loss and the *causal connection* that the plaintiff has in mind.") (emphasis added).

In their Proposed Second Amended Complaint, Plaintiffs allege that Defendants repeatedly published digitally altered photographs that were "widely republished in numerous media outlets and on social media," and that market participants "specifically relied on these images" as evidence that the MEG Center existed as Ideanomics had described. (PSAC ¶¶ 107–15, 133–34, Pl. Letter at 5–6.) When Hindenburg demonstrated that the images were "photoshopped and were from 2018, not 2020," those revelations "proximately caused the stock price decline." (*Id.* at 6.) In their telling, "market observers specifically attributed the decline in Ideanomics'[] stock price to the short sellers' allegations" as conveyed in news articles published in the Hartford Courant, articles on financial commentary website Seeking Alpha, and in comments on Ideanomics' social media pages. (*Id.*, PSAC ¶¶ 117, 133–34, 149–50.)

As this Court previously held, the J Capital and Hindenburg Reports were not corrective disclosures. (Order at 21.) The sole *fact* revealed in the short seller report was that the MEG Center photographs were taken in 2018, not 2020, and had "MEG" superimposed. (PSAC ¶¶ 142,

151, 178.) Plaintiffs have not adequately alleged that the photographs' date or editing was a "but-for cause or cause-in-fact of the losses suffered." *In re Omnicom*, 597 F.3d at 510. Plaintiffs argue that articles—from non-mainstream news sources—mentioning the photographs demonstrates "market reliance." This allegation does not plausibly allege that the date and editing of the photographs, once revealed, caused Ideanomics' stock price to drop. The articles Plaintiffs cite merely emphasize that the short-sellers issued scathing reports about Ideanomics and had taken a short position on the Company's stock. Instead, the causal connection between the photographs and the stock price decline is too attenuated. Plaintiffs have failed to plausibly allege market reliance on the photo being from 2020 and including "MEG," and thus fails to allege that the truth regarding the photographs, once disclosed, caused the dip in Ideanomics' stock price.[9] Moreover, Plaintiffs' assertions fall far short of plausibly alleging that "the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014) (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)). Because Plaintiffs have not plausibly alleged a sufficient nexus between the challenged statements and their losses, they have not pled loss causation. *See In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d at 679.

---

[9] In addition, just four days after the Reports were released, Ideanomics' stock price rose above $2 and stayed over $2 until July 1, 2020 closing at $1.725. Plaintiffs now allege that the stock's upward fluctuation is attributable to the Company's efforts to address the Reports. (Pl. Letter at 7, PSAC ¶ 255.) The upward fluctuation in Ideanomics' stock price just four days after the J Capital and Hindenburg publications undermines Plaintiffs' argument that the Reports' revelations regarding the photographs' date and editing "precipitated a change in the security's price causing [Plaintiffs'] loss." *In re China Organic Sec. Litig.*, No. 11 Civ. 8623 (JMF), 2013 WL 5434637, at *7 (S.D.N.Y. Sept. 30, 2013); *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 456 (S.D.N.Y. 2018) (same); *see also In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 103 (S.D.N.Y. 2011).

## V.   CONCLUSION

Plaintiffs' motion for leave to amend is DENIED.  The Clerk of Court is directed to close the

open motion at ECF No. 109 and this case.

Dated: New York, New York

February 8, 2023

SO ORDERED.

GEORGE B. DANIELS

United States District Judge

12